IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Civil Action No.

SECURITIES AND EXCHANGE COMMISSION
Central Regional Office
1801 California Street, Suite 1500
Denver, CO 80202

                         *Plaintiff,*                    Civil Action No. 1:07-cv-39-SM

v.

PIYUSH G. PATEL
23 Cotton Farm Lane
New Hampton, NH 03862

DAVID J. KIRKPATRICK
292 Middle Road
Portsmouth, NH 03801

ERIC JAEGER
51 Evans Road
Madbury, NH 03820

BRUCE D. KAY
193 Sisquisic Trail
Yarmouth, ME 04096

ROBERT J. GAGALIS
152 Harbor Road
Rye, NH  03870

ROBERT G. BARBER, JR.
15 Surrey Lane
Durham, NH  03824

LAWRENCE COLLINS
8 Steeplebush Road
Cape Elizabeth, ME  04107

MICHAEL A. SKUBISZ
1 Sandy Brook Drive
Durham, NH 03824

JERRY A. SHANAHAN
5 Lr Clevedon
Killmoney Road
Carrigaline
County Cork, Ireland

HOR CHONG (David) BOEY
12571 Huntington Trace
Alpharetta, GA 30005

*Defendants.*

---

# COMPLAINT

---

Plaintiff Securities and Exchange Commission ("SEC ), for its complaint, alleges:

1)    From March 2000 through December 2001 (the "relevant period ), the Defendants, who are former employees, officers, and directors of Cabletron Systems Inc. ("Cabletron ) or its former subsidiaries Enterasys Networks, Inc. ("Enterasys subsidiary ) and Aprisma Management Technologies, Inc. ("Aprisma ), participated in a company-wide scheme to inflate revenues of Enterasys and its former parent company, Cabletron, (which are jointly referred to herein as "Enterasys ) and thereby convince investors that Enterasys was a viable independent company with consistently strong revenue growth.

2)    During the relevant period, the Defendants knowingly negotiated, reviewed, and otherwise participated in numerous transactions for which revenue was improperly recognized in Enterasys's financial statements and falsely reported in periodic and other filings with the SEC and in press releases while the company's stock was publicly trading.   Enterasys restated its revenues for the relevant period on November 26, 2002.

3)    In carrying out the scheme to improperly inflate Enterasys's revenues, the Defendants also misrepresented information to, or concealed information from, Enterasys's outside auditor

concerning the true nature of the transactions for which the company improperly recognized revenue.

4) The Defendants participated in Enterasys's financial fraud by entering into numerous sales transactions that lacked one or more necessary elements for revenue recognition under generally accepted accounting principles ("GAAP"). In these transactions, the Defendants entered into undisclosed "side agreements" with purchasers, in which payment for product was contingent upon the purchaser's resale of the product (i.e, sell through payment terms), or the purchaser was granted full return, exchange, or cancellation rights. The Defendants knew, or were reckless in not knowing, that it was improper to recognize revenue on these transactions that were subject to material contingencies.

5) In addition, other sales were linked to investments that Enterasys made in unaffiliated, privately-held companies in exchange for the investee company's agreement to use the investment proceeds to buy products from Enterasys and Aprisma. The Defendants knew, or were reckless in not knowing, that Enterasys was not interested in the investment aspect of these transactions, but rather used investments to improperly manage its revenues at quarter end. In fact, the Defendants openly discussed in e-mails the fact that Enterasys needed "investment deals in the pipe to close the [revenue] gap" and investment deals representing "$40M in revenue as a safety net" so that Enterasys could "pull the trigger on any and all" at quarter end and thereby meet its revenue projections.

6) Moreover, these investment transactions lacked economic substance. The Defendants failed to perform a reasonable valuation for the investment interest that Enterasys purchased, frequently overpaid for investment interests in companies that could not

otherwise afford Enterasys or Aprisma's products, and, in some cases, the companies did not need the products.

7)   Knowing that the foregoing circumstances would raise auditor concerns and impair Enterasys's ability to recognize revenue, the Defendants frequently structured Enterasys's investments as "three-corner deals  by inserting a third party reseller between Enterasys and the investee company and requiring the investee company to purchase Enterasys product from the third party reseller.  In this manner, the Defendants concealed from Enterasys's outside auditor critical revenue information and the fact that several of Enterasys's large sales were linked to reciprocal investments by Enterasys.

8)   In addition to lacking economic substance, the investment deals structured by the Defendants frequently were not consummated until the quarter after Enterasys recognized revenue for the related sale.  The Defendants knew, or were reckless in not knowing, that it was improper to recognize revenue from sales that were contingent on the finalization of investments in future quarters.

9)   During the relevant period, the Defendants caused Enterasys to improperly recognize at least $48 million in revenue from sales transactions flawed by one or more of the foregoing deficiencies.

10)   The overstated revenues were material because it enabled Enterasys to meet or exceed analysts' consensus pro forma earnings per share estimates.  The Defendants caused Enterasys to overstate by 50% to 600% its announced pro forma earnings per share each quarter during the relevant period.  Further, the Defendants caused Enterasys to understate its operating losses by 5% to 33% for six quarters during the relevant period, and to overstate its net revenues by 8% and 25% for the final two quarters of the relevant period.

11) Largely as a result of its materially overstated revenues, the Enterasys subsidiary was successfully launched as an independent public company on August 6, 2001.

12) During the relevant period, a period in which Enterasys's stock price was artificially inflated due to its material overstatement of revenues, most of the Defendants realized substantial profits from stock sales, bonuses, loan forgiveness incentives, and other forms of compensation.

13) When Enterasys announced on February 1, 2002 that its accounting and revenue recognition practices were being investigated by the SEC, Enterasys's stock price dropped from $10.80 to $4.20 per share, a loss in value of approximately 61%.

## I.   JURISDICTION AND VENUE

14) The SEC brings this action for injunctive relief under Section 20(b) of the Securities Act of 1933 ("Securities Act ) [15 U.S.C. § 77t (b)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act ) [15 U.S.C. §§ 78u (d) and (e)].

15) This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v (a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u (e) and 78aa].

16) In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or the mails, or the means and instruments of transportation or communication in interstate commerce or the mails.

17) Venue is proper in this district because certain of the transactions, acts, practices, and courses of business constituting the violations of law alleged herein occurred within this district.  Moreover, Patel, Kirkpatrick, Jaeger, Gagalis, Barber, and Skubisz reside in this district.

## II.   DEFENDANTS

18) **Defendant Piyush G. Patel**, age 49, was the Chief Executive Officer, President, and Chairman of the Board of Directors of Cabletron from June 1999 until August 2001.  After August 6, 2001, Patel became a consultant to Enterasys and Aprisma.

19) **Defendant David J. Kirkpatrick**, age 54, was the Chief Financial Officer of Cabletron from August 1990 to August 2001 and its Chief Operating Officer from October 2000 to August 2001.  He served as Aprisma's Chief Operating Officer and a member of its Board of Directors from August 2001 until March 2002, and as Chairman of the Board of Directors from January 2002 until March 2002.

20) **Defendant Eric Jaeger**, age 43, was the Executive Vice President of Corporate Affairs for Cabletron from July 1999 through August 2001.  From August 2001 through September 2002, Jaeger was a consultant to Enterasys and Aprisma.  Prior to serving as Executive Vice President, Jaeger, an attorney licensed in Massachusetts, served as General Counsel for Cabletron.

21) **Defendant Jerry A. Shanahan**, age 41, was the Executive Vice President of Operations and Quality at Cabletron from September 2000 to March 2001.  He was the Chief Operating Officer of Enterasys from March 2001 until his resignation in May 2002. Previously Shanahan served as Vice President of international operations for Cabletron from February 2000 to September 2000.

22) **Defendant Robert G. Barber, Jr.**, age 54, was the Executive Vice President of Corporate Affairs at Enterasys from April 2000 through April 2001.  He was responsible for business development for Enterasys from May 2001 through August 2001, when he left the company.  He was a certified public accountant ("CPA ) licensed in Pennsylvania from 1982 to 1989.

23) **Defendant Bruce D. Kay**, age 54, served as Chief Financial Officer of Enterasys from June 2000 until July 2001, and as Senior Vice President of Finance from July 2001 until leaving the company in October 2001.  From February 1999 to June 2000 he served as corporate Controller for Cabletron.  Kay was a CPA licensed in Maine through September 2000.

24) **Defendant Robert J. Gagalis**, age 47, was the Executive Vice President, Chief Financial Officer and Treasurer of Enterasys from July 2001 through October 2002.  Gagalis was licensed as a CPA in Massachusetts from May 1981 through June 1984.

25) **Defendant Lawrence Collins**, age 55, was the Controller for Enterasys from March 2000 through December 2001.  He was licensed as a CPA in Maine from 1984 through 1987.

26) **Defendant Hor Chong (David) Boey** served as Vice President of Finance for Enterasys's Asia Pacific region ("APAC ) during the relevant period.  Boey has a bachelor's degree in accounting.

27) **Defendant Michael A. Skubisz**, age 39, served as Chief Executive Officer and President of Aprisma from 1999 until August 2002.

## OTHER RELATED PERSONS AND ENTITIES

28) **Enrique P. (Henry) Fiallo**, age 53, was the Executive Vice President and Chief Information Officer of Cabletron from November 1998 to February 2000.  Fiallo served as President of Enterasys from February 2000 to August 2001, when Enterasys was a subsidiary of Cabletron.  He served as President, Chairman and Chief Executive Officer of Enterasys from August 2001 until his resignation in April 2002.

29) **Gayle Spence Luacaw**, age 45, was a Vice President in Enterasys's Executive Office of the President from September 2000 through October 2001.  Luacaw began her career with

Cabletron in October 1992 as a sales representative and advanced to the position of Vice President of inside sales before joining the executive office. After October 2001, Luacaw resumed her position of Vice President of inside sales until she left the company in April 2002.

30) **Anthony L. Hurley**, age 35, was the Assistant Controller for Enterasys from October 1998 through November 2002. From November 1994 through June 2002, Hurley was a licensed CPA in Massachusetts.

31) **Gary M. Workman**, age 57, was the President of Operations in the APAC division from January 1999 through February 2002. Workman, who lived in Singapore during the relevant period, supervised the sales, marketing and accounting staff responsible for the nine Asian countries constituting the APAC region.

32) **Enterasys Networks, Inc.** was a publicly-traded corporation with its principal place of business in Rochester, New Hampshire. Enterasys was a worldwide provider of telecommunications switches and related products. Enterasys's securities were registered with the SEC pursuant to Section 12(b) of the Exchange Act. Enterasys reported in its annual report for the year ending February 29, 2000 that there were 184,535,909 shares held by approximately 2,821 shareholders of record and valued at approximately $5 billion. During the relevant period, Enterasys's shares were traded on the New York Stock Exchange and it was required to file annual, quarterly and other periodic reports with the SEC that contained financial statements prepared in accordance with GAAP.

33) **Aprisma Management Technologies, Inc.**, a software design and development company, was a Delaware corporation based in Portsmouth, New Hampshire. During the relevant period, Aprisma was a majority owned subsidiary of Enterasys. On November 20, 2001,

Aprisma filed a Form 10 registration statement with the SEC to register its stock pursuant to Section 12(g) of the Exchange Act, and on July 19, 2002, Aprisma filed a Form 15 to terminate the registration.

## III.    SUMMARY OF VIOLATIONS AND MATERIALLY FALSE STATEMENTS

34)    The Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act  [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2] thereunder, or alternatively aided and abetted violations of Exchange Act Section 10(b) and Rule 10b-5.  The Defendants also aided and abetted violations of Sections 13(a), and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder, and unless restrained and enjoined will in the future violate or aid and abet violations of such provisions.

35)    Collins, Gagalis, Kay, Kirkpatrick, Patel, and Skubisz also aided and abetted violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and unless restrained and enjoined will in the future aid and abet violations of such provisions.

36)    The Defendants' violations resulted in various materially false statements contained in numerous SEC filings and other documents, including:  Enterasys SEC Form 10-K - for the fiscal year March 1, 2000 to March 3, 2001 ("Fiscal Year 2001 ); Enterasys SEC Forms 10-Q - for the quarters March 1, 2000 to June 3, 2000 ("Q1 Fiscal Year 2001 ), June 4, 2000 to September 2, 2000 ("Q2 Fiscal Year 2001 ), September 3, 2000 to December 2, 2000 ("Q3 Fiscal Year 2001 ), March 4, 2001 to June 2, 2001 ("Q1 Transition Year 2001 ), June 3, 2001 to September 1, 2001 ("Q2 Transition Year 2001 ), and July 1, 2001 to September 29, 2001 ("Q3 Transition Year 2001 ); Enterasys SEC

Forms 8-K - filed on March 28, 2001, July 18, 2001, and July 19, 2001 (reporting financial information for Aprisma); Enterasys SEC Form S-8 – filed on August 6, 2001; all SEC filings/statements incorporating the above documents; Representation Letters – dated June 28, 2000 (Cabletron), September 25, 2000 (Cabletron), September 25, 2000 (Enterasys), December 20, 2000 (Cabletron), December 20, 2000 (Enterasys), December 20, 2000 (Aprisma), March 28, 2001 (Aprisma), April 12, 2001 (Cabletron), June 27, 2001 (Cabletron), June 27, 2001 (Enterasys), June 27, 2001 (Aprisma), September 24, 2001 (Enterasys), September 26, 2001 (Aprisma), and October 29, 2001 (Enterasys) Press Releases – June 28, 2000, September 25, 2000, December 20, 2000, March 28, 2001, June 27, 2001, September 26, 2001 and October 29, 2001.

37)   On July 18, 2000, Enterasys filed a quarterly report on Form 10-Q for the quarter ended June 3, 2000 ("June 2000 Form 10-Q ) that reported net sales, also known as net revenues, of $275,064,000.  Enterasys also reported a loss from operations of $69,947,000; and net loss to shareholders of $37,860,000.

38)   The June 2000 Form 10-Q contained materially false and misleading statements because the amount of net revenues was overstated by at least $4,937,000 from transactions with Novatec Corporation ($958,000), JBS Communications, Inc. ($1,651,000), PEAC Infotech, Inc. ($70,000) and DiscJockey.com ($2,258,000).   This overstatement also caused the loss from operations to be understated by approximately $4,000,000 and the net loss to shareholders to be understated by approximately $3,000,000.

39)   On October 18, 2000, Enterasys filed a quarterly report on Form 10-Q for the quarter ended September 2, 2000 ("September 2000 Form 10-Q ) that reported net revenues of

$261,434,000.  Enterasys also reported a loss from operations of $51,716,000 and net loss to shareholders of $142,872,000.

40)  The September 2000 Form 10-Q contained materially false and misleading statements because the amount of net revenues was overstated by at least $1,241,000 from transactions with JBS Communications, Inc. ($537,000), DiscJockey.com ($630,000) and PEAC Infotech, Inc. ($74,000).  This overstatement also caused the loss from operations to be understated by approximately $1,000,000 and the net loss to shareholders to be understated by approximately $1,000,000.

41)  On January 16, 2001, Enterasys filed a quarterly report on Form 10-Q for the quarter ended December 2, 2000 ("December 2000 Form 10-Q ) that reported net revenues of $248,939,000. Enterasys also reported a loss from operations of $31,343,000 and net loss to shareholders of $35,452,000.

42)  The December 2000 Form 10-Q contained materially false and misleading statements because the amount of revenue recognized was overstated by at least $3,195,000 from transactions with Novatec Corporation ($452,000), PEAC Infotech, Inc. ($369,000), S.A. M-Com, Inc. ("Muzicom ) ($457,000) and Societe General Cowen ("SG Cowen ) ($1,917,000).  This overstatement caused the loss from operations to be understated by approximately $3,000,000 and the net loss to shareholders to be understated by approximately $3,000,000.

43)  On June 4, 2001, Enterasys filed an annual report on Form 10-K for the year ended March 3, 2001 ("March 2001 Form 10-K ) that reported net revenues for the entire year of $1,071,453,000. Enterasys also reported a loss from operations for the year of $198,184,000 and net loss to shareholders of $628,901,000.

44) The net revenue in the March 2001 Form 10-K included net revenues for the fourth quarter of $286,016,000.  Enterasys also reported a loss from operations for the fourth quarter of $45,039,000 and net loss to shareholders of $428,028,000.

45) The net revenues for the fourth quarter were overstated by at least $6,967,000 as a result of improper revenue recognition on transactions with JBS ($1,601,000), PEAC ($1,257,000), Muzicom ($17,000), GovStreet USA, LLC. ("GovStreet ) ($1,717,000), Cyber Security Inc. ($273,000), ConvergeLabs Corp. ($179,000), Trustwave Corporation ($43,000), and Choiceway Technologies Co., Ltd. ($1,880,000).  This overstatement caused the loss from operations for the quarter to be understated by $4,000,000 and the net loss to shareholders for the quarter to be understated by $4,000,000.

46) On July 10, 2001, Enterasys filed a quarterly report on Form 10-Q for the quarter ended June 2, 2001 ("June  2001 Form 10-Q ) that reported net revenues for the quarter of $306,898,000.  Enterasys also reported a loss from operations for the year of $12,868,000 and net loss to shareholders of $9,801,000.

47) The June 2001 Form 10-Q contained materially false and misleading statements because the amount of revenue recognized was overstated by at least $10,869,000 from transactions with  GovStreet ($674,000), Cyber Security ($42,000), ConvergeLabs ($20,000), TrustWave ($538,000), Centricity, Inc. ($93,000), HealthCite, Inc. ($1,893,000), Cellit, Inc. ($1,005,000),   iPolicy Networks, Inc. ($850,000), Accton Technology Corp. ($500,000), 3-D Networks Pte Ltd. ($3,495,000), Sonada Do Brazil Ltda. ($501,000), and Choiceway ($1,258,000) for which Enterasys improperly recognized revenues.   This overstatement also caused the loss from operations to be understated by approximately $6,000,000 and the net loss to shareholders to be understated by approximately $3,000,000.

48) On October 16, 2001, Enterasys filed a quarterly report on Form 10-Q for the quarter ended September 1, 2001 ("September 2001 Form 10-Q ) that reported net revenues for the quarter of $240,181,000.  Enterasys also reported a loss from operations for the year of $81,496,000 and net loss to shareholders of $151,278,000.

49) The September 2001 Form 10-Q contained materially false and misleading statements because the amount of revenue recognized was overstated by at least $18,143,000 as a result of transactions with GovStreet ($266,000), ConvergeLabs ($10,000), TrustWave ($60,000), Centricity, Inc. ($7,000), HealthCite, Inc. ($21,000), 3-D Networks Pte Ltd. ($43.000), DigitalMojo ($618,000), GEMMS ($940,000), WorldLink ($3,915,000), Keybridge ($1,859,000), ParaProtect ($150,000), Everest Broadband ($218,000), Ariel ($3,909,000), Tech Data Canada ($3,000,000), Avnet ($1,270,000), Wildflower ($357,000) and JBS/CTC ($1,500,000) for which Enterasys improperly recognized revenues.  This overstatement caused the loss from operations to be understated by approximately $12,000,000 and the net loss to shareholders to be understated by approximately $11,000,000.

50) On September 28, 2001, Enterasys changed its fiscal year-end from the Saturday closest to the last day in February of each year to the Saturday closest to the last day in December of each year.  As a result of this change in accounting procedures, the company filed a Form 10-Q for the three month period ended September 29, 2001, which included a portion of the revenue previously reported in the September 2001 Form 10-Q plus additional revenues recorded during the month of September.

51) On November 14, 2001, Enterasys filed a quarterly report on Form 10-Q for the quarter ended September 29, 2001 ("September 29 2001 Form 10-Q ) that reported net revenues

for the quarter of $105,535,000.  Enterasys also reported a loss from operations for the year of $204,625,000 and net loss to shareholders of $274,079,000.

52)   The September 29, 2001 Form 10-Q contained materially false and misleading statements because the amount of revenue recognized was overstated by at least $20,519,000 as a result of transactions with GovStreet ($266,000), ConvergeLabs ($13,000), TrustWave ($60,000), Centricity, Inc. ($7,000), HealthCite, Inc. ($21,000), 3-D Networks Pte Ltd. ($46.000), DigitalMojo ($701,000), GEMMS ($940,000), WorldLink ($4,180,000), Keybridge ($2,273,000), ParaProtect ($804,000), Everest Broadband ($218,000), Ariel ($3,909,000), Tech Data Canada ($3,000,000), Avnet ($2,224,000), JBS/CCT ($1,500,000) and Wildflower ($357,000) for which Enterasys improperly recognized revenues.  This overstatement caused the loss from operations to be understated by approximately $12,000,000 and the net loss to shareholders to be understated by approximately $12,000,000.

53)   Patel and Kirkpatrick signed and caused Enterasys to file the June 2000 Form 10-Q, September 2000 Form 10-Q, December 2000 Form 10-Q, March 2001 Form 10-K, and June 2001 Form 10-Q. They also signed and caused Enterasys to file Form S-8 on August 6, 2001, which incorporated the false financial information in the March 2001 Form 10-K. Kirkpatrick also signed and caused Enterasys to file Forms 8-K on March 28, July 18, and July 19, 2001, which each incorporated the false financial information listed above.  Fiallo and Gagalis signed and caused Enterasys to file the September 1, 2001 Form 10-Q and the September 29, 2001 Form 10-Q.

### IV.   COMPENSATION OF DEFENDANTS

54)   The SEC seeks an order requiring each Defendant to disgorge all compensation and other financial gains, including, but not limited to, salary, bonuses, commissions, proceeds from

stock and stock options, and loan repayments or discharges, relating to the illegal conduct in which they engaged during the relevant period.  Subject to additional discovery, the Defendants received at least the following estimated amounts of disgorgeable compensation and other financial gains.

55)   During Fiscal Year 2001, Barber received $55,750 in bonuses.  During Transition Year 2001, Barber received $41,780 in bonuses, $267,723 in gains from stock sales, and an additional $1.4 million in proceeds from the sale of stock for which the cost basis is not known.

56)   During Fiscal Year 2001, Collins received $70,782 in bonuses.  During Transition Year 2001, Collins received $65,455 in bonuses and $112,117 in gains from stock sales.

57)   During Fiscal Year 2001, Jaeger received $166,000 in bonuses and $10,848 in gains from stock sales.  During Transition Year 2001, Jaeger received $410,000 in bonuses, $125,000 in loan forgiveness compensation, and approximately $2.6 million in gains from stock sales.

58)   During Fiscal Year 2001, Kay received $137,000 in bonuses.  During Transition Year 2001, Kay received $37,000 in bonuses and $7,811 in proceeds from the sale of stock for which the cost basis is not known.

59)   During Fiscal Year 2001, Kirkpatrick received $76,250 in bonuses and $280,297 in gains from stock sales.  During Transition Year 2001, Kirkpatrick received $110,000 in bonuses, $79,943 in gains from stock sales, and approximately $5.1 million in proceeds from the sale of stock for which the cost basis is not known.

60)   During Fiscal Year 2001, Patel received $625,000 in bonuses and $865,770 in proceeds from the sale of stock for which the cost basis is not known.  During Transition Year 2001,

Patel received $600,000 in bonuses and approximately $4.4 million in proceeds from the sale of stock for which the cost basis is not known.

61)   During Fiscal Year 2001, Shanahan received $184,223 in bonuses.  During Transition Year 2001, Shanahan received $85,300 in bonuses, $108,380 in gains from stock sales, and an additional $323,466 in proceeds from the sale of stock for which the cost basis is not known.

62)   During Fiscal Year 2001, Skubisz received $42,500 in bonuses, $227,279 in gains from stock sales, and $400,571 in proceeds from the sale of stock for which the cost basis is not known. During Transition Year 2001, Skubisz received $22,500 in bonuses, $50,000 in loan forgiveness compensation, $78,995 in gains from stock sales, and $32,943 in proceeds from the sale of stock for which the cost basis is not known.

## V.   THE DEFENDANTS KNOWINGLY PARTICIPATED IN NUMEROUS   SALES TRANSACTIONS FOR WHICH ENTERASYS IMPROPERLY RECOGNIZED REVENUE

### A.   Jaeger's Improper Reciprocal Purchase Agreement with Everest Broadband and Associated Side Agreement

63)   On August 31, 2001, one day before the end of Enterasys's second quarter in Transition Year 2001, Jaeger participated in negotiating and finalizing a reciprocal purchase agreement with Everest Broadband Networks, Inc. ("Everest ), a broadband service provider based in New Jersey.

64)   Under the terms of the agreement, Enterasys agreed to purchase approximately $250,000 of broadband products and related services from Everest in return for Everest agreeing to purchase approximately $250,000 of software and related maintenance services from Aprisma by quarter end.

65)  In fact, neither Enterasys nor Everest had a legitimate need for the other's products or services, and neither company ever used the $250,000 of products and services they purchased from each other.

66)  At the time of the Everest transaction, Jaeger knew, or was reckless in not knowing, that the reciprocal purchase agreement with Everest lacked economic substance and was driven by Enterasys's desire to recognize additional revenue by quarter end.  Jaeger also knew, or was reckless in not knowing, that it was improper for Enterasys to recognize revenue for this transaction.

67)  In addition, since Everest had not defined its future need for Aprisma software, Everest requested, and Jaeger approved, exchange rights for the software.  Although Jaeger knew that exchange rights precluded, or at the very least could impact, revenue recognition, these exchange rights were not disclosed to Enterasys's outside auditor.

68)  Through his active involvement in the Everest transaction, Jaeger knowingly, or recklessly, participated in Enterasys's improper recognition of approximately $218,000 in revenue in both the second and third quarter of the company's Transition Year 2001, all of which was reversed as part of Enterasys's restatement.

## B.   **The Cellit Transaction**

69)  During the first quarter of Transition Year 2001, Enterasys, with Jaeger and Patel's knowledge, entered into a financing arrangement with Cellit, Inc., a software developer based in Miami, Florida.  Under the terms of the agreement, Enterasys agreed to invest $2,000,000 in Cellit in return for two $1,000,000 promissory notes, an equity interest in Cellit, and Cellit's agreement to purchase $1,000,000 of Aprisma product.  In addition, Enterasys agreed that one of the promissory notes would be forgiven in connection with Enterasys's future purchase of Cellit's software.

70) At the time Enterasys entered into its agreement with Cellit, Jaeger, Patel and others at Enterasys knew that Cellit did not need Aprisma product, and that Enterasys did not need Cellit product.  In fact, after purchasing only a portion of the Cellit software, which Enterasys never used, Enterasys eventually canceled the remaining balance of one of the Cellit promissory notes.

71) Jaeger, Patel and others at Enterasys were aware that Enterasys's only reason for entering into the transaction with Cellit was to recognize revenue and that the transaction lacked economic substance.

72) Additionally, Jaeger and Patel knew that the transaction was not completed until the following quarter.

73) Accordingly, Jaeger and Patel knew, or was reckless in not knowing, that it was improper to recognize revenue for the sale of Aprisma product to Cellit.  Nevertheless, Cellit issued a purchase order for approximately $1,005,000 of Aprisma product toward the end of the first quarter of Transition Year 2001, for which Enterasys, with Jaeger's and Patel's knowledge, improperly recognized and reported approximately $1,005,000 in revenue in the Form 10-Q it filed with the SEC for this quarter.

**C.**   **The Ariel Side Agreement (Principally Involving Gagalis, Kay, Collins, and Boey)**

74) On August 31, 2001, one day before the end of the second quarter of Transition Year 2001, Ariel International Technology Co. Ltd ("Ariel ), a company based in Hong Kong, submitted a $4 million purchase order to Enterasys that cross-referenced an associated letter agreement.  Although the letter agreement was not submitted to Enterasys's finance group, Enterasys shipped product and booked revenue for the Ariel order, one of the largest from the APAC region for the quarter.

75) Subsequently, Enterasys's outside auditor selected the Ariel transaction as part of its quarterly review and requested a copy of the letter agreement. Following repeated requests, on September 18, 2001 APAC employees forwarded the letter agreement to Enterasys's headquarters, where it was circulated to numerous individuals, including Gagalis, Kay, and Collins.

76) After reviewing the terms of the letter agreement, Kay and others concluded that Enterasys should not have recognized revenue for the Ariel transaction. Among other things, these individuals noted in e-mails to Gagalis, Collins, Boey and others that the letter agreement did not support revenue recognition because it made Enterasys ultimately responsible for reselling the underlying product and gave Ariel extended payment terms of 150 days.

77) After acknowledging that the letter agreement "is going to give us major problems with our auditors" and expressing the group's sentiment that "[o]bviously, we can't afford to lose $3.9M in revenue," Kay, together with Gagalis and Collins, decided that the letter agreement should not be provided to Enterasys's outside auditor. Notwithstanding that it was more than two weeks after the end of the quarter in which Enterasys had recognized revenue for the Ariel transaction, these Defendants decided that a new letter agreement without objectionable terms should be procured from the APAC office.

78) On September 20, 2001 Luacaw sent an e-mail to Workman, copying Gagalis, stating that she needed a document, *backdated to August 31, 2001*, that relieved Enterasys of the responsibility for reselling the underlying product and reduced Ariel's payment terms from 150 days to 75 days. Luacaw followed up with a second e-mail to Workman stating that the changes to the agreement were needed that day or the revenue "comes off the books."

79)   On September 20, 2001, Kay also sent an e-mail to the APAC office advising Boey that the Ariel agreement needed to be revised "overnight   to eliminate the terms that would be objectionable to the company's outside auditor.

80)   Although it was unwilling to renegotiate or change the actual terms of the letter agreement, Ariel agreed to move the objectionable terms into an undisclosed side agreement and to create a new agreement purporting to give Ariel a 75-day payment term and to make Ariel responsible for reselling the product.  Accordingly, Boey modified the letter agreement by creating a new backdated first page that contained the fabricated terms, and then forwarded the page to Gagalis and Kay, who, in turn, forwarded it to Hurley.

81)   After replacing the original first page of the letter agreement with the backdated first page and then advising both Kay and Collins of his intentions, Hurley presented the letter agreement to Enterasys's outside auditor.

82)   As a result, Gagalis, Kay, Collins, and Boey each knowingly participated in a scheme by which Enterasys presented a backdated document to Enterasys's outside auditor that did not reflect the true terms of the Ariel purchase as of the end of the quarter in which Enterasys recognized revenue for this sale. Moreover, Gagalis and Kay each signed false Representation Letters to Enterasys's outside auditor (dated September 24 and October 29, 2001) stating that 1) revenue had been appropriately modified for transactions involving significant future obligations, 2) all financial records and related data had been provided, and 3) they were not aware of any instances of fraud involving management or employees with a significant role in internal controls.

83)   In addition to knowing that the letter agreement presented to Enterasys's outside auditor was backdated, Boey knew that this document was subject to an undisclosed side agreement that precluded revenue recognition.

84)   Accordingly, Gagalis, Kay, Collins, and Boey each participated in Enterasys's improper recognition of $3.9 million in revenue from the Ariel transaction.

**D.   Skubisz's Improper Side Agreement with Wildflower**

85)   During the second quarter of Transition Year 2001, Aprisma convinced one of its distributors, Wildflower International, Ltd. ("Wildflower ), to place a software order in anticipation of Aprisma winning a federal contract the following quarter.

86)   Carrying out this plan, two days before the end of the second quarter of Transition Year 2001, Wildflower submitted a purchase order with FOB Destination shipping terms, making Aprisma responsible for the risk of loss associated with the shipment until the distributor had received and accepted the shipped products.

87)   Since Aprisma could not guarantee delivery and transferring risk of loss to Wildflower by the end of the quarter, and therefore could not properly recognize revenue for an FOB Destination order, Skubisz, Aprisma's president, entered into a written side agreement to induce Wildflower to submit a new purchase order with FOB Origin shipping terms (i.e., the risk of loss would shift to Wildflower upon Aprisma's shipment of the product and allow Aprisma to recognize revenue in the current quarter).  Skubisz's side agreement, which was not disclosed to Enterasys's outside auditor, assured Wildflower that, notwithstanding an FOB Origin shipment term in the purchase order, Aprisma would bear the risk of loss for the shipment as if the terms were still FOB Destination.

88)   Although Aprisma continued to assume the risk of loss following the end of the quarter in which it improperly recognized revenue for the Wildflower transaction, Skubisz signed a

Management Representation Letter for this quarter advising Enterasys's outside auditor that revenue had been appropriately modified for all transactions involving significant future obligations and that Aprisma's financial information had been fairly presented in conformity with GAAP.

89)  At the time he entered into the side agreement with Wildflower and sent the false Representation Letter to Enterasys's outside auditor, Skubisz knew that the terms of the undisclosed side letter precluded revenue recognition under GAAP.

90)  Given the circumstances of the Wildflower transaction and Skubisz's understanding of the relevant revenue recognition principles, Skubisz knowingly participated in Aprisma's improper recognition of approximately $360,000 in revenue from this transaction during the second quarter of Transition Year 2001.

**E.    Shanahan's Improper Side Agreement with Tech Data Canada**

91)  In the final days of the second quarter of Transition Year 2001, Enterasys attempted to boost its revenues by procuring a $3 million purchase order from Tech Data Canada, Inc. ("Tech Data ), a company with which it was negotiating a primary distributorship relationship in Canada.

92)  After agreeing on the terms of Tech Data's initial purchase order, an Enterasys salesperson memorialized the parties' agreement in an August 23, 2001 letter.  This letter stated that, in return for Tech Data submitting a $3 million purchase order to Enterasys by quarter end, Enterasys agreed to grant Tech Data sell-through payment terms (whereby Tech Data was not required to pay Enterasys until Tech Data resold the inventory to end-users).

93)  The following day, Kay, concerned that the terms of the letter precluded Enterasys from recognizing revenue in the current quarter, sent an e-mail to Shanahan and the letter's author stating:

> Guys, the payment term in the Tech Data Canada letter that states no payment
> unless sold out makes this revenue recognition on a sales out basis. I had
> provided advice on several occasions that this had to be changed.

94) On August 29, 2001, a second Enterasys salesperson sent an e-mail to Shanahan attaching a new letter agreement and advising him that the original letter agreement with Tech Data had been revised to delete the sell-through payment terms. Highlighting that the revisions were made to conceal terms that were problematic for revenue recognition and were not intended to modify the parties' original agreement, this e-mail states:

> We stressed that this was not a retraction of our original commitment to them but
> a requirement to facilitate our ability to recognize the revenue this quarter. [Tech
> Data] was fine with the change and wanted an email from you which referenced
> the two [revisions] and our continuing commitment to the intent of the original
> agreement.

95) That same day, Shanahan sent an e-mail to Tech Data confirming that Enterasys would honor the two terms that had been removed from the parties' official letter agreement.

96) By entering into an undisclosed side agreement with Tech Data with the intent of concealing terms that would otherwise preclude revenue recognition in the current quarter, Shanahan participated in Enterasys's improper recognition of $3 million in revenue in the second quarter of Transition Year 2001 and concealing critical information about the Tech Data transaction from Enterasys's outside auditor.

**F.   Kirkpatrick's Improper Side Agreement with SG Cowen and the Subsequent Attempt by Gagalis, Shanahan, and Collins to Conceal SG Cowen's Product Return**

97) During the second half of 1999, Societe General Cowen ("SG Cowen"), an international investment bank, provided financial services to Enterasys in return for a cash payment and

approximately $7 million in product credits.  To clarify confusion concerning the use of SG Cowen's product credits, Kirkpatrick and others from Enterasys met with SG Cowen on March 2, 2000 and April 13, 2000.

98)  On April 18, 2000, Kirkpatrick prepared a memorandum for SG Cowen, copying Skubisz and others, which set forth the parties' understanding with respect to the terms governing SG Cowen's use of product credits.  Most notably, Kirkpatrick's memo granted SG Cowen full exchange rights for a period of 60 days following delivery of products to an SG Cowen facility.

99)  Thereafter, with two weeks left in the third quarter of Fiscal Year 2001, Kirkpatrick learned that SG Cowen planned to submit purchase orders for approximately $385,000.  In fact, on November 29, 2000, one of the last days of the quarter, Enterasys shipped nearly $2 million in product to SG Cowen, for which Enterasys immediately recognized revenue.

100)  Although Kirkpatrick, Enterasys's chief operating officer and chief financial officer at the time, had given SG Cowen 60 day exchange rights and knew that those exchange rights precluded recognizing revenue until the 60-day exercise period had expired, Kirkpatrick took no steps to ensure that (1) Enterasys properly accounted for SG Cowen's purchase order, or (2) the company's outside auditor was made aware of the exchange rights.

101)  Moreover, during the time period that SG Cowen had exchange rights, Kirkpatrick and Skubisz, each of whom knew, or was reckless in not knowing, about the side agreement granting SG Cowen exchange rights, signed one or more representation letters to Enterasys's outside auditor stating either that there were no side agreements with return rights or that all such agreements had been disclosed.  More specifically, Kirkpatrick signed Cabletron's April 12, 2001 representation letter stating that all side agreements with

return rights had been disclosed and that Cabletron had properly accounted for all sales with return rights or other significant future obligations.

102) In March 28, 2001 and June 27, 2001 Aprisma representation letters, Skubisz similarly represented that all side agreements had been disclosed or that there were no side agreements with return rights. In addition, Kirkpatrick and Skubisz each signed a September 26, 2001 representation letter stating that Aprisma did not have side agreements providing for return rights.

103) Although SG Cowen returned nearly all of its order within 60 days of delivery, Aprisma neither processed the return nor reversed the associated revenue until January 2002, approximately one year later. In fact, on January 30, 2002, Gagalis, Shanahan, and Collins agreed to a plan whereby they would improperly conceal the product return and avoid a revenue reversal of nearly $2 million by simply increasing the financial services fees owed by Aprisma to SG Cowen and issuing SG Cowen a corresponding product credit. Although this plan was not executed, given that Enterasys learned of the SEC's investigation in this matter the next day, the plan to improperly conceal SG Cowen's product return further reflects the improper scienter of Gagalis, Shanahan, and Collins.

**G.    Improper Side Agreement with GovStreet**

104) At the beginning of the fourth quarter of Fiscal Year 2001, members of senior management of Enterasys gave Shanahan revenue goals for the quarter ending on March 3, 2001.

105) In an effort to meet the revenue goals, Shanahan and others met in late January 2001 with corporate officers of ICS Consolidated Inc., a Florida-based reseller of information technology products that operated under the name GovStreetUSA, LLC ("GovStreet"), to discuss an investment by Enterasys in GovStreet. At this meeting, Enterasys proposed that the investment include both product credits and cash.

106) After GovStreet expressed concerns to Shanahan and others that the purchase commitment associated with Enterasys's proposed investment represented an entire year's worth of inventory and that it would need Enterasys to find customers for the product, Enterasys's employees entered into an undisclosed verbal side agreement with GovStreet in which Enterasys agreed, among other things,  (1) to resell the product that GovStreet purchased as part of the investment deal; (2) to unlimited rotation rights for the product; and (3) to guarantee GovStreet a five percent profit on sales of product in state contracts.

107) With these additional concessions and pressure from Enterasys to complete the transaction before the end of its quarter, GovStreet agreed to the investment and submitted purchase orders for approximately $2.6 million to Enterasys during the final days of Fiscal Year 2001. GovStreet submitted its purchase orders contingent upon Enterasys signing a promissory note, and subject to the terms of the side agreement.

108) At the time Enterasys consummated the GovStreet transaction, Shanahan knew, or was reckless in not knowing, that Enterasys intended to recognize revenue from the sale notwithstanding that the material undisclosed contingencies in the verbal side agreement of which he was aware precluded revenue recognition.

109) Notwithstanding his awareness that the undisclosed side agreement with GovStreet precluded revenue recognition, Shanahan participated in the activities that resulted in Enterasys improperly recognizing approximately $2.6 million in revenue from sales to GovStreet over the course of three quarters, including approximately $1.7 million in the fourth quarter of Fiscal Year 2001, approximately $674,000 in the first quarter of Transition Year 2001, and approximately $266,000 in the second quarter of Transition Year 2001.

110) Shanahan also knew, or was reckless in not knowing, that improperly recognized revenue from the GovStreet transaction was included in the financial statements contained in the Form 10-K Enterasys filed with the SEC for Fiscal Year 2001 and the Forms 10-Q Enterasys filed with the SEC for the first, second and third quarters of Transition Year 2001.

**H.    The S.A. M-Com, Inc. Investment Deal (Principally involving Kay and Kirkpatrick)**

111) During the third and fourth quarters of Fiscal Year 2001, Kirkpatrick oversaw the negotiation and finalization of an investment deal for which Enterasys improperly recognized approximately $474,000 in revenue.

112) In this transaction, S.A. M-Com, Inc. ("Muzicom"), a company that was financially unstable and unable to pay for Enterasys's product without a promised investment, agreed to place a $500,000 purchase order with Enterasys by the end of the third quarter of Fiscal Year 2001 in return for Enterasys's agreement to complete an investment deal the following quarter that would cover the cost of the ordered product.

113) Although Kay and Kirkpatrick knew that Muzicom's purchase was contingent on completing an investment the following quarter and that this undisclosed contingency precluded revenue recognition, Kay and Kirkpatrick nevertheless allowed Enterasys to improperly recognize a total of approximately $474,000 in revenue in the third and fourth quarters of Fiscal Year 2001 in connection with the Muzicom transaction.

114) Further highlighting the impropriety of recognizing revenue for this transaction, Kirkpatrick and Kay failed to obtain a meaningful valuation for Enterasys's equity interest in Muzicom. Instead, Kirkpatrick and Kay oversaw a valuation process whereby Enterasys valued Muzicom's shares based on the amount of Enterasys's investment and then backed into a valuation expressed as a multiple of Muzicom's revenues. At the time of the

Muzicom investment deal, Kirkpatrick and Kay knew, or were reckless in not knowing, that this type of valuation did not satisfy the outside auditor's criteria for recognizing investment related revenue.

**I.    The GEMMS Investment and Side Agreement (Principally Involving Barber and Gagalis)**

115)   In the final days of the second quarter of Transition Year 2001, Enterasys, through Barber and Gagalis, completed a three corner deal with a reseller called GEMMS LLC, in which Enterasys agreed to invest $1 million in return for an equity interest in GEMMS and GEMMS's agreement to purchase $1 million of Enterasys product through a third party distributor.

116)   At the time of the investment, Barber and Gagalis knew that the purpose of the investment was to bridge Enterasys's revenue shortfall at quarter end.  Barber and Gagalis reviewed GEMMS's financial information at the time of the investment, and were aware that GEMMS did not have the independent ability to pay for Enterasys product.

117)   In addition, although Enterasys's outside auditor had advised these individuals the previous quarter that three corner deals needed to be collapsed and viewed as one transaction for revenue recognition purposes, Barber and Gagalis were aware that the GEMMS investment was being structured as a three corner deal in order to conceal from the outside auditor GEMMS's precarious financial state and the connection between the investment and the related revenue.

118)   Carrying out this plan to conceal the investment/revenue connection, Barber instructed GEMMS to place its purchase order with a third party distributor, while the distributor was instructed to place an order with Enterasys for the same dollar amount.  Copying Barber, Enterasys's corporate development manager then sent an e-mail to an Enterasys sales

representative directing that the purchase orders from GEMMS and the distributor not be linked. After concealing this connection, Enterasys used wire transfers to round-trip the investment funds through GEMMS, the distributor, and back to itself during the course of one day.

119) In addition to being structured to conceal important revenue information that Enterasys's outside auditor had requested one quarter earlier, the GEMMS investment deal required GEMMS to purchase far more product than it needed or could realistically hope to sell, a fact that GEMMS clearly communicated to Barber. In fact, the $1 million of product that GEMMS was obligated to purchase under the parties' agreement represented more than five times the amount of product GEMMS had sold in the prior year.

120) To address GEMMS's concerns about the quantity of product it was purchasing and the likelihood of obsolescence, Barber granted GEMMS full exchange rights for the portion of its purchase order covering wireless products. Although he knew these rights affected revenue recognition, Barber did not disclose the exchange rights to Enterasys's outside auditor.

121) Through their active involvement in the GEMMS investment deal, Barber and Gagalis knowingly, or at least recklessly, participated in Enterasys's improper recognition of approximately $1 million in revenue.

**J.    The ParaProtect Investment Deal (Principally Involving Gagalis)**

122) In the final days of the second quarter of Transition Year 2001, Enterasys completed a three corner deal with ParaProtect Services, Inc. ("ParaProtect ) in which Enterasys agreed to invest $1 million in cash and to purchase $200,000 of ParaProtect's services in return for ParaProtect's agreement to purchase approximately $850,000 of Enterasys and Aprisma products.

123) At the time of the ParaProtect investment, Gagalis knew that the transaction lacked economic substance and that it was improper for either Enterasys or Aprisma to recognize revenue for this transaction.

124) More specifically, Gagalis was aware that ParaProtect was in a precarious financial state and did not have the independent ability to pay for Enterasys or Aprisma product. Knowing that ParaProtect's financial condition did not meet the criteria for revenue recognition established by Enterasys's outside auditor, Gagalis structured the investment as a three corner deal to conceal ParaProtect's financial condition from Enterasys's outside auditor. In addition, Gagalis instructed others not to disclose the investment/revenue link to Enterasys's outside auditor.

125) Finally, to induce ParaProtect to close the transaction, Enterasys, through Gagalis, agreed to purchase $200,000 of services from Para-Protect for which it had no identifiable need. In fact, Enterasys never used the services it purchased from ParaProtect.

126) Fully aware that the ParaProtect investment lacked economic substance and would not have qualified for revenue had the transaction been fully disclosed to Enterasys's outside auditor, Gagalis signed both the investment agreement and Enterasys's purchase order for ParaProtect's services.

127) Through his involvement in the ParaProtect investment, Gagalis participated in Enterasys's improper recognition of $804,000 in revenue.

**K.   The HealthCite Investment and Side Agreements (Principally Involving Barber)**

128) In the final days of the first quarter of Transition Year 2001, Enterasys completed a three corner deal with HealthCite, Inc. resulting in $2 million of improperly recognized revenue. Under the terms of the investment deal, which was largely negotiated by Barber, Enterasys

invested approximately $2 million in HealthCite in return for an equity interest and HealthCite's commitment to purchase approximately $2 million in products.

129) At the time of the investment, Barber knew that HealthCite was a start-up company with no revenues and insufficient cash to both maintain operations and make a $2 million purchase.  Barber was also aware that HealthCite did not have an immediate need or end-user for the product.

130) Accordingly, since HealthCite did not have the ability to warehouse the product while it attempted to locate a buyer, the parties agreed that the product would be shipped to a third party distributor until needed.  Moreover, in order to address HealthCite's concerns that it might not find a purchaser for an extended period of time, Barber entered into an undisclosed side agreement granting HealthCite (1) extended warranty rights that did not begin to run until the distributor actually shipped product to an end-user and (2) variable exchange rights that declined over a period of two years.  At the time he entered into this side agreement, Barber knew, or was reckless in not knowing, that the rights granted therein precluded or otherwise impacted revenue recognition.

131) Barber and HealthCite also agreed that HealthCite would accept $333,000 of product that it did not need and intended to return, with the understanding that the return would not take place until immediately after the end of Enterasys's quarter.  Although Barber understood that the return rights he granted to HealthCite affected Enterasys's ability to recognize revenue, he again failed to disclose these rights to Enterasys's outside auditor.

132) Through his active involvement in the HealthCite investment deal, Barber knowingly, or at least recklessly, participated in Enterasys's improper recognition of approximately $2 million in revenue.

**L.    The ChoiceWay Investment Deal (Principally Involving Boey)**

133) Two days before the end of the fourth quarter of Fiscal Year 2001, Boey received an e-mail from Enterasys headquarters advising them of the need to close an additional $3 million in sales by the end of the quarter.  At this time Boey was aware of the negotiation of a potential $1 million investment in ChoiceWay Technologies Co. Ltd. ("ChoiceWay"), a Beijing distributor.

134) After receiving the e-mail, Boey and others from the APAC region increased the proposed investment in ChoiceWay to $3.1 million in product credits, to be used to purchase Enterasys product by quarter end, in return for an equity interest in ChoiceWay.

135) Although the investment agreement with ChoiceWay could not be finalized by quarter end, ChoiceWay, based on the understanding that its purchase was contingent on the finalization of an investment by Enterasys the following quarter, submitted a purchase order to Enterasys for $3.1 million of product on the final day of Fiscal Year 2001.  At the time ChoiceWay submitted its purchase order, Boey knew that Enterasys intended to recognize revenue in the current quarter (i.e., the fourth quarter of Fiscal Year 2001) even though the contingent investment to which they agreed, and failed to disclose to Enterasys's outside auditor, made it improper to recognize revenue in this quarter.

136) ChoiceWay's purchase order for $3.1 million exceeded the entire amount of Enterasys product ChoiceWay had sold during the previous year.   Additionally, at the time ChoiceWay submitted its purchase order, there were serious questions about ChoiceWay's independent ability to pay for this order absent Enterasys's investment.

137) By knowingly participating in the ChoiceWay transaction, Boey assisted Enterasys in improperly recognizing a total of $3 million in revenue in the fourth quarter of Fiscal Year 2001 and the first quarter of Transition Year 2001.

**M.**   **The Defendants Knowingly Participated in Numerous Additional Sales Transactions for which Enterasys Improperly Recognized Revenue**

138)   In addition to the transactions discussed above, Enterasys, through the Defendants, improperly recognized revenue from numerous additional sales transactions that, like the foregoing transactions, were tied to material, undisclosed contingencies, including return and exchange rights or promises of future investments, were associated with continuing obligations, including making Enterasys responsible for reselling the underlying product to third parties, or otherwise lacked economic substance.

139)   Boey knowingly participated in improperly recognizing approximately $1.41 million in revenue from sales to Novatec Corporation ("Novatec ) during the first and third quarters of Fiscal Year 2001.  At the time Enterasys recognized revenue from sales to Novatec, Boey knew that Enterasys was responsible for reselling the underlying product to third parties and that this continuing obligation, which Boey failed to disclose, precluded revenue recognition.

140)   Boey knowingly participated in improperly recognizing approximately $3.79 million in revenue from sales to JBS Communications, Inc. ("JBS ) during the first, second, and fourth quarters of Fiscal Year 2001.  At the time Enterasys recognized revenue from sales to JBS, Boey knew that Enterasys was responsible for reselling the underlying product to third parties and that this continuing obligation, which Boey failed to disclose, precluded revenue recognition.

141)   Kirkpatrick participated in improperly recognizing approximately $2.9 million in revenue from sales to DiscJockey.com during the first and second quarters of Fiscal Year 2001.  At the time Enterasys recognized revenue from sales to DiscJockey.com, Kirkpatrick knew that these sales were contingent on Enterasys making a reciprocal investment in

DiscJockey.com in later quarters, and that this undisclosed contingency precluded revenue recognition.

142) Barber and Skubisz knowingly participated in improperly recognizing approximately $315,000 in revenue from sales to Cyber Security, Inc. ("Cyber ) during the fourth quarter of Fiscal Year 2001 and the first quarter of Transition Year 2001.  At or about the time of the sales to Cyber, Barber and Skubisz learned that the product sold to Cyber did not function as Enterasys represented and that Cyber intended to return the product.  Under these circumstances, Barber and Skubisz knew it was improper to fail to record a reserve against revenue from the Cyber transaction.

143) Skubisz knowingly participated in improperly recognizing approximately $222,000 in revenue from sales to ConvergeLabs Corp. during the  fourth quarter of Fiscal Year 2001 and the first, second, and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to ConvergeLabs, Skubisz knew that he had granted undisclosed exchange rights to ConvergeLabs that precluded revenue recognition.

144) Boey knowingly participated in improperly recognizing approximately $1.77 million in revenue from sales to PEAC Infotech, Inc. ("PEAC ) during the first, second, third, and fourth quarters of Fiscal Year 2001.  At the time Enterasys recognized revenue from sales to PEAC, Boey knew that he had granted undisclosed sell through payment terms to PEAC that precluded revenue recognition.

145) Jaeger and Patel participated in improperly recognizing approximately $701,000 in revenue from sales to TrustWave Corp. during the fourth quarter of Fiscal Year 2001 and the first, second, and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to TrustWave, Jaeger and Patel knew that TrustWave did

not need Aprisma product and was only purchasing product to enable Aprisma to meet its quarterly revenue goals.   In addition, Jaeger and Patel knew that the valuation for Enterasys's reciprocal investment in TrustWave lacked substance and was based on the amount of product TrustWave was willing to purchase from Aprisma.   Under these circumstances, Jaeger and Patel knew that the transaction with TrustWave lacked economic substance and that it was improper to recognize revenue for sales to TrustWave.

146) Jaeger participated in improperly recognizing approximately $107,000 in revenue from sales to Centricity, Inc. during the first, second, and third quarters of Transition Year 2001. At the time Enterasys recognized revenue from an investment related sale to Centricity (i.e., Enterasys invested in Centricity in return for Centricity issuing a purchase order to Enterasys), Jaeger knew that Enterasys was not interested in the investment portion of the transaction, and that Enterasys was investing in an insolvent company that could not otherwise afford to purchase Enterasys product.   Under these circumstances, Jaeger knew that the Centricity transaction lacked economic substance and that it was improper to recognize revenue from sales to Centricity.

147) Jaeger participated in improperly recognizing approximately $850,000 in revenue from sales to iPolicy Networks, Inc. during the first quarter of Transition Year 2001.   At the time Enterasys recognized revenue from sales to iPolicy, Jaeger knew that the sales were contingent on Enterasys prepaying iPolicy for a comparable dollar amount of engineering services and making an investment in iPolicy the following quarter.   Jaeger knew that this undisclosed contingency precluded revenue recognition.

148) Shanahan, Collins, and Kay participated in improperly recognizing approximately $500,000 in revenue from sales to Accton Technology Corp. during the first quarter of

Transition Year 2001.  At the time Enterasys recognized revenue from sales to Accton, Shanahan, Collins, and Kay knew that Accton had purchased product to assist Enterasys in meeting its revenue goals, that Accton did not need the product, and that Accton intended to return the purchased product.  In addition, in order to avoid recognizing Accton's return of product, Enterasys, through Shanahan and Kay, purchased unneeded services from Accton to net out the Accton accounts receivable.  Shanahan, Collins and Kay knew that it was improper to recognize revenue from sales to Accton under the foregoing circumstances.

149)  Boey participated in improperly recognizing approximately $3.6 million in revenue from sales to 3-D Networks Pte. Ltd. during the first, second, and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to 3-D Networks, Boey knew that the undisclosed sell through payment terms he had granted to 3-D Networks precluded revenue recognition.

150)  Skubisz participated in improperly recognizing approximately $501,000 in revenue from sales to Sonda do Brasil Ltda. during the first quarter of Transition Year 2001.  At the time Enterasys recognized revenue from sales to Sonda, Skubisz knew that the undisclosed exchange rights and 180-day payment terms he had granted to Sonda precluded revenue recognition.

151)  Gagalis, Jaeger, and Kay participated in improperly recognizing approximately $701,000 in revenue from sales to DigitalMojo, Inc. also known as Three Pillars, that was reported in the second and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to DigitalMojo, Gagalis, Jaeger, and Kay knew that this investment transaction was structured as a three-corner deal to conceal DigitalMojo's precarious

financial condition from Enterasys's outside auditor, that the transaction lacked economic substance (i.e. DigitalMojo did not need the product it was purchasing from Enterasys and Enterasys did not need the reciprocal services it was purchasing from DigitalMojo), and that the transaction did not qualify for revenue under GAAP.

152) Barber, Gagalis, and Kay participated in improperly recognizing approximately $4.18 million in revenue from sales to WorldLink Technologies, Inc. that was reported in the second and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to WorldLink, Barber, Gagalis, and Kay knew that this investment transaction was structured as a three-corner deal to conceal WorldLink's precarious financial condition from Enterasys's outside auditor, and that the transaction did not qualify for revenue under GAAP.

153) Barber, Gagalis, and Kay participated in improperly recognizing approximately $2.27 million in revenue from sales to KeyBridge Corp. that was reported in the second and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to KeyBridge, Barber, Gagalis, and Kay knew that the sales were contingent on Enterasys making an investment in KeyBridge the following quarter, and that the investment transaction was being structured as a three-corner deal to conceal KeyBridge's precarious financial condition from Enterasys's outside auditor.  Under these circumstances, Barber, Gagalis, and Kay knew it was improper to recognize revenue from the KeyBridge sales.

154) Boey participated in improperly recognizing approximately $2.2 million in revenue from sales to Avnet, Inc. that was reported in the second and third quarters of Transition Year 2001.  At the time Enterasys recognized revenue from sales to Avnet, Boey knew that the

undisclosed exchange rights and sell through payment terms he granted to Avnet precluded revenue recognition.

155)  Boey, Collins, and Kay participated in improperly recognizing approximately $1.5 million in revenue from sales to JBS that was reported in the second and third quarters of Transition Year 2001.  The sale to JBS was contingent upon JBS receiving a purchase order from CTC Technology Corp. ("CTC").  At the time Enterasys recognized revenue from sales to JBS, Boey, Collins, and Kay knew that Enterasys was responsible for reselling the underlying product to CTC and that this continuing obligation, which these Defendants failed to disclose, precluded revenue recognition.

## VI.  PATEL, KIRKPATRICK, BARBER, GAGALIS, JAEGER, COLLINS, SHANAHAN, AND KAY COLLABORATED TO PROVIDE FALSE, MISLEADING, AND INCOMPLETE INFORMATION REGARDING INVESTMENT DEALS TO ENTERASYS'S OUTSIDE AUDITOR AND THE PUBLIC

156)  By the first quarter of Transition Year 2001, the volume of Enterasys's investments increased and the quality and financial viability of the companies in which Enterasys considered investing declined.  Aware that Enterasys's outside auditor had identified an investee company's independent ability to pay for product as an important prerequisite to recognizing revenue for an investment, Enterasys's senior management, including Patel and Kirkpatrick, developed and carried out a scheme to structure investment transactions so as to conceal investment related revenue from the company's outside auditor.

157)  In approximately March of 2001, Kirkpatrick, Patel, and Barber first presented the concept of a three corner deal during a conference call with Enterasys's investment team.  During this call, Kirkpatrick, Patel, and Barber detailed an investment structure in which the investee company would purchase Enterasys product from a distributor or "channel

partner  rather than from Enterasys directly to conceal from Enterasys's outside auditor the link between Enterasys's investment and the purchase, for which Enterasys would record revenue.

158) During this conference call, and during numerous future weekly conference calls involving Enterasys's investment team, which included Jaeger, Kirkpatrick, Patel, Fiallo, Barber, Shanahan, Hurley, Kay, Gagalis, Luacaw and others, the participants openly discussed the purpose of three corner deals:  to conceal from Enterasys's outside auditor the connection between investments and purchases, given that the poor financial condition of investee companies could lead the outside auditor to conclude that the related revenue did not comport with GAAP.

159) After Enterasys structured some of its investments as three corner deals during the first quarter of Transition Year 2001, its outside auditor became aware of two of these deals and advised Enterasys that the exchange of equity connected to the purchase of product through a third party reseller needed to be "collapsed  and viewed as a single transaction to perform the appropriate analysis for revenue recognition.

160) Notwithstanding the outside auditor's admonition, Enterasys's investment team accelerated its use of three corner deals and continued to conceal the relevant facts from Enterasys's outside auditor during the second quarter of Transition Year 2001.

161) In fact, during the final month of the second quarter of Transition Year 2001, Fiallo and Gagalis, aware that Enterasys was far behind its quarterly revenue projections and unable to meet those projections, held an emergency meeting with Patel and Jaeger.  At this meeting, Fiallo and Gagalis presented a detailed analysis of the company's overstuffed sales channels and deficient sales projections for the quarter and advised Patel and Jaeger

that Enterasys needed to adjust its revenue guidance for the quarter.  After responding that lowering their target was not an option, Patel and Jaeger directed Fiallo and Gagalis to find more investments by quarter end and to force more products into the channel.

162)  Following this directive to essentially create revenue in the absence of legitimate revenue opportunities, several of the defendants, including Jaeger, Patel, Barber, Shanahan, Kay, Gagalis, and others worked together to close more than $20 million in investment-related sales during the final week of the quarter, many of which were structured as three corner deals to conceal the precarious financial condition of the investee company from Enterasys's outside auditor.

163)  Largely due to the improperly recognized revenue generated from these sales, Enterasys rang the opening bell of the New York Stock Exchange on August 6, 2001 and was successfully launched as a public company.  Approximately three weeks later, Enterasys announced that it had again achieved its quarterly revenue target.

164)  Thereafter, in September 2001 during the outside auditor's review of the second quarter of Transition Year 2001, Enterasys's senior management, including Gagalis and Jaeger, oversaw an effort to purge the three corner deal files of all documents linking purchases to investments, the information the outside auditor had specifically requested for such revenue items in the first quarter.

165)  As part of this effort, Jaeger sent an e-mail to Gagalis on September 4, 2001 entitled "Deal Clean-up  in which he states:

> I suggest you:
> crack the whip on Jack and others to get cleaned-up
> -   remind Bruce [Kay], Larry [Collins] and Tony [Hurley] NOT to talk with [our outside auditor] until they have a clean set of paperwork and understand clearly each deal.  I suggest you get the finance and bus dev guys in the room together and get them on the same page.

166) On the same day, Gagalis replied in an e-mail to Jaeger stating:

> Spoke to jack today – he is putting a package of info for me to review before it
> goes to [our outside auditor] . . . no documentation of purchases through channel
> partners will be provided to [our outside auditor].

167) Completing the scheme to conceal important revenue information from the outside auditor,
on September 8, 2001 Hurley forwarded to Enterasys's outside auditor a summary that
purported to be a complete list of all investments and investment related revenue
recognized by Enterasys for the quarter. In fact, at the direction of Gagalis, this summary
omitted at least $7.6 million in improper revenue associated with the company's three
corner deals and either affirmatively represented that these investments were not associated
with revenue or were associated with significantly less revenue. At the time this summary
was sent to Enterasys's outside auditor, Gagalis, Kay, and Collins each knew that it was
false.

168) Moreover, both Gagalis and Kay signed Enterasys's September 24, 2001 Representation
Letter to the outside auditor stating that they had made all financial records and related
data available to the outside auditor and that there were no undisclosed "[r]elated party
transactions and related amounts receivable or payable, including sales, [or] purchases[.]"
Gagalis signed and made the same representations in Aprisma's September 26, 2001
management representation letter.

169) Accordingly, Gagalis, Kay, and Collins, each of whom knew that the list of investment-
related revenue provided to Enterasys's outside auditor was false, together with Jaeger,
who was involved in the effort to "clean-up the underlying investment files, and
Kirkpatrick, Patel, and Barber, who had introduced the use of three corner deals to conceal
information from the outside auditor, knowingly participated in Enterasys's improper

recognition of $7.6 million in revenue from three corner deals during this quarter and misrepresenting material information concerning these transactions to Enterasys's outside auditor.

170) In addition to misrepresenting the amount of investment-related revenue to Enterasys's outside auditor, Gagalis materially misrepresented the amount of investment-related revenue in the footnotes to the consolidated financial statements contained in Enterasys's Form 10-Q filed with the SEC for the second quarter of Transition Year 2001.  This quarterly report states that Enterasys had only $5.2 million of investment-related revenue for the quarter.  Gagalis, who signed this Form 10-Q, knew at the time that Enterasys had recognized approximately $20 million in revenue from investments during the quarter.

## VII.   DEFENDANTS ISSUED FALSE AND MISLEADING PRESS RELEASES

171) The Defendants knew that the revenue they caused Enterasys to improperly recognize was reported in quarterly press releases that were distributed to the investing public.

172) Patel, Kirkpatrick, Jaeger and others participated in the drafting of the earnings releases.

173) On June 28, 2000, Enterasys and Patel issued a press release reporting the financial results for the quarter ending June 2, 2000.  Patel stated "In one quarter, Cabletron Systems has fully transformed itself -- creating four of the most exciting companies in technology. . . Each company exceeded our expectations for revenue growth while building scalable businesses capable of sustaining rapid growth.   The press release stated further "For the first time, Cabletron is today reporting selected financial results for the subsidiary companies, in addition to its consolidated results. . . .  For the first quarter of fiscal 2001, Cabletron's consolidated net sales were $275.1 million.  These results included the revenues from four operating companies as well as revenues from Cabletron's non-continuing legacy products. . . .  On a consolidated pro forma basis, Cabletron had a net

42

loss of $3.7 million or $0.02 per diluted share.  These results were consistent with Wall Street expectations.   The press release reported that Cabletron's revenues of $275,064,000 included revenues from the Enterasys subsidiary of $177,126,000.

174) The Defendants falsely represented that Cabletron had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were a loss of $0.04, rather than the loss of $0.02 reported.

175) On September 25, 2000, Enterasys and Patel issued a press release, which stated "Cabletron achieved pro forma net income of $0.01 per share or $1.1 million, for the quarter, making the seventh consecutive quarter in which Cabletron has met or exceeded Wall Street's expectations.   The press releases included portions of the financial statements from the September 2000 Form 10-Q.

176) The Defendants falsely represented that the company had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improperly recognized revenue, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.00, rather than the income of $0.01 reported.

177) On December 20, 2000, Enterasys and Patel issued a press release, which stated among other things that "The combined revenues of the four subsidiaries were $265 million which surpassed our expectations in the third quarter. . . . Cabletron achieved a sequential quarterly growth rate of 10%, or a compound annual growth rate of 47%. . . . Cabletron's subsidiary companies achieved pro forma net income of $0.04 per share or $6.9 million,

for the quarter ended December 2, 2000, marking the eighth consecutive quarter in which Cabletron has met or exceeded Wall Street's expectations. . . . Aprisma had revenues of $19.7 million in the quarter, compared with revenues of $17.3 million in Q2.   This represents a sequential quarterly growth rate of approximately 13.4%.   This result compares to $13.1 in Q3 of fiscal 2000, reflecting a year-over-year growth rate of approximately 50%. - - Important customer wins during the quarter include . . . SG Cowen.   The press release also included portions of the financial statements from the December 2000 Form 10-Q.

178) Patel knew or was reckless in not knowing that it was improper for Aprisma to recognize revenue on the transaction with SG Cowen which was subject to exchange rights. Removing the SG Cowen revenue of approximately $1.9 million from Aprisma's revenues materially reduced its sequential growth rate to approximately 2.9% rather than the 13.4% touted by Patel.

179) The Defendants falsely represented that the company had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.02, rather than the income of $0.04 reported.

180) On March 28, 2001, Enterasys and Patel issued a press release, in which they reported "On a pro forma basis, Cabletron's subsidiary companies net income increased to $10.7 million or $0.06 per diluted common [share] . . . .  This compares to Wall Street's estimates of $0.05 per share for the fourth quarter of fiscal 2001. Cabletron has met or exceeded Wall Street's expectations for the ninth consecutive quarter.   The press release contained portions of the financial statements from the March 2001 Form 10-K.

181) The Defendants falsely represented that the company had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.02, rather than the income of $0.06 reported.

182) On June 27, 2001, Enterasys and Patel issued a press release in which they reported, "The combined revenues of the four subsidiaries for the first quarter of fiscal 2002 were $311 million. . . .  On a pro forma basis, Cabletron's subsidiary companies net income increased to $14.5 million or $0.08 per diluted common share . . . .  Cabletron has met or exceeded Wall Street's expectations for the tenth consecutive quarter.

183) The Defendants falsely represented that the company had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.04, rather than the income of $0.08 reported.

184) On September 26, 2001, Enterasys issued a press release in which it reported, "second quarter results exceeded Wall Street estimates for the sixth consecutive quarter, with revenue of $240 million, an increase of 26% compared with the second quarter of fiscal 2001.  Fully diluted, pro forma earnings per share increased to $.11 in the current quarter from $.05 in the second quarter of fiscal 2001.

185) The Defendants falsely represented that the company had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.05, rather than the $0.11 reported.

186) On October 29, 2001, Enterasys issued a press release in which it reported, "fully diluted, pro forma earnings per share for the third quarter of 2001 were $217 million or $.05 per share.    The Defendants incorporated portions of the financial statements from the September 2001 Form 10-Q into the press release.

187) The Defendants falsely represented that the company had earnings per share when in fact it had losses.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma *loss* per share was ($0.01), rather than the *earnings* of $0.05 reported.

### FIRST CLAIM FOR RELIEF
### Fraud – Violations of Securities Act Section 17(a)(1)
### [15 U.S.C. § 77q(a)(1)]

188) The SEC realleges paragraphs 1 through 187 above.

189) As a result of the foregoing, the Defendants directly and indirectly, with scienter, in the offer or sale of Enterasys securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud.

190) The Defendants thereby violated and unless restrained and enjoined will in the future violate Securities Act Section 17(a)(1).

### SECOND CLAIM FOR RELIEF
### Fraud – Violations of Securities Act Sections 17(a)(2) and 17(a)(3)
### [15 U.S.C. § 77q(a)(2) and (3)]

191) The SEC realleges paragraphs 1 through 187 above.

192) The Defendants directly and indirectly, in the offer or sale of Enterasys securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of Enterasys securities.

193) The Defendants violated and unless restrained and enjoined will in the future violate Securities Act Section 17(a)(2) and (3).

### THIRD CLAIM FOR RELIEF
### Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

194) The SEC realleges paragraphs 1 through 187 above.

195) The Defendants directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in violation of Exchange Act Section 10(b) and Rule 10b-5.

196) The Defendants violated and unless restrained and enjoined will in the future violate Exchange Act Section 10(b) and Rule 10b-5.

197) Alternatively, by reason of the conduct alleged in paragraphs 1-187, Enterasys violated Exchange Act Section 10(b) and Rule 10b-5 thereunder, and the Defendants aided and abetted Enterasys's violations by knowingly and substantially assisting those violations. Unless restrained and enjoined, the Defendants will in the future aid and abet violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF
### Falsified Books and Records - Exchange Act Section 13(b)(5) and Rule 13b2-1
### [15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1]

198)  The SEC realleges paragraphs 1 through 187 above.

199)  The Defendants knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2) of the Exchange Act.

200)  The Defendants violated, and unless restrained and enjoined will in the future violate Section 13(b)(5) of the Exchange and Rule 13b2-1.

## FIFTH CLAIM FOR RELIEF
### Deceit of Auditors - Exchange Act Rule 13b2-2
### [17 C.F.R. § 240.13b2-2]

201)  The SEC realleges paragraphs 1 through 187 above.

202)  The Defendants directly or indirectly made, or caused others to make, materially false or misleading statements, or omitted, or caused others to omit, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to Enterasys's accountants and outside auditor in connection with an audit or examination of Enterasys's financial statements or in the preparation or filing of Enterasys's documents or reports filed with the SEC.

203)  By reason of the foregoing, each of the Defendants violated, and unless restrained and enjoined the Defendants will in the future violate Exchange Act Rule 13b2-2.

## SIXTH CLAIM FOR RELIEF
### False SEC Filings - Exchange Act Section 13(a) and Exchange Act
### Rules 12b-20, 13a-1, 13a-11, and 13a-13
### [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20,
### 240.13a-1, 240.13a-11, and 240.13a-13]

204)  The SEC realleges paragraphs 1 through 187 above.

48

205) The Defendants aided and abetted Enterasys, in that they provided knowing and substantial assistance to Enterasys, which as an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially misleading annual and quarterly reports with the SEC and failed to file with the SEC, in accordance with rules and regulations the SEC has prescribed, information and documents required by the SEC to keep current information and documents required in or with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the SEC has prescribed in violation of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

206) Unless restrained and enjoined, the Defendants will in the future aid and abet violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

**SEVENTH CLAIM FOR RELIEF**
**False Books and Records - Exchange Act Section 13(b)(2)(A)**
**[15 U.S.C. § 78m(b)(2)]**

207) The SEC realleges paragraphs 1 through 187 above.

208) The Defendants aided and abetted Enterasys's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

209) By reason of the foregoing, Enterasys violated Exchange Act Section 13(b)(2)(A), and the Defendants aided and abetted Enterasys's violations.  Unless restrained and enjoined, the Defendants will in the future aid and abet violations of Section 13(b)(2)(A) of the Exchange Act.

**EIGHTH CLAIM FOR RELIEF**
**Inadequate Internal Accounting Controls – Exchange Act Section 13(b)(2)(B)**
**[15 U.S.C. § 78m(b)(2)]**

210) The SEC realleges paragraphs 1 through 187 above.

211) Defendants Kirkpatrick, Collins, Gagalis, Kay, Patel, and Skubisz aided and abetted Enterasys's failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements.

212) By reason of the foregoing, Enterasys violated Exchange Act Section 13(b)(2)(B), and Defendants Kirkpatrick, Collins, Gagalis, Kay, Patel, and Skubisz aided and abetted Enterasys's violations.  Unless restrained and enjoined, these Defendants will in the future aid and abet violations of Section 13(b)(2)(B) of the Exchange Act.

## PRAYER FOR RELIEF

The SEC respectfully requests that this Court:

1) Find that the Defendants committed the violations alleged;

2) Enter an Injunction permanently restraining and enjoining the Defendants from violating, directly or indirectly, or aiding and abetting violations of the federal securities laws and rules alleged in this Complaint;

3) Order the Defendants to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, including, but not limited to, salary, bonuses, proceeds from stock sales, and loan forgiveness benefits, plus pre-judgment interest;

4) Order the Defendants to pay civil penalties, including post-judgment interest, pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], in an amount to be determined by the Court;

5)      Order that Defendants Gagalis, Kay, Kirkpatrick, Patel, Jaeger, Shanahan, Skubisz, and
Boey be permanently barred from serving as an officer or director of any public
company; and

6)      Order such other relief as is necessary and appropriate.

Respectfully submitted, February 9, 2007.


/s/ Leslie J. Hughes
Leslie J. Hughes (Colo. 15043)



/s/ Jeffrey S. Lyons
Jeffrey S. Lyons (Colo. 27389)



/s/James A. Scoggins
James A. Scoggins (Colo. 28094)

Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202
Switchboard          303.844.1000
Fax                  303.844.1068