UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Securities and Exchange
Commission,
    Plaintiff

    v.                             Civil No. 07-cv-39-SM
                                      Opinion No. 2008 DNH 054

Piyush G. Patel; David J.
Kirkpatrick; Eric Jaeger;
Bruce D. Kay; Robert J. Gagalis;
Robert G. Barber, Jr.; Lawrence
Collins; Michael A. Skubisz;
Jerry A. Shanahan; and Hor Chong
(David) Boey,
    Defendants

## **O R D E R**

The Securities and Exchange Commission ("SEC") has sued in eight counts, seeking injunctive relief under 15 U.S.C. § 77t(b) and 15 U.S.C. §§ 78u(d) & (e) for various alleged violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and certain rules promulgated thereunder. Before the court is David Kirkpatrick's motion to dismiss. The SEC objects. For the reasons given, Kirkpatrick's motion is granted in part and denied in part.

## **The Legal Standard**

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the

court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under Rule 12(b)(6), the court "must assume the truth of all well-plead facts and give the plaintiff[s] the benefit of all reasonable inferences therefrom."  Alvarado Aguilera v. Negrón, 509 F.3d 50, 52 (1st Cir. 2007) (quoting Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007)).  However, the court need not "credit 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.'"  Brown v. Latin Am. Music Co., 498 F.3d 18, 24 (1st Cir. 2007) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)).  "[A] complaint is properly dismissed for failure to state a claim 'only if the facts lend themselves to no viable theories of recovery.'"  Garnier v. Rodríguez, 506 F.3d 22, 26 (1st Cir. 2007) (quoting Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007)).

## Background

The SEC alleges that from March 2000 through December 2001, various employees, officers, and directors of Cabletron Systems, Inc. ("Cabletron") or its former subsidiaries, Enterasys

Networks, Inc. ("Enterasys") and Aprisma Management Technologies, Inc. ("Aprisma") participated in a company-wide scheme to inflate the revenues of Cabletron and Enterasys for the purpose of convincing investors that Enterasys was a viable independent company with consistently strong revenue growth.  Kirkpatrick served as Cabletron's Chief Financial Officer from August 1990 to August 2001 and as its Chief Operating Officer from October 2000 to August 2001.  He served as Aprisma's Chief Operating Officer and as a member of its Board of Directors from August 2001 until March 2002, and served as Chairman of the Board from January 2002 until March 2002.

Turning to the conduct at issue in this case, the SEC alleges that Enterasys improperly recognized revenue, reported that improperly recognized revenue in SEC filings and press releases, and misrepresented material information concerning improper revenue recognition to outside auditors, or concealed such information from them.  According to the SEC, Enterasys improperly recognized at least $48 million in revenue, thus allowing it to overstate earnings, understate operating losses, and successfully launch itself as an independent public company on August 6, 2001.

3

The SEC alleges that improperly recognized revenue was produced by several kinds of transactions: (1) contingent sales (detailed in undisclosed side agreements with purchasers) that allowed, for example, full return, exchange, or cancellation rights; (2) investments in privately held companies that agreed to use their investment proceeds to purchase Enterasys and Aprisma products; and (3) so-called "three-corner deals" that involved placing another company between Enterasys and an investee company, to disguise purchases of Enterasys products made with funds invested by Enterasys in the purchaser company. The complaint discusses in greater detail twelve separate contingent sales transactions or investment deals (Compl. ¶¶ 63-137) and mentions in lesser detail seventeen additional sales transactions (¶¶ 138-55) for which the SEC claims that Enterasys recognized revenue that was not subject to recognition under GAAP.

Kirkpatrick is mentioned by name in the factual allegations concerning: (1) a side agreement between Enterasys and Societe General Cowen ("SG Cowen") (Compl. ¶¶ 97-103); (2) an investment deal between Enterasys and S.A. M-Com, Inc. ("Muzicom") that resulted in the improper recognition of $474,000 in revenue during the third and fourth quarters of Fiscal Year 2001 (¶¶ 111-14); and (3) improper recognition of $2.9 million in revenue from

sales to DiscJockey.com ("DiscJockey") during the first and
second quarters of Fiscal Year 2001 (¶ 141).

Regarding the Muzicom transaction, the complaint alleges
that "Kirkpatrick oversaw the negotiation and finalization of an
investment deal for which Enterasys improperly recognized
approximately $474,000 in revenue."  (Compl. ¶ 111.)  Revenue
recognition was improper, according to the SEC, because Muzicom,
a financially unstable company that was "unable to pay for
Enterasys's product without a promised investment, agreed to
place a . . . purchase order with Enterasys by the end of the
third quarter of Fiscal Year 2001 in return for Enterasys's
agreement to complete an investment deal the following quarter
that would cover the cost of the ordered product."  (¶ 112.)  In
connection with the Muzicom transaction, Kirkpatrick and Bruce
Kay[1] are alleged to have: (1) known that the undisclosed
contingency precluded revenue recognition (¶ 113); and (2)
"failed to obtain a meaningful valuation for Enterasys's equity
interest in Muzicom," but instead, "oversaw a valuation process
whereby Enterasys valued Muzicom's shares based on the amount of

_____

[1] Kay served as Cabletron's Controller from February 1999 to
June 2000, as Enterasys's Chief Financial Officer from June 2000
until July 2001, and as Enterasys's Senior Vice President of
Finance from July until October 2001.

Enterasys's investment and then backed into a valuation expressed as a multiple of Muzicom's revenues" (¶ 114).

Regarding the DiscJockey transaction, the complaint alleges that "[a]t the time Enterasys recognized revenue from sales to DiscJockey.com, Kirkpatrick knew that these sales were contingent on Enterasys making a reciprocal investment in DiscJockey.com in later quarters, and that this undisclosed contingency precluded revenue recognition."  (Compl. ¶ 141.)

Regarding the SG Cowen transaction, the complaint alleges that: (1) during the second half of 1999, SG Cowen provided financial services to Enterasys in exchange for a cash payment plus $7 million in product credits (Compl. ¶ 97); (2) on April 8, 2000, Kirkpatrick prepared a memorandum for SG Cowen granting SG Cowen full exchange rights for sixty days after the delivery of Enterasys products (¶ 98); (3) Kirkpatrick learned, near the end of the third quarter of Fiscal Year 2001, that SG Cowen planned to submit purchase orders in the amount of $385,000 (¶ 99); (4) in response, Enterasys shipped $2 million worth of product and immediately recognized $2 million in revenue (id.); (5) Kirkpatrick took no steps to ensure that Enterasys properly accounted for SG Cowen's purchase order or to inform the outside auditor of SG Cowen's exchange rights (¶ 100); (6) "Kirkpatrick

signed Cabletron's April 12, 2001, representation letter [to
Enterasys's outside auditor] stating that all side agreements
with return rights had been disclosed and that Cabletron had
properly accounted for all sales with return rights or other
significant future obligations" (¶ 101); and (7) "Kirkpatrick and
[Michael] Skubisz[2] each signed a September 26, 2001,
representation letter stating that Aprisma did not have side
agreements providing for return rights" (¶ 102).

    The complaint further alleges that: (1) by the first quarter
of Transition Year 2001, Kirkpatrick, Piyush Patel,[3] and other
members of Enterasys's senior management, knowing that the
company's "outside auditor had identified an investee company's
independent ability to pay for product as an important
prerequisite to recognizing revenue for an investment . . .
developed and carried out a scheme to structure investment
transactions so as to conceal investment related revenue from the
company's outside auditor" (Compl. ¶ 156); (2) in March 2001,

_____

    [2] Skubisz served as Aprisma's Chief Executive Officer and
President from 1999 until August 2002.

    [3] Patel served as Cabletron's Chief Executive Officer,
President, and Chairman of the Board of Directors from June 1999
until August 2001.  Thereafter, he served as a consultant to
Enterasys and Aprisma.

Kirkpatrick, Patel, and Robert Barber[4] first presented to
Enterasys's investment team[5] "an investment structure in which
the investee company would purchase Enterasys product from a
distributer or 'channel partner' rather than from Enterasys
directly to conceal from Enterasys's outside auditor the link
between Enterasys's investment and the purchase, for which
Enterasys would record revenue" (¶ 157); and (3) during "numerous
. . . weekly conference calls" members of Enterasys's investment
team "openly discussed the purpose of three corner deals: to
conceal from Enterasys's outside auditor the connection between
investments and purchases, given that the poor financial
condition of investee companies could lead the outside auditor to
conclude that the related revenue did not comport with GAAP"
(¶ 158).

    The SEC asserts that any public statement of earnings that
included improperly recognized revenue was materially false and
that Enterasys made such statements in: one SEC 10-K form, six

---

[4] Barber served as Enterasys's Vice President of Corporate
Affairs from April 2000 through April 2001, and was responsible
for business development at Enterasys from May through August
2001.

[5] The complaint describes the investment team as consisting
of Eric Jaeger, Kirkpatrick, Patel, Enrique Fiallo, Barber, Jerry
Shanahan, Anthony Hurley, Kay, Robert Gagalis, Gayle Luacaw, and
others.

SEC 10-Q forms, three SEC 8-K forms, fourteen representation letters, and seven press releases.  (Compl. ¶ 36.)  The complaint then specifies the amount of overstated revenue and understated losses reported in each of the identified SEC filings, (¶¶ 37-53), and provides similar specifications for the press releases (¶¶ 171-87).  The SEC alleges that Kirkpatrick, either in concert with Patel or on his own, signed and caused Enterasys to file four 10-Q forms, three 8-K forms, one 10-K form, and one S-8 form (¶ 53), and that he, along with Patel and Eric Jaeger,[6] "participated in the drafting of [quarterly] earnings [press] releases" (¶ 172).

## Discussion

Kirkpatrick moves to dismiss, arguing that the complaint: (1) does not allege adequately that he acted with scienter; (2) fails to sufficiently plead materiality; (3) does not state a claim against him based upon the allegations concerning Enterasys's three-corner transactions; (4) does not allege adequately that he acted fraudulently regarding SEC filings and press releases; and (5) sounds in fraud in its entirety, and must

---

[6] Jaeger served as Cabletron's Executive Vice President of Corporate Affairs from July 1999 through August 2001 and as a consultant to Enterasys and Aprisma from August 2001 through September 2002.  Before becoming Cabletron's Executive Vice President, he served as the company's General Counsel.

be dismissed in its entirety because it fails to meet the
heightened pleading standard imposed by Rule 9(b) of the Federal
Rules of Civil Procedure.  While Kirkpatrick criticizes the
shotgun pleading style of the SEC's complaint – a criticism that
is not unfounded – Kirkpatrick's motion to dismiss suffers from a
similar deficiency.  Its five main arguments are only loosely
tied to the eight counts of the SEC's complaint, making it
somewhat difficult to know which arguments pertain to which
claims.  That said, as best the court can determine,
Kirkpatrick's first argument pertains to Counts I and III;[7] his
second argument pertains to Counts I, II, III, V, and VI;[8] his
third argument pertains to Count III;[9] his fourth argument

_____

[7] In his scienter argument, Kirkpatrick refers to Counts I,
II, and III, but because Count II is a claim under Securities Act
sections 17(a)(2) & (3), which do not have a scienter
requirement, see SEC v. Durgarian, 477 F. Supp. 2d 342, 355 (D.
Mass. 2007) (citing Aaron v. SEC, 446 U.S. 680, 681 (1980)),
Kirkpatrick's scienter argument is inapplicable to Count II.

[8] The court so concludes because of the eight claims brought
in the complaint, only those brought under Securities Act section
17(a) (Counts I and II), Exchange Act sections 10(b) (Count III)
and 13(a) (Count VI), and Exchange Act Rules 10b-5 (Count III),
12b-20 (Count VI), 13a-1 (Count VI), 13a-11 (Count VI), 13a-13
(Count VI), and 13b2-2 (Count V), are subject to a lack of
materiality defense.

[9] On its face, Kirkpatrick's third argument is entirely
unclear about which claim(s) it applies to.  However, because the
principal case to which he cites, Simpson v. AOL Time Warner
Inc., 452 F.3d 1040 (9th Cir. 2006), vacated by Avis Budget
Group, Inc. v. Cal. State Teachers' Ret. Sys., 128 S. Ct. 1119
(2008), is a section 10(b) case, the court presumes that
Kirkpatrick's third argument is directed toward the SEC's section

pertains to Counts I, II, III, and VI;[10] and his fifth argument
pertains to all eight counts.  Because the SEC's objection to
Kirkpatrick's motion to dismiss also serves as an objection to
motions filed by Patel and Jaeger, it does not precisely track
any of the three motions to which it objects.  Suffice it to say
that the SEC categorically opposes Kirkpatrick's motion.  In this
section, the court begins with the applicable pleading standard,
and then proceeds to a claim-by-claim analysis.

A.  The Pleading Standard

     In document no. 130, the order on Lawrence Collins' motion
to dismiss, the court determined that the "sounds in fraud"
doctrine is applicable in this circuit and ruled that the Rule
9(b) pleading requirements apply to all of the SEC's claims in
this case.  That ruling applies with equal force to Kirkpatrick's
motion to dismiss, and the SEC's arguments to the contrary are
rejected for the reasons given in document no. 130.

     The version of Rule 9(b) in effect when the SEC filed its
complaint provided that "[i]n all averments of fraud or mistake,

10b claim in Count III.

     [10] These are the only four counts in the complaint that
appear to be based upon Enterasys's allegedly false SEC filings
and press releases.

11

the circumstances constituting fraud or mistake shall be stated
with particularity."  FED. R. CIV. P. 9(b).[11]  The rule further
provided that "[m]alice, intent, knowledge, and other
condition[s] of mind of a person may be averred generally."  Id.
"In applying [the Rule 9(b)] standard to securities fraud
actions, this circuit has been notably strict and rigorous."
Durgarian, 477 F. Supp. 2d at 348 (citing Greebel v. FTP
Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)).

The particularity "requirement 'entails specifying in the
pleader's complaint the time, place, and content of the alleged
false or fraudulent representations.'"  Arruda v. Sears, Roebuck
& Co., 310 F.3d 13, 19 (1st Cir. 2002) (quoting Powers v. Boston
Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)); see also In re
StockerYale Sec. Litig., 453 F. Supp. 2d 345, 350 (D.N.H. 2006)
("The rule requires that the particular times, dates, places, or
other details of the alleged fraudulent involvement of the actors
be alleged.").  In addition, "general averments of the
defendants' knowledge of material falsity will not suffice."
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st
Cir. 1994) (citing Greenstone v. Cambex Corp., 975 F.2d 22, 25

---

[11] Rule 9(b) was amended effective December 1, 2007, but the
Advisory Committee Notes to the Federal Rules explain that the
2007 amendment was "intended to be stylistic only."

(1st Cir. 1992)), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.
Rather, "[c]onsistent with Fed. R. Civ. P. 9(b), the complaint
must set forth specific facts that make it reasonable to believe
that defendant[s] knew that a statement was materially false or
misleading." Serabian, 24 F.3d at 361 (citation and internal
quotation marks omitted). Allegations of fraud must be organized
"into discrete units that are, standing alone, each capable of
evaluation." StockerYale, 453 F. Supp. 2d at 350 (quoting In re
Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 55-56 (D. Mass.
1998)). And, "where . . . 'multiple defendants are involved,
each defendant's role in the fraud must be particularized.'"
Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802
F. Supp. 595, 600 (D.N.H. 1992) (quoting Shields v. Amoskeag Bank
Shares, Inc., 766 F. Supp. 32, 40 (D.N.H. 1991)).


     "In a case where fraud is not an essential element of a
claim, only allegations of fraudulent conduct must satisfy the
heightened pleading requirements of Rule 9(b)." Sparling v. Daou
(In re Daou Sys., Inc., Sec. Litig.), 411 F.3d 1006, 1027 (9th
Cir. 2005) (citing Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097,
1105 (9th Cir. 2003)). "Allegations of non-fraudulent conduct
need satisfy only the ordinary notice pleading standards of Rule
8(a)." Daou Sys., 411 F.3d at 1027 (citation omitted). "Thus,

if particular averments of fraud are insufficiently pled under
Rule 9(b), a district court should 'disregard' those averments or
'strip' them from the claim.  The court should then examine the
allegations that remain to determine whether they state a claim."
Id. at 1028 (citation omitted).

> Rule 9(b) may prove fatal to 1933 Securities Act claims
> grounded in fraud when the complaint makes a wholesale
> adoption of the securities fraud allegations for
> purposes of the Securities Act claims.  In such cases,
>
> > a district court is not required to sift through
> > allegations of fraud in search of some lesser
> > included claim of strict liability.  It may
> > dismiss.  If it does so, it should ordinarily
> > accept a proffered amendment that either pleads
> > with the requisite particularity or drops the
> > defective allegations and still states a claim.

Id. (internal punctuation and citations omitted).


B.  The SEC's Claims

     As noted above, Kirkpatrick attacks the SEC's complaint on a
variety of grounds, some applying to individual claims, others
applying to multiple claims.  The SEC's fifty-page objection is
equally complex.  For the sake of clarity, the court will
consider Kirkpatrick's motion to dismiss on a claim-by-claim
basis.

Counts I & III

In Count I, the SEC claims that all defendants violated Securities Act section 17(a)(1), while in Count III, the SEC claims that all defendants violated Exchange Act section 10(b) and Exchange Act Rule 10b-5, either as primary violators or as aiders and abettors.  The claims themselves do not specify the conduct upon which they are based.  Rather, they incorporate, by reference, all 187 paragraphs of factual allegations in the complaint.  The complaint, in turn, discusses two categories of statements: those contained in SEC filings and those made in press releases announcing earnings.  According to the SEC, both the SEC filings and the press releases contained untrue statements of material fact because the financial results they reported included revenue from contingent sales and investment-related purchases, i.e., revenue that was not properly subject to recognition under GAAP.

Because "[t]he elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents," SEC v. Tambone (Tambone I), 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (citing Aaron, 446 U.S. at 695; Ernst & Ernst v. Hochfelder, 425

15

U.S. 185, 196 (1976)), the court will consider Counts I and III together.

It appears that Kirkpatrick is arguing that Counts I and III should be dismissed because the complaint fails to adequately allege that: (1) he acted with scienter; and (2) the false statements ascribed to him involved enough falsely reported revenue to make them material misrepresentations.  He also argues that a substantial portion of the revenue the SEC claims was falsely reported in SEC filings and press releases was generated by transactions he is not alleged to have participated in or even known about.  He further argues that Count III does not state a claim against him arising from his role in Enterasys's three-corner deals because, as a usual and legitimate business practice, those deals did not have the principal purpose of creating a false appearance of fact in furtherance of a scheme to defraud.  The SEC counters that: (1) under the correct legal standards, it has adequately alleged both scienter and the materiality of Kirkpatrick's alleged false statements; and (2) the SEC filings at issue reported revenue from transactions that Kirkpatrick personally executed or approved.

Securities Act section 17(a) provides that "[i]t shall be unlawful for any person in the offer or sale of any securities

. . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to employ any device, scheme or artifice to defraud." 15 U.S.C. § 77q(a)(1). Exchange Act section 10(b) provides that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national security exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . .

15 U.S.C. § 78j(b). Exchange Act Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17

17 C.F.R. § 240.10b-5.

To succeed on the claims asserted in Counts I and III, "the SEC must show that 1) defendants engaged in fraudulent conduct, 2) in connection with the purchase or sale of securities, 3) through the means or instruments of transportation or communication in interstate commerce or the mails and 4) with the requisite scienter." Tambone I, 417 F. Supp. 2d at 131 (citing SEC v. Graystone Nash, Inc., 820 F. Supp. 863, 870-71 (D.N.J. 1993)).  While it is less than clear, given the manner in which the SEC has framed its claims, it appears that the fraudulent conduct on which Counts I and III are based consists of allegedly untrue statements of material fact made in various SEC filings and press releases.

For an untrue statement of fact to be actionable under Securities Act section 17(a) and Exchange Act section 10(b), it must be material.  Tambone I, 417 F. Supp. 2d at 131.  "The boundaries of materiality in the securities context are clearly enunciated in [the] case law [of the First Circuit]." Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994).  Specifically,

> [t]he mere fact that an investor might find information interesting or desirable is not sufficient to satisfy

> the materiality requirement.  Rather, information is
> "material" only if its disclosure would alter the
> "total mix" of facts available to the investor and "if
> there is a substantial likelihood that a reasonable
> shareholder would consider it important" to the
> investment decision.

Id. (quoting Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir.

1992)).[12]

"Materiality is usually a matter for the trier of fact."

ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 65 (1st Cir.

2007) (citation omitted).  "A court is thus free to find, as a

matter of law, that a statement was not false, or not materially

false, only if a jury could not reasonably find falsity or

materiality on the evidence presented."  Brody v. Stone &

Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.), 414

F.3d 187, 209 (1st Cir. 2005) (citing TSC Indus., Inc. v.

Northway, Inc., 426 U.S. 438, 450 (1976)).  As the court of

appeals for the Eighth Circuit has explained, "a complaint that

alleges only immaterial misrepresentations presents an

'insuperable bar to relief,' and dismissal of such a complaint is

---

[12] While Lucia was a case brought under Sections 11 and
12(2) of the Securities Act, "[t]he same standard of materiality
. . . applies to claims under Section 10(b) and Rule 10b-5 as to
claims under Sections 11 and 12(b) of the Securities Act."  Shaw
v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)
(citation omitted), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.

proper." <u>Parnes v. Gateway 2000, Inc.</u>, 122 F.3d 539, 546 (8th
Cir. 1997) (quoting <u>Fusco v. Xerox Corp.</u>, 676 F.2d 332, 334 (8th
Cir. 1982)).

The untrue statements of material fact alleged by the SEC in
this action consist of overstatements of Enterasys's actual
recognizable revenues and earnings, and understatements of the
company's losses, contained in nine SEC filings and seven press
releases.  Both parties appear to agree that the "specific facts
that make it reasonable to believe that [Kirkpatrick] knew that
[those] statement[s] [were] materially false or misleading,"
<u>Serabian</u>, 24 F.3d at 361, are facts pertinent to his
participation in or knowledge of the improper recognition of
revenue generated by the SG Cowen, Muzicom, and DiscJockey
transactions.  According to the complaint, that revenue was
directly reported in SEC forms signed by Kirkpatrick and filed on
July 18 and October 18, 2000, and January 16 and June 4, 2001
(Compl. ¶¶ 37, 39, 41, and 43).  The complaint further alleges
that information from the forms listed above was incorporated
into four other SEC filings.  (¶ 53.)  Of the seven press
releases mentioned in the complaint, four reported on the SEC
filings noted above.  (¶¶ 173, 175, 177, and 180.)  As previously
stated, the SEC has identified allegedly false statements

attributable to Kirkpatrick in both SEC forms and press releases. The court begins with the former.

The most substantial misrepresentation attributed to Kirkpatrick in an SEC filing is the reporting of Enterasys's third quarter of fiscal year 2001.  According to the complaint: (1) the SEC Form 10-Q signed by Kirkpatrick reported net revenue of $248,939,000 (Compl. ¶ 41); (2) revenue was overstated by $3,195,000 (¶ 42); and (3) the two transactions Kirkpatrick is alleged to have participated in or known about, those with Muzicom and SG Cowen, accounted for $2,374,000 of inappropriately recognized revenue (id.).  In other words, the improperly recognized revenue directly tied to Kirkpatrick through either participation or knowledge was less than one percent of the revenue Enterasys reported that quarter.[13]  The complaint further alleges that the "overstatement [of revenue] caused the loss from

---

[13] In the three other quarters at issue, improperly recognized revenue directly tied to Kirkpatrick accounts for an even smaller percentage of the total revenue reported.  According to the complaint: the June 2000 Form 10-Q reported net revenue of $275,064,000 (Compl. ¶ 37), $2,258,000 of which (approximately 0.82 percent) is alleged to have come from the DiscJockey transaction (¶ 38); the September 2000 Form 10-Q reported net revenue of $261,434,000 (¶ 39), $630,000 of which (approximately 0.24 percent) is alleged to have come from the DiscJockey transaction (¶ 40); and the March 2001 Form 10-K reported net revenue for the preceding quarter of $286,016,000 (¶ 44), $17,000 of which (approximately 0.006 percent) is alleged to have come from the Muzicom transaction (¶ 45).

operations to be understated by approximately $3,000,000 and the net loss to shareholders to be understated by approximately $3,000,000." (Id.)

Kirkpatrick asks the court to determine that even if he misrepresented revenue in SEC filings, the amount of overstated revenue for which he can be held liable is so small as to render his false statements immaterial, as a matter of law. The SEC counters that Kirkpatrick's argument fails to acknowledge the qualitative materiality of the alleged misrepresentations, and notes that profit statements and earnings reports are of particular interest to investors.

"[A]lthough overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." Daou Sys., 411 F.3d at 1018. Here, the SEC has pled with particularity how Kirkpatrick's alleged false statements affected Enterasys's financial statements. Thus, the critical question is whether those effects were material, based upon the company's overall financial position.

"Minor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law." In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 170 (D. Mass. 2000) (citing Greebel, 194 F.3d at 206; Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996); Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 234 (D. Mass. 1999)).  In Segue Software, the trial court ruled that "[a]s in Greebel, the overstatement of Segue's revenues was insignificant ($1.1 million or 2.6% of Segue's $41 million in sales in 1998) and nonsystemic (involving only ten sales out of hundreds consummated during the two final quarters of 1998)." 106 F. Supp. 2d at 171.  Similarly, courts have determined the following misrepresentations to be immaterial, as a matter of law: (1) a 0.3 percent ($217 million) overstatement of revenues over a two-year period, see In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003); (2) a 0.2 percent understatement of a company's costs of goods sold, see In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426-27 (3d Cir. 1997); (3) an overstatement of a company's loan-loss reserves where "[t]he charge that would have followed the write-down of this asset would have amounted to merely 0.54% of [the company]'s net income of $234 million for that quarter," In re Westinghouse Sec. Litig., 90 F.3d 696, 715 (3d Cir. 1996); (4) a two percent ($6.8 million) overstatement of a company's assets,

23

see <u>Parnes</u>, 122 F.3d at 547; and (5) a $2 million understatement of a company's outstanding loans and a $2 million overstatement its derivative receivables, where the amount involved was about 0.3 percent of the company's total assets), <u>see</u> <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 630–31 (S.D.N.Y. 2005).[14]

Given the persuasive precedent cited, the court has little difficulty concluding that the false statements in SEC filings for which Kirkpatrick could be held liable do not meet the materiality requirement, as a matter of law.  None of Kirkpatrick's allegedly false statements involved more than one percent of Enterasys's actual quarterly revenue, and two of the four involved less than one quarter of one percent of quarterly revenue.

---

[14] In an opinion not directly on point, the court of appeals for this circuit held that scienter was not demonstrated by the issuance of a revenue report that incorporated between $416,000 and $1.55 million in improperly recognized revenue, when overall revenue for the quarter in question was $37.5 million.  <u>See</u> <u>Greebel</u>, 194 F. 3d at 206.  In contrast, in <u>Chalverus</u>, the trial court held that the PSLRA's strong-inference-of-scienter requirement was met by a combination of several factors, including the following:

> Pegasystems restated its second quarter revenue
> from $12,200,000 to $4,700,000 and restated its
> earnings from a <u>gain</u> of $2.2 million to a <u>loss</u> of $2.8
> million.  The total amount by which Pegasystems
> restated its revenue – $7,485,000 – equals 158 percent
> of its actual revenue for that quarter.

59 F. Supp. 2d at 234 (citation to the record omitted).

While statements concerning revenue undoubtedly qualify as qualitatively material, cf. Burlington, 114 F.3d at 1420 n.9 ("earnings reports are among the pieces of data that investors find most relevant to their investment decisions"), the concept of qualitative materiality has its limits:

> The district court recognized that the adequacy of loan loss reserves is generally the type of information that would significantly influence a reasonable investor. Westinghouse I, 832 F. Supp. [948,] 972 [(W.D. Pa. 1993)] (citing [Shapiro v.] UJB [Fin. Corp.], 964 F.2d [272,] 281 [(3d Cir. 1992)]). However, the court also tested plaintiffs' complaint to determine whether the allegations regarding loan loss reserves were quantitatively material in this particular case.  The district court stated that "[t]he failure to disclose that a loan portfolio is likely to be impaired by some de minimis amount may be 'relevant' in that it is the type of information that investors care about, but of such 'dubious significance' as to be 'trivial,' and 'hardly conducive to informed decisionmaking,' so that to reasonable shareholders, such omission must be immaterial as a matter of law." Id. at 972 (quoting TSC Industries, 426 U.S. at 448– 49).  We agree.  See generally Loss & Seligman, Fundamentals of Securities Regulation 137–41, 479–80 (1995) (quantitative materiality analysis is generally appropriate, though not when "such matters as a conflict of interest or criminal violations are at issue"); see also Ferber v. Travelers Corp., 802 F. Supp. 698, 708 (D. Conn. 1992) (omission of extent of second mortgages not material in relation to overall real estate, investment, and asset portfolios); In re First Chicago Corp. Securities Litigation, 769 F. Supp. 1444, 1454 (N.D. Ill. 1991) (total value of alleged bad loan immaterial in relation to size of defendant's real estate loan portfolio).

25

_Westinghouse_, 90 F.3d at 714 (parallel citation omitted).  The court elaborated upon its reasoning in a footnote that is particularly relevant:

> We thus reject plaintiffs' argument that all misstatements regarding loan loss reserves and nonearning receivables are inherently material.  But we also reject defendants' similarly categorical assertion that materiality must be quantified at a specified percentage of income or assets.  Although "a 'rule of thumb' of 5-10 percent of net income is widely used as a general materiality criterion" in the accounting profession, <u>see</u> Financial Accounting Standards Board, <u>Accounting Standards</u>: Statements of Financial Accounting Concepts No. 2, App. C, ¶ 167, at 81 (1989) (citing James W. Pattillo, <u>The Concept of Materiality in Financial Reporting</u> (1976)), the question of materiality must be considered on a case-by-case basis under the standards set forth in <u>T.S.C. Industries</u> and our cases.  <u>See also</u> Pattillo, <u>supra</u>, at 12 (advocating consideration of various factors in determining materiality in the accounting profession and concluding that "the single rule-of-thumb materiality criterion of 5%-10% of net income or loss should be used – if at all, and by itself – with extreme caution").

<u>Id.</u> at 714 n.14.  Based upon the reasoning outlined in <u>Westinghouse</u>, the SEC's reliance upon the concept of qualitative materiality is unavailing; the overstatements of revenue in this case fall far below the "rule-of-thumb" threshold described in <u>Westinghouse</u>, and the SEC has identified no other factors that persuasively enhance the materiality of the mathematically negligible overstatements upon which the SEC bases its claims.

In re Kidder Peabody Securities Litigation, 10 F. Supp. 2d
398 (S.D.N.Y. 1998), upon which the SEC relies, does not support
a contrary result.  In Kidder Peabody, the defendant argued that
"none of the alleged misstatements [could] be considered material
given the amount of the alleged false profits in relation to
[General Electric]'s total earnings."  Id. at 409-10.
Specifically, "none of the alleged misstatements, taken
individually, affected GE's profits by more than 2.54%, with most
of the alleged misstatements individually affecting GE's profits
by less than 1%."  Id. at 410.  While acknowledging "the appeal
of defendants' statistical approach," id., the court found itself
"hard-pressed to find that misstatements of profits totaling over
$338 million dollars are immaterial as a matter of law," id., and
"decline[d] to adopt a statistical bright line rule to determine
what a reasonable investor would consider significant," id.
(citing Basic Inc. v. Levinson, 485 U.S. 224, 236 n.14 (1988)).
Besides, in Kidder Peabody the false profits were generated by a
single trader at Kidder, then a subsidiary of General Electric.
Id. at 402-05.  To overcome the defendants' statistical approach,
"the plaintiffs . . . put forth several theories for why a
reasonable GE investor would have placed particular emphasis on
information related to Kidder," id., and the court found several
of them persuasive:

27

First, while the false profits may have been minor compared to GE's earnings as a whole, they were quite significant to Kidder, accounting for 13.5% of Kidder's reported profits in 1992 and 45% in 1993.  Kidder's profits, in turn, represented a significant portion of GE's balance sheet.  Buffeted by the false profits, Kidder's total profits accounted for 7% of GE's reported earnings in 1993, up from 5% in 1992 and 2% in 1991.  As a result, news about Kidder may have held special interest to a GE investor.  Put differently, $338 million of false profits attributed solely to Kidder might have had greater significance to an investor than the same $338 million dispersed broadly throughout GE's balance sheet.

Second, the false profits might have been especially important to investors due to Kidder's visible role in GE's business.  Under this theory, the importance of reports related to Kidder was magnified because investors had been monitoring Kidder's performance closely since GE purchased Kidder in 1986.  In support of this theory, plaintiffs note that when GE announced the purchase of Kidder some analysts believed that the purchase would have a detrimental impact on GE's stock.  These analysts felt that GE's inexperience in the securities brokerage industry, as well as the volatility of the securities market, made Kidder an unwise acquisition for GE.  According to plaintiffs' expert, these analysts' fears were realized when Kidder reported at least intermittent losses from 1986 to 1991, despite substantial cash infusions from GE.  In this context, Kidder's reported profits in 1992 and 1993, which included the false profits, took on special significance to investors and analysts who viewed Kidder as a turnaround success story.

. . . .

In addition to these theories, the Court notes that the materiality of the misstatements must be considered in light of their impact on GE's reputation, wholly apart from their statistical impact on GE's reported earnings.  Under plaintiffs' theory, the false profits enabled GE to tout Kidder's success, thereby allaying analysts' fears.  That this success, at a minimum, was inflated likely would have been significant to a reasonable investor.  Moreover, that a

       prominent subsidiary of GE was able to generate false
       profits, apparently without GE's knowledge, arguably
       raised concerns about GE's internal controls,
       efficiency, and integrity, all of which would have been
       relevant to a reasonable investor. See Ross v. Warner,
       [No. 77 Civ. 243,] 1980 WL 1474, at *8 [(S.D.N.Y. Dec.
       11, 1980)] (discussing materiality of failure to
       disclose questionable payments in terms of effect on
       public perception of management's integrity).

Id. at 411.  While the SEC cites Kidder Peabody, it offers no

argument – much less a persuasive one – that the theories adopted

in that case apply in equal measure – or at all – in this case.


    In sum, the court is persuaded that none of the false

statements about revenue attributed to Kirkpatrick that were made

in SEC filings rises to the required level of materiality.


    With regard to the alleged falsity of the press releases,

the SEC alleges that "[t]he Defendants knew that the revenue they

caused Enterasys to improperly recognize was reported in

quarterly press releases that were distributed to the investing

public" (Compl. ¶ 171), thus indicating that knowledge of

transactions generating revenue inappropriate for recognition

constituted the "specific facts that make it reasonable to

believe that [Patel, Kirkpatrick, and Jaeger] knew that [the]

statement[s] [contained in the press releases were] materially

false or misleading." Serabian, 24 F.3d at 361.  Of the seven

press releases described in the complaint, the first four
reported results from quarters during which Kirkpatrick is
alleged to have participated in or known about improper revenue
recognition.  With regard to the other three, the complaint does
not describe specific facts making it reasonable to believe that
Kirkpatrick knew that the statements contained in them were
materially false or misleading.  With respect to the first four
press releases, the complaint makes similar claims, asserting,
for example:

> The Defendants falsely represented that Cabletron
> had met Wall Street expectations for earnings per share
> estimates.  When adjustments are made to correct the
> improper revenue recognized, the understated operating
> losses, and the understated losses to shareholders, the
> pro forma earnings per share were a loss of $0.04,
> rather than the loss of $0.02 reported.

(Compl. ¶ 174; see also ¶¶ 176, 179, 181.)  While the complaint
alleges that Enterasys falsely reported that Cabletron had met
Wall Street expectations, it does not say what those expectations
actually were for three of the four press releases.  Without any
specificity about the Wall Street expectations that Enterasys
claimed Cabletron had met, the complaint does not adequately
allege either the falsity or the materiality of the alleged false
statement.  See Serabian, 24 F.3d at 361.  The lone press release
for which Wall Street expectations are actually specified was
issued on March 28, 2001, and reported on a quarter in which

Enterasys claimed $286,016,000 in revenue and Kirkpatrick is alleged to have known that about $17,000 of that revenue was improperly recognized.  The minute magnitude of the alleged misrepresentation – amounting to 0.006 percent of Enterasys's reported quarterly revenue – necessarily fails the materiality requirement, as a matter of law.  Accordingly, the allegations in paragraphs 174, 176, 179, and 181 are insufficient to support the claims in Counts I and III.

One alleged misrepresentation in the press releases stands on a different footing.  The December 20, 2000, press release, alleged to have been issued by Enterasys and Patel (Compl. ¶ 177), and drafted by Patel, Kirkpatrick, and others (¶ 172),[15] stated, among other things:

> Aprisma had revenues of $19.7 million in the quarter, compared with revenues of $17.3 million in Q2.  This represents a sequential quarterly growth rate of approximately 13.4%.  This result compares to $13.1 [million] in Q3 of fiscal 2000, reflecting a year-over-year growth rate of approximately 50%. – Important customer wins during the quarter include . . . SG Cowen."

---

[15] Paragraph 172 alleges that "Patel, Kirkpatrick, Jaeger and others participated in the drafting of the earnings releases."  The complaint then discusses each of the seven press releases in detail, but says nothing further about authorship. For purposes of this motion to dismiss, the court infers that the blanket allegation in paragraph 172 applies to each of the seven press releases.

(¶ 177.)  The SEC alleges the falsity of that statement in the
following way:

> Patel knew or was reckless in not knowing that it
> was improper for Aprisma to recognize revenue on the
> transaction with SG Cowen which was subject to exchange
> rights.  Removing the SG Cowen revenue of approximately
> $1.9 million from Aprisma's revenues materially reduced
> its sequential growth rate to approximately 2.9% rather
> than the 13.4% touted by Patel.

(¶ 178.)

There may be a basis in the complaint for charging Patel

with knowledge that Aprisma had inappropriately recognized $1.9

million in revenue – a question to be addressed, presumably, when

the court rules on Patel's motion to dismiss – but there is no

basis for attributing that knowledge to Kirkpatrick.  The

complaint alleges that Kirkpatrick: (1) sent SG Cowen a

memorandum granting the company full exchange rights for sixty

days following delivery (Compl. ¶ 98); (2) learned that SG Cowen

planned to submit purchase orders for approximately $385,000

(¶ 99); (3) knew that the exchange rights he granted SC Cowen

precluded revenue recognition until the end of the exchange

period (¶ 100); (4) took no steps to insure that Enterasys

properly accounted for SG Cowen's purchase order (id.); and (5)

took no steps to inform the outside auditor of SG Cowen's

exchange rights (id.).  However, while the complaint alleges that

"Enterasys shipped nearly $2 million in product to SG Cowen, for which Enterasys immediately recognized revenue" (¶ 99), it nowhere alleges that Kirkpatrick knew about either the shipment itself or the manner in which Enterasys or Aprisma accounted for the revenue associated with it.  Thus, the complaint does not set forth specific facts that make it reasonable to believe that Kirkpatrick knew that the statement about Aprisma's sequential growth rate was materially false or misleading.  See Serabian, 24 F.3d at 3561.

Because the alleged false statements attributable to Kirkpatrick contained in SEC filings are immaterial as a matter of law, and because the SEC has failed to adequately allege false statements attributable to Kirkpatrick in the press releases, Counts I and III are dismissed as to Kirkpatrick to the extent they assert claims of primary liability.  Count III also asserts that Kirkpatrick is liable as an aider and abettor.  The court's determination that the misrepresentations in the SEC filings are immaterial as a matter of law also applies to the aider and abettor claim.  To the extent the aider and abettor claim is based upon the press releases, the complaint alleges no act on Kirkpatrick's part that could qualify as a proximate cause of the

issuance of a false press release,[16] which is the test for aider and abettor liability.  See 15 U.S.C. § 78t(e); SEC v. Power, 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007) (citations omitted). Accordingly, as to Kirkpatrick, Counts I and III are dismissed in their entirety.

Count II

Kirkpatrick moves to dismiss Count II on the same grounds that supported his arguments for dismissal of Counts I and III. Count II is the SEC's claim that defendants violated Securities Act sections 17(a)(2) & (3).[17]  "The requirements for establishing a violation of Section 17(a) are nearly the same as those required for a claim under Securities Exchange Act Section 10(b) and Rule 10b-5 thereunder, although there is no requirement for the SEC to demonstrate scienter with respect to subsections (a)(2) and (a)(3)."  Durgarian, 477 F. Supp. 2d at 355 (citing Aaron, 446 U.S. at 681)).  For the same reasons that support dismissal of Counts I and III, Count II is also dismissed as to Kirkpatrick.

---

[16] Obviously, the complaint alleges that Kirkpatrick "participated in the drafting of the earnings releases" (Compl. ¶ 172), but it alleges no facts that connect Kirkpatrick to the inclusion of the only sufficiently pled false statement in those releases, i.e., the one concerning Aprisma's sequential growth rate.

[17] 15 U.S.C. §§ 77q(a)(2) & (3).

Count IV

In Count IV, the SEC asserts that all defendants violated Exchange Act section 13(b)(5) and Rule 13b2-1, which pertain to internal accounting controls and proscribe the falsification of corporate books and records.  <u>See</u> 15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1.  Kirkpatrick moves to dismiss Count IV, arguing that the SEC's complaint does not satisfy Rule 9(b).  In its objection, the SEC challenges defendants' argument that the "sounds in fraud" doctrine applies to its claims under section 13 of the Exchange Act, but the SEC directs the court to no factual allegations in its complaint that might support its claims under section 13(b)(5) and Rule 13b2-1.  It is not the job of the court to sift through 187 paragraphs of the SEC's complaint in search of adequate factual allegations to support its claims.  The SEC's silence is a sufficient concession of its failure to plead adequate facts.  Accordingly, the court finds that Count IV does not state a claim against Kirkpatrick.  Accordingly, Kirkpatrick is entitled to dismissal of Count IV.


Count V

In Count V, the SEC claims that all defendants violated Exchange Act Rule 13b2-2, which prohibits directors and officers from making false statements to accountants or auditors. Kirkpatrick moves to dismiss Count V, arguing that the SEC's

35

complaint does not satisfy Rule 9(b).  As with Count IV, the SEC
challenges defendants' argument that the "sounds in fraud"
doctrine applies to its claims under section 13 of the Exchange
Act, and it further argues that the complaint adequately alleges
that "Kirkpatrick signed false and misleading representation
letters to the auditor."  (Pl.'s Obj. at 32.)

The regulatory provision on which Count V is based provides,
in pertinent part:

> (a) No director or officer of an issuer shall,
> directly or indirectly:
> (1) Make or cause to be made a materially false or
> misleading statement to an accountant in connection
> with; or
> (2) Omit to State, or cause another person to omit
> to State, any material fact necessary in order to make
> statements made, in light of the circumstances under
> which such statements were made, not misleading, to an
> accountant in connection with:
> (I) Any audit, review or examination of the
> financial statements of the issuer required to be made
> pursuant to this subpart; or
> (ii) The preparation or filing of any document or
> report required to be filed with the [Securities and
> Exchange] Commission pursuant to this subpart or
> otherwise.

240 C.F.R. § 240.13b2-2.

The SEC's complaint alleges that: (1) in a memorandum
prepared on April 18, 2000, Kirkpatrick granted SG Cowen full
exchange rights for sixty days following its receipt of products

36

from Enterasys (Compl. ¶ 98); (2) "on November 29, 2000, . . .
Enterasys shipped nearly $2 million in product to SG Cowen, for
which Enterasys immediately recognized revenue" (¶ 99); (3)
"Kirkpatrick took no steps to insure that . . . the company's
outside auditor was made aware of [SG Cowen's] exchange rights"
(¶ 100); (4) "Kirkpatrick signed Cabletron's April 12, 2001,
representation letter [to Enterasys's outside auditor] stating
that all side agreements with return rights had been disclosed
and that Cabletron had properly accounted for all sales with
return rights or other significant future obligations" (¶ 101);
(5) "Kirkpatrick . . . signed a September 26, 2001,
representation letter stating that Aprisma did not have side
agreements providing for return rights" (¶ 102); and (6)
"[a]lthough SG Cowen returned nearly all of its [November 2000]
order within 60 days of delivery, Aprisma neither processed the
return nor reversed the associated revenue until January 2002"
(¶ 103).  That is enough to state a claim under Rule 13b2-2.[18]
See SEC v. Nacchio, 438 F. Supp. 2d 1266, 1285 (D. Colo. 2006);
SEC v. Baxter, No. C-05-03843 RMW, 2007 WL 2013958, at *9 (N.D.
Cal. July 11, 2007).  Accordingly, Kirkpatrick's motion to
dismiss is denied as to Count V.

---

[18] Kirkpatrick does not challenge Count V on materiality
grounds.  See SEC v. Baxter, No. C-05-03843 RMW, 2007 WL 2013958,
at *8 (N.D. Cal. July 11, 2007).

Count VI

In Count VI, the SEC claims that all defendants aided and abetted Enterasys in violating Exchange Act section 13(a) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13, which describe the requirements imposed upon issuers of securities to file various reports with the SEC.  See 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13; see also Ponce v. SEC, 345 F.3d 722, 735 (9th Cir. 2003). Kirkpatrick moves to dismiss Count VI, arguing that the SEC's complaint does not satisfy Rule 9(b).  The SEC counters that it adequately alleged Kirkpatrick's participation in making false statements to the SEC by alleging that he signed various SEC reports or submitted revenue for inclusion in those reports while knowing that some of the revenue he submitted was not subject to recognition under either the company's revenue recognition policy or GAAP.

Because all of the allegedly false statements attributable to Kirkpatrick in SEC filings are immaterial as a matter of law, for the reasons already discussed, Kirkpatrick is also entitled to dismissal of Count VI.  See SEC v. Coffman, No. 06-cv-00088-REB-BNB, 2007 WL 2412808, at *12 (D. Colo. Aug. 21, 2007) ("the SEC's claim based on § 13(a) of the Exchange Act, and rules promulgated thereunder, requires proof of a material

38

misrepresentation or a materially misleading omission"); <u>cf.</u> <u>Ponce</u>, 345 F.3d at 736 (holding that where conduct alleged to support claims of section 10(b) and Rule 10b-5 violations was also alleged in support of section 13(a) violations, violation of section 10(b) and Rule 10b-5 established violation of sections 13(a) and 13(b)(2)).

<u>Count VII</u>

In Count VII, the SEC claims that all defendants aided and abetted Enterasys in violating Exchange Act section 13(b)(2)(A), which sets out various requirements for corporate record keeping. Kirkpatrick moves to dismiss Count VII, arguing that the SEC's complaint does not satisfy Rule 9(b).  The SEC counters that "[t]he complaint alleges [that] the Defendants caused the Company to keep inaccurate books and records by entering into contingent sales transactions or three-corner investment deals in which the true nature of the transactions [was] not accurately recorded in the Company's books and records."  (Pl.'s Obj. at 36.)

The statutory provision on which Count VII is based provides as follows:

> Every issuer which has a class of securities
> registered pursuant to section 78<u>l</u> of this title and
> every issuer which is required to file reports pursuant
> to section 78<u>o</u>(d) of this title shall—

39

> **(A)** make and keep books, records, and
> accounts, which, in reasonable detail, accurately
> and fairly reflect the transactions and
> dispositions of the assets of the issuer.

15 U.S.C. § 78m(b)(2); see also Ponce, 345 F.3d at 735 ("Section

13(b)(2) requires companies to maintain books, records and

accounts accurately and record transactions in conformity with

GAAS."). Section 13(b)(2)(A) has "been read to require issuers

to employ and supervise reliable personnel, to ensure that

transactions are executed as authorized, to segregate accounting

functions, and to have procedures designed to prevent errors and

irregularities." SEC v. Yuen, No. CV 03-4376MRP(PLAX), 2006 WL

1390828, at *42 (C.D. Cal. March 16, 2006). However, unlike

various other provisions of the Exchange Act, section 13(b)(2)

does not require the SEC to establish the materiality of an

alleged inaccuracy in a company's books and records. See SEC v.

Thielbar, No. CIV 06-4253, 2007 WL 2903948, at *10 (D.S.D. Sept.

28, 2007) (citing SEC v. World-Wide Coin Invs., Ltd., 567 F.

Supp. 724, 748-50 (N.D. Ga. 1983)).


With regard to aider and abettor liability, the Exchange Act

provides:

> For purposes of any action brought by the
> [Securities and Exchange] Commission under paragraph
> (1) or (3) of section 78u(d) of this title, any person

that knowingly provides substantial assistance to
another person in violation of a provision of this
chapter, or of any rule or regulation issued under this
chapter, shall be deemed in violation of such provision
to the same extent as the person to whom such
assistance is provided.

15 U.S.C. § 78t(e).  Specifically,

[l]iability for aiding and abetting securities fraud
under [Exchange Act section 10(b)] attaches only upon a
showing that: 1) a primary violation was committed, 2)
the defendant[ ] had a general awareness that [his]
conduct was part of an overall activity that was
improper, and 3) the defendant[ ] knowingly and
substantially assisted in the primary violation.

SEC v. Tambone (Tambone II), 473 F. Supp. 2d 162, 167–68 (D.

Mass. 2006) (citing SEC v. Druffner, 353 F. Supp. 2d 141, 150 (D.

Mass. 2005)).  "[M]ere awareness and approval of the primary

violation is insufficient to make out a claim for substantial

assistance."  Power, 525 F. Supp. 2d at 422 (quoting SEC v.

Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006)).  Rather,

"[t]he aider and abettor's substantial assistance must be a

proximate cause of the primary violation."  Power, 525 F. Supp.

2d at 422 (citation omitted).

Here, the complaint alleges that Enterasys's corporate

books, records, and accounts did not reflect the company's

transactions accurately and fairly because those books and

records reported revenue that should not have been recognized for

41

a variety of reasons, which is enough to assert the commission of a primary violation of section 13(b)(2)(A) by Enterasys.  In its objection to Kirkpatrick's motion to dismiss, the SEC argues that Kirkpatrick aided and abetted that primary violation "by entering into contingent sales transactions or three-corner investment deals."  (Pl.'s Obj. at 36.)  That argument is not persuasive. The act of entering into a transaction that does not generate recognizable revenue under GAAP is sufficiently attenuated from the process of corporate accounting that mere participation in such a transaction, without more, cannot be said to qualify as a proximate cause of the later act of inaccurate accounting, when the generated revenue is improperly recognized and reported. Better pleading (if the facts allow) is required.

However, the complaint also alleges that Kirkpatrick: (1) "took no steps to ensure that . . . Enterasys properly accounted for SG Cowen's purchase order, or [that] . . . the company's outside auditor was made aware of [SG Cowen's] exchange rights" (Compl. ¶ 100); (2) "signed Cabletron's April 12, 2001, representation letter [falsely] stating that all side agreements with return rights had been disclosed and that Cabletron had properly accounted for all sales with return rights or other significant future obligations" (¶ 101); (3) "signed a September 26, 2001, representation letter [falsely] stating that Aprisma

42

did not have side agreements providing for return rights"
(¶ 102); (4) "allowed Enterasys to improperly recognize a total
of approximately $474,000 in revenue in the third and fourth
quarters of Fiscal Year 2001 in connection with the Muzicom
transaction" (¶ 113); (5) "failed to obtain a meaningful
valuation for Enterasys's equity interest in Muzicom . . . [but]
[i]nstead . . . oversaw a valuation process whereby Enterasys
valued Muzicom's shares based on the amount of Enterasys's
investment and then backed into a valuation expressed as a
multiple of Muzicom's revenues" (¶ 114); and (6) "developed and
carried out a scheme to structure investment transactions so as
to conceal investment related revenue from the company's outside
auditor" (¶ 156).

    The foregoing allegations are sufficient to state a claim
that Kirkpatrick aided and abetted Enterasys's primary violation
of section 13(b)(2)(A).  See Ponce, 345 F. 3d at 737–38 (holding
that defendant "provided substantial assistance to [company's]
primary violation of Sections 13(a) and 13(b)(2), by preparing
the financial statements that were eventually filed with both the
quarterly and annual reports, as well as auditing and certifying
the [false] reports that [the company] filed"); Thielbar, 2007 WL
2903948, at *10 (denying motion to dismiss section 13(b)(2)
aiding and abetting claim when complaint "contain[ed] several

allegations regarding [defendant]'s conduct in falsifying the books and records of NCS . . . and in circumventing or failing to implement internal accounting controls"); Baxter, 2007 WL 2013958, at *9  (denying motion to dismiss section 13(b) aiding and abetting claim when plaintiff alleged that defendant "participated in drafting . . . false and misleading disclosures, . . . reviewed the financial statements, directed the reclassification of unsubstantiated balances to conceal such balances from the auditors, and signed the management representation letters"); SEC v. Hopper, No. Civ.A. H-04-1054, 2006 WL 778640, at *15-16 (S.D. Tex. Mar. 24, 2006) (denying motion to dismiss section 13(b) aiding and abetting claim when plaintiff alleged that one defendant orchestrated and directed "round-trip" trading scheme without notifying accountants, legal staff, or external auditors and was provided financial statements reflecting fictitious revenues generated by that scheme, and alleged that second defendant was chief accounting officer who continued to report trades in corporate books and records on a gross bases, after being instructed to report them on a net basis); Yuen, 2006 WL 1390828, at *42 ("By directing the shifting of revenue from the print and channel advertisements to the IPG platform, Yuen caused Gemstar to create false and misleading books and records to support this improper revenue recognition practice.  Yuen substantially assisted in Gemstar's record-

44

keeping violation, and Rule 13b2–1, by directing the improper recognition of IPG licensing revenue and approving the shifting of revenues on Gemstar's books from one advertising platform to another, in order to recognize IPG advertising revenue.").

Because the SEC's allegations against Kirkpatrick state a claim under Exchange Act section 13(b)(2)(A), his motion to dismiss is denied as to Count VII.

### Count VIII

In Count VIII, the SEC claims that defendants aided and abetted Enterasys in violating Exchange Act section 13(b)(2)(B), which requires any company that issues securities to "devise and maintain a system of internal accounting controls" that meets certain specified standards.  See 15 U.S.C. § 78m(b)(2); see also SEC v. Dauplaise, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, at *9 (M.D. Fla. Feb. 22, 2006) (footnote omitted) (describing the characteristics of a system of internal accounting controls). Kirkpatrick moves to dismiss Count VIII, arguing that the SEC's complaint does not satisfy Rule 9(b).

While the SEC objects to dismissal of Count VIII, it does not point to any factual allegations in the complaint concerning Enterasys's system of internal accounting controls, and it does

45

not point to any factual allegations concerning Kirkpatrick's role in establishing or administering any such system of accounting controls.  The pleadings in this case have much in common with those found deficient in Dauplaise:

> The SEC alleges that Bio One failed to devise or maintain the required system of internal accounting controls, and that Shinder aided and abetted that violation.  There are no allegations linking Shinder to this violation.  Indeed, Shinder is not even mentioned in the background section of the Complaint specifically addressing this violation.  Therefore the SEC has failed to state a claim against Shinder for a violation of Section 13(b)(2)(B).

2006 WL 449175, at *9.  Here, the complaint does not even have a background section devoted to the SEC's section 13(b)(2)(B) claim.  In any event, the SEC has failed to adequately allege either a primary violation of section 13(b)(2)(B) by Enterasys or conduct by Kirkpatrick that could be found to be a proximate cause of any such violation.  Accordingly, Kirkpatrick is entitled to dismissal of Count VIII.  Compare SEC v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326, 337 (S.D.N.Y. 2006) (granting summary judgment to defendant on section 13(b)(2)(B) aider and abettor claim when plaintiff produced no evidence that defendant "was responsible for . . . maintaining adequate controls, or that he aided or abetted any violation with respect to [that] requirement[ ]") and Marsden v. Select Med. Corp., No. Civ.A. 04-4020, 2006 WL 891445, at *15 (E.D. Pa. Apr.

6, 2006) (granting motion to dismiss section 13(b)(2)(B) claim because "[p]laintiffs fail[ed] to connect the litany of alleged wrongdoings to any control or type of control that, if properly established, would have prevented the same"), vacated in part on other grounds, 2007 WL 518556 (E.D. Pa. Feb. 12, 2007); with Thielbar, 2007 WL 2903948, at *10 (denying motion to dismiss section 13(b)(2)(B) aider and abettor claim when complaint "contained several allegations regarding [defendant]'s conduct in . . . circumventing or failing to implement internal accounting controls") and SEC v. Intelliquis Int'l, Inc., No. 2:02-CV-764 PGC, 2003 WL 23356426, at *13 (granting summary judgment to SEC on section 13(b)(2)(B) aider and abettor claim where complaint adequately alleged primary violation, alleged that one defendant permitted company to record certain transactions as sales while knowing that they did not qualify as such, and alleged that second defendant, retained to audit financial statements, "essentially abandoned all responsibility for this job").

## Conclusion

For the reasons given, Kirkpatrick's motion to dismiss (document no. 73) is granted in part and denied in part. Specifically, the motion is denied as to Counts V and VII, but granted as to Counts I, II, III, IV, VI, and VIII. Dismissal of those six counts is without prejudice. See Daou Sys., 411 F.3d

47

at 369 (explaining that when a claim is dismissed for failing to satisfy Rule 9(b), the court "should ordinarily accept a proffered amendment that either pleads with the requisite particularity or drops the defective allegations and still states a claim").

       **SO ORDERED.**

                              _____
                              Steven J. McAuliffe
                              Chief Judge

March 24, 2008

cc:  James A. Scoggins, II, Esq.
     Jeffrey S. Lyons, Esq.
     Leslie J. Hughes, Esq.
     Nancy J. Gegenheimer, Esq.
     Diana K. Lloyd, Esq.
     John R. Baraniak, Jr., Esq.
     Lucy J. Karl, Esq.
     Peter B. Moores, Esq.
     Steven M. Gordon, Esq.
     Jeffrey B. Rudman, Esq.
     Jonathan A. Shapiro, Esq.
     Miranda Hooker, Esq.
     Peter A. Spaeth, Esq.
     Bruce A. Singal, Esq.
     John C. Kissinger, Esq.
     Michelle R. Peirce, Esq.
     Mark B. Dubnoff, Esq.
     Richard J. McCarthy, Esq.
     Michael D. Ramsdell, Esq.
     Jennifer M. Ryan, Esq.
     Maria R. Durant, Esq.
     William H. Kettlewell, Esq.
     Kevin E. Sharkey, Esq.
     Ann Pauly, Esq.
     Victor W. Dahar, Esq.

Andrew Good, Esq.
Philip G. Cormier, Esq.
Peter D. Anderson, Esq.
William Cintolo, Esq.