UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Securities and Exchange
Commission,
        Plaintiff

        v.                                  Civil No. 07-cv-39-SM
                                            Opinion No. 2008 DNH 055
Piyush G. Patel; David J.
Kirkpatrick; Eric Jaeger;
Bruce D. Kay; Robert J. Gagalis;
Robert G. Barber, Jr.; Lawrence
Collins; Michael A. Skubisz;
Jerry A. Shanahan; and Hor Chong
(David) Boey,
        Defendants


## O R D E R


The Securities and Exchange Commission ("SEC") has sued in eight counts, seeking injunctive relief under 15 U.S.C. § 77t(b) and 15 U.S.C. §§ 78u(d) & (e) for various alleged violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and certain rules promulgated thereunder.  Before the court is Piyush Patel's motion to dismiss.  The SEC objects.  For the reasons given, Patel's motion is granted in part.


## The Legal Standard

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the

court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under Rule 12(b)(6), the court "must assume the truth of all well-plead facts and give the plaintiff[s] the benefit of all reasonable inferences therefrom."  Alvarado Aguilera v. Negrón, 509 F.3d 50, 52 (1st Cir. 2007) (quoting Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007)).  However, the court need not "credit 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.'"  Brown v. Latin Am. Music Co., 498 F.3d 18, 24 (1st Cir. 2007) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)).  "[A] complaint is properly dismissed for failure to state a claim 'only if the facts lend themselves to no viable theories of recovery.'"  Garnier v. Rodríguez, 506 F.3d 22, 26 (1st Cir. 2007) (quoting Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007)).

## Background

The SEC alleges that from March 2000 through December 2001, various employees, officers, and directors of Cabletron Systems, Inc. ("Cabletron") or its former subsidiaries, Enterasys

Networks, Inc. ("Enterasys") and Aprisma Management Technologies, Inc. ("Aprisma") participated in a company-wide scheme to inflate the revenues of Cabletron and Enterasys for the purpose of convincing investors that Enterasys was a viable independent company with consistently strong revenue growth.  Patel served as Cabletron's Chief Executive Officer, President, and Chairman of the Board of Directors from June 1999 until August 2001, and on August 6, 2001, became a consultant to Enterasys and Aprisma.

Turning to the conduct at issue in this case, the SEC alleges that Enterasys improperly recognized revenue, reported that improperly recognized revenue in SEC filings and press releases, and misrepresented material information concerning improper revenue recognition to outside auditors, or concealed such information from them.  According to the SEC, Enterasys improperly recognized at least $48 million in revenue, thus allowing it to overstate earnings, understate operating losses, and successfully launch itself as an independent public company on August 6, 2001.

The SEC alleges that improperly recognized revenue was generated by several kinds of transactions: (1) contingent sales (detailed in undisclosed side agreements with purchasers) that allowed, for example, full return, exchange, or cancellation

rights; (2) investments in privately held companies that agreed to use their investment proceeds to purchase Enterasys and Aprisma products; and (3) so-called "three-corner deals" that involved placing another company between Enterasys and an investee company, to disguise purchases of Enterasys products made with funds invested by Enterasys in the purchaser company. The complaint discusses in greater detail twelve separate contingent sales transactions or investment deals (Compl. ¶¶ 63–137) and mentions in lesser detail seventeen additional sales transactions (¶¶ 138–55) for which the SEC claims that Enterasys recognized revenue that was not subject to recognition under GAAP.

Patel is mentioned by name in the factual allegations concerning: (1) an investment/purchase deal with Cellit, Inc. that resulted in the improper recognition of $1,005,000 in revenue that was reported in the SEC Form 10-Q Enterasys filed for the first quarter of Transition Year 2001 (Compl. ¶¶ 69–73); and (2) improper recognition of $701,000 in revenue from sales to TrustWave Corp. during the fourth quarter of Fiscal Year 2001 and the first three quarters of Transition Year 2001 (¶ 145).

Regarding the Cellit transaction, the complaint alleges that Enterasys, with Eric Jaeger[1] and Patel's knowledge, entered into an agreement with Cellit under which Enterasys invested in Cellit and Cellit agreed, among other things, to purchase product from Aprisma.  (Compl. ¶ 69.)  The complaint further alleges that Jaeger and Patel knew that: (1) Enterasys did not need Cellit product (¶ 70); (2) Cellit did not need Aprisma product (id.); (3) the transaction lacked economic substance (¶ 71); (4) Enterasys entered into the agreement only as a way of recognizing revenue (id.); and (5) the transaction was not completed until the quarter after Enterasys recognized revenue from it and reported that revenue in an SEC Form 10-Q (¶ 72).

Regarding the TrustWave transaction, the complaint alleges that

> [a]t the time Enterasys recognized revenue from sales to TrustWave, Jaeger and Patel knew that TrustWave did not need Aprisma product and was only purchasing product to enable Aprisma to meet its quarterly revenue goals [and that] the valuation for Enterasys's reciprocal investment in TrustWave lacked substance and was based on the amount of product TrustWave was willing to purchase from Aprisma.

---

[1] Jaeger served as Cabletron's Executive Vice President of Corporate Affairs from July 1999 through August 2001 and as a consultant to Enterasys and Aprisma from August 2001 through September 2002.  Before becoming Cabletron's Executive Vice President, he served as the company's General Counsel.

(Compl. ¶ 145.)  The SEC further alleges that Jaeger and Patel knew "that it was improper to recognize revenue for sales to TrustWave."  (Id.)

The complaint further alleges that: (1) by the first quarter of Transition Year 2001, Patel, David Kirkpatrick,[2] and others, knowing that the company's "outside auditor had identified an investee company's independent ability to pay for product as an important prerequisite to recognizing revenue for an investment . . . developed and carried out a scheme to structure investment transactions so as to conceal investment related revenue from the company's outside auditor" (Compl. ¶ 156); (2) in March 2001, Patel, Kirkpatrick, and Robert Barber[3] first presented to Enterasys's investment team[4] "an investment structure in which

---

[2] Kirkpatrick served as Cabletron's Chief Financial Officer from August 1990 to August 2001, as Cabletron's Chief Operating Officer from October 2000 to August 2001, and as Aprisma's Chief Operating Officer from August 2001 until March 2002, as a member of Aprisma's Board of Directors from August 2001 until March 2002, and as Chairman of the Board from January 2002 until March 2002.

[3] Barber served as Enterasys's Vice President of Corporate Affairs from April 2000 through April 2001, and was responsible for business development at Enterasys from May through August 2001.

[4] The complaint describes the investment team as consisting of Jaeger, Kirkpatrick, Patel, Enrique Fiallo, Barber, Jerry Shanahan, Anthony Hurley, Kay, Robert Gagalis, Gayle Luacaw, and others.

the investee company would purchase Enterasys product from a
distributer or 'channel partner' rather than from Enterasys
directly to conceal from Enterasys's outside auditor the link
between Enterasys's investment and the purchase, for which
Enterasys would record revenue" (¶ 157); (3) during "numerous
. . . weekly conference calls" members of Enterasys's investment
team "openly discussed the purpose of three corner deals: to
conceal from Enterasys's outside auditor the connection between
investments and purchases, given that the poor financial
condition of investee companies could lead the outside auditor to
conclude that the related revenue did not comport with GAAP"
(¶ 158); (4) Patel and Jaeger, after having been briefed on
Enterasys's deficient sales projections and overstuffed sales
channels, directed Robert Gagalis[5] and Enrique Fiallo[6] to find
more investments and force more products into the channel by the
end of the quarter (¶ 161); and (5) Patel, along with Jaeger,
Barber, Jerry Shanahan,[7] Bruce Kay,[8] Robert Gagalis, and others

---

[5] Gagalis served as Enterasys's Executive Vice President,
Chief Financial Officer, and Treasurer from July 2001 through
October 2002.

[6] Fiallo served as Cabletron's Executive Vice President and
Chief Information Officer from November 1998 to February 2000, as
Enterasys's President from February 2000 to August 2001, and as
Enterasys's President, Chairman, and Chief Executive Officer from
August 2001 until April 2002.

[7] Shanahan served as Cabletron's Vice President of
International Operations from February to September 2000, as

"worked together to close more than $20 million in investment-related sales during the final week of the [second] quarter [of Transition Year 2001], many of which were structured as three corner deals to conceal the precarious financial condition of the investee company from Enterasys's outside auditor" (¶ 162).

The SEC asserts that any public statement of earnings that included improperly recognized revenue was materially false and that Enterasys made such statements in: one SEC 10-K form, six SEC 10-Q forms, three SEC 8-K forms, fourteen representation letters, and seven press releases. (Compl. ¶ 36.) The complaint then specifies the amount of overstated revenue and understated losses reported in each of the identified SEC filings (¶¶ 37-53), and provides similar specifications for the press releases (¶¶ 171-87). The SEC alleges that Patel and Kirkpatrick signed and caused Enterasys to file four 10-Q forms, one 10-K form, and one S-8 form (¶ 53), and that Patel, along with Kirkpatrick and Jaeger, "participated in the drafting of [quarterly] earnings [press] releases" (¶ 172). In addition, the complaint identifies

Cabletron's Executive Vice President of Operations and Quality from September 2000 to March 2001, and as Enterasys's Chief Operating Officer from March 2001 until May 2002.

    [8] Kay served as Cabletron's Controller from February 1999 to June 2000, as Enterasys's Chief Financial Officer from June 2000 until July 2001, and as Enterasys's Senior Vice President of Finance from July until October 2001.

five specific press releases issued by Enterasys and Patel that contained statements attributed either to Patel directly (¶ 173), or to Enterasys and Patel collectively (¶¶ 175, 177, 180, 182).

### Discussion

Patel moves to dismiss, arguing that the complaint does not: (1) allege particularized facts linking him to any of the transactions discussed in the complaint other than those with Cellit and TrustWave; (2) allege specific facts giving rise to a strong inference that he acted with scienter with regard to the Cellit and TrustWave transactions; or (3) connect him with any fraudulent conduct in connection with the three-corner transactions. He also argues that the SEC's claims regarding statements made in SEC filings and press releases do not survive Rule 9(b) and that because the entire complaint sounds in fraud, it must be dismissed in its entirety because it fails to allege facts giving rise to a strong inference that he acted with scienter.[9] Because the SEC's objection to Patel's motion to dismiss also serves as an objection to motions filed by Jaeger and Kirkpatrick, it does not precisely track any of the three motions to which it objects. Suffice it to say that the SEC categorically opposes the motion to dismiss. The court begins by

---

[9] He also makes several more specific arguments that will be taken up in due course.

9

setting out the pleading standard, continues with a discussion of scienter, and concludes by examining the SEC's complaint on a claim-by-claim basis.

A.  The Pleading Standard

In document no. 130, the order on Lawrence Collins' motion to dismiss, the court determined that the "sounds in fraud" doctrine is the law of this circuit and ruled that the Rule 9(b) pleading requirements apply to all of the SEC's claims.  That ruling applies with equal force to Patel's motion to dismiss, and the SEC's arguments to the contrary are rejected for the reasons given in document no. 130.

The version of Rule 9(b) in effect when the SEC filed its complaint provided that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  FED. R. CIV. P. 9(b).[10]  The rule further provided that "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally."  Id. "In applying [the Rule 9(b)] standard to securities fraud actions, this circuit has been notably strict and rigorous."  SEC

---

[10] Rule 9(b) was amended effective December 1, 2007, but the Advisory Committee Notes to the Federal Rules explain that the 2007 amendment was "intended to be stylistic only."

v. Durgarian, 477 F. Supp. 2d 342, 348 (D. Mass. 2007) (citing
Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir.
1999)).

The particularity "requirement 'entails specifying in the
pleader's complaint the time, place, and content of the alleged
false or fraudulent representations.'" Arruda v. Sears, Roebuck
& Co., 310 F.3d 13, 19 (1st Cir. 2002) (quoting Powers v. Boston
Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)); see also In re
StockerYale Sec. Litig., 453 F. Supp. 2d 345, 350 (D.N.H. 2006)
("The rule requires that the particular times, dates, places, or
other details of the alleged fraudulent involvement of the actors
be alleged.").  In addition, "general averments of the
defendants' knowledge of material falsity will not suffice."
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st
Cir. 1994) (citing Greenstone v. Cambex Corp., 975 F.2d 22, 25
(1st Cir. 1992)), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.
Rather, "[c]onsistent with Fed. R. Civ. P. 9(b), the complaint
must set forth specific facts that make it reasonable to believe
that defendant[s] knew that a statement was materially false or
misleading." Serabian, 24 F.3d at 361 (citation and internal
quotation marks omitted).  Allegations of fraud must be organized
"into discrete units that are, standing alone, each capable of

evaluation." StockerYale, 453 F. Supp. 2d at 350 (quoting In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 55–56 (D. Mass. 1998)).  And, "where . . . 'multiple defendants are involved, each defendant's role in the fraud must be particularized.'" Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802 F. Supp. 595, 600 (D.N.H. 1992) (quoting Shields v. Amoskeag Bank Shares, Inc., 766 F. Supp. 32, 40 (D.N.H. 1991)).

"In a case where fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." Sparling v. Daou (In re Daou Sys., Inc., Sec. Litig.), 411 F.3d 1006, 1027 (9th Cir. 2005) (citing Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003)).  "Allegations of non–fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." Daou Sys., 411 F.3d at 1027 (citation omitted).  "Thus, if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments or 'strip' them from the claim.  The court should then examine the allegations that remain to determine whether they state a claim." Id. at 1028 (citation omitted).

> Rule 9(b) may prove fatal to 1933 Securities Act claims
> grounded in fraud when the complaint makes a wholesale
> adoption of the securities fraud allegations for

12

purposes of the Securities Act claims.  In such cases,

> a district court is not required to sift through
> allegations of fraud in search of some lesser
> included claim of strict liability.  It may
> dismiss.  If it does so, it should ordinarily
> accept a proffered amendment that either pleads
> with the requisite particularity or drops the
> defective allegations and still states a claim.

Id. (internal punctuation and citations omitted).


B.  Scienter

Because Patel's motion to dismiss substantially relies upon
the argument that the SEC has failed to allege sufficient facts
to give rise to a strong inference that he acted with scienter,
it is necessary to first establish the correct standard for
pleading scienter in an enforcement action brought by the SEC.


Patel argues that the strong-inference-of-scienter standard
applies not just to claims subject to the Private Securities
Litigation Reform Act ("PSLRA"), but also to SEC enforcement
actions.  He begins by citing two court of appeals decisions in
private securities fraud actions that describe that standard,
Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc.,
Securities Litigation, 414 F.3d 187, 204 (1st Cir. 2005) and
Serabian, 24 F.3d at 361.  He then cites three cases from the
District of Massachusetts for the proposition that the strong-

inference standard also applies to SEC enforcement actions, Durgarian, 477 F. Supp. 2d at 353 (citation omitted), SEC v. Tambone (Tambone I), 417 F. Supp. 2d 127, 130–31 (D. Mass. 2006), and SEC v. Druffner, 353 F. Supp. 2d 141, 149–50 (D. Mass. 2005). In addition to relying upon Durgarian, Tambone I, and Druffner, Patel points out, correctly, that the court of appeals for this circuit has held that "[t]he PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit," Greebel, 194 F.3d at 193, and that its "strict pleading requirements under Rule 9(b) are . . . consistent with the PSLRA," id. at 194 (citing Maldonado v. Dominguez, 137 F.3d 1, 10 n.6 (1st Cir. 1998)).

    For its part, the SEC points to cases from across the country that stand for the proposition that the "strong-inference" standard applies only to private securities actions. See, e.g., SEC v. Sandifur, No. C05–1631C, 2006 WL 538210, at *7 (W.D. Wash. March 2, 2006) ("The SEC is correct that the more stringent pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ('PSLRA') do not apply to enforcement actions brought by the Commission.  Thus, to satisfy Fed. R. Civ. P. 9(b), the SEC need only state that scienter existed.") (citation omitted); SEC v. Lucent Techs., Inc., 363 F. Supp. 2d 708, 717 (D.N.J. 2005) ("The parties appear

14

to agree . . . and the case law supports the conclusion, that the heightened requirements for pleading scienter under the PSLRA do not apply to actions brought by the SEC.") (citing <u>SEC v. Prater</u>, 296 F. Supp. 2d 210, 215 (D. Conn. 2003) ("Since actions brought by the SEC are not considered 'private litigation,' the standard imposed in the PSLRA for pleading scienter does not apply to the SEC."); <u>SEC v. ICN Pharm., Inc.</u>, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) ("[T]he 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC."); <u>SEC v. Blackman</u>, No. 3:99-1072, 2000 WL 868770, at *5 (M.D. Tenn. May 26, 2000) (agreeing with the SEC that the pleading requirement of the PSLRA does not apply to the SEC)); <u>SEC v. Guenthner</u>, 212 F.R.D. 531, 532 n.1 (D. Neb. 2003) ("the court notes that this is an SEC enforcement proceeding, not a private securities action and thus it is not subject to the heightened pleading standards of the . . . PSLRA") (citing <u>Marksman Partners, L.P. v. Chantal Pharm. Corp.</u>, 927 F. Supp. 1297, 1308 (C.D. Cal. 1996); <u>In re Credit Acceptance Corp. Sec. Litig.</u>, 50 F. Supp. 2d 662, 675 (E.D. Mich. 1999) (finding that the PSLRA "only applies to private securities fraud actions," such as a plaintiff class action suit)).

The SEC has the better argument.  While obviously not binding on this court, the authority cited by the SEC from other jurisdictions is persuasive.  Turning to the authority that is binding on this court, i.e., decisions from the court of appeals for this circuit, there is no authority for the proposition that the strong-inference standard applies to SEC enforcement actions. To be sure, the court of appeals has held that its pre-PSLRA interpretation of Rule 9(b) is consistent with the standards established by the PSLRA, see Greebel, 194 F.3d at 193–94, but the explanation of that holding in Greebel discusses only the Rule 9(b) requirement that a plaintiff must state with particularity "the circumstances constituting fraud or mistake." Greebel says nothing about the second sentence in Rule 9(b), which allows "[m]alice, intent, knowledge, and other condition of mind of a person [to] be averred generally."  Stone & Webster, like Greebel, draws a parallel between the PSLRA's "clarity-and-basis" requirement,[11] and the "pre-existing Rule 9(b) pleading standards in this Circuit," 414 F.3d at 195 (citing Greebel, 194 F.3d at 193), but draws no such parallel between the PSLRA's strong-inference requirement and the circuit's pre-PSLRA construction of the second sentence of Rule 9(b).  In short, there is no basis in either Greebel or Stone & Webster for

---

[11] 15 U.S.C. § 78u-4(b)(1).

arguing that the court of appeals has ever construed Rule 9(b) to require securities fraud plaintiffs of any kind to plead facts giving rise to a strong inference of scienter.

As noted, Patel relies on <u>Durgarian</u>, <u>Tambone I</u>, and <u>Druffner</u> as district court cases from this circuit in which the strong-inference standard has been applied in enforcement actions brought by the SEC.[12]  Those opinions cannot support the weight Patel places on them.  The court in <u>Tambone I</u> rejected the SEC's argument that it should relax the Rule 9(b) particularity requirement, 417 F. Supp. 2d at 131, but said nothing about the pleading standard for scienter.  Moreover, while both <u>Durgarian</u> and <u>Druffner</u> appear to have applied the strong-inference standard in SEC enforcement actions, <u>see</u> <u>Durgarian</u>, 477 F. Supp. 2d at 353; <u>Druffner</u>, 353 F. Supp. 2d at 149-50, it does not appear that in either case the question of the pleading standard for scienter was actually contested.  Of course, it is difficult to know for certain, but neither decision distinguished or even cited the rather large number of cases holding that the strong-inference standard does not apply to SEC enforcement actions, which suggests that the issue was not presented to the court.  Thus,

---

[12] It is perhaps worth noting that Patel has identified no pre-PSLRA district court case from this circuit that imposed a heightened pleading standard on averments of scienter made by either private securities fraud plaintiffs or the SEC.

<u>Durgarian</u> and <u>Druffner</u> are not persuasive regarding the applicable pleading standard for scienter in SEC enforcement actions.

In light of the substantial body of persuasive authority supporting the proposition that the strong-inference standard is specific to the PSLRA and does not apply to SEC enforcement actions, and in the absence of an opinion from the court of appeals for this circuit holding to the contrary, this court is satisfied that the strong-inference standard does not apply to SEC enforcement actions. The SEC is entitled, under Rule 9(b), to aver scienter generally. Accordingly, Patel's reliance upon the strong-inference standard is misplaced, and any arguments based upon that standard are necessarily rejected.

C.  <u>The SEC's Claims</u>

As noted above, Patel attacks the SEC's complaint on a variety of grounds, some applicable to individual claims, others applicable to multiple claims or the complaint as a whole. The SEC's fifty-page objection is equally complex. For the sake of clarity, the court will consider Patel's motion to dismiss on a claim-by-claim basis.

18

Counts I & III

In Count I, the SEC claims that all defendants violated Securities Act section 17(a)(1), while in Count III, the SEC claims that all defendants violated Exchange Act section 10(b) and Exchange Act Rule 10b-5, either as primary violators or as aiders and abettors.  The claims themselves do not specify the conduct upon which they are based.  Rather, they incorporate, by reference, all 187 paragraphs of factual allegations in the complaint.  The complaint, in turn, discusses two categories of statements: those contained in SEC filings and those made in press releases announcing earnings.  According to the SEC, both the SEC filings and the press releases contained untrue statements of material fact because the financial results they reported included revenue from contingent sales and investment-related purchases, _i.e._, revenue that was not subject to recognition under Generally Accepted Accounting Principles ("GAAP").

Because "[t]he elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents," Tambone I, 417 F. Supp. 2d at 131 (citing Aaron, 446 U.S. at 695;

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 (1976)), the court
will consider Counts I and III in a single discussion.[13]

It appears that Patel is arguing that Counts I and III
should be dismissed because the complaint fails to specifically
allege facts that could support a strong inference that he acted
with scienter.  That argument is unavailing, for the reasons
outlined above.  He also argues that Counts I and III should be
dismissed because: (1) he is alleged to have had knowledge of
only two transactions, those with Cellit and TrustWave; and (2)
the amount of revenue involved in those two transactions was
sufficiently small, in light of Enterasys's overall revenue, to
make any misstatement related to those transactions immaterial as
a matter of law.  The SEC counters that under the correct legal
standard, it has adequately alleged the materiality of Patel's
alleged false statements.

Securities Act section 17(a) provides that "[i]t shall be
unlawful for any person in the offer or sale of any securities
. . . by the use of any means or instruments of transportation or

---

[13] Patel takes much the same tack in his motion to dismiss.
He frames a single set of arguments that cover Counts I and III,
because Securities Act section 17(a)(1), Exchange Act section
10(b), and Rule 10b-5 share the same elements, and that also
cover the remainder of the claims in the complaint, because those
claims all sound in fraud.

communication in interstate commerce or by use of the mails, directly or indirectly . . . to employ any device, scheme or artifice to defraud."  15 U.S.C. § 77q(a)(1).  Exchange Act section 10(b) provides that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national security exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . .

15 U.S.C. § 78j(b).  Exchange Act Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

21

To succeed on the claims asserted in Counts I and III, "the SEC must show that 1) defendants engaged in fraudulent conduct, 2) in connection with the purchase or sale of securities, 3) through the means or instruments of transportation or communication in interstate commerce or the mails and 4) with the requisite scienter." Tambone I, 417 F. Supp. 2d at 131 (citing SEC v. Graystone Nash, Inc., 820 F. Supp. 863, 870-71 (D.N.J. 1993)).  While it is less than clear, given the manner in which the SEC has framed its claims, it appears that the fraudulent conduct on which Counts I and III are based consists of allegedly untrue statements of material fact made in various SEC filings and press releases.

For an untrue statement of fact to be actionable under Securities Act section 17(a) and Exchange Act 10(b), it must be material.  Tambone I, 417 F. Supp. 2d at 131.  "The boundaries of materiality in the securities context are clearly enunciated in [the] case law [of the First Circuit]." Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994). Specifically,

> [t]he mere fact that an investor might find information
> interesting or desirable is not sufficient to satisfy
> the materiality requirement.  Rather, information is
> "material" only if its disclosure would alter the
> "total mix" of facts available to the investor and "if
> there is a substantial likelihood that a reasonable

22

shareholder would consider it important" to the
investment decision.

Id. (quoting Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir.

1992)).[14]


"Materiality is usually a matter for the trier of fact."

ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 65 (1st Cir.

2007) (citation omitted).  "A court is thus free to find, as a

matter of law, that a statement was not false, or not materially

false, only if a jury could not reasonably find falsity or

materiality on the evidence presented."  Stone & Webster, 414

F.3d at 209 (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S.

438, 450 (1976)).  As the court of appeals for the Eighth Circuit

has explained, "a complaint that alleges only immaterial

misrepresentations presents an 'insuperable bar to relief,' and

dismissal of such a complaint is proper."  Parnes v. Gateway

2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quoting Fusco v.

Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982)).

---

[14] While Lucia was a case brought under Sections 11 and
12(2) of the Securities Act, "[t]he same standard of materiality
. . . applies to claims under Section 10(b) and Rule 10b-5 as to
claims under Sections 11 and 12(b) of the Securities Act."  Shaw
v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)
(citation omitted), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.

The untrue statements of material fact alleged by the SEC in this action consist of overstatements of Enterasys's revenues and earnings, and understatements of the company's losses, contained in nine SEC filings and seven press releases.  Both parties appear to agree that the "specific facts that make it reasonable to believe that [Patel] knew that [those] statement[s] [were] materially false or misleading," <u>Serabian</u>, 24 F.3d at 361, are the facts related to his participation in, or knowledge of, improper recognition of the revenue generated by the Cellit and TrustWave transactions.  According to the complaint, that revenue was directly reported on SEC forms signed by Patel and filed on June 4 and July 10, 2001, and on SEC forms signed by Fiallo and Gagalis and filed on October 16 and November 14, 2001.[15]  (Compl. ¶¶ 43, 46, 48, and 51).  The complaint further alleges that information from the forms listed above was incorporated into four other SEC filings.  (¶ 53.)  Of the seven press releases mentioned in the complaint, four reported on the SEC filings noted above.  (¶¶ 180, 182, 184, 186.)  As previously stated, the

---

[15] Given that Patel is not alleged to have signed or to have caused Enterasys to file the October 16 and November 14 SEC reports, it is not at all clear that the representations contained therein may be attributed to him, but that is an issue the court need not address, given the immateriality of any overstatement resulting from inclusion of revenue from the TrustWave transaction, as explained below.

SEC has identified allegedly false statements attributable to
Patel on both SEC forms and press releases.

The most substantial misrepresentation attributed to Patel
in an SEC filing is the reporting of Enterasys's performance for
the quarter that ended June 2, 2001.  According to the complaint:
(1) the SEC Form 10-Q signed by Patel reported net revenue of
$306,898,000 (Compl. ¶ 46); (2) revenue was overstated by
$10,869,000 (¶ 47); and (3) the two transactions Patel is alleged
to have known about, those with Cellit and TrustWave, accounted
for $1,543,000 of inappropriately recognized revenue (id.).  In
other words, the improperly recognized revenue directly tied to
Patel through either participation or knowledge was less than
0.51 percent of the revenue Enterasys reported that quarter.[16]
The complaint further alleges that the "overstatement [of
revenue] caused the loss from operations to be understated by

_____

[16] In the three other quarters at issue, improperly
recognized revenue directly tied to Patel accounts for an even
smaller percentage of the total revenue reported.  According to
the complaint: the March 2001 Form 10-K reported net revenue for
the preceding quarter of $286,016,000 (Compl. ¶ 44), $43,000 of
which (approximately 0.02 percent) is alleged to have come from
the TrustWave transaction (¶ 45); the September 2001 Form 10-Q
reported net revenue of $240,181,000 (¶ 48), $60,000 of which
(approximately 0.02 percent) is alleged to have come from the
TrustWave transaction (¶ 49); and the September 29, 2001, Form
10-Q reported net revenue of $105,535,000 (¶ 51), $60,000 of
which (approximately 0.06 percent) is alleged to have come from
the TrustWave transaction (¶ 52).

approximately $6,000,000 and the net loss to shareholders to be understated by approximately $3,000,000."  (Id.)

Patel asks the court to determine that even if he is liable for misrepresenting revenue in SEC filings, the amount of overstated revenue for which he can be held liable is so small as to render his false statements immaterial, as a matter of law. The SEC counters that Patel's argument fails to acknowledge the qualitative materiality of the alleged misrepresentations, and notes that profit statements and earnings reports are of particular interest to investors.

"[A]lthough overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." Daou Sys., 411 F.3d at 1018.  Here, the SEC has shown with particularity how Patel's alleged false statements affected Enterasys's financial statements.  Thus, the question is whether those effects were material, based upon the company's overall financial position.

"Minor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities

law." <u>In re Segue Software, Inc. Sec. Litig.</u>, 106 F. Supp. 2d
161, 170 (D. Mass. 2000) (citing <u>Greebel</u>, 194 F.3d at 206;
<u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 633 (1st Cir.
1996); <u>Chalverus v. Pegasystems, Inc.</u>, 59 F. Supp. 2d 226, 234
(D. Mass. 1999)).  In <u>Segue Software</u>, the trial court ruled that
"[a]s in <u>Greebel</u>, the overstatement of Segue's revenues was
insignificant ($1.1 million or 2.6% of Segue's $41 million in
sales in 1998) and nonsystemic (involving only ten sales out of
hundreds consummated during the two final quarters of 1998)."
106 F. Supp. 2d at 171.  Similarly, courts have determined the
following misrepresentations to be immaterial, as a matter of
law: (1) a 0.3 percent ($217 million) overstatement of revenues
over a two-year period, <u>see</u> <u>In re Duke Energy Corp. Sec. Litig.</u>,
282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003); (2) a 0.2 percent
understatement of a company's costs of goods sold, <u>see</u> <u>In re
Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426-27 (3d
Cir. 1997); (3) an overstatement of a company's loan-loss
reserves where "[t]he charge that would have followed the write-
down of this asset would have amounted to merely 0.54% of [the
company]'s net income of $234 million for that quarter," <u>In re
Westinghouse Sec. Litig.</u>, 90 F.3d 696, 715 (3d Cir. 1996); (4) a
two percent ($6.8 million) overstatement of a company's assets,
<u>see</u> <u>Parnes</u>, 122 F.3d at 547; and (5) a $2 million understatement
of a company's outstanding loans and a $2 million overstatement

27

its derivative receivables, where the amount involved was about 0.3 percent of the company's total assets), <u>see</u> <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 630–31 (S.D.N.Y. 2005).[17]

Given that persuasive authority, the court has little difficulty concluding that the false statements in SEC filings for which Patel could be held liable fail to meet the materiality requirement, as a matter of law.  None of Patel's allegedly false statements related to more than one percent of Enterasys's quarterly revenue, and three of the four relates to less than one tenth of one percent of quarterly revenue.

While statements concerning revenue undoubtedly qualify as qualitatively material, <u>cf.</u> <u>Burlington</u>, 114 F.3d at 1420 n.9

---

[17] In an opinion that not directly on point, the court of appeals for this circuit held that scienter was not demonstrated by the issuance of a revenue report that incorporated between $416,000 and $1.55 million in improperly recognized revenue, when overall revenue for the quarter in question was $37.5 million. <u>See</u> <u>Greebel</u>, 194 F. 3d at 206.  In contrast, in <u>Chalverus</u>, the trial court held that the PSLRA's strong-inference-of-scienter requirement was met by a combination of several factors, including the following:

> Pegasystems restated its second quarter revenue from $12,200,000 to $4,700,000 and restated its earnings from a <u>gain</u> of $2.2 million to a <u>loss</u> of $2.8 million.  The total amount by which Pegasystems restated its revenue – $7,485,000 – equals 158 percent of its actual revenue for that quarter.

59 F. Supp. 2d at 234 (citation to the record omitted).

("earnings reports are among the pieces of data that investors
find most relevant to their investment decisions"), the concept
of qualitative materiality has its limits:

> The district court recognized that the adequacy of
> loan loss reserves is generally the type of information
> that would significantly influence a reasonable
> investor.  Westinghouse I, 832 F. Supp. [948,] 972
> [(W.D. Pa. 1993)] (citing [Shapiro v.] UJB [Fin.
> Corp.], 964 F.2d [272,] 281 [(3d Cir. 1992)]).
> However, the court also tested plaintiffs' complaint to
> determine whether the allegations regarding loan loss
> reserves were quantitatively material in this
> particular case.  The district court stated that "[t]he
> failure to disclose that a loan portfolio is likely to
> be impaired by some de minimis amount may be 'relevant'
> in that it is the type of information that investors
> care about, but of such 'dubious significance' as to be
> 'trivial,' and 'hardly conducive to informed
> decisionmaking,' so that to reasonable shareholders,
> such omission must be immaterial as a matter of law."
> Id. at 972 (quoting TSC Industries, 426 U.S. at 448-
> 49).  We agree.  See generally Loss & Seligman,
> Fundamentals of Securities Regulation 137-41, 479-80
> (1995) (quantitative materiality analysis is generally
> appropriate, though not when "such matters as a
> conflict of interest or criminal violations are at
> issue"); see also Ferber v. Travelers Corp., 802 F.
> Supp. 698, 708 (D. Conn. 1992) (omission of extent of
> second mortgages not material in relation to overall
> real estate, investment, and asset portfolios); In re
> First Chicago Corp. Securities Litigation, 769 F. Supp.
> 1444, 1454 (N.D. Ill. 1991) (total value of alleged bad
> loan immaterial in relation to size of defendant's real
> estate loan portfolio).

Westinghouse, 90 F.3d at 714 (parallel citation omitted).  The
court elaborated its reasoning in a footnote that is particularly
relevant:

> We thus reject plaintiffs' argument that all
> misstatements regarding loan loss reserves and
> nonearning receivables are inherently material.  But we
> also reject defendants' similarly categorical assertion
> that materiality must be quantified at a specified
> percentage of income or assets.  Although "a 'rule of
> thumb' of 5-10 percent of net income is widely used as
> a general materiality criterion" in the accounting
> profession, <u>see</u> Financial Accounting Standards Board,
> <u>Accounting Standards</u>: Statements of Financial
> Accounting Concepts No. 2, App. C, ¶ 167, at 81 (1989)
> (citing James W. Pattillo, <u>The Concept of Materiality
> in Financial Reporting</u> (1976)), the question of
> materiality must be considered on a case-by-case basis
> under the standards set forth in <u>T.S.C. Industries</u> and
> our cases.  <u>See also</u> Pattillo, <u>supra</u>, at 12 (advocating
> consideration of various factors in determining
> materiality in the accounting profession and concluding
> that "the single rule-of-thumb materiality criterion of
> 5%-10% of net income or loss should be used – if at
> all, and by itself – with extreme caution").

<u>Id.</u> at 714 n.14.  Based upon the reasoning outlined in

<u>Westinghouse</u>, the SEC's reliance upon the concept of qualitative

materiality is unavailing; the overstatements of revenue in this

case fall far below the "rule-of-thumb" threshold described in

<u>Westinghouse</u>, and the SEC has identified no factors that

compellingly enhance the materiality of the mathematically

negligible overstatements upon which the SEC bases its claims.


   <u>In re Kidder Peabody Securities Litigation</u>, 10 F. Supp. 2d

398 (S.D.N.Y. 1998), upon which the SEC relies, does not support

a contrary result.  In <u>Kidder Peabody</u>, the defendant argued that

"none of the alleged misstatements [could] be considered material

given the amount of the alleged false profits in relation to
[General Electric]'s total earnings." Id. at 409-10.
Specifically, "none of the alleged misstatements, taken
individually, affected GE's profits by more than 2.54%, with most
of the alleged misstatements individually affecting GE's profits
by less than 1%." Id. at 410.  While acknowledging "the appeal
of defendants' statistical approach," id., the court found itself
"hard-pressed to find that misstatements of profits totaling over
$338 million dollars are immaterial as a matter of law," id., and
"decline[d] to adopt a statistical bright line rule to determine
what a reasonable investor would consider significant," id.
(citing Basic Inc. v. Levinson, 485 U.S. 224, 236 n.14 (1988)).
In Kidder Peabody, the false profits were generated by a single
trader at Kidder, then a subsidiary of General Electric.  Id. at
402-05.  To overcome the defendants' statistical approach, "the
plaintiffs . . . put forth several theories for why a reasonable
GE investor would have placed particular emphasis on information
related to Kidder," id., and the court found several of them
persuasive:

>       First, while the false profits may have been minor
> compared to GE's earnings as a whole, they were quite
> significant to Kidder, accounting for 13.5% of Kidder's
> reported profits in 1992 and 45% in 1993.  Kidder's
> profits, in turn, represented a significant portion of
> GE's balance sheet.  Buffeted by the false profits,
> Kidder's total profits accounted for 7% of GE's
> reported earnings in 1993, up from 5% in 1992 and 2% in

1991.  As a result, news about Kidder may have held
special interest to a GE investor.  Put differently,
$338 million of false profits attributed solely to
Kidder might have had greater significance to an
investor than the same $338 million dispersed broadly
throughout GE's balance sheet.

Second, the false profits might have been
especially important to investors due to Kidder's
visible role in GE's business.  Under this theory, the
importance of reports related to Kidder was magnified
because investors had been monitoring Kidder's
performance closely since GE purchased Kidder in 1986.
In support of this theory, plaintiffs note that when GE
announced the purchase of Kidder some analysts believed
that the purchase would have a detrimental impact on
GE's stock.  These analysts felt that GE's inexperience
in the securities brokerage industry, as well as the
volatility of the securities market, made Kidder an
unwise acquisition for GE.  According to plaintiffs'
expert, these analysts' fears were realized when Kidder
reported at least intermittent losses from 1986 to
1991, despite substantial cash infusions from GE.  In
this context, Kidder's reported profits in 1992 and
1993, which included the false profits, took on special
significance to investors and analysts who viewed
Kidder as a turnaround success story.

. . . .

In addition to these theories, the Court notes
that the materiality of the misstatements must be
considered in light of their impact on GE's reputation,
wholly apart from their statistical impact on GE's
reported earnings.  Under plaintiffs' theory, the false
profits enabled GE to tout Kidder's success, thereby
allaying analysts' fears.  That this success, at a
minimum, was inflated likely would have been
significant to a reasonable investor.  Moreover, that a
prominent subsidiary of GE was able to generate false
profits, apparently without GE's knowledge, arguably
raised concerns about GE's internal controls,
efficiency, and integrity, all of which would have been
relevant to a reasonable investor.  See Ross v. Warner,
[No. 77 Civ. 243,] 1980 WL 1474, at *8 [(S.D.N.Y. Dec.
11, 1980)] (discussing materiality of failure to

disclose questionable payments in terms of effect on
public perception of management's integrity).

Id. at 411.  While the SEC cites Kidder Peabody, it makes no
arguments – much less persuasive ones – that the theories adopted
in that case apply in equal measure – or at all – in this case.


   In sum, the court is persuaded that none of the false
statements about revenue attributed to Patel that were made in
SEC filings can meet the materiality requirement.


   With regard to the alleged falsity of the press releases,
the SEC alleges that "[t]he Defendants knew that the revenue they
caused Enterasys to improperly recognize was reported in
quarterly press releases that were distributed to the investing
public" (Compl. ¶ 171), thus indicating that knowledge of
transactions generating revenue inappropriate for recognition
constituted the "specific facts that make it reasonable to
believe that [Patel, Kirkpatrick, and Jaeger] knew that [the]
statement[s] [contained in the press releases were] materially
false or misleading."  Serabian, 24 F.3d at 361.  Of the seven
press releases described in the complaint, only the last four
reported results from quarters during which Patel is alleged to
have known about improper revenue recognition.  For the other
three, then, the complaint does not "set forth specific facts

that make it reasonable to believe that [Patel] knew that [any] statement [contained in those releases] was materially false or misleading." <u>Serabian</u>, 24 F.3d at 361.  With respect to the last four press releases, the complaint makes similar claims, asserting, for example:

> The Defendants falsely represented that [Enterasys] had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.02, rather than the income of $0.06 reported.

(Compl. ¶ 181; <u>see also</u> ¶¶ 183, 185, 187.)  The complaint alleges that Enterasys falsely reported that it had met Wall Street expectations, but it does not say what those expectations actually were for three of the four press releases.  Without any specificity about the Wall Street expectations that Enterasys claimed to have met, the complaint does not adequately allege either the falsity or the materiality of the alleged false statement.  <u>See</u> <u>Serabian</u>, 24 F.3d at 361.  The lone press release for which Wall Street expectations are actually described is the one issued on March 28, 2001.  That release reported on a quarter in which Enterasys claimed $286,016,000 in revenue and Patel is alleged to have known about $43,000 of revenue that was, allegedly, improperly recognized.  The magnitude of the alleged

34

misrepresentation – amounting to approximately 0.015 percent of Enterasys's quarterly revenue – is insufficient to meet the requirement by materiality, as a matter of law.  Accordingly, the allegations in paragraphs 181, 183, 185, and 187 are insufficient to support the claims in Counts I and III.

Similarly insufficient are the allegations concerning the December 20, 2000, press release.  (Compl. ¶¶ 177–79.)  For one thing, that press release did not report revenue from either the Cellit or TrustWave transaction, the only two transactions that Patel is alleged to have known about.  Moreover, while the SEC asserts, in a conclusory way, that "Patel knew or was reckless in not knowing that it was improper for Aprisma to recognize revenue on the transaction with SG Cowen which was subject to exchange rights" (¶ 178), and that "[r]emoving the SG Cowen revenue of approximately $1.9 million from Aprisma's revenues materially reduced its sequential growth rate to approximately 2.9% rather than the 13.4% touted by Patel" (id.), the complaint's discussion of the SG Cowen transaction includes no allegation that Patel had any knowledge of it.  Thus, the complaint does not set forth specific facts that make it reasonable to believe that Patel knew that the statement about Aprisma's sequential growth rate was materially false or misleading.  See Serabian, 24 F.3d at 361.

Because the alleged false statements attributable to Patel contained in SEC filings are immaterial as a matter of law, and because the SEC has failed to adequately allege material false statements attributable to Patel in the press releases, Counts I and III are dismissed as to Patel to the extent they assert claims of primary liability.  Count III also asserts that Patel is liable as an aider and abettor.  The court's determination that the misrepresentations in the SEC filings are immaterial as a matter of law also applies to the aider and abettor claim.  To the extent the aider and abettor claim is based upon the press releases, the complaint alleges no act on Patel's part that could qualify as a proximate cause of the issuance of a materially false press release,[18] which is the test for aider and abettor liability.  See 15 U.S.C. § 78t(e); SEC v. Power, 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007) (citations omitted).  Accordingly, as to Patel, Counts I and III are dismissed in their entirety.

Count II

Count II is the SEC's claim that defendants violated Securities Act sections 17(a)(2) & (3).[19]  "The requirements for

---

[18] Obviously, the complaint alleges that Patel "participated in the drafting of the earnings releases" (Compl. ¶ 172), but it alleges no facts that connect Patel to the inclusion of materially false statements in any of those releases.

[19] 15 U.S.C. §§ 77q(a)(2) & (3).

establishing a violation of Section 17(a) are nearly the same as those required for a claim under Securities Exchange Act Section 10(b) and Rule 10b-5 thereunder, although there is no requirement for the SEC to demonstrate scienter with respect to subsections (a)(2) and (a)(3)." <u>Durgarian</u>, 477 F. Supp. 2d at 355 (citing <u>Aaron</u>, 446 U.S. at 681)).

Patel moves to dismiss Count II on grounds that the SEC's complaint does not adequately plead scienter, does not sufficiently allege specific facts of his participation in the alleged fraud, and, with regard to Securities Act section 17(a)(2), does not identify any money or property he obtained or any untrue statement he made.  For the same reasons that support dismissal of Counts I and III, Count II is also dismissed as to Patel.

<u>Count IV</u>

In Count IV, the SEC asserts that all defendants violated Exchange Act section 13(b)(5) and Rule 13b2-1, which pertain to internal accounting controls and proscribe the falsification of corporate books and records.  <u>See</u> 15 U.S.C. § 78m(b)(5); 17 C.F.R. § 240.13b2-1.  Patel moves to dismiss Count IV, arguing that the SEC's complaint does not adequately plead scienter and does not sufficiently allege his knowledge of: (1) internal

accounting controls that were circumvented or not implemented; or
(2) falsified books, records, or accounts.  In its objection, the
SEC challenges defendants' argument that the "sounds in fraud"
doctrine applies to its claims under section 13 of the Exchange
Act, but the SEC directs the court to no factual allegations in
its complaint that might support its claims under section
13(b)(5) and Rule 13b2-1.  It is not the job of the court to sift
through 187 paragraphs of the SEC's complaint in search of
adequate factual allegations to support its claims.  Accordingly,
the court interprets plaintiff's failure to identify any factual
allegations supporting its section 13(b)(5) and Rule 13b2-1
claims as adequate concession that Count IV does not state a
claim against Patel.  Accordingly, Patel is entitled to dismissal
of Count IV.

Count V

In Count V, the SEC claims that all defendants violated
Exchange Act Rule 13b2-2, which prohibits directors and officers
from making false statements to accountants or auditors.  Patel
moves to dismiss Count V, arguing that the SEC's complaint does
not: (1) adequately plead scienter; (2) allege that he made, or
caused to be made, any statements to Enterasys's auditors; or (3)
plead his knowledge of any false statements made to auditors.
The SEC counters that the complaint adequately alleges that

"Patel and Jaeger, as officers, participated in numerous transactions in which they knew the Company was improperly recognizing revenues and yet they omitted to disclose this information to the Company's auditor."  (Pl.'s Obj. (document no. 92) at 32.)

The regulatory provision on which Count V is based provides, in pertinent part:

> (a) No director or officer of an issuer shall, directly or indirectly:
> (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or
> (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:
> (I) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
> (ii) The preparation or filing of any document or report required to be filed with the [Securities and Exchange] Commission pursuant to this subpart or otherwise.

240 C.F.R. § 240.13b2-2.

Notwithstanding the SEC's contention to the contrary, the complaint does not allege that Patel participated in "numerous transactions" in which he knew that Enterasys was improperly recognizing revenue and yet omitted to disclose this information

to the company's auditor.[20]   However, even if the complaint did
say what the SEC thinks, Patel would still be entitled to
dismissal of Count V.  The SEC relies upon Rule 13b2-2(a)(2),
which makes it improper to omit material facts from statements
made to an accountant, but the prohibition on omitting material
facts is limited to situations where the omitted material facts
were "necessary in order to make statements made, in light of the
circumstances under which such statements were made, not
misleading."  In other words, the rule does not impose upon
directors or officers a duty to report information to
accountants; it merely requires them not to make false statements
to accountants and not to omit information from statements to
accountants, when such an omission would result in a misleading
statement.  Here, the complaint identifies <u>no</u> statements Patel
made to the company's accountants or auditors, much less a
statement that was made misleading by the omission of information
from it.  Without identifying a statement rendered misleading by
the omission of information, the SEC has not stated a claim under
Rule 13b2-2.

---

[20] Rather, read in the light most favorable to the SEC, the
complaint alleges that Enterasys entered into the Cellit
transaction with Patel's knowledge (Compl. ¶¶ 69-72) and that
Patel "participated in improperly recognizing . . . revenue from
sales to TrustWave" because he knew about that transaction (¶
145).

Count VI

In Count VI, the SEC claims that all defendants aided and abetted Enterasys in violating Exchange Act section 13(a) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13, which describe the requirements imposed upon issuers of securities to file various reports with the SEC.  See 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13; see also Ponce v. SEC, 345 F.3d 722, 735 (9th Cir. 2003).  Patel moves to dismiss Count VI, arguing that the SEC's complaint does not adequately plead: (1) scienter; (2) general awareness of impropriety; (3) knowledge of falsity; or (4) substantial assistance in the allegedly fraudulent scheme.  The SEC counters that it adequately alleged Patel's participation in making false statements to the SEC by alleging that he signed various SEC reports or submitted revenue for inclusion in those reports while knowing that some of the revenue he submitted was not subject to recognition under either the company's revenue recognition policy or GAAP.

Because all of the allegedly false statements attributable to Patel in SEC filings are immaterial as a matter of law, for the reasons already discussed, Patel is also entitled to dismissal of Count VI.  See SEC v. Coffman, No. 06-cv-00088-REB-BNB, 2007 WL 2412808, at *12 (D. Colo. Aug. 21, 2007) ("the SEC's

41

claim based on § 13(a) of the Exchange Act, and rules promulgated thereunder, requires proof of a material misrepresentation or a materially misleading omission"); cf. Ponce, 345 F.3d at 736 (holding that where conduct alleged to support claims of section 10(b) and Rule 10b-5 violations was also alleged in support of section 13(a) violations, violation of section 10(b) and Rule 10b-5 established violation of sections 13(a) and 13(b)(2)).

Count VII

In Count VII, the SEC claims that all defendants aided and abetted Enterasys in violating Exchange Act section 13(b)(2)(A), which sets out various requirements for corporate record keeping. Patel moves to dismiss Count VII, arguing that the SEC's complaint does not adequately plead: (1) scienter; (2) general awareness of impropriety; (3) knowledge of falsity; or (4) substantial assistance in the allegedly fraudulent scheme.  The SEC counters that "[t]he complaint alleges [that] the Defendants caused the Company to keep inaccurate books and records by entering into contingent sales transactions or three-corner investment deals in which the true nature of the transactions [was] not accurately recorded in the Company's books and records."  (Pl.'s Obj. at 36.)

The statutory provision on which Count VII is based provides as follows:

> Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall—
>
> **(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

15 U.S.C. § 78m(b)(2); see also Ponce, 345 F.3d at 735 ("Section 13(b)(2) requires companies to maintain books, records and accounts accurately and record transactions in conformity with GAAS."). Section 13(b)(2)(A) has "been read to require issuers to employ and supervise reliable personnel, to ensure that transactions are executed as authorized, to segregate accounting functions, and to have procedures designed to prevent errors and irregularities." SEC v. Yuen, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *42 (C.D. Cal. March 16, 2006). However, unlike various other provisions of the Exchange Act, section 13(b)(2) does not require the SEC to establish the materiality of an alleged inaccuracy in a company's books and records. See SEC v. Thielbar, No. CIV 06-4253, 2007 WL 2903948, at *10 (D.S.D. Sept. 28, 2007) (citing SEC v. World-Wide Coin Invs., Ltd., 567 F. Supp. 724, 748-50 (N.D. Ga. 1983)).

43

With regard to aider and abettor liability, the Exchange Act provides:

> For purposes of any action brought by the [Securities and Exchange] Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e).  Specifically,

> [l]iability for aiding and abetting securities fraud under [Exchange Act section 10(b)] attaches only upon a showing that: 1) a primary violation was committed, 2) the defendant[ ] had a general awareness that [his] conduct was part of an overall activity that was improper, and 3) the defendant[ ] knowingly and substantially assisted in the primary violation.

SEC v. Tambone (Tambone II), 473 F. Supp. 2d 162, 167–68 (D. Mass. 2006) (citing Druffner, 353 F. Supp. 2d at 150).  "[M]ere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance."  Power, 525 F. Supp. 2d at 422 (quoting SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006)).  Rather, "[t]he aider and abettor's substantial assistance must be a proximate cause of the primary violation."  Power, 525 F. Supp. 2d at 422 (citation omitted).

44

Here, the complaint alleges that Enterasys's corporate books, records, and accounts did not reflect the company's transactions accurately and fairly because those books and records reported revenue that should not have been recognized for a variety of reasons, which is enough to assert the commission of a primary violation of section 13(b)(2)(A) by Enterasys.  In its objection to Patel's motion to dismiss, the SEC argues that Patel aided and abetted that primary violation "by entering into contingent sales transactions or three-corner investment deals." (Pl.'s Obj. at 36.)  That argument is not persuasive.

The act of entering into a transaction is sufficiently attenuated from the process of corporate accounting that mere participation in a transaction that generates revenue that cannot later be recognized under GAAP, without more, cannot be a proximate cause of inaccurate accounting.  Cf. Ponce, 345 F. 3d at 738 (holding that defendant "provided substantial assistance to [a] primary violation of Sections 13(a) and 13(b)(2), by preparing the financial statements that were eventually filed with both the quarterly and annual reports, as well as auditing and certifying the [false] reports that [the company] filed"); Thielbar, 2007 WL 2903948, at *10 (denying motion to dismiss section 13(b)(2) aiding and abetting claim when complaint "contain[ed] several allegations regarding [defendant]'s conduct

45

in falsifying the books and records of NCS . . . and in circumventing or failing to implement internal accounting controls); SEC v. Baxter, No C-OF003843 RMW, 2007 WL 2013958, at *9  (N.D. Cal. July 11, 2007) (denying motion to dismiss section 13(b) aiding and abetting claim when plaintiff alleged that defendant "participated in drafting . . . false and misleading disclosures . . ., reviewed the financial statements, directed the reclassification of unsubstantiated balances to conceal such balances from the auditors, and signed the management representation letters"); SEC v. Hopper, No. Civ.A. H-04-1054, 2006 WL 778640, at *15-16 (S.D. Tex. 2005) (denying motion to dismiss section 13(b) aiding and abetting claim when plaintiff alleged that one defendant orchestrated and directed 'round-trip' trading scheme without notifying accountants, legal staff, or external auditors and was provided financial statements reflecting fictitious revenues generated by that scheme, and alleged that second defendant was chief accounting officer who continued to report trades in corporate books and records on a gross bases, after being instructed to report them on a net basis); Yuen, 2006 WL 1390828, at *42 ("By directing the shifting of revenue from the print and channel advertisements to the IPG platform, Yuen caused Gemstar to create false and misleading books and records to support this improper revenue recognition practice.  Yuen substantially assisted in Gemstar's record-

keeping violation, and Rule 13b2-1, by directing the improper recognition of IPG licensing revenue and approving the shifting of revenues on Gemstar's books from one advertising platform to another, in order to recognize IPG advertising revenue.").

Because the SEC's allegations do not describe conduct by Patel sufficiently to establish a causal link to the alleged falsification of Enterasys's books, records, and accounts, the SEC has failed adequately to allege facts that would subject him to liability as an aider and abettor of Enterasys's primary violation of Exchange Act section 13(b)(2)(A).  Accordingly, Patel is entitled to dismissal of Count VII.

Count VIII

In Count VIII, the SEC claims that defendants aided and abetted Enterasys in violating Exchange Act section 13(b)(2)(B), which requires any company that issues securities to "devise and maintain a system of internal accounting controls" that meets certain specified standards.  See 15 U.S.C. § 78m(b)(2); see also SEC v. Dauplaise, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, at *9 (M.D. Fla. Feb. 22, 2006) (footnote omitted) (describing the characteristics of a system of internal accounting controls). Patel moves to dismiss Count VIII, arguing that the SEC's complaint does not adequately plead: (1) scienter; (2) general

awareness of impropriety; (3) knowledge of falsity; or (4) substantial assistance in the allegedly fraudulent scheme.

While the SEC objects to dismissal of Count VIII, it does not point to any factual allegations in the complaint concerning Enterasys's system of internal accounting controls, and it does not point to any factual allegations concerning Patel's role in establishing or administering any such system.  The pleadings in this case have much in common with those found deficient in Dauplaise:

> The SEC alleges that Bio One failed to devise or maintain the required system of internal accounting controls, and that Shinder aided and abetted that violation.  There are no allegations linking Shinder to this violation.  Indeed, Shinder is not even mentioned in the background section of the Complaint specifically addressing this violation.  Therefore the SEC has failed to state a claim against Shinder for a violation of Section 13(b)(2)(B).

2006 WL 449175, at *9.  Here, the complaint does not even have a background section devoted to the SEC's section 13(b)(2)(B) claim.  In any event, the SEC has failed to adequately allege either a primary violation of section 13(b)(2)(B) by Enterasys or conduct by Patel that was a proximate cause of any such violation.  Accordingly, Patel is entitled to dismissal of Count VIII.  Compare SEC v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326, 337 (S.D.N.Y. 2006) (granting summary judgment to

defendant on section 13(b)(2)(B) aider and abettor claim when
plaintiff produced no evidence that defendant "was responsible
for . . . maintaining adequate controls, or that he aided or
abetted any violation with respect to [that] requirement[ ]") and
Marsden v. Select Med. Corp., No. Civ.A. 04-4020, 2006 WL 891445,
at *15 (E.D. Pa. Apr. 6, 2006) (granting motion to dismiss
section 13(b)(2)(B) claim because "[p]laintiffs fail[ed] to
connect the litany of alleged wrongdoings to any control or type
of control that, if properly established, would have prevented
the same"), vacated in part on other grounds, 2007 WL 518556
(E.D. Pa. Feb. 12, 2007); with Thielbar, 2007 WL 2903948, at *10
(denying motion to dismiss section 13(b)(2)(B) aider and abettor
claim when complaint "contained several allegations regarding
[defendant]'s conduct in . . . circumventing or failing to
implement internal accounting controls") and SEC v. Intelliquis
Int'l, Inc., No. 2:02-CV-764 PGC, 2003 WL 23356426, at *13
(granting summary judgment to SEC on section 13(b)(2)(B) aider
and abettor claim where complaint adequately alleged primary
violation, alleged that one defendant permitted company to record
certain transactions as sales while knowing that they did not
qualify as such, and alleged that second defendant, retained to
audit financial statements, "essentially abandoned all
responsibility for this job").

## Conclusion

For the reasons given, Patel's motion to dismiss (document no. 68) is granted, but without prejudice.  See <u>Daou Sys.</u>, 411 F.3d at 1028 (explaining that when a claim is dismissed for failing to satisfy Rule 9(b), the court "should ordinarily accepted a proffered amendment that either pleads with the requisite particularity or drops the defective allegations and still states a claim").


**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 24, 2008

cc:  James A. Scoggins, II, Esq.
     Jeffrey S. Lyons, Esq.
     Leslie J. Hughes, Esq.
     Nancy J. Gegenheimer, Esq.
     Diana K. Lloyd, Esq.
     John R. Baraniak, Jr., Esq.
     Lucy J. Karl, Esq.
     Peter B. Moores, Esq.
     Steven M. Gordon, Esq.
     Jeffrey B. Rudman, Esq.
     Jonathan A. Shapiro, Esq.
     Miranda Hooker, Esq.
     Peter A. Spaeth, Esq.
     Bruce A. Singal, Esq.
     John C. Kissinger, Esq.
     Michelle R. Peirce, Esq.
     Mark B. Dubnoff, Esq.
     Richard J. McCarthy, Esq.
     Michael D. Ramsdell, Esq.

Jennifer M. Ryan, Esq.
Maria R. Durant, Esq.
William H. Kettlewell, Esq.
Kevin E. Sharkey, Esq.
Ann Pauly, Esq.
Victor W. Dahar, Esq.
Andrew Good, Esq.
Philip G. Cormier, Esq.
Peter D. Anderson, Esq.
William Cintolo, Esq.