UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Securities and Exchange
Commission,
    Plaintiff

    v.                              Civil No. 07-cv-39-SM
                                        Opinion No. 2008 DNH 056
Piyush G. Patel; David J.
Kirkpatrick; Eric Jaeger;
Bruce D. Kay; Robert J. Gagalis;
Robert G. Barber, Jr.; Lawrence
Collins; Michael A. Skubisz;
Jerry A. Shanahan; and Hor Chong
(David) Boey,
    Defendants

**O R D E R**

The Securities and Exchange Commission ("SEC") has sued in eight counts,[1] seeking injunctive relief under 15 U.S.C. § 77t(b) and 15 U.S.C. §§ 78u(d) & (e) for various alleged violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and certain rules promulgated thereunder. Before the court is Eric Jaeger's motion to dismiss. The SEC objects. For the reasons given, Jaeger's motion is granted in part.

---

[1] Counts V through VII have been brought against all defendants while Count VIII has been brought only against defendants Patel, Kirkpatrick, Kay, Gagalis, Collins, and Skubisz.

## The Legal Standard

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under Rule 12(b)(6), the court "must assume the truth of all well-plead facts and give the plaintiff[s] the benefit of all reasonable inferences therefrom." Alvarado Aguilera v. Negrón, 509 F.3d 50, 52 (1st Cir. 2007) (quoting Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007)).  However, the court need not "credit 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.'" Brown v. Latin Am. Music Co., 498 F.3d 18, 24 (1st Cir. 2007) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)).  "[A] complaint is properly dismissed for failure to state a claim 'only if the facts lend themselves to no viable theories of recovery.'" Garnier v. Rodríguez, 506 F.3d 22, 26 (1st Cir. 2007) (quoting Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007)).

**Background**

The SEC alleges that from March 2000 through December 2001, various employees, officers, and directors of Cabletron Systems, Inc. ("Cabletron") or its former subsidiaries, Enterasys Networks, Inc. ("Enterasys") and Aprisma Management Technologies, Inc. ("Aprisma") participated in a company-wide scheme to inflate the revenues of Cabletron and Enterasys for the purpose of convincing investors that Enterasys was a viable independent company with consistently strong revenue growth. Jaeger served as Cabletron's Executive Vice President of Corporate Affairs from July 1999 through August 2001 and as a consultant to Enterasys and Aprisma from August 2001 through September 2002. Before becoming Cabletron's Executive Vice President, he served as the company's General Counsel.

Turning to the conduct at issue in this case, the SEC alleges that Enterasys improperly recognized revenue, reported that improperly recognized revenue in SEC filings and press releases, and misrepresented material information concerning improper revenue recognition to outside auditors, or concealed such information from them. According to the SEC, Enterasys improperly recognized at least $48 million in revenue, thus allowing it to overstate earnings, understate operating losses,

and successfully launch itself as an independent public company
on August 6, 2001.

The SEC alleges that improperly recognized revenue was
produced by several kinds of transactions: (1) contingent sales
(detailed in undisclosed side agreements with purchasers) that
allowed, for example, full return, exchange, or cancellation
rights; (2) investments in privately held companies that agreed
to use their investment proceeds to purchase Enterasys and
Aprisma products; and (3) so-called "three-corner deals" that
involved placing another company between Enterasys and an
investee company, to disguise purchases of Enterasys products
made with funds invested by Enterasys in the purchaser company.
The complaint discusses in greater detail twelve separate
contingent sales transactions or investment deals (Compl. ¶¶ 63-
137) and mentions in lesser detail seventeen additional sales
transactions (¶¶ 138-55) for which the SEC claims that Enterasys
recognized revenue that was not subject to recognition under
GAAP.

Jaeger is mentioned by name in the factual allegations
concerning: (1) a reciprocal purchase agreement between Enterasys
and Everest Broadband Networks, Inc. ("Everest") with an
associated side agreement which produced $218,000 in revenue that

was improperly recognized in the second and third quarters of
Transition Year 2001 and that was eventually reversed in a
restatement of earnings (Compl. ¶¶ 63-68); (2) an
investment/purchase deal with Cellit, Inc. ("Cellit") that
produced $1,005,000 in revenue that was improperly recognized and
reported in the SEC Form 10-Q Enterasys filed for the first
quarter of Transition Year 2001 (¶¶ 69-73); (3) improper
recognition of $701,000 in revenue from sales to TrustWave Corp.
("TrustWave") during the fourth quarter of Fiscal Year 2001 and
the first three quarters of Transition Year 2001 (¶ 145); (4)
improper recognition of $107,000 in revenue from sales to
Centricity, Inc. ("Centricity") during the first three quarters
of Transition Year 2001 (¶ 146); (5) improper recognition of
$850,000 in revenue from sales to iPolicy Networks, Inc.
("iPolicy") during the first quarter of Transition Year 2001
(¶ 147); and (6) improper recognition of $701,000 in revenue from
sales to DigitalMojo, Inc. ("DigitalMojo") reported in the second
and third quarters of Transition Year 2001 (¶ 151).

Regarding the Everest transaction, the complaint alleges
that Jaeger "participated in negotiating and finalizing a
reciprocal purchase agreement" (Compl. ¶ 63) that produced
revenue that he knew or should have known was not subject to
recognition (¶ 66).  The complaint also alleges that: (1) Jaeger

approved the extension of exchange rights to Everest, knowing that an extension of such rights could have an impact on revenue recognition; and (2) the exchange rights he extended to Everest "were not disclosed to Enterasys's outside auditor." (¶ 67.)

Regarding the Cellit transaction, the complaint alleges that Enterasys, with the knowledge of Jaeger and Piyush Patel,[2] entered into an agreement with Cellit under which Enterasys invested in Cellit and Cellit agreed, among other things, to purchase product from Aprisma.  (Compl. ¶ 69.)  The complaint further alleges that Jaeger and Patel knew that: (1) Enterasys did not need Cellit product (¶ 70); (2) Cellit did not need Aprisma product (id.); (3) the transaction lacked economic substance (¶ 71); (4) Enterasys entered into the agreement only as a way of recognizing revenue (id.); and (5) the transaction was not completed until the quarter after Enterasys recognized revenue from it (¶ 72).  The complaint further alleges that Enterasys, with Jaeger's and Patel's knowledge, improperly recognized revenue from the Cellit transaction and reported that revenue in the SEC Form 10-Q for the first quarter of Transition Year 2001.  (¶ 73.)

---

[2] Patel served as Cabletron's Chief Executive Officer, President, and Chairman of the Board of Directors from June 1999 until August 2001.  Thereafter, he served as a consultant to Enterasys and Aprisma.

Regarding the TrustWave transaction, the complaint alleges that

> [a]t the time Enterasys recognized revenue from sales to TrustWave, Jaeger and Patel knew that TrustWave did not need Aprisma product and was only purchasing product to enable Aprisma to meet its quarterly revenue goals [and that] the valuation for Enterasys's reciprocal investment in TrustWave lacked substance and was based on the amount of product TrustWave was willing to purchase from Aprisma.

(Compl. ¶ 145.)  The SEC further alleges that Jaeger and Patel knew "that it was improper to recognize revenue for sales to TrustWave."  (Id.)

Regarding the Centricity transaction, the complaint alleges that

> [a]t the time Enterasys recognized revenue from an investment related sale to Centricity . . . Jaeger knew that Enterasys was not interested in the investment portion of the transaction . . . [,] that Enterasys was investing in an insolvent company that could not otherwise afford to purchase Enterasys product . . . [,] that the Centricity transaction lacked economic substance and that it was improper to recognize revenue from sales to Centricity.

(Compl. ¶ 146.)

Regarding the iPolicy transaction, the complaint alleges that "[a]t the time Enterasys recognized revenue from sales to

7

iPolicy, Jaeger knew that the sales were contingent on Enterasys prepaying iPolicy for a comparable dollar amount of engineering services and making an investment in iPolicy the following quarter [and] that this undisclosed contingency precluded revenue recognition."  (Compl. ¶ 147.)

Regarding the DigitalMojo transaction, the complaint alleges that

> [a]t the time Enterasys recognized revenue from sales to DigitalMojo, [Robert] Gagalis,[3] Jaeger, and [Bruce] Kay[4] knew that this investment transaction was structured as a three-corner deal to conceal DigitalMojo's precarious financial condition from Enterasys's outside auditor, that the transaction lacked economic substance . . . and that the transaction did not qualify for revenue [recognition] under GAAP.

(Compl. ¶ 151.)

The complaint further alleges that: (1) during "numerous . . . weekly conference calls," starting in approximately March

---

[3] Gagalis served as Enterasys's Executive Vice President, Chief Financial Officer, and Treasurer from July 2001 through October 2002.

[4] Kay served as Cabletron's Controller from February 1999 to June 2000, as Enterasys's Chief Financial Officer from June 2000 until July 2001, and as Enterasys's Senior Vice President of Finance from July until October 2001.

2001, members of Enterasys's investment team,[5] including Jaeger, "openly discussed the purpose of three corner deals: to conceal from Enterasys's outside auditor the connection between investments and purchases, given that the poor financial condition of investee companies could lead the outside auditor to conclude that the related revenue did not comport with GAAP" (Compl. ¶ 158); (2) Jaeger and Patel, after having been briefed on Enterasys's deficient sales projections and overstuffed sales channels, directed Gagalis and Enrique Fiallo[6] to find more investments and force more products into the channel by the end of the quarter (¶ 161); (3) Jaeger, along with Patel, Robert Barber,[7] Jerry Shanahan,[8] Kay, Gagalis, and others "worked

---

[5] The complaint describes the investment team as consisting of Jaeger, David Kirkpatrick, Patel, Enrique Fiallo, Robert Barber, Jerry Shanahan, Anthony Hurley, Kay, Gagalis, Gayle Luacaw, and others.

[6] Fiallo served as Cabletron's Executive Vice President and Chief Information Officer from November 1998 to February 2000, as Enterasys's President from February 2000 to August 2001, and as Enterasys's President, Chairman, and Chief Executive Officer from August 2001 until April 2002.

[7] Barber served as Enterasys's Vice President of Corporate Affairs from April 2000 through April 2001, and was responsible for business development at Enterasys from May through August 2001.

[8] Shanahan served as Cabletron's Vice President of International Operations from February to September 2000, as Cabletron's Executive Vice President of Operations and Quality from September 2000 to March 2001, and as Enterasys's Chief Operating Officer from March 2001 until May 2002.

together to close more than $20 million in investment-related
sales during the final week of the [second] quarter [of
Transition Year 2001], many of which were structured as three
corner deals to conceal the precarious financial condition of the
investee company from Enterasys's outside auditor" (¶ 162); (4)
during the outside auditor's review of the second quarter of
Transition Year 2001, "Enterasys's senior management, including
Gagalis and Jaeger, oversaw an effort to purge the three corner
deal files of all documents linking purchases to investments, the
information the outside auditor had specifically requested for
such revenue items in the first quarter" (¶ 164); and (4) on
September 4, 2001, Jaeger sent an e-mail to Gagalis directing him
to "crack the whip" on other Enterasys employees "to get cleaned-
up" and remind them "NOT" to talk to the outside auditor "until
they have a clean set of paperwork and understand clearly each
deal." (¶ 165).

    The SEC asserts that any public statement of earnings that
included improperly recognized revenue was materially false and
that Enterasys made such statements in: one SEC 10-K form, six
SEC 10-Q forms, three SEC 8-K forms, fourteen representation
letters, and seven press releases.  (Compl. ¶ 36.)  The complaint
then specifies the amount of overstated revenue and understated
losses reported in each of the identified SEC filings (¶¶ 37-53),

and provides similar specifications for the press releases (¶¶ 171-87).  Jaeger is not alleged to have prepared or signed any of the SEC filings, but he is alleged, along with Patel, [David] Kirkpatrick,[9] and others, to have "participated in the drafting of the [quarterly] earnings [press] releases."  (¶ 172.)  The first five press releases were issued during Jaeger's tenure as Cabletron's Executive Vice President of Corporate Affairs, while the last two were issued while Jaeger was serving as a consultant to Enterasys and Aprisma.

## Discussion

Jaeger moves to dismiss, arguing that the SEC has failed to: (1) state a primary liability claim against him under Exchange Act 10(b) and Rule 10b-5; (2) allege facts from which the requisite strong inference of scienter can be drawn; (3) allege facts sufficient to demonstrate that he aided or abetted a primary violation of Exchange Act sections 10(b), 13(a), and 13(b)(2)(A); (4) allege with the requisite particularity that he violated Securities Act section 17(a)(1); (5) allege with the

---

[9] Kirkpatrick served as Cabletron's Chief Financial Officer from August 1990 to August 2001, as Cabletron's Chief Operating Officer from October 2000 to August 2001, as Aprisma's Chief Operating Officer from August 2001 until March 2002, as a member of Aprisma's Board of Directors from August 2001 until March 2002, and as Chairman of the Board from January 2002 until March 2002.

requisite particularity that he violated Exchange Act 13(b)(5),
Rule 13b2-1, or Rule 13b2-2.  He further argues that the
remaining claims also fail because the complaint: (1) sounds in
fraud in its entirety, and is subject to a heightened pleading
standard, which it does not meet; (2) does not state a claim for
a violation of Securities Act section 17(a)(2); (3) does not
state a claim for a violation of Exchange Act Rules 13b2-1 or
13b2-2; and (4) does not properly plead a claim for injunctive
relief.  Because the SEC's objection to Jaeger's motion to
dismiss also serves as an objection to motions filed by Patel and
Kirkpatrick, it does not precisely track any of the three motions
to which it objects.  Suffice it to say that the SEC
categorically opposes Jaeger's motion to dismiss.  In this
section, the court begins with the pleading standard, and then
continues on a claim-by-claim basis.


A.  The Pleading Standard

     In document no. 130, the order on Lawrence Collins' motion
to dismiss, the court determined that the "sounds in fraud"
doctrine is applicable in this case, and held that the Rule 9(b)
pleading requirements apply to all of the SEC's claims.  That
ruling applies with equal force to Jaeger's motion to dismiss,
and the SEC's arguments to the contrary are rejected for the
reasons given in document no. 130.

The version of Rule 9(b) in effect when the SEC filed its complaint provided that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  FED. R. CIV. P. 9(b).[10]  The rule further provided that "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally."  Id. "In applying [the Rule 9(b)] standard to securities fraud actions, this circuit has been notably strict and rigorous."  SEC v. Durgarian, 477 F. Supp. 2d 342, 348 (D. Mass. 2007) (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999)).

The particularity "requirement 'entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.'"  Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 19 (1st Cir. 2002) (quoting Powers v. Boston Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)); see also In re StockerYale Sec. Litig., 453 F. Supp. 2d 345, 350 (D.N.H. 2006) ("The rule requires that the particular times, dates, places, or other details of the alleged fraudulent involvement of the actors be alleged.").  In addition, "general averments of the

---

[10] Rule 9(b) was amended effective December 1, 2007, but the Advisory Committee Notes to the Federal Rules explain that the 2007 amendment was "intended to be stylistic only."

defendants' knowledge of material falsity will not suffice."
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st
Cir. 1994) (citing Greenstone v. Cambex Corp., 975 F.2d 22, 25
(1st Cir. 1992)), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.
Rather, "[c]onsistent with Fed. R. Civ. P. 9(b), the complaint
must set forth specific facts that make it reasonable to believe
that defendant[s] knew that a statement was materially false or
misleading." Serabian, 24 F.3d at 361 (citation and internal
quotation marks omitted). Allegations of fraud must be organized
"into discrete units that are, standing alone, each capable of
evaluation." StockerYale, 453 F. Supp. 2d at 350 (quoting In re
Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 55–56 (D. Mass.
1998)). And, "where . . . 'multiple defendants are involved,
each defendant's role in the fraud must be particularized.'"
Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802
F. Supp. 595, 600 (D.N.H. 1992) (quoting Shields v. Amoskeag Bank
Shares, Inc., 766 F. Supp. 32, 40 (D.N.H. 1991)).

"In a case where fraud is not an essential element of a
claim, only allegations of fraudulent conduct must satisfy the
heightened pleading requirements of Rule 9(b)." Sparling v. Daou
(In re Daou Sys., Inc., Sec. Litig.), 411 F.3d 1006, 1027 (9th
Cir. 2005) (citing Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097,

1105 (9th Cir. 2003)).  "Allegations of non-fraudulent conduct
need satisfy only the ordinary notice pleading standards of Rule
8(a)."  <u>Daou Sys.</u>, 411 F.3d at 1027 (citation omitted).  "Thus,
if particular averments of fraud are insufficiently pled under
Rule 9(b), a district court should 'disregard' those averments or
'strip' them from the claim.  The court should then examine the
allegations that remain to determine whether they state a claim."
<u>Id.</u> at 1028 (citation omitted).

> Rule 9(b) may prove fatal to 1933 Securities Act claims
> grounded in fraud when the complaint makes a wholesale
> adoption of the securities fraud allegations for
> purposes of the Securities Act claims.  In such cases,
>
>> a district court is not required to sift through
>> allegations of fraud in search of some lesser
>> included claim of strict liability.  It may
>> dismiss.  If it does so, it should ordinarily
>> accept a proffered amendment that either pleads
>> with the requisite particularity or drops the
>> defective allegations and still states a claim.

<u>Id.</u> (internal punctuation and citations omitted).


<u>B.  The SEC's Claims</u>

     As noted above, Jaeger attacks the SEC's complaint on a
variety of grounds, some applicable to individual claims, others
applicable to multiple claims or the complaint as a whole.  The
SEC's fifty-page objection is equally complex.  For the sake of

clarity, the court will consider Jaeger's motion to dismiss on a claim-by-claim basis.

### Counts I & III

In Count I, the SEC alleges that all defendants violated Securities Act section 17(a)(1), while in Count III, the SEC claims that all defendants violated Exchange Act section 10(b) and Exchange Act Rule 10b-5, either as primary violators or as aiders and abettors.  The claims themselves do not specify the conduct upon which they are based.  Rather, they incorporate, by reference, all 187 paragraphs of factual allegations in the complaint.  The complaint, in turn, discusses two categories of statements, those made in earnings releases and those contained in SEC forms.  According to the SEC, both the press releases and the SEC filings contained untrue statements of material fact because the financial results they reported included revenue from contingent sales and investment-related purchases, i.e., revenue that was not subject to recognition under GAAP.

Because "[t]he elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents," SEC v. Tambone (Tambone I), 417 F. Supp. 2d 127, 131 (D. Mass. 2006)

(citing <u>Aaron v. SEC</u>, 446 U.S. 680, 695 (1980); <u>Ernst & Ernst v.</u> <u>Hochfelder</u>, 425 U.S. 185, 196 (1976)), the court will consider Counts I and III in a single discussion.[11]

Jaeger argues that Counts I and III should be dismissed because: (1) the complaint's generalized allegations that all defendants committed fraud do not state a claim against him; (2) the few factual allegations that directly mention him are insufficient to identify his role in any fraud; and (3) the amount of revenue at issue in the Everest transaction – the one transaction in which his participation is mentioned in anything other than a conclusory way – is so small as to make immaterial any fraudulent conduct that may be attributable to him in connection with that transaction.  He further argues that even if the facts surrounding the Everest transaction were otherwise sufficient to state a claim against him, the SEC does not allege facts from which the requisite strong inference of scienter could be drawn.  Finally, he argues that the SEC has failed to plead sufficient facts to establish aider and abettor liability under Exchange Act section 10(b), as asserted in Count III.

---

[11] In his motion to dismiss, Jaeger takes the same tack, arguing that Count I (asserting claims under Securities Act section 17(a)) should be dismissed for the same reasons he gave as supporting dismissal of Count III (asserting claims under Exchange Act section 10(b) and Rule 10b–5).

The SEC counters that under the correct pleading standard, it has adequately alleged facts concerning Jaeger's role in: (1) executing transactions that generated revenue that did not qualify for recognition; (2) concealing the contingencies that disqualified that revenue from recognition; (3) contributing to false SEC filings by participating in or knowing about transactions that generated revenue that was not subject to recognition; and (4) drafting false and misleading earnings releases.  The SEC further argues that, under the correct legal standard, it has adequately alleged both scienter and the materiality of Jaeger's misrepresentations.

Securities Act section 17(a) provides that "[i]t shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to employ any device, scheme or artifice to defraud."  15 U.S.C. § 77q(a)(1).  Exchange Act section 10(b) provides that

> [i]t shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or any facility
> of any national security exchange . . . [t]o use or
> employ, in connection with the purchase or sale of any
> security . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and

regulations as the [Securities and Exchange] Commission
may prescribe . . . .

15 U.S.C. § 78j(b).  Exchange Act Rule 10b-5 provides:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to
defraud,

(b) To make any untrue statement of a material
fact or to omit to state a material fact necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not
misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5.


To succeed on the claims asserted in Counts I and III, "the

SEC must show that 1) defendants engaged in fraudulent conduct,

2) in connection with the purchase or sale of securities, 3)

through the means or instruments of transportation or

communication in interstate commerce or the mails and 4) with the

requisite scienter."  Tambone I, 417 F. Supp. 2d at 131 (citing

SEC v. Graystone Nash, Inc., 820 F. Supp. 863, 870-71 (D.N.J.

1993)).  While it is less than clear, given the manner in which
the SEC has framed its claims, it appears that the fraudulent
conduct on which Counts I and III are based consists of allegedly
untrue statements of material fact made in various SEC filings
and press releases.

For an untrue statement of fact to be actionable under
Securities Act section 17(a) and Exchange Act 10(b), it must be
material.  Tambone I, 417 F. Supp. 2d at 131.  "The boundaries of
materiality in the securities context are clearly enunciated in
[the] case law [of the First Circuit]."  Lucia v. Prospect St.
High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994).
Specifically,

> [t]he mere fact that an investor might find information
> interesting or desirable is not sufficient to satisfy
> the materiality requirement.  Rather, information is
> "material" only if its disclosure would alter the
> "total mix" of facts available to the investor and "if
> there is a substantial likelihood that a reasonable
> shareholder would consider it important" to the
> investment decision.

Id. (quoting Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir.
1992)).[12]

---

[12] While Lucia was a case brought under Sections 11 and
12(2) of the Securities Act, "[t]he same standard of materiality
. . . applies to claims under Section 10(b) and Rule 10b-5 as to
claims under Sections 11 and 12(b) of the Securities Act."  Shaw
v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)

"Materiality is usually a matter for the trier of fact."
ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 65 (1st Cir.
2007) (citation omitted).  "A court is thus free to find, as a
matter of law, that a statement was not false, or not materially
false, only if a jury could not reasonably find falsity or
materiality on the evidence presented."  Stone & Webster, 414
F.3d at 209 (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S.
438, 450 (1976)).  As the court of appeals for the Eighth Circuit
has explained, "a complaint that alleges only immaterial
misrepresentations presents an 'insuperable bar to relief,' and
dismissal of such a complaint is proper."  Parnes v. Gateway
2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quoting Fusco v.
Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982)).

The untrue statements of material fact alleged by the SEC in
this action are overstatements of Enterasys's revenues and
earnings, and understatements of the company's losses, contained
in nine SEC filings and seven press releases.  The SEC appears to
contend that the "specific facts that make it reasonable to
believe that [Jaeger] knew that [those] statement[s] [were]
materially false or misleading," Serabian, 24 F.3d at 361, are
the facts concerning his participation in or knowledge of

(citation omitted), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.

21

improper recognition of the revenue generated by the Everest,
Cellit, TrustWave, Centricity, iPolicy, and DigitalMojo
transactions.  Jaeger, however, argues that because the SEC
alleges that he actually participated in only one transaction,
the one with Everest, his alleged knowledge of the other five
should not be taken into account when addressing the question of
materiality.  The SEC has the better argument.  Whether or not
Jaeger actually participated in a transaction that generated
revenue inappropriate for recognition is beside the point, so
long as the SEC adequately alleges that when he made a particular
statement about revenue, he knew – from participation in a
transaction or otherwise – that the statement was materially
false.  Accordingly, when assessing materiality, the court will
consider revenue generated by all six transactions rather than
just the Everest transaction.

    According to the complaint, revenue from the six
transactions was directly reported in SEC forms signed by Patel
and Kirkpatrick and filed on June 4 and July 10, 2001, and in SEC
forms signed by Fiallo and Gagalis and filed on October 16 and
November 14, 2001.[13]  (Compl. ¶¶ 43, 46, 48, and 51).  The

_____

    [13] Given that Jaeger is not alleged to have signed or to
have caused Enterasys to file any of those SEC reports, it is not
at all clear that he may be held primarily liable for any
statements contained in them, see Tambone I, 417 F. Supp. 2d at

complaint further alleges that information from the forms listed above was incorporated into four other SEC filings. (¶ 53.) Of the seven press releases mentioned in the complaint, four reported on the SEC filings noted above. (¶¶ 180, 182, 184, 186.) As previously stated, the SEC has identified allegedly false statements attributable to Jaeger in both SEC forms and press releases.

The most substantial misrepresentation attributed to Jaeger in an SEC filing is the reporting of Enterasys's performance for the quarter that ended September 29, 2001. According to the complaint: (1) the SEC Form 10-Q for that quarter reported net revenue of $105,535,000 (Compl. ¶ 51); (2) revenue was overstated by $20,519,000 (¶ 52); and (3) the four transactions Jaeger is alleged to have known about, those with TrustWave, Centricity, DigitalMojo, and Everest, accounted for $986,000 of inappropriately recognized revenue (id.). In other words, the improperly recognized revenue directly tied to Jaeger through either participation or knowledge was less than 0.94 percent of

_____

132 ("In order to be liable for a primary violation of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, a defendant must have personally made either an allegedly untrue statement or a material omission.").

the revenue Enterasys reported that quarter.[14]  The complaint
further alleges that the "overstatement [of revenue] caused the
loss from operations to be understated by approximately
$12,000,000 and the net loss to shareholders to be understated by
approximately $12,000,000."  (Id.)

Jaeger asks the court to determine that even if, as alleged,
he misrepresented revenue in SEC filings, the amount of
overstated revenue for which he can be held liable is so small as
to render the alleged false statements immaterial, as a matter of
law.  The SEC counters that Jaeger's argument fails to
acknowledge the qualitative materiality of the alleged
misrepresentations, and notes that profit statements and earnings
reports are of particular interest to investors.

-----

[14] In the three other quarters at issue, improperly
recognized revenue directly tied to Jaeger accounts for an even
smaller percentage of the total revenue reported.  According to
the complaint: the March 2001 Form 10-K reported net revenue for
the preceding quarter of $286,016,000 (Compl. ¶ 44), $43,000 of
which (approximately 0.02 percent) is alleged to have come from
the TrustWave transaction (¶ 45); the June 2001 Form 10-Q
reported net revenue of 306,898,000 (¶ 46), $2,533,000 of which
(approximately 0.83 percent) is alleged to have come from the
TrustWave, Centricity, Cellit, and iPolicy transactions (¶ 47);
and the September 2001 Form 10-Q reported net revenue of
$240,181,000 (¶ 48), $903,000 of which (approximately 0.38
percent) is alleged to have come from the TrustWave, Centricity,
DigitalMojo, and Everest transactions (¶ 49).

"[A]lthough overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position."  Daou Sys., 411 F.3d at 1018.  Here, the SEC has shown with particularity how Jaeger's alleged false statements affected Enterasys's financial statements.  Thus, the critical question is whether those effects were material, based upon the company's overall financial position.

"Minor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law."  In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 170 (D. Mass. 2000) (citing Greebel, 194 F.3d at 206; Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996); Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 234 (D. Mass. 1999)).  In Segue Software, the trial court ruled that "[a]s in Greebel, the overstatement of Segue's revenues was insignificant ($1.1 million or 2.6% of Segue's $41 million in sales in 1998) and nonsystemic (involving only ten sales out of hundreds consummated during the two final quarters of 1998)."  106 F. Supp. 2d at 171.  Similarly, courts have determined the following misrepresentations to be immaterial, as a matter of

25

law: (1) a 0.3 percent ($217 million) overstatement of revenues over a two-year period, see In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003); (2) a 0.2 percent understatement of a company's costs of goods sold, see In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426-27 (3d Cir. 1997); (3) an overstatement of a company's loan-loss reserves where "[t]he charge that would have followed the write-down of this asset would have amounted to merely 0.54% of [the company]'s net income of $234 million for that quarter," In re Westinghouse Sec. Litig., 90 F.3d 696, 715 (3d Cir. 1996); (4) a two percent ($6.8 million) overstatement of a company's assets, see Parnes, 122 F.3d at 547; and (5) a $2 million understatement of a company's outstanding loans and a $2 million overstatement its derivative receivables, where the amount involved was about 0.3 percent of the company's total assets), see In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 630-31 (S.D.N.Y. 2005).[15]

---

[15] In an opinion not directly on point, the court of appeals for this circuit held that scienter was not demonstrated by the issuance of a revenue report that incorporated between $416,000 and $1.55 million in improperly recognized revenue, when overall revenue for the quarter in question was $37.5 million.   See Greebel, 194 F. 3d at 206.   In contrast, in Chalverus, the trial court held that the PSLRA's strong-inference-of-scienter requirement was met by a combination of several factors, including the following:

> Pegasystems restated its second quarter revenue from $12,200,000 to $4,700,000 and restated its earnings from a gain of $2.2 million to a loss of $2.8 million.   The total amount by which Pegasystems

Based upon the foregoing authorities, the court has little difficulty concluding that the false statements in SEC filings for which Jaeger could be held liable are immaterial as a matter of law.  None of Jaeger's allegedly false statements involved more than one percent of Enterasys's quarterly revenue, and two of the four involved less than one half of one percent of quarterly revenue.

While statements concerning revenue undoubtedly qualify as qualitatively material, cf. Burlington, 114 F.3d at 1420 n.9 ("earnings reports are among the pieces of data that investors find most relevant to their investment decisions"), the concept of qualitative materiality has its limits:

> The district court recognized that the adequacy of loan loss reserves is generally the type of information that would significantly influence a reasonable investor.  Westinghouse I, 832 F. Supp. [948,] 972 [(W.D. Pa. 1993)] (citing [Shapiro v.] UJB [Fin. Corp.], 964 F.2d [272,] 281 [(3d Cir. 1992)]). However, the court also tested plaintiffs' complaint to determine whether the allegations regarding loan loss reserves were quantitatively material in this particular case.  The district court stated that "[t]he failure to disclose that a loan portfolio is likely to be impaired by some de minimis amount may be 'relevant' in that it is the type of information that investors care about, but of such 'dubious significance' as to be

restated its revenue – $7,485,000 – equals 158 percent of its actual revenue for that quarter.

59 F. Supp. 2d at 234 (citation to the record omitted).

'trivial,' and 'hardly conducive to informed
decisionmaking,' so that to reasonable shareholders,
such omission must be immaterial as a matter of law."
Id. at 972 (quoting TSC Industries, 426 U.S. at 448–
49). We agree. See generally Loss & Seligman,
Fundamentals of Securities Regulation 137–41, 479–80
(1995) (quantitative materiality analysis is generally
appropriate, though not when "such matters as a
conflict of interest or criminal violations are at
issue"); see also Ferber v. Travelers Corp., 802 F.
Supp. 698, 708 (D. Conn. 1992) (omission of extent of
second mortgages not material in relation to overall
real estate, investment, and asset portfolios); In re
First Chicago Corp. Securities Litigation, 769 F. Supp.
1444, 1454 (N.D. Ill. 1991) (total value of alleged bad
loan immaterial in relation to size of defendant's real
estate loan portfolio).

Westinghouse, 90 F.3d at 714 (parallel citation omitted). The

court elaborated its reasoning in a footnote that is particularly

relevant:

We thus reject plaintiffs' argument that all
misstatements regarding loan loss reserves and
nonearning receivables are inherently material. But we
also reject defendants' similarly categorical assertion
that materiality must be quantified at a specified
percentage of income or assets. Although "a 'rule of
thumb' of 5–10 percent of net income is widely used as
a general materiality criterion" in the accounting
profession, see Financial Accounting Standards Board,
Accounting Standards: Statements of Financial
Accounting Concepts No. 2, App. C, ¶ 167, at 81 (1989)
(citing James W. Pattillo, The Concept of Materiality
in Financial Reporting (1976)), the question of
materiality must be considered on a case-by-case basis
under the standards set forth in T.S.C. Industries and
our cases. See also Pattillo, supra, at 12 (advocating
consideration of various factors in determining
materiality in the accounting profession and concluding
that "the single rule-of-thumb materiality criterion of
5%–10% of net income or loss should be used – if at

all, and by itself – with extreme caution").

Id. at 714 n.14.  Based upon the reasoning outlined in

Westinghouse, the SEC's reliance upon the concept of qualitative

materiality is unavailing; the overstatements of revenue in this

case fall far below the "rule-of-thumb" threshold described in

Westinghouse, and the SEC has identified no factors that

compellingly enhance the materiality of the mathematically

negligible overstatements upon which the SEC bases its claims.


In re Kidder Peabody Securities Litigation, 10 F. Supp. 2d

398 (S.D.N.Y. 1998), upon which the SEC relies, does not support

a contrary result.  In Kidder Peabody, the defendant argued that

"none of the alleged misstatements [could] be considered material

given the amount of the alleged false profits in relation to

[General Electric]'s total earnings."  Id. at 409-10.

Specifically, "none of the alleged misstatements, taken

individually, affected GE's profits by more than 2.54%, with most

of the alleged misstatements individually affecting GE's profits

by less than 1%."  Id. at 410.  While acknowledging "the appeal

of defendants' statistical approach," id., the court found itself

"hard-pressed to find that misstatements of profits totaling over

$338 million dollars are immaterial as a matter of law," id., and

"decline[d] to adopt a statistical bright line rule to determine

what a reasonable investor would consider significant," id.
(citing Basic Inc. v. Levinson, 485 U.S. 224, 236 n.14 (1988)).
In Kidder Peabody, the false profits were generated by a single
trader at Kidder, then a subsidiary of General Electric. Id. at
402-05. To overcome the defendants' statistical approach, "the
plaintiffs . . . put forth several theories for why a reasonable
GE investor would have placed particular emphasis on information
related to Kidder," id., and the court found several of them
persuasive:

> First, while the false profits may have been minor
> compared to GE's earnings as a whole, they were quite
> significant to Kidder, accounting for 13.5% of Kidder's
> reported profits in 1992 and 45% in 1993. Kidder's
> profits, in turn, represented a significant portion of
> GE's balance sheet. Buffeted by the false profits,
> Kidder's total profits accounted for 7% of GE's
> reported earnings in 1993, up from 5% in 1992 and 2% in
> 1991. As a result, news about Kidder may have held
> special interest to a GE investor. Put differently,
> $338 million of false profits attributed solely to
> Kidder might have had greater significance to an
> investor than the same $338 million dispersed broadly
> throughout GE's balance sheet.
>
> Second, the false profits might have been
> especially important to investors due to Kidder's
> visible role in GE's business. Under this theory, the
> importance of reports related to Kidder was magnified
> because investors had been monitoring Kidder's
> performance closely since GE purchased Kidder in 1986.
> In support of this theory, plaintiffs note that when GE
> announced the purchase of Kidder some analysts believed
> that the purchase would have a detrimental impact on
> GE's stock. These analysts felt that GE's inexperience
> in the securities brokerage industry, as well as the
> volatility of the securities market, made Kidder an
> unwise acquisition for GE. According to plaintiffs'

expert, these analysts' fears were realized when Kidder
reported at least intermittent losses from 1986 to
1991, despite substantial cash infusions from GE.  In
this context, Kidder's reported profits in 1992 and
1993, which included the false profits, took on special
significance to investors and analysts who viewed
Kidder as a turnaround success story.

.   .   .   .

In addition to these theories, the Court notes
that the materiality of the misstatements must be
considered in light of their impact on GE's reputation,
wholly apart from their statistical impact on GE's
reported earnings.  Under plaintiffs' theory, the false
profits enabled GE to tout Kidder's success, thereby
allaying analysts' fears.  That this success, at a
minimum, was inflated likely would have been
significant to a reasonable investor.  Moreover, that a
prominent subsidiary of GE was able to generate false
profits, apparently without GE's knowledge, arguably
raised concerns about GE's internal controls,
efficiency, and integrity, all of which would have been
relevant to a reasonable investor.  See Ross v. Warner,
[No. 77 Civ. 243,] 1980 WL 1474, at *8 [(S.D.N.Y. Dec.
11, 1980)] (discussing materiality of failure to
disclose questionable payments in terms of effect on
public perception of management's integrity).

Id. at 411.  While the SEC cites Kidder Peabody, it makes no

argument – much less a persuasive one – that the theories adopted

in that case apply in equal measure – or at all – in this case.


In sum, the court is persuaded that none of the false

statements about revenue attributable to Jaeger that were made in

SEC filings rises to the requisite level of materiality.

With regard to the alleged falsity of the press releases, the SEC alleges that "[t]he Defendants knew that the revenue they caused Enterasys to improperly recognize was reported in quarterly press releases that were distributed to the investing public" (Compl. ¶ 171), thus indicating that knowledge of transactions generating revenue inappropriate for recognition constituted the "specific facts that make it reasonable to believe that [Patel, Kirkpatrick, and Jaeger] knew that [the] statement[s] [contained in the press releases were] materially false or misleading." Serabian, 24 F.3d at 361.  Of the seven press releases described in the complaint, the last four reported results from quarters during which Jaeger is alleged to have known about improper revenue recognition.  For the other three, then, the complaint does not "set forth specific facts that make it reasonable to believe that [Jaeger] knew that [any] statement [contained in those releases] was materially false or misleading." Serabian, 24 F.3d at 361.  With respect to each of the last four press releases, the complaint makes similar claims, asserting, for example:

> The Defendants falsely represented that [Enterasys] had met Wall Street expectations for earnings per share estimates.  When adjustments are made to correct the improper revenue recognized, the understated operating losses, and the understated losses to shareholders, the pro forma earnings per share were $0.02, rather than the income of $0.06 reported.

(Compl. ¶ 181; <u>see also</u> ¶¶ 183, 185, 187.)  The complaint alleges that Enterasys falsely reported that it had met Wall Street expectations, but it does not say what those expectations actually were for three of the four press releases.  Without any specificity about the Wall Street expectations that Enterasys claimed to have met, the complaint does not adequately describe either the falsity or the materiality of the alleged false statement.  <u>See</u> <u>Serabian</u>, 24 F.3d at 361.  The lone press release for which Wall Street expectations are actually specified is the one issued on March 28, 2001.  That release reported on a quarter in which Enterasys claimed $286,016,000 in revenue and Jaeger is alleged to have known about $43,000 of revenue that was, allegedly, improperly recognized.  The minor magnitude of the alleged misrepresentation – amounting to approximately 0.015 percent of Enterasys's quarterly revenue – renders that misrepresentation immaterial as a matter of law.  Accordingly, the allegations in paragraphs 181, 183, 185, and 187 are insufficient to support the claims in Counts I and III.

Because the alleged false statements attributable to Jaeger contained in SEC filings are immaterial as a matter of law, and because the SEC has failed to adequately allege material false statements attributable to Jaeger in the press releases, Counts I

and III are dismissed as to Jaeger to the extent they assert claims of primary liability.  Count III also asserts that Jaeger is liable as an aider and abettor.  The court's determination that the misrepresentations in the SEC filings are immaterial as a matter of law also applies to the aider and abettor claim.  To the extent the aider and abettor claim is based upon the press releases, the complaint alleges no act on Jaeger's part that was a proximate cause of the issuance of a materially false press release,[16] which is the test for aider and abettor liability. See 15 U.S.C. § 78t(e); SEC v. Power, 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007) (citations omitted).  Accordingly, as to Jaeger, Counts I and III are dismissed in their entirety.

Count II

Count II is the SEC's claim that defendants violated Securities Act sections 17(a)(2) & (3).[17]  "The requirements for establishing a violation of Section 17(a) are nearly the same as those required for a claim under Securities Exchange Act Section 10(b) and Rule 10b-5 thereunder, although there is no requirement for the SEC to demonstrate scienter with respect to subsections

---

[16] Obviously, the complaint alleges that Jaeger "participated in the drafting of the earnings releases" (Compl. ¶ 172), but it alleges no facts that connect him to the inclusion of materially false statements in any of those releases.

[17] 15 U.S.C. §§ 77q(a)(2) & (3).

(a)(2) and (a)(3)."  Durgarian, 477 F. Supp. 2d at 355 (citing

Aaron, 446 U.S. at 681)).


     Jaeger moves to dismiss Count II on grounds that the SEC's

complaint does not satisfy Rule 9(b) and further argues that the

SEC has failed to state a claim that he violated Securities Act

section 17(a)(2) because the complaint does not identify any

money or property he obtained or any untrue statement he made.

For the same reasons that support dismissal of Counts I and III,

Count II is also dismissed as to Jaeger.


     Count IV

     In Count IV, the SEC asserts that all defendants violated

Exchange Act section 13(b)(5) and Rule 13b2-1, which pertain to

internal accounting controls and proscribe the falsification of

corporate books and records.  See 15 U.S.C. § 78m(b)(5); 17

C.F.R. § 240.13b2-1.  Jaeger moves to dismiss Count IV on grounds

that the SEC's complaint does not satisfy either Rule 9(b) or the

less stringent standard of Rule 8(a).  Specifically, he argues

that Count IV's claim under Exchange Act section 13(b)(5) fails

because the SEC has not alleged either particularized facts, or

any facts at all, showing that he: (1) had any involvement with

corporate books, records, or internal accounting controls or (2)

was knowingly involved in falsifying any such books or records or

failing to implement internal controls.  He further argues that Count IV's Rule 13b2-1 claim fails because the complaint does not identify any book, record, or account that he falsified and does not allege that he had any responsibility for implementing the company's internal accounting controls.  In its objection, the SEC challenges defendants' argument that the "sounds in fraud" doctrine applies to its claims under section 13 of the Exchange Act, but the SEC directs the court to no factual allegations in its complaint that might support its claims under section 13(b)(5) and Rule 13b2-1.  It is not the job of the court to sift through 187 paragraphs of the SEC's complaint in search of adequate factual allegations to support its claims.  Thus, the court construes plaintiff's failure to identify any factual support for its section 13(b)(5) and Rule 13b2-1 claims as an adequate concession that Count IV does not state a claim against Jaeger.  Accordingly, Jaeger is entitled to dismissal of Count IV.

Count V

In Count V, the SEC claims that all defendants violated Exchange Act Rule 13b2-2, which prohibits directors and officers from making false statements to accountants or auditors.  Jaeger moves to dismiss Count V on grounds that the SEC's complaint does not satisfy either Rule 9(b) or the less stringent standard of

Rule 8(a).  Specifically, he argues that Count V is deficient because the SEC has failed to allege either particularized facts, or any facts at all, that might support the conclusion that he ever once spoke to an auditor, caused others to speak to an auditor, or had any role in internal accounting controls.  The SEC counters that the complaint adequately alleges that "Patel and Jaeger, as officers, participated in numerous transactions in which they knew the Company was improperly recognizing revenues and yet they omitted to disclose this information to the Company's auditor."  (Pl.'s Obj. (document no. 92) at 32.)

The regulatory provision on which Count V is based provides, in pertinent part:

> (a) No director or officer of an issuer shall, directly or indirectly:
> (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or
> (2) Omit to State, or cause another person to omit to State, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:
> (I) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
> (ii) The preparation or filing of any document or report required to be filed with the [Securities and Exchange] Commission pursuant to this subpart or otherwise.

240 C.F.R. § 240.13b2-2.

37

Notwithstanding the SEC's contention to the contrary, the complaint does not allege that Jaeger participated in "numerous transactions" in which he knew that Enterasys was improperly recognizing revenues and yet omitted to disclose this information to the company's auditor.[18]  However, even if the complaint did say what the SEC thinks, Jaeger would still be entitled to dismissal of Count V.  The SEC relies upon Rule 13b2-2(a)(2), which makes it improper to omit to state material facts to an accountant, but the prohibition on omitting to state material facts is limited to situations where the omitted material facts were "necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading."  In other words, the rule does not impose upon directors or officers a duty to report information to accountants; it merely requires them not to make false statements to accountants and not to omit information from statements to accountants, when such an omission would result in a misleading statement.  Here, the complaint identifies no statements Jaeger made to the company's accountants or auditors, much less a statement that was made misleading by the omission of information

---

[18] Rather, read in the light most favorable to the SEC, the complaint alleges that Jaeger participated in the Everest transaction but, with regard to the Cellit, TrustWave, Centricity, iPolicy, and DigitalMojo transactions, only alleges that he had knowledge of them.

from it.  Without identifying a statement rendered misleading by the omission of information, the SEC has not stated a claim under Rule 13b2-2.

Count VI

In Count VI, the SEC claims that all defendants aided and abetted Enterasys in violating Exchange Act section 13(a) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13, which describe the requirements imposed upon issuers of securities to file various reports with the SEC.  See 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13; see also Ponce v. SEC, 345 F.3d 722, 735 (9th Cir. 2003).  Jaeger moves to dismiss Count VI on grounds that the SEC's complaint alleges no facts connecting him with any of Enterasys's allegedly false SEC filings.  The SEC counters that it adequately alleged Jaeger's participation in making false statements to the SEC by alleging that he submitted revenue for inclusion in the company's SEC reports, knowing that some of the revenue he submitted was not subject to recognition under either the company's revenue recognition policy or GAAP.

Exchange Act section 13(a) provides:

> Every issuer of a security registered pursuant to section 78l of this title shall file with the

[Securities and Exchange] Commission, in accordance
with such rules and regulations as the Commission may
prescribe as necessary or appropriate for the proper
protection of investors and to insure fair dealing in
the security—

> **(1)** such information and documents (and such
> copies thereof) as the Commission shall require to
> keep reasonably current the information and
> documents required to be included in or filed with
> an application or registration statement filed
> pursuant to section 78l of this title, except that
> the Commission may not require the filing of any
> material contract wholly executed before July 1,
> 1962.

> **(2)** such annual reports (and such copies
> thereof), certified if required by the rules and
> regulations of the Commission by independent
> public accountants, and such quarterly reports
> (and such copies thereof), as the Commission may
> prescribe.

Every issuer of a security registered on a national
securities exchange shall also file a duplicate
original of such information, documents, and reports
with the exchange.

15 U.S.C. § 78m(a). Exchange Act Rules 13a–1, 13a–11, and 13a–13

pertain, respectively, to the SEC's requirements for annual

reports on Form 10-K, <u>see</u> 17 C.F.R. § 240.13a-1, current reports

on Form 8-K, <u>see</u> 17 C.F.R. § 240.13a-11, and quarterly reports on

Form 10-Q, <u>see</u> 17 C.F.R. § 240.13a-13.  As the Ninth Circuit has

explained,

> these provisions of the Exchange Act require the filing
> of financial statements that (1) are prepared in
> conformity with GAAP; and (2) contain a report by an
> independent auditor certifying that the auditor had
> audited the company's financial statements, in

40

accordance with GAAS, to determine whether the
statements were prepared in conformity with GAAP.

Ponce v. SEC, 345 F.3d 722, 735 (9th Cir. 2003).  Rule 12b-20,

titled "[a]dditional information," provides:

> In addition to the information expressly required
> to be included in a statement or report, there shall be
> added such further material information, if any, as may
> be necessary to make the required statements, in the
> light of the circumstances under which they are made
> not misleading.

17 C.F.R. § 240.12b-20.

With regard to aider and abettor liability, the Exchange Act

provides:

> For purposes of any action brought by the
> [Securities and Exchange] Commission under paragraph
> (1) or (3) of section 78u(d) of this title, any person
> that knowingly provides substantial assistance to
> another person in violation of a provision of this
> chapter, or of any rule or regulation issued under this
> chapter, shall be deemed in violation of such provision
> to the same extent as the person to whom such
> assistance is provided.

15 U.S.C. § 78t(e).  Specifically,

> [l]iability for aiding and abetting securities fraud
> under [Exchange Act section 10(b)] attaches only upon a
> showing that: 1) a primary violation was committed, 2)
> the defendant[ ] had a general awareness that [his]
> conduct was part of an overall activity that was
> improper, and 3) the defendant[ ] knowingly and
> substantially assisted in the primary violation.

SEC v. Tambone (Tambone II), 473 F. Supp. 2d 162, 167–68 (D.
Mass. 2006) (citing SEC v. Druffner, 353 F. Supp. 2d 141, 150
(D. Mass. 2005)).  "[M]ere awareness and approval of the primary
violation is insufficient to make out a claim for substantial
assistance."  Power, 525 F. Supp. 2d at 422 (quoting SEC v.
Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006)).  Rather,
"[t]he aider and abettor's substantial assistance must be a
proximate cause of the primary violation."  Power, 525 F. Supp.
2d at 422 (citation omitted).

     With regard to factual support for the SEC's theory that
Jaeger's aider and abettor liability is established by his
submission of revenue for inclusion in Enterasys's SEC filings,
the complaint alleges that Jaeger: (1) "participated in
negotiating and finalizing" the reciprocal purchase agreement
with Everest (Compl. ¶ 63); (2) knew, or was reckless in not
knowing, that it was improper to recognize revenue from the
Everest transaction (¶ 66); (3) approved granting exchange rights
to Everest, despite knowing that such a grant of rights could
have an impact upon revenue recognition (¶ 67); (4) knew that
Enterasys entered into a financing arrangement with Cellit, that
neither company needed the other's product, that the only reason
for the agreement was to create revenue to recognize, and that

42

the transaction was not completed until the quarter after it was
reported (¶¶ 69-72); (5) <u>knew</u> that Enterasys's investment in
TrustWave lacked economic substance and was based upon the amount
of product TrustWave was willing to purchase from Aprisma, and
that TrustWave purchased Aprisma product it did not need and did
so only to help Aprisma meet its quarterly revenue goals; (¶ 145)
(6) <u>knew</u> that when Enterasys invested in Centricity, it was not
interested in the investment portion of the deal, and was
investing in an insolvent company that could not otherwise afford
the purchase it made from Enterasys (¶ 146); (7) <u>knew</u> that
Enterasys's sale to iPolicy was contingent on Enterasys prepaying
iPolicy for a comparable dollar value of engineering services and
making an investment in iPolicy, and that those contingencies
precluded revenue recognition (¶ 147); and (8) <u>knew</u> that
Enterasys's investment transaction with DigitalMojo was
structured as a three-corner deal to conceal DigitalMojo's
precarious financial condition from the outside auditor, that the
transaction lacked economic substance, and that revenue resulting
from it did not qualify for recognition under GAAP (¶ 151).
While the complaint alleges that Jaeger participated in one
transaction, and knew the revenue implications of several others,
it does not allege that Jaeger had any responsibility for or role
in submitting revenue from those transactions for inclusion in
the company's SEC reports, notwithstanding the SEC's statement

that the complaint alleged Jaeger's participation in submitting

revenue for inclusion in those reports.[19]


The factual allegations against Jaeger do not rise to the

level of aiding and abetting the preparation and filing of

Enterasys's allegedly false SEC reports.  Most of them concern

what Jaeger knew rather than what he did; liability for aiding

and abetting requires allegations of affirmative conduct, see

Druffner, 353 F. Supp. 2d at 151, rather than mere awareness and

approval,[20] see Power, 525 F. Supp. 2d at 422 (citation omitted).

The SEC does not allege that Jaeger had any role in: (1)

preparing Enterasys' SEC reports; (2) providing information to

---

[19] This representation is made at pages 35 and 36 of the
SEC's objection to Jaeger's motion to dismiss.  In combination
with the memorandum's previous representation, at page 32, that
the complaint alleges that Jaeger participated in the Cellit,
TrustWave, Centricity, iPolicy, and DigitalMojo transactions,
when all the complaint actually says is that Jaeger participated
in improper revenue recognition because he knew things about
those transactions that disqualified their revenue from
recognition, there appears to be an unfortunate pattern of
overstatement about the complaint in the SEC's responsive
pleadings.  The basic problem faced by the SEC with respect to
defendants' motions to dismiss is its draftsmanship.  Perhaps it
has pled what little facts it has, as best it can, but the
complaint must stand or fall on what it actually says and what
reasonable inferences may be drawn from what is actually pled.

[20] Wherever Jaeger is charged with knowledge, he is charged
with knowing that certain revenue was not recognizable, or that
factors weighing against revenue recognition were being withheld
from auditors; nowhere is he charged with knowing about, or
causing, the primary violation – Enterasys's submission of false
reports to the SEC.

those who did prepare such reports; or (3) preparing or providing
information for the preparation of the corporate books and
records on which the company's SEC filings were based.  Rather,
the only allegation of actual affirmative conduct related to the
SEC filings, under the SEC's stated theory of liability, is the
SEC's allegation that Jaeger participated in the negotiation and
finalization of the Everest deal.  That allegation, alone, does
not meet the requirement that Jaeger's acts proximately caused
Enterasys's primary violation, because there are simply too many
intervening steps between the negotiation of a deal that resulted
in revenue not subject to recognition under GAAP, and Enterasys's
preparation and submission of allegedly false and misleading SEC
reports, which is the primary violation at issue.  See SEC v.
Dauplaise, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, at *7 (M.D.
Fla. Feb. 22, 2006) (denying motion to dismiss section 13(a)
aiding and abetting claim based upon allegedly false SEC Form 8-K
when complaint alleged that defendant provided false information
to attorney preparing the 8-K, but granting motion as to
allegedly false SEC Form 10-Q when complaint alleged no facts
connecting defendant to preparation of 10-Q); SEC v. Orr, No. 04-
74702, 2006 WL 542986, at *18 (E.D. Mich. 2006) (denying motion
to dismiss section 13(a) aiding and abetting claim against
defendants alleged to have executed or to have caused to be
executed VATS forms containing false information, but granting

motion as to defendant not alleged to have made any
misrepresentations on VATS forms).

In sum, Jaeger's conduct, as pled by the SEC, does not
satisfy the proximate cause requirement – _i.e._, the SEC has not
sufficiently pled that Jaeger's conduct proximately caused the
falsification of Enterasys's SEC filings.  Thus, the SEC has
failed adequately to allege facts that would subject Jaeger to
liability as an aider and abettor of Enterasys's primary
violations of Exchange Act section 13(a) and Rules 12b-20, 13a-1,
13a-11, and 13a-13.

Count VII

In Count VII, the SEC claims that all defendants aided and
abetted Enterasys in violating Exchange Act section 13(b)(2)(A),
which sets out various requirements for corporate record keeping.
Jaeger moves to dismiss Count VII on grounds that the SEC's
complaint alleges no facts connecting him with any of Enterasys's
bookkeeping or accounting activities.  The SEC counters that
"[t]he complaint alleges [that] the Defendants caused the Company
to keep inaccurate books and records by entering into contingent
sales transactions or three-corner investment deals in which the
true nature of the transactions [was] not accurately recorded in
the Company's books and records."  (Pl.'s Obj. at 36.)

46

The statutory provision on which Count VII is based provides as follows:

> Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall—
>
> > **(A)** make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

15 U.S.C. § 78m(b)(2); see also Ponce, 345 F.3d at 735 ("Section 13(b)(2) requires companies to maintain books, records and accounts accurately and record transactions in conformity with GAAS."). Section 13(b)(2)(A) has "been read to require issuers to employ and supervise reliable personnel, to ensure that transactions are executed as authorized, to segregate accounting functions, and to have procedures designed to prevent errors and irregularities." SEC v. Yuen, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *42 (C.D. Cal. March 16, 2006).

As with Count VI, where the complaint fails to allege facts connecting Jaeger with the preparation of Enterasys's allegedly false SEC filings, the complaint also fails to allege facts that adequately connect Jaeger with the preparation of Enterasys's corporate books, records, and accounts. The only affirmative conduct attributed to Jaeger – negotiating the Everest deal – is

47

far too attenuated from the creation of false corporate records
to qualify as aiding and abetting a violation of section
13(b)(2)(A).  Cf. Ponce, 345 F. 3d at 738 (holding that defendant
"provided substantial assistance to [a] primary violation of
Sections 13(a) and 13(b)(2), by preparing the financial
statements that were eventually filed with both the quarterly and
annual reports, as well as auditing and certifying the [false]
reports that [the company] filed"); SEC v. Thielbar, No. CIV 06-
4253, 2007 WL 2903948, at *10 (D.S.D. Sept. 28, 2007) (denying
motion to dismiss section 13(b)(2) aiding and abetting claim when
complaint "contain[ed] several allegations regarding
[defendant]'s conduct in falsifying the books and records of NCS
. . . and in circumventing or failing to implement internal
accounting controls); SEC v. Baxter, No C-OF003843 RMW, 2007 WL
2013958, at *9  (N.D. Cal. July 11, 2007) (denying motion to
dismiss section 13(b) aiding and abetting claim when plaintiff
alleged that defendant "participated in drafting . . . false and
misleading disclosures . . ., reviewed the financial statements,
directed the reclassification of unsubstantiated balances to
conceal such balances from the auditors, and signed the
management representation letters"); SEC v. Hopper, No. Civ.A. H-
04-1054, 2006 WL 778640, at *15-16 (S.D. Tex. 2006) (denying
motion to dismiss section 13(b) aiding and abetting claim when
plaintiff alleged that one defendant orchestrated and directed

48

'round-trip' trading scheme without notifying accountants, legal staff, or external auditors and was provided financial statements reflecting fictitious revenues generated by that scheme, and alleged that second defendant was chief accounting officer who continued to report trades in corporate books and records on a gross basis, after being instructed to report them on a net basis); <u>Yuen</u>, 2006 WL 1390828, at *42 ("By directing the shifting of revenue from the print and channel advertisements to the IPG platform, Yuen caused Gemstar to create false and misleading books and records to support this improper revenue recognition practice.  Yuen substantially assisted in Gemstar's record-keeping violation, and Rule 13b2-1, by directing the improper recognition of IPG licensing revenue and approving the shifting of revenues on Gemstar's books from one advertising platform to another, in order to recognize IPG advertising revenue.").

Because the affirmative conduct Jaeger is alleged to have engaged in does not meet the proximate cause requirement, <u>i.e.</u>, that he proximately caused the alleged falsification of Enterasys's books, records, and accounts, the SEC has failed to allege sufficient facts to subject Jaeger to liability as an aider and abettor of Enterasys's primary violations of Exchange Act section 13(b)(2)(A).

## Conclusion

For the reasons given, Jaeger's motion to dismiss (document no. 72) is granted in part and denied in part. Specifically, all seven counts against Jaeger are dismissed, but without prejudice. See Daou Sys., 411 F.3d at 1028 (explaining that when a claim is dismissed for failing to satisfy Rule 9(b), the court "should ordinarily accept a proffered amendment that either pleads with the requisite particularity or drops the defective allegations and still states a claim").

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 24, 2008

cc:  James A. Scoggins, II, Esq.
     Jeffrey S. Lyons, Esq.
     Leslie J. Hughes, Esq.
     Nancy J. Gegenheimer, Esq.
     Diana K. Lloyd, Esq.
     John R. Baraniak, Jr., Esq.
     Lucy J. Karl, Esq.
     Peter B. Moores, Esq.
     Steven M. Gordon, Esq.
     Jeffrey B. Rudman, Esq.
     Jonathan A. Shapiro, Esq.
     Miranda Hooker, Esq.
     Peter A. Spaeth, Esq.
     Bruce A. Singal, Esq.
     John C. Kissinger, Esq.
     Michelle R. Peirce, Esq.
     Mark B. Dubnoff, Esq.

Richard J. McCarthy, Esq.
Michael D. Ramsdell, Esq.
Jennifer M. Ryan, Esq.
Maria R. Durant, Esq.
William H. Kettlewell, Esq.
Kevin E. Sharkey, Esq.
Ann Pauly, Esq.
Victor W. Dahar, Esq.
Andrew Good, Esq.
Philip G. Cormier, Esq.
Peter D. Anderson, Esq.
William Cintolo, Esq.