UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Securities and Exchange
Commission,
    Plaintiff

    v.                              Civil No. 07-cv-39-SM
                                      Opinion No. 2009 DNH 143
Piyush G. Patel, David J.
Kirkpatrick; Eric Jaeger;
Lawrence Collins; Michael A.
Skubisz; and Jerry A. Shanahan,
    Defendants

## O R D E R

A number of dispositive motions are pending.  Because the case's procedural history provides some context for their resolution, it is briefly summarized.

In response to the SEC's original complaint, four defendants filed motions to dismiss, which were granted either in full or in part, with leave to amend.  The SEC elected to file a First Amended Complaint (hereinafter "amended complaint").  Piyush Patel, David Kirkpatrick, Eric Jaeger, Lawrence Collins, and Jerry Shanahan moved to dismiss the amended complaint, and Michael Skubisz moved for judgment on the pleadings.  Thereafter, the court issued an order noting the SEC's ponderous pleading style, and setting a hearing, at which the SEC was directed to "efficiently and effectively review its claims against Patel,

Kirkpatrick, Jaeger, Collins, Skubisz, and Shanahan, [on the record,] defendant by defendant, and distinct legal theory by distinct legal theory, pointing out, element by element, the specific factual allegations pled in the amended complaint (by paragraph number) that support each claim." (Order (document no. 182), at 5.) The court further explained that the SEC would be bound by its representations at the hearing. (Id.)

The hearing was held on August 18, 2009. The court's high expectation that an organized presentation of hard factual allegations with respect to each defendant and claim was about to be had was quickly dashed. At the hearing, the SEC merely recited scores of paragraphs, by number, that it claimed would support the "employ any device, scheme, or artifice to defraud" element of a claim under 15 U.S.C. § 77q(a)(1) (Count I), and additional paragraph lists supporting the "false statement" element of a claim under section 77q(a)(2) (Count II). In response to a direct question from the court, inspired by the SEC's apparent and conceded strategy of orally listing, for each defendant, every paragraph in the amended complaint that mentioned his name, plus others,[1] the SEC agreed that it would list the same paragraphs for the claims in Counts III through

---

[1] The SEC routinely designated well over 100 paragraphs as supporting a single element of a single claim.

VIII that it designated as supporting the claims in Counts I and II.  Taking the SEC's oral listings at face value, a trudge through the repetitive and verbose amended complaint is unavoidable.

After the hearing, the SEC submitted a supplemental filing (document no. 202), purporting to further identify factual allegations in the amended complaint supporting its legal claims. The supplemental filing works in two ways.  It lists both paragraphs supporting elements of the claims that were not directly addressed at the hearing, and it also lists "new paragraphs" supporting the two claims that were addressed.  Patel objects to the court's consideration of those "add-on" paragraphs, and his point is well taken.  The SEC was told, well in advance of the hearing, that it would be required to identify the factual allegations supporting its claims, paragraph by paragraph, and would be bound by its representations at the hearing.  Accordingly, the court does not consider the SEC's "add-on" paragraphs, <u>i.e.</u>, the new paragraphs identified as supporting the two claims specifically addressed at the hearing.

## Prologue

Having considered the amended complaint and the SEC's objections to the six pending motions, having listened to the

SEC's specification and argument in support of its claims at the hearing, and having considered, in part, the SEC's supplemental filing, it seems evident that the SEC is laboring mightily to pound a number of square pegs into round holes of individual liability.  The court must, of course, deal with the case that has actually been pled, not the one that might have been.

Viewed broadly, the SEC's theory of liability is simply stated:

> During the relevant period, each of the Defendants, in a collective effort to artificially inflate the financial condition of Cabletron, Enterasys, and Aprisma, knowingly or recklessly negotiated, reviewed, participated in, and permitted numerous transactions for which revenue was improperly recognized under GAAP in the financial statements of Cabletron, Enterasys, and Aprisma and falsely reported in filings with the SEC, in press releases, and in analyst conference calls while the companies' stock was publicly trading.
>
> The Defendants also misrepresented information to, or concealed information from, the companies' outside auditor concerning the true nature of the transactions for which the company improperly recognized revenues. Patel, Kirkpatrick, and Jaeger were not only aware of the practice of concealing critical information from the companies' outside auditor, but approved and encouraged this practice to enable Cabletron, Enterasys, and Aprisma to continue to report consistently strong revenue growth and earnings per share results that met or exceeded Wall Street's expectations.

(Am. Compl. ¶¶ 29-30.)

4

The SEC's repeated references in the amended complaint to a "collective effort," and its practice of collectively attributing actions or statements to groups of people, or simply to "the defendants," are imprecise and make it difficult to understand just what is being claimed against each discrete defendant.   The SEC is not pursuing a conspiracy claim but, rather, is seeking to hold six defendants individually liable for violating numerous provisions of the Securities Act, the Exchange Act, and the rules promulgated thereunder.   The difficulties created by the disconnect between the SEC's general narrative descriptions of collective behavior and its effort to assert individual liability have been further compounded by several other factors, all within the control of the SEC: (1) a steadfast commitment to "shotgun" and "puzzle" pleading, see SEC v. Fraser, No. CV-09-00443-PHX-GMS, 2009 WL 2450508, at *14 (D. Ariz. Aug. 11, 2009) (granting in part the defendants' motion to dismiss the SEC's first amended complaint, and giving the SEC thirty days to replead);[2] (2)

---

[2] In Fraser, Judge Snow provides the following useful definitions:

> "Shotgun pleadings" are pleadings that "incorporate every antecedent allegation by reference to each subsequent claim for relief or affirmative defense." Teamsters Local 617 Pension & Welfare Funds v. Apollo Group., Inc., --- F. Supp. 2d ---, 2009 WL 890479, at *16 (D. Ariz. 2009) (citation omitted).  "Puzzle pleadings" are pleadings that "require the defendant and the court to match the statements up with the reasons they are false or misleading."  Id. (citation omitted).

continual blurring of three distinct theories asserted in Counts I, II, and III, <u>i.e.</u>, fraudulent scheme,[3] false statement,[4] and fraudulent course of business;[5] (3) a tendency to base multiple legal claims on the same conduct; and (4) a view of aider-and-abettor liability that calls to mind the apocryphal butterfly accused of causing a tornado in Texas by fluttering its wings in Brazil.

The court also notes, as it did in its order of July 7, 2009, that the amended complaint is no more helpful than the original complaint, and further observes that the SEC's presentation at the August 18 hearing (buttressed by its supplemental filing) suggest its own seeming inability to line up specific factual allegations with specific legal claims against specific defendants.  Defendants find themselves, by and large, in the untenable position of not being able to determine what precise conduct each is said to have engaged in that allegedly

---

2009 WL 2450508, at *14.  He continues: "A complaint which relies on shotgun or puzzle pleading <u>does not meet Rule 9(b)'s particularity requirement</u>."  <u>Id.</u> (quoting <u>Teamsters Local 617</u>, 2009 WL 890479, at *16) (emphasis added in <u>Fraser</u>).

   [3] <u>See</u> 15 U.S.C. § 77q(a)(1); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a).

   [4] <u>See</u> 15 U.S.C. § 77q(a)(2); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

   [5] <u>See</u> 15 U.S.C. § 77q(a)(3); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(c).

gives rise to liability under the various claims brought against them.  As the court observed at the hearing, the imprecision, passive voice, and circumlocutions employed throughout the amended complaint give the impression of drafters more intent on avoiding defamation liability than plainly and directly leveling factual allegations in support of legal claims.

There is no practical alternative, at this point, to the court's slogging through the amended complaint in search of meaningful factual allegations.  Requiring the SEC to file an amended complaint has proved futile, as has the hearing.  This order considers each of the five pending motions to dismiss, and the motion for judgment on the pleadings, defendant by defendant, and claim by claim.

## The Legal Standard

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under Rule 12(b)(6), a trial court "assume[s] the truth of all well-plead facts and give[s] the plaintiff[s] the benefit

of all reasonable inferences therefrom." <u>Vernet v. Serrano-Torres</u>, 566 F.3d 254, 258 (1st Cir. 2009) (quoting <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007)). However, the court need not credit "bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, . . . outright vituperation or subjective characterizations, optimistic predictions, or problematic suppositions." <u>Fantini v. Salem State Coll.</u>, 557 F.3d 22, 26 (1st Cir. 2009) (citations and internal quotation marks omitted).

"[T]o survive a motion to dismiss, a complaint must establish 'a plausible entitlement to relief' " <u>Vernet</u>, 566 F.3d 254 at 258 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559, (2007)), and "must contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the claims." <u>Fantini</u>, 557 F.3d at 26 (quoting <u>Bell Atlantic</u>, 550 U.S. at 544); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (citation and internal quotation marks omitted). <u>Iqbal</u> also teaches that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 129 S. Ct. at 1949 (citation omitted).

On the other hand, a Rule 12(b)(6) motion should be granted
if "the facts, evaluated in [a] plaintiff-friendly manner, [do
not] contain enough meat to support a reasonable expectation that
an actionable claim may exist." Andrew Robinson Int'l, Inc. v.
Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008)
(citations omitted). "A motion for judgment on the pleadings
under Federal Rule of Civil Procedure 12(c) is treated much like
a Rule 12(b)(6) motion to dismiss." Estate of Bennett v.
Wainwright, 548 F.3d 155, 163 (1st Cir. 2008) (citing Pérez-
Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008)).

The court has previously ruled that the "sounds in fraud"
doctrine applies to the entire complaint, thus obligating the SEC
to meet the heightened pleading standard of Rule 9(b) of the
Federal Rules of Civil Procedure. Rule 9(b), in effect when the
SEC filed its complaint, provided that "[i]n all averments of
fraud or mistake, the circumstances constituting fraud or mistake
shall be stated with particularity." FED. R. CIV. P. 9(b).[6] The
rule further provided that "[m]alice, intent, knowledge, and
other condition[s] of mind of a person may be averred generally."
Id. "In applying [the Rule 9(b)] standard to securities fraud
actions, this circuit has been notably strict and rigorous." SEC

---

[6] Rule 9(b) was amended effective December 1, 2007, but the
Advisory Committee Notes to the Federal Rules explain that the
2007 amendment was "intended to be stylistic only."

v. Durgarian, 477 F. Supp. 2d 342, 348 (D. Mass. 2007) (citing
Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir.
1999)).


The particularity "requirement 'entails specifying in the
pleader's complaint the time, place, and content of the alleged
false or fraudulent representations.' "  Arruda v. Sears, Roebuck
& Co., 310 F.3d 13, 19 (1st Cir. 2002) (quoting Powers v. Boston
Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991)); see also In re
StockerYale Sec. Litig., 453 F. Supp. 2d 345, 350 (D.N.H. 2006)
("The rule requires that the particular times, dates, places, or
other details of the alleged fraudulent involvement of the actors
be alleged.").  In addition, "general averments of the
defendants' knowledge of material falsity will not suffice."
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st
Cir. 1994) (citing Greenstone v. Cambex Corp., 975 F.2d 22, 25
(1st Cir. 1992)), superseded by statute on other grounds, 15
U.S.C. § 74u-4(b)(2), as recognized in Greebel, 194 F.3d at 197.
Rather, "[c]onsistent with Fed. R. Civ. P. 9(b), the complaint
must set forth specific facts that make it reasonable to believe
that defendant[s] knew that a statement was materially false or
misleading."  Serabian, 24 F.3d at 361 (citation and internal
quotation marks omitted).

Allegations of fraud must be organized "into discrete units that are, standing alone, each capable of evaluation." StockerYale, 453 F. Supp. 2d at 350 (quoting In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 55–56 (D. Mass. 1998)). And, "where . . . 'multiple defendants are involved, each defendant's role in the fraud must be particularized.' " Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802 F. Supp. 595, 600 (D.N.H. 1992) (quoting Shields v. Amoskeag Bank Shares, Inc., 766 F. Supp. 32, 40 (D.N.H. 1991)).

### Piyush Patel

"Piyush G. Patel was the Chief Executive Officer, President, and Chairman of the Board of Cabletron Systems Inc. ('Cabletron') from June 1999 until August 2001. After August 6, 2001, Patel became a consultant to Enterasys Networks, Inc. ('Enterasys') and Aprisma Management Technologies, Inc. ('Aprisma')." (Am. Compl. ¶ 5.)

A. Count I

In Count I (captioned "Fraud"), the SEC claims violations of Securities Act section 17(a)(1):

> As a result of the foregoing [the conduct alleged in
> paragraphs 1 through 374], the Defendants directly and
> indirectly, with scienter, in the offer or sale of
> Cabletron, Enterasys and Aprisma securities, by use of
> the means or instruments of transportation or

> communication in interstate commerce or by use of the
> mails, employed a device, scheme, or artifice to
> defraud.

(Am. Compl. ¶ 376).


Securities Act section 17(a)(1) provides:

> It shall be unlawful for any person in the offer
> or sale of any securities . . . by the use of any means
> or instruments of transportation or communication in
> interstate commerce or by use of the mails, directly or
> indirectly
>
> **(1)** to employ any device, scheme, or artifice
> to defraud.

15 U.S.C. § 77q(a)(1).  To violate § 77q(a)(1), a defendant must

act with scienter.  See Aaron v. SEC, 446 U.S. 680, 697 (1980).

Scienter, in turn, is "a mental state embracing intent to

deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues

& Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst

v. Hochfelder, 425 U.S. 185, 193–94 & n.12 (1976)).


Patel argues that the SEC's Securities Act scheme claim

should be dismissed for two reasons.  First, he says that,

notwithstanding the SEC's attempt to describe this case as

involving a scheme to defraud investors, it is, at its core, a

false-statement case, not a fraudulent-scheme (or course-of-

business) case, and that the SEC's scheme claim is nothing more

than a repackaged false-statement claim.  He also argues that
even if the amended complaint adequately alleges independent
bases for both a scheme claim and a false-statement claim in
general, it does not adequately allege facts to support a scheme
claim against him.  More precisely, Patel argues that the amended
complaint does not, as required by Rule 9(b), adequately allege
facts capable of supporting a finding of liability for fraud
against him, because its allegations are too generalized, do not
identify specific conduct by him involving investment deals
(three-cornered or otherwise), and rely too heavily on "pleading
by status," a practice he says has been soundly rejected in this
circuit.  The SEC disagrees, countering that it has adequately
alleged both false statements and a fraudulent scheme, and that
its factual allegations support a scheme claim against Patel.

    Because the Securities Act does not bar all schemes related
to the sale of securities, but only schemes to defraud, it is
necessary to describe the scheme the SEC claims Patel employed.
Count I does not, itself, describe any scheme at all.  (See Am.
Compl. ¶¶ 375-77.)  Rather, paragraph 375 simply alludes to the
374 paragraphs that precede it, leaving the reader to deduce the
outlines of the specific unlawful scheme charged.  That is
shotgun pleading.  See Fraser, 2009 WL 2450508, at *14.  The

overview section of the amended complaint does, however, offer

some guidance:

> From March 2000 through December 2001 (the "relevant
> period"), the Defendants, who are former employees,
> officers, and directors of Cabletron or its former
> subsidiaries Enterasys and Aprisma, participated in a
> company-wide scheme to artificially inflate the
> financial condition of Cabletron, Enterasys and Aprisma
> and thereby convince investors that Enterasys and
> Aprisma were viable independent companies with
> consistently strong revenue growth and earnings per
> share performance.

(Am. Compl. ¶ 22.)  The amended complaint continues: "The

Defendants' concerted efforts to publicly distort the financial

condition of Cabletron, Enterasys and Aprisma were driven by

Cabletron's February 2000 announcement that it would split into

four publicly traded companies."  (¶ 23.)


In its response to Patel's motion to dismiss, the SEC

explains that "[t]he [amended complaint] alleges that defendants

engaged in a scheme and course of business for seven consecutive

quarters during 2000 and 2001[7] in order to mislead the investing

public into believing that Cabletron had created four independent

stand alone companies that were viable enough to become publicly

traded."  (Pl.'s Resp. (document no. 177), at 2.)  The SEC

---

[7] The seven quarters at issue begin with the first quarter
of Fiscal Year 2001 ("Q1, FY 01") and end with the third quarter
of Transition Year 2001 ("Q3, TY 01").

further explains, more succinctly, "[t]he essence of the scheme
was to create and then report revenues from transactions that did
not meet the requirements for revenue recognition."  (Id. at 3.)
Finally, and again in its response to Patel's motion to dismiss
(i.e., not in the amended complaint), the SEC adds some
additional detail, identifying three "manipulative" or
"fraudulent" devices,[8] and then stating that "the [amended
complaint] alleges that, quarter after quarter, Defendants used
sham transactions to make up the 'revenue gap' and lead investors
to believe that the newly spun-off independent companies were
growing and performing as expected, all aimed at getting
investors to buy their stock when they went public."  (Id. at
15.)

     15 U.S.C. § 77q(a)(1) bars the employment of devices,
schemes, or artifices to defraud.  Section 77q(a)(2) bars the use

---

     [8] According to the SEC's response to Patel's motion to
dismiss: (1) "[o]ne manipulative device used in the scheme was to
put nonstandard terms, including rights of return and other
contingencies to payment in side letters" (Pl.'s Resp., at 4);
(2) "[a]nother device employed in the scheme was to utilize
Cabletron's substantial cash reserves to in effect 'buy' revenue
by investing in companies and requiring them to immediately use
the invested funds to buy Enterasys or Aprisma product" (id.);
and (3) "Patel and the other Defendants devised and employed
another fraudulent device, whereby they would interpose a third
party channel partner between the investee company and the
purchase order, so that the auditors would not know that the
investment and purchase order were in fact one interdependent
transaction" (id.).

of untrue statements of material fact.  Thus, "[c]laims for

engaging in a fraudulent scheme and for making a fraudulent

statement or omission are . . . distinct claims, with distinct

elements."  In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp.

2d 319, 336 (S.D.N.Y. 2004).[9]


     Judge Woodlock of the District of Massachusetts recently

explained the distinction between scheme claims and false-

statement claims under the Exchange Act.  And, because "[t]he

elements of an action for securities fraud under Section 10(b) of

the Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1)

of the Securities Act are substantially the same under the

Supreme Court's precedents," SEC v. Tambone (Tambone I), 417 F.

Supp. 2d 127, 131 (D. Mass. 2006), that explanation applies with

equal force to the SEC's Securities Act claims:

----

     [9] There are several reasons why a plaintiff might prefer to
make a claim under the scheme or course-of-business provisions
rather than the false-statement provisions.  See In re Alstom SA
Sec. Litig., 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) (observing
that plaintiffs might "cast claims of misrepresentations as
claims under Rule 10b-5(a) and (c) and thus evade the pleading
requirements imposed in misrepresentation cases") (citing Schnell
v. Conseco, Inc., 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999);
Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 238 (D.
Mass. 2004) (observing that scheme or course-of-business "claims
do not require false or misleading statements") (citing In re
Enron Corp. Sec, Derivative, & ERISA Litig, 235 F. Supp. 2d 549,
577 (S.D. Tex. 2002)).  Moreover, as is apparent from the
relevant statutes and regulations, there is no materiality
requirement for scheme or course-of-business liability.
     In this case, of course, the SEC is not making a scheme
claim instead of a false-statement claim, but in addition to one.

The conduct necessary to form a Rule 10b–5(a) or (c) violation can vary widely, but presumably these sections are intended to cover different conduct than Rule 10b–5(b).  See, e.g., SEC v. Martino, 255 F. Supp. 2d 268, 287 (S.D.N.Y. 2003) (defining stock market manipulation broadly to include any "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities," but delineating factors suggesting that manipulation is limited to manipulating the market itself) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)).  If the claimed fraudulent schemes or practices consisted simply of misleading statements and omissions, then they would fall entirely within the ambit of Rule 10b–5(b), and no separate (a) or (c) actions would lie.  If, on the other hand, they were part of a broader fraudulent "scheme," "practice," or "course of business," then they might allege something slightly different from a Rule 10b–5(b) claim, which could rest on a single misleading statement.

Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223, 238–39

(D. Mass. 2004) (parallel citations omitted).  Moreover, as Judge

Marrero of the Southern District of New York has explained:

Courts have held that a plaintiff may not cast claims of misrepresentations as claims under Rule 10b–5(a) and (c) and thus evade the pleading requirements imposed in misrepresentation cases.  See Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 447–48 (S.D.N.Y. 1999) (refusing to characterize allegations as market manipulation claims where alleged "scheme to defraud" consisted largely of an aggregation of material misrepresentations to inflate stock, such as research reports containing misrepresentations of the underlying facts and use of false names to solicit investors).  Furthermore, a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made.  Under these provisions, a

17

defendant can be held liable only for "specific false statements to the extent that it can be said to have made those statements under Rule 10b-5(b)." <u>See</u> <u>In re Global Crossing</u> [<u>Ltd. Sec. Litig.</u>], 322 F. Supp. 2d [319,] 337 n.17 [(S.D.N.Y. 2004)]; <u>see also</u> [<u>In re</u>] <u>Parmalat</u> [<u>Sec. Litig.</u>], 376 F. Supp. 2d [472,] 503 [(S.D.N.Y. 2005)] (noting that the application of subsections (a) and (c) of Rule 10b-5 "is not a backdoor into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5."). Nonetheless, it is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b-5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations. The subsections provide alternate mechanisms of pleading a primary violation of Section 10(b). Thus, even if a defendant who did not make any statements in connection with a particular fraud may not be held liable for fraudulent misrepresentations under subsection (b), that defendant may still be held liable under subsections (a) and (c) if it is alleged that they participated in [a] scheme that encompassed conduct beyond misrepresentations.

<u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) (footnote omitted). Finally:

> Market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by § 10(b) and Rule 10b-5 that do not fall within the category of misleading statements and omissions.

<u>In re Enron Corp. Sec., Derivative & ERISA Litig.</u>, 235 F. Supp. 2d 549, 579 (S.D. Tex. 2002). Applying these principles, the

court concludes that the SEC has identified and adequately
alleged a fraudulent scheme, in addition to the false statements
it alleges.[10]

Here, as in <u>Global Crossing</u>, defendant argues that "because
plaintiff[ ] [has] failed to allege 'market manipulation' [it
has] failed to state a claim for a fraudulent scheme under
subsections (a) and (c)."  322 F. Supp. 2d at 336.  However,
"subsections (a) and (c) encompass much more than illegal trading
activity: they encompass the use of '<u>any</u> device, scheme or
artifice,' or '<u>any</u> act, practice, or course of business' used to
perpetrate a fraud on investors."  <u>Id.</u> (quoting 17 C.F.R. §
240.10b–5(a) & (c).  The allegations found sufficient to state a
scheme claim in <u>Global Crossing</u> are remarkably similar to the
SEC's scheme claim in this case:

> The Complaint asserts that Andersen masterminded the
> misleading accounting for IRUs and the subsequent sham
> swap transactions used to circumvent GAAP and inflate
> the Companies' revenues, that it actively participated
> in structuring each swap, that it was intimately
> involved in all of GC's and AGC's accounting functions,
> and that it directly participated in the creation of
> the misleading 'pro forma' numbers that concealed these

---

[10] In that regard, this case has much in common with <u>SEC v.
Berry</u>, 580 F. Supp. 2d 911 (N.D. Cal. 2008).  There, the district
court determined that the SEC had stated a scheme claim arising
out of the defendant's alleged backdating of stock options, <u>id.</u>
at 923, and also stated a false–statement claim arising out of
the defendant's signing two SEC Forms S-8 that incorporated
various allegedly false financial statements, <u>id.</u>

> practices from investors.  Andersen's allegedly central
> role in these schemes, as their chief architect and
> executor, leaves no doubt as to its potential liability
> as a primary violator under section 10(b).

Id.  The court elaborated: "If the behavior alleged does not make

out a claim for engaging in 'any act, practice, or course of

business which operates or would operate as a fraud or deceit

upon any person,' then it is hard to imagine what would."  Id. at

337.


     Moreover, while the SEC correctly cites In re Parmalat

Securities Litigation, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005),

for the proposition that liability under Rule 10b-5 (a) and (c)

"is not a back door into liability for those who help others make

a false statement or omission in violation of subsection (b) of

Rule 10b-5," the court in Parmalat also determined that the

plaintiffs stated a valid scheme claim by alleging that

"Citigroup securitized, and BNL factored, invoices that, for

various reasons, were worthless."  Id. at 504.  The court

reasoned:

> [T]he arrangements involving the regular factoring and
> securitization of worthless invoices were deceptive
> devices or contrivances for purposes of Section 10(b).
> These were inventions, projects, or schemes with the
> tendency to deceive because they created the appearance
> of a conventional factoring or securitization operation
> when, in fact, the reality was quite different.  BNL
> knew when it paid Parmalat for the invoices that they
> were worth nothing and were in fact a trick to disguise

> its loan to Parmalat.  The same is true of Citigroup's
> purchase of certain invoices.  If the allegations of
> the complaint are accepted, the banks used these
> devices.  In the language of Rule 10b-5(c), the banks
> engaged in acts, practices, or courses of business that
> would operate as a fraud or deceit upon others.  In
> these circumstances, it cannot be said that the banks'
> conduct fell outside of Rule 10b-5 or Section 10(b).

Id.  Parmalat, like Global Crossing, counsels in favor of a

determination that, at least in general, the SEC has adequately

described and alleged a scheme, in addition to the false

statements it also identifies and alleges as a basis for

liability.


     Finally, it is necessary to delineate, precisely, the scheme

the SEC has pled.  That scheme is one to generate revenue not

properly recognized as revenue under generally accepted

accounting principles ("GAAP") and to improperly recognize that

revenue while claiming to adhere to GAAP principles.  There is

nothing inherently fraudulent about generating non-GAAP revenue;

the fraud or deception in the scheme arises when revenue not

recognizable under GAAP is presented as if it were.  Even absent

a statement of the sort necessary to establish liability under 15

U.S.C. § 77q(a)(2), employing a scheme to bring about the knowing

recognition non-GAAP revenue as GAAP revenue is sufficiently

deceptive to support liability under 15 U.S.C. § 77a(a)(1).[11]
Such a scheme might not be as effective without accompanying
statements reporting the falsified revenue, but, even so, the SEC
need not allege an effective scheme, only a scheme that is
fraudulent.

Having determined that, in general, the SEC has adequately
alleged a scheme, in addition to various false statements made in
furtherance of it, the next question is whether the amended
complaint adequately alleges that <u>Patel</u> employed that scheme.
Regarding the elements of employing a fraudulent scheme:

> [A] defendant can be liable for a fraudulent scheme if
> she has "<u>engaged in conduct that had the principal</u>

---

[11]  In <u>Quaak v. Dexia, S.A.</u>, 357 F. Supp. 2d 330 (D. Mass.
2005), Judge Saris described the relationship between scheme
liability and false-statement liability:

> [T]his Court has held that primary liability under
> Section 10(b) and Rule 10b-5 may in some cases be found
> where a person "substantially participates in a
> manipulative or deceptive scheme . . . even if a
> material misstatement by another person creates the
> nexus between the scheme and the securities market."
> [<u>In re</u>] <u>Lernout</u> [<u>& Hauspie Sec. Litig.</u>], 236 F. Supp.
> 2d [161,] 173 [(D. Mass. 2003)].  In that case, this
> Court found that plaintiffs' allegations that
> defendants FLV and Mercator set up, funded, and
> operated sham entities designed to enter into
> fraudulent licensing agreements with L & H in order to
> artificially inflate L & H's profits provided a strong
> inference of scienter and satisfied the requirements
> for liability under Section 10(b).  <u>Id.</u> at 174-76.

<u>Id.</u> at 341.

> purpose and effect of creating a false appearance of
> fact in furtherance of the scheme." Simpson v. AOL
> Time Warner Inc., 452 F.3d 1040, 1048 (9th Cir. 2006).
> To clarify, "[i]t is not enough that a transaction in
> which a defendant was involved had a deceptive purpose
> and effect; the defendant's own conduct contributing to
> the transaction or overall scheme must have had a
> deceptive purpose and effect." Id. For example,
> masterminding a misleading accounting scheme can
> suffice as conduct that furthers a fraudulent scheme.
> Id. at 1049 (citing In re Global Crossing, Ltd. Sec.
> Litig., 322 F. Supp. 2d 319, 336-337 (S.D.N.Y. 2004)).

SEC v. Berry, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008) (emphasis

added).  The relevant inquiry here, then, is whether the amended

complaint alleges that Patel engaged in conduct that had both the

purpose and effect of recognition, by Cabletron, Enterasys,

and/or Aprisma, of revenue that should not have been recognized

under GAAP.


It is important to note, at this point, that the question is

not whether the complaint alleges that Cabletron, Enterasys, or

Aprisma employed a fraudulent scheme or schemes.  Those corporate

entities are not named defendants.  The defendants here are not,

as in Global Crossing and Parmalat, corporate entities;[12] they

---

[12] In the discussion from Global Crossing quoted above, the
defendant was an accounting firm, see 322 F. Supp. 2d at 324,
while in the discussion from Parmalat quoted above, the
defendants were banks, see 376 F. Supp. 2d at 504 ("the major
question here is whether the banks directly or indirectly used or
employed any device or contrivance with the capacity or tendency
to deceive").

are individuals, against whom specific allegations of individual
conduct must be made.

The amended complaint does not adequately state a claim
against Patel under the Securities Act scheme provision for a
variety of reasons, discussed in detail below.  As a general
matter, the amended complaint includes many allegations
concerning what Patel knew, but few concerning what he did, or
said, or when.  And, where the amended complaint does allege
conduct by Patel, it is not conduct that had both the purpose and
effect of improper revenue recognition.  The amended complaint
distantly implies, hints at, and generalizes Patel's alleged role
in the scheme, but does not specify it – it does not, for
example, directly state that Patel "masterminded" the described
scheme, or concocted it, or set it in motion, or oversaw its
implementation, nor does it specifically allege how he did so,
beyond conclusory declarations.

Paragraphs 22, 23, 24, 26, 28, 29, 31-34, and 36-47 are all
part of an overview section that, as a rule, speaks in general
terms but does not make specific factual allegations.  The two
paragraphs that do allege specific conduct by Patel are
ineffective.  The first of those paragraphs states:

> Similarly, Patel sent a March 31, 2001 e-mail to the president of one of Cabletron's subsidiaries stating **"I want to do a deal that I invest $XM right now and I get PO of $XM right now, not later."** Patel also made clear that a customer's need for the product was irrelevant, stating: **"It does not seem like [the customer] ha[s] need for RSTN equipment.  We can always force the equipment on them."**

(Am. Compl. ¶ 38 (emphasis in the original).)  That paragraph says only that Patel sent an e-mail to "the president of one of Cabletron's subsidiaries," <u>not</u> that he sent it to the president of Enterasys or Aprisma.  The failure to name the recipient matters, because Cabletron had <u>four</u> subsidiaries, not just two, (¶ 23), and sending an e-mail to the president of a subsidiary other than Enterasys or Aprisma is not an act by Patel that could have caused either Enterasys or Aprisma to do anything fraudulent.  The second overview paragraph with specific content states:

> Knowing that the circumstances of the Defendants' investment deals would raise outside auditor's concerns and impair the companies' ability to recognize revenue from future investment deals, in approximately March 2001, Patel, Kirkpatrick, and Barber introduced and encouraged the investment team, which included Defendants Jaeger, Kirkpatrick, Patel, Fiallo, Barber, Shanahan, Hurley, Kay, Gagalis, Luacaw, and others, to utilize a new fraudulent device – a "three-corner deal" investment – to conceal improper revenue recognition from the companies' outside auditor.

(Am. Compl. ¶ 42.)  Paragraph 42 falls short of the Rule 9(b) pleading standard for several reasons.  It does not particularize

Patel's role.  See Manchester Mfg., 802 F. Supp. at 600.  By
saying that Patel (and others) "encouraged" others to use three-
corner deals, without saying how he did so, when he did so, etc.,
the amended complaint does not sufficiently allege specific
conduct by Patel that had a fraudulent purpose or effect.  See
Berry, 580 F. Supp. 2d at 923.  Patel could defend against a
specific allegation that he said something to the investment
team, orally or in writing, or that he offered incentives for
doing three-corner deals, or that he threatened adverse
consequences for those who did not do enough of them, or that he
communicated in some way what fraudulent purpose or effect he
intended.  But a generalized accusation of encouragement does not
tell Patel what conduct he must defend against.

     Finally, the amended complaint does not adequately allege
Patel's knowledge that three-corner deals posed a problem for
revenue recognition or were potentially fraudulent.  Paragraph 38
alleges that "Defendants knew or were reckless in not knowing
that it was improper to recognize revenue from investment
transactions unless certain criteria were met" (Am. Compl. ¶ 36),
and quotes an e-mail from Hurley that explained the outside
auditor's criteria for recognizing revenue under GAAP (id.).  The
SEC alleges that Hurley's e-mail went to "Fiallo, Kay, Collins
and others" (id.), but does not allege that it went to Patel.

Moving beyond the overview section, paragraph 58 states:

> Contrary to the guidance previously provided by its
> outside auditor (see ¶ 36), Patel distributed
> guidelines for investment deals in January 2001 making
> it clear that investment deals would not be approved
> unless they were connected to the purchase of product.
> Patel stated that "revenue must be recognizable in the
> current quarter," and any exception from that required
> his explicit approval.  This policy was distributed to
> Kirkpatrick, Skubisz, Fiallo, Kay, Barber and others.

(Am. Compl. ¶ 58.)  Whatever else that paragraph may allege, it
does not allege conduct by Patel that caused the false appearance
of fact.  As noted above, Patel did not receive the e-mail quoted
in paragraph 36.  Moreover, Patel's guidelines did not direct
anyone to make deals that resulted in revenue that was not
suitable for recognition under GAAP; as quoted in the amended
complaint, Patel's guidelines directed others to pursue deals
that resulted in revenue that <u>was</u> recognizable.

In paragraphs 71 through 79, the amended complaint describes
Cabletron's and Enterasys's SEC reporting, press release, and
analyst conference call at the end of Q1, FY 01.  While those
paragraphs may support false-statement claims, they say nothing
about Patel's role in revenue recognition at Cabletron or
Enterasys and, consequently, do not support the SEC's Securities
Act scheme claim.  In paragraph 83, also listed as supporting the

"employ any device, scheme, or artifice to defraud" element of Count I, the SEC alleges:

> Patel, Jaeger, and Kirkpatrick, who closely monitored the revenues generated from all investment deals, knew, or were reckless in not knowing, that Enterasys continued to recognize revenues from the DiscJockey.com deal even though the contingent investment had not been completed.  In fact, on October 2, 2000, these individuals received an e-mail from a member of the investment team advising them that the DiscJockey.com investment had still not been completed.

Plainly, that paragraph alleges that Patel knew something about the DiscJockey.com transaction and the manner in which revenue from it was being recognized by Enterasys, but it does not allege any conduct on Patel's part — anything Patel did — to bring about Enterasys's allegedly improper recognition of its Discjockey.com revenue.  Paragraph 92 is even less effective:

> Muzicom was precisely the type of investment deal that Patel had authorized and encouraged the Defendants to utilize to meet revenue projections at quarter end. Moreover, given their practice of monitoring, approving, and funding investment deals, both Patel and Jaeger knew, or were reckless in not knowing, that Muzicom was a sham transaction for which revenue should not have been recognized.

(Am. Compl. ¶ 92.)  There are several problems with paragraph 92. First, what Patel knew, as opposed to what he did, does not support scheme liability.  Turning to what Patel is alleged to have done, paragraph 92 does not allege that he specifically authorized or encouraged the Muzicom deal, only that he had

authorized and encouraged deals of that type.  The court has
already determined that the paragraph 42 encouragement
allegations are insufficient.  Moreover, those allegations
concerned the encouragement of three-corner deals, and as
described in paragraphs 88 through 91, the Muzicom transaction
was not a three-corner deal.  Nowhere in the amended complaint –
at least not in the paragraphs designated by the SEC – is it
alleged that Patel authorized and encouraged investment deals
similar to Muzicom transaction.

Yet another example of the amended complaint's inadequacy is
provided by the following paragraphs:

> In furtherance of Defendants' scheme, Jaeger and Patel
> participated in improperly recognizing revenues from
> sales to TrustWave Corp. during the fourth quarter of
> Fiscal Year 2001 ($43,000), and the first ($538,000)
> and second ($60,000) quarters of Transition Year 2001,
> and improperly reporting revenues in the third quarter
> ($60,000) of Transition Year 2001.

> At the time Enterasys and Aprisma recognized revenue
> from sales to TrustWave, Jaeger and Patel knew that
> TrustWave did not need the product and was only
> purchasing product to enable them to meet quarterly
> revenue goals.  In addition, Jaeger and Patel knew, or
> were reckless in not knowing, that the valuation for
> Cabletron's reciprocal investment in TrustWave lacked
> substance and was based on the amount of product
> TrustWave was willing to purchase.  Under these
> circumstances, Jaeger and Patel knew that the
> transaction with TrustWave lacked economic substance
> and that it was improper to recognize revenue for sales
> to TrustWave.

(Am. Compl. ¶¶ 128-29.)  For one thing, paragraph 128  does not particularize Patel's role.  See Manchester Mfg., 802 F. Supp. at 600.  More importantly, while paragraph 128 alleges that Patel "participated" in improper revenue recognition, it does not say how.  Regarding the adequacy of pleading "participation" in fraudulent activity, the district court in Parmalat explained:

> The complaint contains vague allegations that Parmalat made a number of statements "with the active participation" of the bank defendants.  These assertions are entirely conclusory, at least with respect to the banks, and therefore fail to meet the requirements of Rule 9(b) and the PSLRA for purposes of the claims against the banks.

376 F. Supp. 2d at 503 n.159 (citation to the record omitted).  Similarly, in Berry, the district court explained, à propos of the pleadings in this case:

> The SEC's allegations fall short of these thresholds. The SEC's conclusory pleadings that Ms. Berry "reviewed" and "discussed" various filings is insufficient to plead (with particularity) Ms. Berry's role in the purported fraud.  With respect to certain filings at KLA, the SEC goes one verb further and alleges that Ms. Berry "reviewed, discussed, and finalized" various public filings.  Finalizing a document for another executive to sign may suffice.  In re Software Toolworks [Inc.], 50 F.3d [615,] 628 & n.3 [(9th Cir. 1994)] (holding auditor liable for its "significant role in drafting and editing" a false filing).  Yet the SEC fails to allege with particularity what Ms. Berry's role was in "finalizing" these filings.  The SEC presumably knows what Ms. Berry's role was as it has already obtained significant document discovery from Ms. Berry's former employers.

580 F. Supp. 2d at 922.  And, in <u>Filler v. Lernout</u> (<u>In re Lernout</u>
<u>& Hauspie Securities Litigation</u>), the court noted that KPMG
Singapore's "role was more akin to the 'review and approval'
allegations which <u>no court has found sufficient to trigger</u>
<u>liability</u> after <u>Central Bank</u>."  230 F. Supp. 2d 152, 171 (D.
Mass. 2002) (citing <u>Central Bank of Denver, N.A. v. First</u>
<u>Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994)) (emphasis
added).

        Paragraph 129, which purports to expand upon paragraph 128,
merely says what Patel (and Jaeger) knew, or would have been
reckless in not knowing; it does not allege anything that Patel
<u>did</u>, as CEO of Cabletron, either to secure the revenue from
TrustWave or to cause its recognition by Enterasys and Aprisma,
two Cabletron subsidiaries.  The SEC also cites this paragraph:

> In addition to closely monitoring the details of the
> companies' investments and being responsible for
> approving investments in excess of $500,000, Patel also
> signed the iPolicy investment agreement the following
> quarter.  Accordingly, Patel knew, or was reckless in
> not knowing, that Aprisma had improperly recognized
> approximately $850,000 in revenues from the sale to
> iPolicy during the first quarter of Transition Year
> 2001 even though the contingent investment to which the
> sale was tied was not consummated until the following
> quarter.

(Am. Compl. ¶ 163.)   The subject of paragraph 163 seems to be what Patel knew, not what he did – his signing of the iPolicy investment agreement appears to be alleged in support of the proposition that he knew about improper recognition of revenue from that transaction.   A false appearance of fact, however, does not result from what a person thinks, but from what a person does.   Moreover, even if paragraph 163 is construed as alleging that Patel engaged in conduct supporting a scheme claim when he signed the iPolicy agreement, it fails.   Patel is alleged to have signed the iPolicy agreement during the quarter after Jaeger negotiated the deal.   (¶¶ 161, 163.)   The amended complaint also alleges that revenue from the iPolicy deal had already been recognized by the time Patel signed the investment agreement. (¶¶ 160, 163.)   The false appearance of fact that was the object of the scheme alleged in this case was the treatment of non-GAAP revenue as if it were GAAP revenue; the iPolicy revenue had already been recognized, and the false appearance of fact created, <u>before</u> Patel is alleged to have acted by signing the agreement.   In other words, Patel's conduct could not have caused the improper accounting treatment of revenue from the iPolicy deal.

Yet another paragraph identified by the SEC demonstrates the inadequacy of its allegations:

> Given Patel and Kirkpatrick's role in directing the
> Defendants to use fraudulent three corner deals, as
> well as their detailed review of the investments being
> consummated each quarter, Patel and Kirkpatrick also
> knowingly, or recklessly, caused Enterasys to
> improperly recognize $804,000 from the ParaProtect
> transaction.

(Am. Compl. ¶ 261.)  Those allegations come nowhere near meeting

the Rule 9(b) standard.  First, paragraph 261 does not

particularize Patel's role.  Second, it treats his role in

"directing" the use of three-corner deals as a given,

notwithstanding the lack of any antecedent paragraph adequately

alleging specific conduct on his part that amounted to

"directing" others to use three-corner deals.  There is nothing

in paragraph 261 that specifically connects Patel to the

ParaProtect transaction, or links him to the recognition of

revenue from it.  The paragraph alleges that Patel (and

Kirkpatrick) performed a "detailed review" of investment deals

each quarter, but does not indicate what details they examined,

or whether they ever actually reviewed the ParaProtect deal, or

what they might have said or done with respect to it.  It might,

perhaps, be inferred that if Patel and Kirkpatrick "reviewed"

investment deals each quarter, then they necessarily reviewed the

ParaProtect deal.  But one wonders, in light of the obligation to

plead fraud with specificity, why paragraph 261 does not simply

allege that Patel and Kirkpatrick reviewed the ParaProtect deal,

and that they acted in some culpable way as a result of that review.

Finally, perhaps the clearest example of the SEC's approach is this:

> Through their active involvement in the GEMMS investment deal, Barber and Gagalis caused Enterasys to improperly recognize approximately $1 million in revenue during this quarter, and to improperly report approximately $1 million in revenue in the third quarter of Transition Year 2001.  Shanahan, Gagalis, and Fiallo, who were responsible for reviewing and approving the GEMMS investment, as well as Patel, Kirkpatrick and Jaeger, who continued to closely monitor the details of all investment deals and to push the Defendants to complete fraudulent three-corner deals like GEMMS, also caused Enterasys to improperly recognize approximately $1 million in revenue from this transaction.

(Am. Compl. ¶ 253.)  Without specifically identifying an affirmative act, the SEC alleges that eight different defendants are individually liable for employing a fraudulent scheme.

Obviously, the foregoing discussion does not touch on each of the ninety-eight paragraphs identified by the SEC as supporting the "employ any device, scheme, or artifice to defraud" element of its claim in Count I.  Suffice it to say that after carefully examining each of the ninety-eight paragraphs

identified by the SEC,[13] under the applicable pleading standard, the court concludes that Count I does not adequately state a claim against Patel under 15 U.S.C. § 77q(a)(1).  Consequently, Patel is entitled to dismissal of Count I.

As this is the first of several claims that are dismissed for failure to meet the Rule 9(b) pleading standard, it is worth noting that Rule 9(b) should not present an obstacle in this case, unless the SEC simply does not have the evidence necessary to state its claims against each defendant with some specificity. If the SEC has sufficient evidence supporting the individual claims made – and defendants repeatedly point out that nearly everything that could possibly be relevant has already been collected by the SEC, and disclosed in a parallel criminal prosecution – all Rule 9(b) requires is a modest degree of clarity – who did what, said what, to whom, and when?  At this stage, inference, innuendo, resort to the passive voice, group pleading, and vague conclusory language all tend to suggest that

---

[13] With respect to the "employ any device, scheme, or artifice to defraud" element of Count I, the court extracted all of the ninety-eight paragraphs from the amended complaint designated by the SEC, collated them into a separate document, highlighted each use of Patel's name in one color, and then highlighted every verb, i.e., every single act Patel is alleged to have performed.  Then, the court attempted to cobble together any set of paragraphs that specifically alleged affirmative conduct by Patel, including statements, that support the claim that he had a purpose to create, and actually effected the creation of, a false appearance of fact.  It was futile.

the SEC does not have, and has little hope of finding, evidence necessary to support its claims.

B. Count II

In Count II (captioned "Fraud"), the SEC claims violations of Securities Act sections 17(a)(2) and (3):

> The Defendants directly and indirectly, in the offer or sale of Cabletron, Enterasys, or Aprisma securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of Cabletron or Enterasys securities.

(Am. Compl. ¶ 379.)

> Securities Act sections 17(a)(2) and (3) provide:

> > It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

> > > . . . .

> > > **(2)** to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

36

> **(3)** to engage in any transaction, practice, or
> course of business which operates or would operate
> as a fraud or deceit upon the purchaser.

15 U.S.C. §§ 77q(a)(2) & (3).  Scienter is not an essential

element of a false-statement or course-of-business claim under

the Securities Act.  <u>See</u> <u>Aaron</u>, 446 U.S. at 697.


In its order on Patel's previous motion to dismiss (document

no. 132), the court treated Counts I, II, and III as being based

entirely on Patel's alleged false statements in SEC filings and

press releases, and dismissed those counts, on two grounds.  With

regard to the statements in SEC filings, the court ruled that the

SEC failed to adequately allege that the false statements

attributed to Patel were material.  With regard to the statements

in press releases, the court ruled that the SEC failed to

adequately allege falsity, Patel's knowledge of falsity, or

materiality (or some combination thereof).  The amended complaint

appears to: (1) increase the number of statements for which the

SEC seeks to hold Patel liable (by making additional allegations

concerning Patel's knowledge of transactions entered into by

others and by identifying additional factual statements in

various documents it attributes to Patel); (2) advance additional

arguments relative to materiality;[14] and (3) point out that the
SEC is also making a Securities Act course-of-business claim in
Count II.

The court begins with the false-statement claims.  The SEC
says that Patel is liable for false statements made at the ends
of each of seven consecutive quarters, in SEC filings (Am. Compl.
¶¶ 71, 76, 109-11, 139-41, 144, 178-81, 170-72, 278, 280-83, 352-
54, 356-57), earnings releases (¶¶ 71, 78, 84, 102, 112-14, 142,
182-83, 186-87, 273-75, 284-85), and analyst conference calls (¶¶
71-74, 78, 84, 102, 112-14, 142, 182-84, 187, 276, and 284).  The
court proceeds quarter by quarter.

The SEC has failed to state a claim under 15 U.S.C. §
77q(a)(2) based upon Patel's alleged false statements about Q1,
FY 01 (March 1, 2000, through June 3, 2000).  According to the

_____

[14] Specifically, the SEC responds to the prior dismissal of
the false-statement claims by suggesting that the court's
transaction-by-transaction approach is incorrect, and arguing
that "[t]he allegations of the [amended complaint] show that
Patel is responsible for all of the misstatements because of his
central role in causing the misstatements to be made . . ."
(Pl.'s Resp., at 18-19.)  Andy may be held liable for a false
statement uttered by Bill, when Andy has knowingly provided false
information to Bill, knowing that Bill will utter it, see SEC v.
Wolfson, 539 F.3d 1249, 1261 (10th Cir. 2008), but the SEC has
identified no legal authority for its more expansive approach,
which would make Andy liable merely for inspiring Bill to make a
false statement.  The SEC's approach conflates scheme liability
and false-statement liability.

SEC, Cabletron and Enterasys improperly recognized $4.937 million in revenue for that quarter, and Patel made various statements that incorporated the improperly recognized revenue.[15]

The SEC has not met the Rule 9(b) pleading standard with respect to Patel's knowledge that the revenue in question was recognized improperly.  The figure of $4.937 million is comprised of $2.258 million in revenue from a transaction between Enterasys and DiscJockey.com (conducted by Kirkpatrick), and $2.679 million in revenue from three separate transactions between Enterasys and Novatec, PEAC, and JBS (all conducted by Hor Chong (David) Boey).

Regarding Patel's knowledge of the DiscJockey.com transaction, the complaint alleges:

> Given their daily involvement in closely tracking the companies' revenue numbers and each of the transactions constituting those numbers in the final weeks of each quarter, as well as Patel's practice of reviewing, approving, and funding investment deals, Patel and Jaeger each knew, or was reckless in not knowing, that DiscJockey.com's purchase was contingent upon an uncompleted investment and lacked economic substance.

---

[15] Among those statements was Patel's statement, in Cabletron's Form 10-Q, that the company had net revenue of $275 million for the quarter, when actual revenue was $270 million. In other words, the SEC claims that Patel overstated Cabletron's net revenue by 1.85 percent.  Even if the SEC had adequately alleged Patel's knowledge of the falsity of that statement, which it has not, see infra, that false statement is immaterial as a matter of law under the principles described in the order on Patel's motion to dismiss the original complaint.

(Am. Compl. ¶ 63.)  Those allegations do not "set forth <u>specific</u> <u>facts</u> that make it reasonable to believe that [Patel] knew that [his] statement[s] [about Cabletron's performance in Q1, FY 01 were] materially false or misleading."  <u>Serabian</u>, 24 F.3d at 361. Again, Patel's role is not fully particularized; his close tracking of revenue numbers is lumped in with Jaeger's. Moreover, paragraph 63 does not allege that Patel had any specific knowledge of the DiscJockey.com transaction; that conclusion requires an inference from the more general allegations the SEC does actually make.  And, while the SEC alleges, as a "given," that Patel (and Jaeger) "had daily involvement in closely tracking . . . revenue numbers," and that Patel had a practice of reviewing, approving, and funding investment deals, there are no factual allegations describing what, exactly, they tracked, reviewed, or approved, which would be necessary to allege that Patel's review and approval would have informed him of the key fact noted in paragraph 63, <u>i.e.</u>, that the DiscJockey.com transaction lacked economic substance.

Had paragraph 63 said: "Patel reviewed the DiscJockey.com investment deal, and in the process, had access to information about DiscJockey.com's financial condition," then that paragraph would support the knowledge-of-falsity element of a false-

40

statement claim.  But that is not what paragraph 63 says.  At this point, the court must presume that the SEC's lack of specificity is deliberate, and that it is simply not able to plead very much of this case with the necessary level of detail.

Regarding Patel's knowledge of the Novatec, PEAC, and JBS transactions, the complaint alleges:

> Although Boey knew that the sell through payment terms in the agreements with Novatec, PEAC, and JBS precluded revenue recognition, he nevertheless used these sham sales to bridge Enterasys's revenue shortfall and improperly recognize $2.679 million in revenue during the first quarter of Fiscal Year 2001.

> Throughout the scheme, Patel, Kirkpatrick, and Jaeger knowingly failed to implement and/or circumvented internal accounting controls that would have ensured transactions such as Novatec, PEAC, and JBS were properly accounted for because they knew they intended to recognize revenue if it was needed to meet expectations, whether appropriate or not.

> Patel, Kirkpatrick, and Jaeger either knew of the sell-through payment terms as a result of monitoring transactions, or were reckless in not implementing a system of internal controls which would have alerted them to the contingent sales terms which made revenue recognition on these transactions improper.

(Am. Compl. ¶¶ 68-70.)  Again, those allegations do not set forth specific facts from which one could reasonably infer Patel's knowledge that the Novatec, PEAC, and JBS transactions resulted in non-GAAP revenue that was improperly recognized.  For one thing, those paragraphs lack particularized allegations.  Then,

they do not allege that Patel actually knew anything about the transactions, only that he might have, or should have.  But even under the reading most favorable to the SEC, the amended complaint alleges only that Patel should have known of revenue-disqualifying aspects of those transactions, not that he had any knowledge of their actual accounting treatment.  That is, those paragraphs do not adequately allege that Patel knew that revenue from those three transactions was treated as GAAP revenue when it should not have been.

The SEC has failed to state a claim under 15 U.S.C. § 77q(a)(2) based upon Patel's alleged false statements about Q2, FY 01 (June 4, 2000, through September 2, 2000).  Because the alleged Q2, FY 01, false statements reported the same revenue that supported the SEC's claims regarding false statements about Q1, FY 01 (see Am. Compl. ¶ 82), the SEC has failed to adequately allege specific facts which, if proven, would demonstrate Patel's knowledge of the falsity of any statements he made about the performance of Cabletron and its subsidiaries in Q2, FY 01.

The SEC has failed to state a claim under 15 U.S.C. § 77q(a)(2) based upon Patel's alleged false statements about Q3, FY 01 (September 2, 2000, through December 2, 2000).  As with the two previous quarters, the SEC has failed to adequately allege

42

specific facts which, if proven, would demonstrate Patel's knowledge of the falsity of any statements he made about the performance of Cabletron and its subsidiaries in Q3, FY 01.  (See Am. Compl. ¶¶ 92-93 (alleging Patel's knowledge of a transaction with Muzicom), 102 (alleging Patel's knowledge of a transaction with SG Cowen), 108 (indicating that the alleged Q3, FY 01, false statements were also based on the Novatec and PEAC transactions)).[16]

The SEC has failed to state a claim under 15 U.S.C. § 77q(a)(2) based upon Patel's alleged false statements about Q4, FY 01 (December 3, 2000, through March 3, 2001).  In the order on Patel's previous motion to dismiss, the court noted that the original complaint adequately alleged Patel's knowledge of a mere $43,000 of improperly recognized revenue (from a transaction with TrustWave) and held that, under the circumstances, a $43,000 misrepresentation was comparatively minor, and was not material with respect to Enterasys's actual revenue, as a matter of law. The SEC's allegations seeking to impute to Patel knowledge of transactions with GovStreet and ConvergeLabs (see Am. Compl. ¶¶

---

[16] The SEC has also failed to allege the materiality of any alleged false statements concerning Cabletron's Q3, FY 01, net revenue.  The complaint alleges that net revenue was overstated by $3 million (Am. Compl. ¶ 109), but does not say what the net revenue actually was, making it impossible to determine the relative magnitude of a $3 million overstatement.

122, 126) do not meet the Rule 9(b) pleading standard,[17] and the
allegations concerning Patel's knowledge of the deal Boey
negotiated with ChoiceWay are barely better.  Regarding
ChoiceWay, the amended complaint states:

> Because the ChoiceWay and TrustWave investment deals
> exceeded $500,000, they required the prior approval of
> Patel.  Moreover, given that Patel and Jaeger were
> copied on e-mails reflecting the sham nature of the
> TrustWave investment, and that Patel, Kirkpatrick, and
> Jaeger were regularly briefed on the details of all
> investment deals, including the revenues to be
> recognized from each deal, they each knew, or were
> reckless in not knowing, that Aprisma and Enterasys
> would improperly recognize or report a total of
> $701,000 in revenues ($43,000 this quarter) from the
> TrustWave deal and that Enterasys would improperly
> recognize a total of $3.1 million in revenues ($1.88
> million this quarter) from the ChoiceWay deal.

(Am. Compl. ¶ 136.)  The foregoing paragraph does not allege
specific facts; it consists of collective conclusory generalities
("Patel, Kirkpatrick, and Jaeger were regularly briefed") and
conclusory descriptions ("the sham nature of the TrustWave
investment").  Moreover, even if the SEC had adequately alleged
Patel's knowledge of the falsity of his statements concerning Q4,
FY 01, based on the TrustWave and ChoiceWay transactions, his

---

[17] Paragraph 122 says only that the GovStreet investment was
the type of deal that Patel had encouraged, and that it required
the approval of Patel <u>or</u> Kirkpatrick.  It does not allege that
Patel actually approved the GovStreet deal.  Paragraph 126 says
only that Patel and Jaeger closely monitored the companies'
investment deals in general, not that they knew anything about
this particular investment deal.

knowing overstatement of Cabletron's revenue would amount to only $1.923 million, or .69 percent of Cabletron's actual revenue, which discrepancy would not meet the materiality requirement as a matter of law.

Finally, notwithstanding the SEC's identification of allegedly false statements by Patel concerning operating losses in Q4, FY 01, the SEC has not adequately alleged materiality. Statements about operating losses (as well as statements about net losses to shareholders and statements about earnings or losses per share) are, at least in this case, directly derivative of statements concerning net revenue, which means that, although they are false, the materiality requirement is not met.[18]

The statements concerning Wall Street expectations present a slightly different situation.  Regarding Q4, FY 01, the SEC says that Patel claimed Cabletron had achieved pro forma earnings per share of $.06, while the actual earnings were $.04 per share. Given that discrepancy, says the SEC, Patel's claim that Cabletron had met or exceeded the Wall Street estimate of $.05 per share in the March 29, 2001, earnings release and analyst

---

[18] Those other measures of performance are directly derivative of net revenue, in this case, because the SEC alleges only one basis for defendants' knowledge of the falsity of statements concerning those other financial data, their knowledge of improperly recognized revenue.

conference call amounted to a material misrepresentation.  Had
the SEC adequately alleged Patel's knowledge of the full $7
million in non-GAAP revenue that was recognized in Q4, FY 01,
then, perhaps, it would have adequately alleged that his
statements about beating Wall Street expectations constituted
material misrepresentations.  But, the SEC has adequately alleged
only that Patel knew of approximately $2 million in improperly
recognized revenue.  If $7 million in net revenue generated $.02
in pro forma earnings per share, i.e., made the difference
between the $.04 the SEC says Cabletron actually earned and the
$.06 it claimed to have earned, then, necessarily, it took $3.5
million in net revenue to generate $.01 in pro forma earnings per
share during Q4, FY 01.  Because Patel is alleged to have known
about only $2 million in improperly recognized non-GAAP revenue,
the SEC has failed to allege that Patel knew that Cabletron had
fallen short of the Wall Street estimate when he reported that
Cabletron had exceeded it.

    The SEC has, however, stated a claim under 15 U.S.C. §
77q(a)(2) based upon Patel's alleged false statements about Q1,
TY 01 (March 4, 2001, through June 2, 2001).  In the order on
Patel's previous motion to dismiss, the court noted that the
original complaint adequately alleged Patel's knowledge of $1.543
million of improperly recognized revenue (from transactions with

TrustWave and Cellit), and ruled that a $1.543 million
misrepresentation failed to meet the materiality requirement, as
a matter of law.  The SEC's attempts to impute to Patel knowledge
of transactions with HealthCite and iPolicy do not meet the Rule
9(b) pleading standard.  The allegations concerning the
HealthCite transaction consist of the standard generalities
("Given that they closely monitored, reviewed, and/or approved
the details of the HealthCite investment, Patel, Jaeger, and
Kirkpatrick knew, or were reckless in not knowing, that Enterasys
improperly recognized approximately $2 million in revenues from
this investment." (Am. Compl. ¶ 159)).  The allegations
concerning the iPolicy transaction are even more tenuous:

> In addition to closely monitoring the details of the
> companies' investments and being responsible for
> approving investments in excess of $500,000, Patel also
> signed the iPolicy investment agreement the following
> quarter.  Accordingly, Patel knew, or was reckless in
> not knowing, that Aprisma had improperly recognized
> approximately $850,000 in revenues from the sale to
> iPolicy during the first quarter of Transition Year
> 2001 even though the contingent investment to which the
> sale was tied was not consummated until the following
> quarter.

(Am. Compl. ¶ 163.)  That paragraph does not adequately allege
Patel's knowledge of the iPolicy deal at the time he made
statements that were based, in small part, on the revenue it
generated.  Thus, with respect to net revenue, the analysis is
identical to that in the previous order; the amended complaint

47

fails to adequately allege that Patel made a <u>material</u>
misrepresentation because the complaint only alleges that Patel
knowingly overstated Cabletron's net revenue by .51 percent,
which discrepancy is not material.  Other allegations about false
statements directly derivative of the net revenue figure, such as
statements reporting operating losses, net income, and earnings
per share, also fail to meet the materiality requirement.

The SEC also alleges that during the analyst conference call
and earnings release on June 27, 2001, Patel announced that
Cabletron had met Wall Street's expectation of $.08 per share in
pro forma earnings, and Cabletron announced that Aprisma had
revenue of $22.3 million.  Regarding the Wall Street expectation
for Cabletron's pro forma earnings per share for the quarter,
Patel is alleged to have known about $1.543 million in non-GAAP
revenue that was improperly recognized.  Because it took $2.75
million in net revenue to generate $.01 in pro forma earnings per
share that quarter, Patel knew that Cabletron's pro forma
earnings were actually closer to $.07 per share than $.08 per
share when he said that Cabletron's earnings had met the Wall
Street expectation of $.08.  That, arguably, was a material
misrepresentation.  Moreover, when Cabletron reported in the June
27, 2001, earnings release that Aprisma had revenue of $22.3
million, Patel knew that at least $1 million of that revenue was

from the Cellit transaction, which means that, if Cabletron's statement is properly attributed to Patel,[19] he knowingly overstated Aprisma's revenue by approximately five percent, which again, arguably, constituted a material misrepresentation.

The amended complaint fails to state a claim under 15 U.S.C. § 77q(a)(2) based upon Patel's alleged false statements about Q2, TY 01 (June 3, 2001, through September 1, 2001).  For one thing, the amended complaint does not allege that Patel actually signed any SEC filings for that quarter,[20] or provided any information that was included in any such filing; it only alleges that he "reviewed and approved" various statements.  Moreover, the SEC's attempts to impute to Patel knowledge of improperly recognized revenue from the transactions with KeyBridge, GEMMS, and ParaProtect do not meet the Rule 9(b) pleading standard.  (See ¶¶

---

[19] That is a close question.  In paragraph 182, the amended complaint alleges that "Patel announced in Cabletron's June 27, 2001 earnings release and analyst conference call that Cabletron had achieved pro forma earnings per share of $.08 . . . ."  In paragraph 184, it expressly attributes statements about Aprisma in the June 27 conference call to Skubisz.  And, in paragraph 186, it attributes statements about Aprisma in the June 27 earnings release to "Cabletron," rather than to Patel or Skubisz. For purposes of this ruling, the court will assume that the June 27 earnings release statement about Aprisma was a statement by Patel.

[20] By the time the filings at issue were submitted to the SEC, Patel was no longer CEO of Cabletron.  (Am. Compl. ¶ 5.)

214, 253, 261, 269).[21]  Thus, as with the original complaint,
Patel is specifically alleged to have knowingly overstated
Enterasys's net revenue by only $60,000, or less than .03
percent.  That is not material as a matter of law, and that
amount of overstated revenue falls far below the threshold
necessary to subject Patel to liability for his statement that
Enterasys had exceeded Wall Street expectations.[22]

The amended complaint fails to state a claim under 15 U.S.C.
§ 77q(a)(2) with respect to Patel's alleged false statements
about Q3, TY 01 (July 1, 2001, through September 29, 2001).  The
amended complaint does not rely on any new transactions
consummated during that quarter, but only the revenue generated
by previously negotiated deals.  Thus, as with the original

---

[21] Paragraph 214 lumps Patel, Jaeger, Kirkpatrick, and
Shanahan, and does not allege any specific involvement in the
KeyBridge deal, only that they, collectively, "closely monitored
investment deals."  Paragraph 253 lumps Patel, Kirkpatrick, and
Jaeger and does not allege any specific involvement in the GEMMS
deal, only that they, collectively, "continued to closely monitor
the details of all investment deals."  Paragraph 261 lumps Patel
and Kirkpatrick, and does not allege any specific involvement in
the ParaProtect deal, only that they, collectively, reviewed
investment deals each quarter.  Paragraph 269 lumps Kirkpatrick,
Patel, and Barber, and alleges only that they, collectively,
introduced the use of three-corner deals.

[22] That quarter, it took $3 million in net revenue to
generate $.01 in pro forma earnings per share.  Thus, Patel's
alleged knowledge of $60,000 in non-GAAP revenue is nowhere near
adequate to support a claim that he made a knowing material
misrepresentation when he said that Enterasys had met Wall Street
estimates that quarter.

complaint, allegations that Patel knowingly overstated Enterasys's net revenue by only $60,000 for the quarter, or approximately .07 percent, fail to meet the materiality element.

In sum, the false-statement allegations against Patel under 15 U.S.C. § 77q(a)(2) are sufficient only to state a claim based on two statements concerning Q1, TY 01, made in the quarterly analyst conference call and earnings release: the statement that Cabletron met Wall Street expectations and the statement that Aprisma had $22.3 million of net revenue.

The course-of-business claim in Count II under 15 U.S.C. § 77q(a)(3) fails for the same reasons given regarding the scheme claim in Count I.

C. Count III

In Count III (captioned "Fraud"), the SEC alleges violations of Exchange Act section 10(b) and Rule 10b-5:

> The Defendants directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as

51

a fraud or deceit upon any person, in violation of
Exchange Act Section 10(b) and Rule 10b-5.

Alternatively, by reason of the conduct alleged in
paragraphs 1-374, Cabletron and Enterasys violated
Exchange Act Section 10(b) and Rule 10b-5 thereunder,
and the Defendants aided and abetted Cabletron's and
Enterasys's violations by knowingly and substantially
assisting those violations.

(Am. Compl. ¶¶ 382, 384.)

Exchange Act section 10(b) provides:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce or of the mails, or of any
facility of any national securities exchange--

. . . .

**(b)** To use or employ, in connection with the
purchase or sale of any security registered on a
national securities exchange . . . any
manipulative or deceptive device or contrivance in
contravention of such rules and regulations as the
Commission may prescribe as necessary or
appropriate in the public interest or for the
protection of investors.

15 U.S.C. § 78j(b).  Exchange Act Rule 10b-5 provides:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to
defraud,

(b) To make any untrue statement of a material
fact or to omit to state a material fact necessary in

52

order to make the statements made, in the light of the
circumstances under which they were made, not
misleading, or

     (c) To engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b-5.  Scienter is an element under all three
Rule 10b-5 theories.  See Tellabs, 551 U.S. at 319.


     Turning first to direct liability, because "[t]he elements
of an action for securities fraud under Section 10(b) of the
Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1) of
the Securities Act are substantially the same under the Supreme
Court's precedents," Tambone I, 417 F. Supp. 2d at 131, the
court's disposition of Counts I and II dictates the disposition
of the Rule 10b-5(a) scheme claim and the Rule 10b-5(c) course-
of-business claim in Count III.  Moreover, because the SEC
adequately alleges scienter, the court's disposition of the
Securities Act false-statement claim in Count II dictates the
disposition of the Rule 10b-5 false-statement claim in Count III.
In other words, the SEC has adequately alleged a claim for direct
liability against Patel under Rule 10b-5(b), with the proviso
that the claim is limited to the two statements identified in the
foregoing discussion of Count II.

53

The SEC also pleads Count III in the alternative, asserting a claim of aider-and-abettor liability.  Given the foregoing disposition of the direct-liability aspect of the SEC's Rule 10b-5 claims, there is no need to address the SEC's aider-and-abettor theory of liability for its false-statement claim.  That alternative theory remains alive, and available to the SEC at future stages of this case.  On the other hand, with regard to the Rule 10b-5 scheme and course-of-business claims, it is necessary to address aider-and-abettor liability, because successful pleading of that alternative theory could, potentially, save the claims under Rules 10b-5(a) and (c).

Regarding aider-and-abettor liability, the Exchange Act provides:

> For purposes of any action brought by the [Securities and Exchange] Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e).  More specifically:

> Liability for aiding and abetting securities fraud under [Exchange Act section 10(b)] attaches only upon a showing that: 1) a primary violation was committed, 2) the defendant[ ] had a general awareness that [his] conduct was part of an overall activity that was

54

        improper, and 3) the defendant[ ] knowingly and
        substantially assisted in the primary violation.

SEC v. Tambone (Tambone II), 473 F. Supp. 2d 162, 167–68 (D.

Mass. 2006) (citing SEC v. Druffner, 353 F. Supp. 2d 141, 150

(D. Mass. 2005)).  "[M]ere awareness and approval of the primary

violation is insufficient to make out a claim for substantial

assistance."  SEC v. Power, 525 F. Supp. 2d 415, 422 (S.D.N.Y.

2007) (quoting SEC v. Treadway, 430 F. Supp. 2d 293, 339

(S.D.N.Y. 2006)).  Rather, "[t]he aider and abettor's substantial

assistance must be a proximate cause of the primary violation."

Power, 525 F. Supp. 2d at 422 (citation omitted, emphasis added).


        As a preliminary matter, given the shotgun pleading in this

case, the amended complaint does not allege any specific primary

violation it claims Patel aided and abetted.  That said, the

court turns its attention to the allegations concerning the

"substantial assistance" element.  The amended complaint

discusses Patel's role in a fraudulent scheme employed by

Cabletron, Enterasys and/or Aprisma in a general way, with some

isolated bits of particularity.  However, the thirty-one

paragraphs the SEC identifies as supporting the "substantial

assistance" element of its Rule 10b–5(a) aider–and–abettor claim

fall short of the mark, as explained below.


                                55

Paragraph 42 alleges, in pertinent part, "[k]nowing that the circumstances of the Defendants' investment deals would raise [the] outside auditor's concerns . . . in approximately March 2001, Patel, Kirkpatrick, and Barber introduced and encouraged the investment team, which included Defendants Jaeger, Kirkpatrick, Patel, Fiallo, Barber, Shanahan, Hurley, Kay, Gagalis, Luacaw, and others, to utilize a new fraudulent device – – a "three-corner deal" investment –– to conceal improper revenue recognition from the companies' outside auditor." As noted above, there are no facts alleged concerning Patel's knowledge of the outside auditor's concerns. Thus, the amended complaint does not adequately allege his awareness of the impropriety of using three-corner deals. Moreover, paragraph 42 does not particularize Patel's participation in the vaguely alleged "introduction" of three-corner deals or "encouragement" of their use.

Paragraphs 71 through 80 merely describe Cabletron's reports to the SEC and the public at the end of Q1, FY 01. Paragraph 122 alleges that the GovStreet deal, transacted by people other than Patel, "was . . . the type of investment deal that Patel had encouraged employees to consummate," and that it had "required the approval of Patel or Kirkpatrick" (emphasis added). Paragraph 159 alleges that Patel, Jaeger, and Kirkpatrick

56

"closely monitored, reviewed, and/or approved the details of the HealthCite investment" and, as a result, "knew, or were reckless in not knowing, that Enterasys improperly recognized approximately $2 million in revenues from this investment." Paragraph 163 alleges that Patel signed the iPolicy investment deal in the quarter after it was consummated and, thus, "knew . . . that Aprisma had improperly recognized approximately $850,000 in revenues from the sale to iPolicy during the first quarter of Transition Year 2001."  Paragraph 172 merely alleges, in a conclusory way, that "Patel . . . participated in improperly recognizing approximately $1 million in revenue from investment related sales to Cellit."  Paragraph 177 follows up in similar fashion by alleging that "Jaeger, Kirkpatrick and Patel knew, or were reckless in not knowing, that it was improper under GAAP to recognize revenue for the sale of Aprisma product to Cellit" and that "Cellit issued a purchase order for approximately $1,005,000 of Aprisma product toward the end of the first quarter of Transition Year 2001, for which Cabletron, with Jaeger, Kirkpatrick and Patel's knowledge, improperly recognized and reported on a consolidated basis approximately $1,005,000 in revenue in the Form 10-Q it filed with the SEC for this quarter."

Paragraph 261 alleges that Patel and Kirkpatrick "caused Enterasys to improperly recognize $804,000 from the ParaProtect

transaction" because of their "role in directing the Defendants
to use fraudulent three-corner deals, as well as their detailed
review of the investments GAAP being consummated each quarter."
Paragraph 263 alleges that Patel, Jaeger and Kirkpatrick closely
tracked transactions "through regular briefings, conference
calls, and e-mails," and quotes from an e-mail from one Huffard
in which Huffard reported that Patel "want[ed] to have targets by
week on what will close 8/3, 8/10, 8/17, and 8/24."  Paragraphs
280 through 283 discuss the SEC Form 10-Q filed by Enterasys for
Q3, TY 01.

Paragraph 297 contains nothing but generalized allegations
that fall far short of the Rule 9(b) pleading standard:

> Furthermore, Patel, Kirkpatrick and Jaeger directed
> others to enter into transactions for the purpose of
> fraudulently inflating the companies' revenues, which
> they knew, or were reckless in not knowing, were
> subject to material terms, contingencies or otherwise
> inappropriate for revenue recognition under GAAP.  It
> was understood by these Defendants that in order to
> fraudulently report revenue from these transactions the
> terms could not be recorded in the company's books,
> records and accounts in a manner which accurately and
> fairly reflected the company's transactions or
> permitted the preparation of financial statements in
> conformity with GAAP.  Patel, Kirkpatrick and Jaeger
> did not require that the terms of the side agreements,
> investments or three-corner deals appear on the
> purchase order, or be communicated in any other way, to
> the finance department.

(Am. Compl. ¶ 291.)  That paragraph lumps Patel with Kirkpatrick
and Jaeger.  It does not say what they did to direct "others" to
enter into transactions.  It does not identify either the
"others" who were directed, or the transactions they entered
into.  It alleges that Patel, Kirkpatrick, and Jaeger did not
require that the terms of side agreements be communicated to the
finance department, but there are no allegations concerning who,
at Cabletron, Enterasys, or Aprisma had the responsibility for
directing the details of financial reporting, and it does not say
that Patel took any affirmative action to conceal the terms of
side agreements, investments, or three-corner deals from the
finance department.  The allegations in paragraph 310 are
similarly ineffective:

> By failing to make adjusting or correcting entries
> necessary to accurately and fairly reflect transactions
> that they knew were subject to contingencies or
> otherwise lacking one or more necessary elements for
> revenue recognition under GAAP, Patel, Jaeger,
> Kirkpatrick, Kay, Collins, Hurley, Boey and Gagalis
> knowingly, or recklessly, caused Cabletron, Enterasys
> and Aprisma's books, records and accounts to wrongly
> report revenue or other information related to
> transactions.

(Am. Compl. ¶ 310.)  Without any allegations concerning who had
the responsibility for adjusting or correcting accounting
entries, paragraph 310 alleges that eight different defendants
failed to do so.  That is far too generalized an allegation.

59

Paragraphs 312 through 316 do not mention Patel or any other defendant by name, but simply make group allegations about things that "defendants" did or failed to do in general.  Paragraph 324 alleges:

> By hiding the internal policy of requiring that investment deals be directly linked to purchases of product, a condition that the outside auditor told them was an obstacle to revenue recognition, Patel, Kirkpatrick, Collins, Shanahan, Skubisz, Barber, Kay, Fiallo and Hurley directly or indirectly made, or caused others to make, materially false or misleading statements, or omitted, or caused others to omit, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to Enterasys's accountants and outside auditor.

(Am. Compl. ¶ 324.)  Finally, paragraph 349 alleges that "Defendants knew, or were reckless in not knowing, that the financial information contained in Cabletron's and Enterasys's required filings with the Commission flowed directly from the fraudulently misstated books, records and accounts they had caused to be created or for which they were directly responsible."

Due primarily to their lack of particularization and specificity, none of the paragraphs identified by the SEC adequately states the "substantial assistance" element of a Rule 10b-5(a) aiding-and-abetting claim.  Moreover, for the same

reasons given above regarding Rule 10b-5(a), the SEC has failed to state an aider-and-abettor claim under Rule 10b-5(c).

To conclude, Count III is reduced to the limited false-statement claim described in the discussion of Count II.

D. Count IV

In Count IV (captioned "Falsified Books and Records"), the SEC claims violations of Exchange Act section 13(b)(5) and Rule 13b2-1:

> The Defendants knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2) of the Exchange Act.

(Am. Compl. ¶ 387.)

Exchange Act section 13(b)(5) provides:

> No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

15 U.S.C. § 78m(b)(5).  However,

> [i]t does not appear that any court has attempted to conclusively define the elements that constitute a violation of this statute, but the text of the statute

> contemplates three different ways in which it may be
> violated: (i) a defendant knowingly circumvents an
> existing system of accounting controls; (ii) a
> defendant knowingly fails to implement a system of
> accounting controls; or (iii) a defendant knowingly
> falsifies a relevant corporate book or record.

SEC v. Nacchio, 438 F. Supp. 2d 1266, 1283 (D. Colo. 2006).

Scienter is not an essential element.  See SEC v. Lucent Techs.,

Inc., 363 F. Supp. 2d. 708, 727 (D.N.J. 2005) (citing SEC v.

McNulty, 137 F.3d 732, 741 (2d Cir. 1998)).


"The 'book, record, or account' described in Section

13(b)(2)(A) are those which 'in reasonable detail, accurately and

fairly reflect the transactions and dispositions of the assets of

the issuer.' "  SEC v. Adoni, 60 F. Supp. 2d 401, 411 (D.N.J.

1999) (quoting 15 U.S.C. § 778m(b)(2)(A)).  "Examples of internal

controls include manual or automated review of records to check

for completeness, accuracy and authenticity; a method to record

transactions completely and accurately; and reconciliation of

accounting entries to detect errors."  McConville v. SEC, 465

F.3d 780, 790 (7th Cir. 2006) (citing In re Albert Glenn Yesner,

CPA, Initial Decision, Exchange Act Release No. 184, 2001 WL

587989 at *33 (May 22, 2001) (citing STATEMENT ON AUDITING STANDARDS

NO. 55 ¶ 32, CONSIDERATION OF INTERNAL CONTROL IN A FINANCIAL STATEMENT AUDIT

(1998)); VINCENT M. O'REILLY ET AL., MONTGOMERY'S AUDITING 9-7 through

9-10, 9-13 through 9-14 (12th ed. 1988)).

Count IV is also premised on Exchange Act Rule 13b2-1, which provides:

> No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

17 C.F.R. § 240.13b2-1.

According to the SEC's supplemental filing, the following paragraphs of the amended complaint allege facts supporting a claim that Patel knowingly circumvented an existing system of accounting controls: 29-32, 36, 38, 42-44, 58, 69, 147-49, 193, 290-94, 297, 335, 336.  The first four of those paragraphs allege:

> During the relevant period, each of the Defendants, in a collective effort to artificially inflate the financial condition of Cabletron, Enterasys, and Aprisma, knowingly or recklessly negotiated, reviewed, participated in, and permitted numerous transactions for which revenue was improperly recognized under GAAP in the financial statements of Cabletron, Enterasys, and Aprisma and falsely reported in filings with the SEC, in press releases, and in analyst conference calls while the companies' stock was publicly trading.
>
> The Defendants also misrepresented information to, or concealed information from, the companies' outside auditor concerning the true nature of the transactions for which the company improperly recognized revenues. Patel, Kirkpatrick, and Jaeger were not only aware of

the practice of concealing critical information from
the companies' outside auditor, but approved and
encouraged this practice to enable Cabletron,
Enterasys, and Aprisma to continue to report
consistently strong revenue growth and earnings per
share results that met or exceeded Wall Street's
expectations.

Acquiescing to senior management's directive to find
additional revenues, whether legitimate or not, the
Defendants collectively participated in the companies'
fraudulent scheme by entering into numerous sales
transactions that lacked one or more necessary elements
for revenue recognition under GAAP.  In these
transactions, the Defendants entered into undisclosed
"side agreements" with purchasers, in which payment for
product was contingent upon the purchaser's resale of
the product (i.e., sell through payment terms), or the
purchaser was granted full return, exchange, or
cancellation rights.  The Defendants knew, or were
reckless in not knowing, that it was improper under
GAAP to recognize revenue on these transactions that
were subject to material contingencies.

The Defendants also devised sham investment
transactions whereby Cabletron used its own cash to
create the appearance of revenues for Enterasys and
Aprisma.  In these transactions, which were closely
monitored, reviewed, and approved by Patel,
Kirkpatrick, and Jaeger, Cabletron and Enterasys made
investments in unaffiliated, privately-held companies
in exchange for the investee company's agreement to use
the invested proceeds to buy products from Enterasys
and Aprisma.

(Am. Compl. ¶¶ 29-32.)  Obviously, those paragraphs do not allege

specific acts, conduct, directives, or communication that might

be proved at trial, and they do not make particularized

allegations against any defendant.  More importantly, they say

nothing about manual or automated reviews of records, methods to

record transactions, reconciliation of accounting entries, see

McConville, 465 F.3d at 790, or anything else that might remotely
qualify as an internal accounting control.  In that regard, those
paragraphs have much in common with the pleadings in Berry, in
which the court ruled: "Ms. Berry correctly points out that while
the complaint implies that certain controls were insufficient or
circumvented, it does not state them.  To the extent the SEC
wishes to rely on this alternate theory for its eighth claim of
relief, it must plead the factual allegations to support it."
580 F. Supp. 2d at 924–25.  The amended complaint gets a bit
closer to the mark in paragraphs 36 and 46, which refer to
guidance from the assistant controller (¶ 36) and Cabletron's
annual report (¶ 46), but that corporate guidance referred to the
company's revenue recognition policy, not its internal accounting
controls.

     As a further illustration of the general unhelpfulness of
the SEC's supplemental filing, the court notes that the SEC lists
twenty-one paragraphs as alleging facts supporting a claim that
Patel knowingly circumvented an existing system of accounting
controls, and nine paragraphs as alleging facts supporting a
claim that Patel knowingly failed to implement a system of
accounting controls.  Of the nine paragraphs purportedly alleging
that Patel failed to implement a system of accounting controls,
however, seven of them are also listed as alleging that Patel

65

knowingly circumvented an existing system of accounting controls.
It cannot be both.  Patel is entitled to dismissal of Count IV to
the extent it asserts claims based on either circumvention of
accounting controls or failure to implement them.[23]

    The SEC's attempt to state a claim against Patel for
falsifying corporate books and records is only marginally more
effective.  For example, the SEC says that the following
paragraphs allege facts supporting its claim:

---

    [23] In <u>McConville</u>, the Seventh Circuit described a legitimate
"failure to implement" claim:

> As chief financial officer, McConville's very job at
> Akorn was to manage its financial department and ensure
> its records and accounts were accurately and fairly
> maintained, and there is substantial evidence that she
> failed to do so.  The record indicates that Akorn's
> financial records were in an ongoing state of disarray.
> By spring 2001, the wholesaler accounts (which were the
> bulk of Akorn's sales) had never been reconciled; and
> there was an accumulation of problems over a three or
> four year period.  Even McConville admits that the
> reconciliation process in Akorn's financial department
> was continuing when her employment terminated in July
> 2001.  We affirm the SEC's conclusion that she caused
> Akorn to violate Section 13(b)(2)(A) of the Act.
>
>     McConville also challenges the Commission's
> conclusions that she violated Sections 13(b)(5) and
> 13(b)(2)(B) of the Act, which require corporations to
> implement and maintain internal accounting controls. .
> . . For reasons similar to why we affirm the
> Commission's Section 13(b)(2)(A) finding, we likewise
> conclude there is substantial evidence that McConville
> failed to implement and maintain internal accounting
> controls at Akorn in violation of Section 13(b)(5).

465 F.3d at 790.

Jaeger and Kirkpatrick participated in procuring a
purchase order for approximately $900,000 from iPolicy
Networks, Inc. one day before the end of the first
quarter of Transition Year 2001 and improperly
recognizing approximately $850,000 in revenue from this
purchase order during the quarter.

At the time Aprisma recognized revenue from the sale to
iPolicy, Jaeger, who negotiated the terms of the deal,
and Kirkpatrick, who was actively involved in the
investment and signed the investment agreement the
following quarter, knew, or were reckless in not
knowing, that the sales were contingent on Enterasys
prepaying iPolicy for a comparable dollar amount of
engineering services and making an investment in
iPolicy the following quarter.

Jaeger and Kirkpatrick also knew, or were reckless in
not knowing, that Aprisma intended to and did, in fact,
recognize revenue for the iPolicy sale during the first
quarter of Transition Year 2001, even though the
material undisclosed contingencies of which they were
aware precluded revenue recognition under GAAP.

In addition to closely monitoring the details of the
companies' investments and being responsible for
approving investments in excess of $500,000, Patel also
signed the iPolicy investment agreement the following
quarter.  Accordingly, Patel knew, or was reckless in
not knowing, that Aprisma had improperly recognized
approximately $850,000 in revenues from the sale to
iPolicy during the first quarter of Transition Year
2001 even though the contingent investment to which the
sale was tied was not consummated until the following
quarter.

(Am. Compl. ¶¶ 160–63.)  In other words, the SEC seems to claim

that Patel, the CEO, President, and Chairman of the Board of

Cabletron, falsified the corporate books and records of

Cabletron's subsidiary, Aprisma, by signing an agreement

negotiated by Jaeger and by "knowing," or "recklessly not

knowing," that Aprisma recognized non-GAAP revenue from the transaction that resulted from that agreement.

To take another example, the SEC says that the following allegations support a claim that Patel falsified corporate books and records:

> Kirkpatrick also signed and caused to be filed with the SEC Forms 8-K on July 18 and July 19, 2001 reporting the unaudited pro forma financial statements for Enterasys and Aprisma, respectively, for this quarter and the four quarters of Fiscal Year 2001.  Although these filings were reviewed and approved by Patel, Jaeger, and Kirkpatrick, each of these individuals knew, or was reckless in not knowing, that the financial information contained therein, including the reported revenues, was materially misstated due to the Defendants' concerted effort to fraudulently inflate the companies' revenues.

(Am. Compl. ¶ 188.)  Glaringly absent from paragraph 188 is any mention of corporate books or records, or any affirmative act by Patel, other than reviewing and approving an SEC Form 8-K. Reviewing and approving an SEC filing, even one that contains false information, is not the same thing as falsifying a corporate book or record, no matter how many times the contention is repeated.  See In re Lernout & Hauspie, 230 F. Supp. 2d at 171 (noting the universal rejection of "review and approval" allegations).

68

The SEC's claim is stated somewhat more clearly, though not more strongly, in the following paragraphs:

> By failing to make adjusting or correcting entries necessary to accurately and fairly reflect transactions that they knew were subject to contingencies or otherwise lacking one or more necessary elements for revenue recognition under GAAP, Patel, Jaeger, Kirkpatrick, Kay, Collins, Hurley, Boey and Gagalis knowingly, or recklessly, caused Cabletron, Enterasys and Aprisma's books, records and accounts to wrongly report revenue or other information related to transactions.
>
> . . . .
>
> Defendants' misrepresentations or omissions caused Cabletron, Enterasys and Aprisma's books, records and accounts to fail to accurately and fairly reflect the company's transactions and disposition of its assets or to permit preparation of financial statements in conformity with GAAP.

(Am. Compl. ¶¶ 310, 314.)  While those paragraphs generally describe the SEC's theory, they hardly meet the Rule 9(b) pleading requirement, as they are neither particularized nor adequately specific.

The SEC's falsified–books–and–records claim is saved by the following paragraph:

> As set forth in Sections IV. E. and F., Patel entered into side agreements with TrustWave and Cellit.  These agreements included material terms, contingencies or other elements of sales transactions which barred revenue recognition under GAAP.  However, Patel did not require that the terms of the side agreement appear on the purchase order, be communicated in any other way to

the finance department, or recorded accurately in the
company's books, records or accounts.

(Am. Compl. ¶ 294.)


Regarding the TrustWave transaction, Section IV. E. of the
amended complaint alleges:

> In furtherance of Defendants' scheme, Jaeger and Patel
> participated in improperly recognizing revenues from
> sales to TrustWave Corp. during the fourth quarter of
> Fiscal Year 2001 ($43,000), and the first ($538,000)
> and second ($60,000) quarters of Transition Year 2001,
> and improperly reporting revenues in the third quarter
> ($60,000) of Transition Year 2001.
>
> At the time Enterasys and Aprisma recognized revenue
> from sales to TrustWave, Jaeger and Patel knew that
> TrustWave did not need the product and was only
> purchasing product to enable them to meet quarterly
> revenue goals.  In addition, Jaeger and Patel knew, or
> were reckless in not knowing, that the valuation for
> Cabletron's reciprocal investment in TrustWave lacked
> substance and was based on the amount of product
> TrustWave was willing to purchase.  Under these
> circumstances, Jaeger and Patel knew that the
> transaction with TrustWave lacked economic substance
> and that it was improper to recognize revenue for sales
> to TrustWave.

(Am. Compl. ¶¶ 128-29.)  Those paragraphs provide the only

allegations concerning the TrustWave transaction.  The SEC

alleges that Patel knew that revenue from that transaction was

not recognizable under GAAP, but those paragraphs allege nothing

to suggest that Patel had any obligation to report the details of

the TrustWave transaction to the finance departments of Enterasys

70

or Aprisma.   Absent specific allegations about Patel's role in
the transaction, the allegation that he "participated in
improperly recognizing revenues" is far too vague and conclusory
to meet the Rule 9(b) pleading standard.   See Parmalat, 376 F.
Supp. 2d at 503 n.159.

That leaves the Cellit transaction, about which the amended
complaint says:

> During this quarter, Cabletron, through Patel, with
> Jaeger and Kirkpatrick's knowledge, entered into a
> financing arrangement with Cellit.  Under the terms of
> the agreement, Cabletron agreed to invest $2 million in
> Cellit in return for two $1 million promissory notes,
> an equity interest in Cellit, and Cellit's agreement to
> purchase $1 million of Aprisma product.  In addition,
> Cabletron agreed that one of the promissory notes would
> be forgiven in connection with Enterasys's future
> purchase of Cellit's software.
>
> At the time Cabletron entered into its agreement with
> Cellit, Patel and Jaeger knew, or were reckless in not
> knowing, that Cellit did not need Aprisma product, and
> that Enterasys did not need Cellit product.  In fact,
> after purchasing only a portion of the Cellit software,
> which Enterasys never used, Cabletron eventually
> canceled the remaining balance of one of the Cellit
> promissory notes.
>
> Jaeger and Patel also knew, or were reckless in not
> knowing, that the investment deal with Cellit lacked
> economic substance and was simply a vehicle through
> with Cabletron was improperly purchasing its revenues
> for its subsidiary, Aprisma.

(Am. Compl. ¶¶ 173-75.)   In other words, the SEC has alleged that
Patel, acting for Cabletron, entered into an agreement with

71

Cellit that included terms precluding revenue recognition, yet
failed to notify the finance department of those terms (¶ 294),
thus causing the creation of corporate books and records that
falsely described the transaction.  Assuming that a person who
entered into an agreement had some obligation to report its terms
to the finance department, the allegations in paragraphs 173
through 175 are adequate to state a claim under 15 U.S.C. §
78m(b)(5) and Rule 13b2-1.


Requiring the defendant (and the court) to complete a
scavenger hunt through forty-three repetitive and unfocussed
paragraphs in search of a claim that is stated in four is
burdensome.  The bulk of the amended complaint implies its
weakness, not its strength.


E. Count V

In Count V (captioned "Deceit of Auditors"), the SEC claims
violations of Exchange Act Rule 13b2-2:

> The Defendants directly or indirectly made, or caused
> others to make, materially false or misleading
> statements, or omitted, or caused others to omit, to
> state material facts necessary in order to make the
> statements made, in light of the circumstances under
> which they were made, not misleading, to Cabletron's,
> Enterasys's, and Aprisma's accountants and outside
> auditor in connection with an audit or examination of
> Cabletron's, Enterasys's and Aprisma's financial
> statements or in the preparation or filing of
> Enterasys's documents or reports filed with the SEC.

(Am. Compl. ¶ 390.)

Exchange Act Rule 13b2-2 provides:

(a) No director or officer of an issuer shall,
directly or indirectly:

(1) Make or cause to be made a materially false or
misleading statement to an accountant in connection
with; or

(2) Omit to state, or cause another person to omit
to state, any material fact necessary in order to make
statements made, in light of the circumstances under
which such statements were made, not misleading, to an
accountant in connection with:

(i) Any audit, review or examination of the
financial statements of the issuer required to be made
pursuant to this subpart; or

(ii) The preparation or filing of any document or
report required to be filed with the Commission
pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2.  For purposes of liability under Rule

13b2-2, "information is material if a reasonable auditor would

conclude that it would significantly alter the total mix of

information available to him."  United States v. Goyal, No. CR

04-00201 MJJ, 2008 WL 755010, at *5 (C.D. Cal. March 21, 2008)

(citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445

(1976)).

In a previous order, the court dismissed Count V on grounds
that the original complaint identified no statements that Patel
made to accountants.  The amended complaint attempts to correct
that deficiency by alleging that Patel signed nine management
representation letters to outside auditors, five for Cabletron
(Am. Compl. ¶ 335) and four for Enterasys (¶ 336).  Those are the
only statements to auditors by Patel alleged in the amended
complaint, which describes the management representation letters
as follows:

> In connection with annual audits and quarterly reviews,
> the outside auditor required Executive Officers of
> Cabletron, Enterasys and Aprisma to attest to the full
> disclosure of relevant information and to the
> reliability of the information that was provided.  This
> communication is commonly referred to as a "Management
> Representation Letter."  This document includes
> representations, among other things, that: 1) financial
> information is presented in accordance with GAAP; 2)
> there are no side-agreements or other undisclosed
> contingencies; 3) there have been no "instances of
> fraud involving any member of management or employees
> who have significant roles in internal control"; and 4)
> no "[i]nstances of fraud involving others could have
> material effect on the financial information."  The
> Management Representation Letter states that, as to
> materiality:
>
>> items are considered material, regardless of size,
>> if they involve an omission or misstatement of
>> accounting information that, in light of
>> surrounding circumstances, makes it probable that
>> the judgment of a reasonable person relying on the
>> information would be changed or influenced by the
>> omissions or misstatement.

(Am. Compl. ¶ 334.)

Patel is entitled to dismissal of Count V, because the SEC has failed to meet the Rule 9(b) pleading standard.  Rather than specifically identifying one or more allegedly false statements in one or more management representation letters, and identifying the basis for claiming that Patel was aware of the falsity at the time he made the statement, the SEC merely provides a generalized description of the Cabletron and Enterasys management representation letters and says that Patel signed nine of them. That is puzzle pleading, see Fraser, 2009 WL 2450508, at *14, and it is insufficient to state a claim.  What the court said in dismissing Count IV in its previous order is relevant here: "It is not the job of the court to sift through [374] paragraphs of the SEC's complaint in search of adequate factual allegations to support its claims."  It is counsel's job to plead with specificity, or at least brief the issue with some clarity when challenging a motion to dismiss.


F. Count VI

In Count VI (captioned "False SEC Filings"), the SEC claims violations of Exchange Act section 13(a) and Exchange Act Rules 12b–20, 13a–1, 13a–11, and 13a–13:

> Based on the foregoing allegations [stated in paragraphs 1 through 374], Cabletron and Enterasys violated Exchange Act Section 13(a) and Rules 12b–20, 13a–1, 13a–11, and 13a–13 thereunder.

75

The Defendants aided and abetted Cabletron and
Enterasys, in that they provided knowing and
substantial assistance to the companies' violations of
Exchange Act Section 13(a) and Rules 12b-20, 13a-1,
13a-11, and 13a-13, by causing the companies to file
materially misleading annual, quarterly and current
reports with the SEC and to fail to file with the SEC,
in accordance with rules and regulations the SEC has
prescribed, such further information, if any, as may be
necessary to make the required statements, in the light
of the circumstances under which the are made not
misleading as the SEC has prescribed in Exchange Act
Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-
13 thereunder.

(Am. Compl. ¶¶ 393-94.)


Exchange Act section 13(a) provides:


Every issuer of a security registered pursuant to
section 78l of this title shall file with the
Commission, in accordance with such rules and
regulations as the Commission may prescribe as
necessary or appropriate for the proper protection of
investors and to insure fair dealing in the security--

**(1)** such information and documents (and such
copies thereof) as the Commission shall require to
keep reasonably current the information and
documents required to be included in or filed with
an application or registration statement filed
pursuant to section 78l of this title . . . .

**(2)** such annual reports (and such copies
thereof), certified if required by the rules and
regulations of the Commission by independent
public accountants, and such quarterly reports
(and such copies thereof), as the Commission may
prescribe.


15 U.S.C. § 77m(a).  Exchange Act Rule 12b-20 provides:


76

> In addition to the information expressly required
> to be included in a statement or report, there shall be
> added such further material information, if any, as may
> be necessary to make the required statements, in the
> light of the circumstances under which they are made
> not misleading.

17 C.F.R. § 240.12b-20.  Exchange Act Rule 13a-1 requires the

filing of annual reports with the SEC.  See 17 C.F.R. § 240.13a-

1.  Exchange Act Rule 13a-11 requires the filing of current

reports on Form 8-K with the SEC.  See 17 C.F.R. § 240.13a-11(a).

Exchange Act Rule 13a-13 requires the filing of quarterly reports

on Form 10-Q with the SEC.  See 17 C.F.R. § 240.13a-13(a).[24]  As

one court has explained:

> In short, these provisions of the Exchange Act
> [i.e., Section 13(a) and Rule 13a-1] require the filing
> of financial statements that (1) are prepared in
> conformity with GAAP; and (2) contain a report by an
> independent auditor certifying that the auditor had
> audited the company's financial statements, in
> accordance with GAAS,[25] to determine whether the
> statements were prepared in conformity with GAAP.

Ponce v. SEC, 345 F.3d 722, 735 (9th Cir. 2003).

In its order on Patel's previous motion to dismiss, the

court ruled that because all the false statements in SEC filings

---

[24] "Rule 13a-13 requires the filing of quarterly reports
that are not misleading."  Ponce v. SEC, 345 F.3d 722, 735 (9th
Cir. 2003).

[25] "GAAS" stands for "generally accepted auditing
standards."  Ponce, 345 F.3d at 726.

attributable to Patel were not material as a matter of law, he
was also entitled to dismissal of Count VI.  There is nothing in
the amended complaint that requires a different result.  The
adequately alleged false-statement claims in Counts II and III
are based exclusively on statements Patel made in press releases
and analyst conference calls, not in SEC filings.  To be sure,
Count VI claims that Patel is liable as an aider and abettor of
violations by Cabletron and Enterasys, and there are at least two
quarters in which Enterasys appears to be liable for material
false statements in SEC filings.[26]  But, there are no factual
allegations in the amended complaint concerning conduct by Patel

---

[26] The amended complaint alleges that Cabletron's Q1, FY 01,
Form 10-Q overstated the company's quarterly net revenue of $270
million by $5 million, or approximately 1.8 percent.  That false
statement is not material, as a matter of law.  The amended
complaint makes no specific allegations concerning any SEC
filings for Q2, FY 01.  The amended complaint alleges that
Cabletron's Q3, FY 01, Form 10-Q overstated net revenue by $3
million, but does not indicate what the actual net revenue was,
and thus, fails to allege materiality.  The amended complaint
alleges that Cabletron's Q4, FY 01, Form 10-Q and an April 21,
2001, Form 8-K overstated the company's quarterly net revenue of
$279 million by $7 million, or approximately 2.5 percent.  That
false statement is not material, as a matter of law.  The amended
complaint alleges that Cabletron's Q1, TY 01, Form 10-Q
overstated the company's quarterly net revenue of $296 million by
$11 million, or approximately 3.7 percent.  That false statement
is not material, as a matter of law.  The amended complaint
alleges that Enterasys's Q2, TY 01, Form 10-Q overstated the
company's quarterly net revenue of $222.2 million by $18 million,
or approximately 8.1 percent.  That false statement is not
immaterial as a matter of law.  The amended complaint alleges
that Enterasys's Q3, TY 01, Form 10-Q overstated the company's
quarterly net revenue of $85,373,000 million by more than $20
million, or more than 8.1 percent.  That false statement is not
immaterial as a matter of law.

that was the proximate cause of false statements in SEC filings
pertaining to revenue generated by transactions he was not
alleged to have known about.  Allegations that Patel was an
architect of a scheme, or a cheerleader for it, could possibly be
viewed as being a "but for" cause of generating non-GAAP revenue,
which could be viewed as being a "but for" cause of treating non-
GAAP revenue as if it were GAAP revenue, which could be viewed as
a "but for" cause of reporting non-GAAP revenue to the SEC as if
it were GAAP revenue, but generalized allegations that Patel
(along with others) encouraged the use of three-corner deals fall
short of being a proximate cause for the false SEC filings
alleged here, which is necessary for liability as an aider and
abettor.

Accordingly, the SEC has failed to state a claim against
Patel under 15 U.S.C. § 77m(a) and the Exchange Act reporting
rules, which entitles him to dismissal of Count VI.

G. Count VII

In Count VII (captioned "False Books and Records"), the SEC
claims violations of Exchange Act section 13(b)(2)(A):

> By reason of the foregoing allegations [stated in
> paragraphs 1 through 374], Cabletron and Enterasys
> violated Exchange Act Section 13(b)(2)(A).

The Defendants aided and abetted Cabletron's and
Enterasys's failure to make and keep books, records,
and accounts, which, in reasonable detail, accurately
and fairly reflected the company's transactions and
dispositions of its assets.

(Am. Compl. ¶¶ 397-98.)


Exchange Act section 13(b)(2)(A) provides:

Every issuer which has a class of securities
registered pursuant to section 78<u>l</u> of this title and
every issuer which is required to file reports pursuant
to section 78<u>o</u>(d) of this title shall--

**(A)** make and keep books, records, and
accounts, which, in reasonable detail, accurately
and fairly reflect the transactions and
dispositions of the assets of the issuer.

15 U.S.C. § 78m(b)(2)(A).  "Section 13(b)(2) requires companies

to maintain books, records and accounts accurately and record

transactions in conformity with GAAS."  <u>Ponce</u>, 345 F.3d at 735.

Section 13(b)(2)(A) has "been read to require issuers to employ

and supervise reliable personnel, to ensure that transactions are

executed as authorized, to segregate accounting functions, and to

have procedures designed to prevent errors and irregularities."

<u>SEC v. Yuen</u>, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *42

(C.D. Cal. March 16, 2006).


In its order on Patel's previous motion to dismiss, the

court ruled that the original complaint contained no allegations

80

of conduct by Patel that constituted aiding and abetting a

violation of 15 U.S.C. § 78m(b)(2)(A).  The SEC has not cured

that deficiency in the amended complaint.  The best way to

demonstrate the shortcomings of the amended complaint is to let

it speak for itself.  Accordingly, what follows is the complete

text of all eight of the paragraphs identified by the SEC in its

supplemental filing as alleging facts that support the

"substantial assistance" element of a section 78m(b)(2)(A)

aiding-and-abetting claim:

>        During the relevant period, each of the Defendants, in
>        a collective effort to artificially inflate the
>        financial condition of Cabletron, Enterasys, and
>        Aprisma, knowingly or recklessly negotiated, reviewed,
>        participated in, and permitted numerous transactions
>        for which revenue was improperly recognized under GAAP
>        in the financial statements of Cabletron, Enterasys,
>        and Aprisma and falsely reported in filings with the
>        SEC, in press releases, and in analyst conference calls
>        while the companies' stock was publicly trading.
>
>        . . . .
>
>        Furthermore, Patel, Kirkpatrick and Jaeger directed
>        others to enter into transactions for the purpose of
>        fraudulently inflating the companies' revenues, which
>        they knew, or were reckless in not knowing, were
>        subject to material terms, contingencies or otherwise
>        inappropriate for revenue recognition under GAAP.  It
>        was understood by these Defendants that in order to
>        fraudulently report revenue from these transactions the
>        terms could not be recorded in the company's books,
>        records and accounts in a manner which accurately and
>        fairly reflected the company's transactions or
>        permitted the preparation of financial statements in
>        conformity with GAAP.  Patel, Kirkpatrick and Jaeger
>        did not require that the terms of the side agreements,
>        investments or three-corner deals appear on the

purchase order, or be communicated in any other way, to the finance department.

. . . .

Patel, Jaeger, Kirkpatrick, Kay, Collins, Hurley, Boey and Gagalis were the last line of defense to ensure that the books and records accurately reported transactions because they had the authority to make adjusting and correcting entries in Cabletron, Enterasys and Aprisma's books, records and accounts.

. . . .

Defendants, knowingly or recklessly, either misrepresented or failed to disclose to the finance department the existence of contingencies or other material terms of sales transactions which barred revenue recognition under GAAP.

. . . .

Defendants' misrepresentations or omissions caused Cabletron, Enterasys and Aprisma's books, records and accounts to fail to accurately and fairly reflect the company's transactions and disposition of its assets or to permit preparation of financial statements in conformity with GAAP.

. . . .

Kirkpatrick and Patel signed Management Representation Letters for Cabletron dated June 28, 2000, September 25, 2000, December 20, 2000, April 12, 2001, and June 27, 2001 which covered all of the reporting periods for Fiscal Year 2001 and the first two reporting periods of Transition Year 2001.

. . . .

Kirkpatrick and Patel signed Management Representation Letters for Enterasys dated June 28, 2000, September, 25, 2000, December 20, 2000, and June 27, 2001 which covered the first three reporting periods for Fiscal Year 2001 and the first two reporting periods of Transition Year 2001.

. . . .

At the time that Kirkpatrick, Patel, Collins, Skubisz, Kay, Gagalis and Fiallo signed each of these Management Representation Letters they knew that they, and others, had engaged in a fraudulent scheme to inflate the company's revenues and, in carrying out that scheme, had either misrepresented or failed to disclose the existence of material terms, contingencies or other elements of sales transactions which barred revenue recognition under GAAP. Accordingly, the Defendants knew that financial information was not presented in accordance with GAAP, that there were side-agreements and other undisclosed contingencies, that there were "instances of fraud involving any member of management or employees who have significant roles in internal control," and that there were "[i]nstances of fraud involving others could have material effect on the financial information."

(Am. Compl. ¶¶ 29, 297, 309, 312, 314, 335, 336, 343.)

Those paragraphs set out the SEC's theory of the case in a conclusory fashion, but they do not meet the Rule 9(b) pleading standard. Paragraph 29 is not at all particularized, referring instead to "each of the Defendants." Paragraph 297 does not particularize Patel's conduct, and offers no specificity as to the conduct collectively engaged in by Patel, Kirkpatrick, and Jaeger. Paragraph 309 alleges no conduct at all, and while it describes who had the authority to make entries in various corporate books, it says nothing about who had the responsibility to do so. Paragraphs 312 and 314 do not particularize Patel's conduct, and offer no specificity. Paragraphs 335 and 335 merely allege that Patel and Kirkpatrick signed management representation letters, but give no indication how that act

provided substantial assistance to Cabletron, Enterasys, or Aprisma in maintaining false books and records.  Finally, paragraph 343 suffers from an overall lack of specificity.  Accordingly, Patel is entitled to dismissal of Count VII.


H. Count VIII

In Count VIII (captioned "Inadequate Internal Accounting Controls"), the SEC claims violations of Exchange Act section 13(b)(2)(B):

> By reason of the foregoing allegations [stated in paragraphs 1 through 374], Cabletron and Enterasys violated Exchange Act Section 13(b)(2)(B).
>
> Defendants Kirkpatrick, Collins, Patel, and Skubisz aided and abetted Cabletron's and Enterasys's failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements.

(Am. Compl. ¶¶ 401–02.)


Exchange Act section 13(b)(2)(B) provides:

> Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall-
>
> . . . .

84

> **(B)** devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–
>
> . . . .
>
>> **(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . .

15 U.S.C. § 77m(b)(2)(B)(ii)(I).

As an initial matter, the court notes that unlike Counts VI and VII, which are properly read as claiming that the individual defendants substantially assisted Cabletron or Enterasys in doing something wrong (*i.e.*, making false reports to the SEC and creating false corporate books and records), Count VIII claims that the individual defendants aided and abetted Cabletron or Enterasys in failing to do something (*i.e.*, failing to devise a system of internal accounting controls).  Aiding and abetting an omission seems somewhat oxymoronic, as it is not at all clear just how one substantially assists another in failing to do something, short of both having and exercising the power to command inaction.

Be that as it may, in its order on Patel's previous motion to dismiss, the court ruled that the original complaint did not

adequately allege either a primary violation of section
13(b)(2)(B) by Cabletron or Enterasys, or conduct by Patel that
would qualify as a proximate cause of any such violation.  In his
motion to dismiss, Patel argues that Count VIII of the amended
complaint should be dismissed for the same reasons.  The SEC
counters that "[b]ecause the [amended complaint] adequately
alleges a claim against Patel for violation of Section 13(b)(5)
and Rule 13b2-1, the same allegations establish that he aided and
abetted the Companies' violations of Exchange Act Sections
13(b)(2)(A) and 13(b)(2)(B)."  (Pl.'s Resp., at 38.)  Because
Count IV has been dismissed with regard to the accounting control
theories, however, Count VIII is also dismissed.

Moreover, it is plain to see that the amended complaint does
not allege conduct anything like that which courts have found
sufficient to support claims for aiding and abetting corporate
violations of the internal accounting controls requirement.  For
example, in SEC v. Thielbar, No. CIV 06-4253, 2007 WL 2903948
(D.S.D. Sept. 28, 2007), the court denied Thielbar's motion to
dismiss a claim under 15 U.S.C. § 78m(b)(2) where the SEC
alleged, among other things, that "Thielbar . . . instructed
Defendant Cary Griswold to make . . . fraudulent revenue
entries."  Id. at *1.  The court further described Thielbar's
misconduct:

NCS began recognizing revenue based upon a purported percentage-of-completion accounting method in late 2000 on a few jobs. By early 2001, Thielbar and Beachler began instructing the former NCS controller to recognize revenue using this method for an increasing number of jobs. Griswold's predecessor . . . was uncomfortable with this accounting method and resigned in April 2001. Griswold then became the primary NCS accountant. When Griswold became the accountant, Thielbar increased his use of percentage-of-completion revenue recognition. Thielbar demanded that NCS sales staff provide him with information on any additional sales they had closed or anticipated closing, which were not included in Griswold's proposed financial statements. Thielbar would then use this information to instruct Griswold to record additional estimated revenue on these additional jobs before submitting NCS's financial statements to NSG. Griswold often immediately recorded 100% of the estimated revenue and costs for these additional jobs, allowing NCS to recognize its entire profit from a job before performing any work.

By late 2001, Griswold knew that Thielbar's instructions to record the additional revenues described above were not accurate. In late 2001, Griswold attempted to obtain more documentation for the revenue she was being instructed by Thielbar to record. But she continued to record the revenue as instructed by Thielbar without first obtaining proper documentation.

In February or March 2002, Griswold confronted Thielbar with the fact that NCS has recorded more revenue than NCS had actually earned by misuse of percentage-of-completion revenue recognition. Despite Griswold' warning, Thielbar refused to authorize accounting entries to correct the unearned revenue entries and continued to require Griswold to improperly record revenue with the percentage-of-completion accounting method.

Id. at *2. In the paragraphs cited by the SEC in its

supplemental filing as supporting the "substantial assistance"

element of Count VIII, there is nothing remotely similar to the
conduct alleged in <u>Thielbar</u>.  The amended complaint makes no
allegations of specific conduct by Patel that effectively
directed any accounting function.  For that reason, as well,
Patel is entitled to dismissal of Count VIII.

## David Kirkpatrick

"David J. Kirkpatrick was the Corporate Executive Vice
President of Finance of Cabletron starting July 1999, the Chief
Financial Officer (principal financial and accounting officer)
from August 1990 to August 2001, and its Chief Operating Officer
from October 2000 to August 2001.  He served as Aprisma's Chief
Operating Officer and a member of its Board of Directors from
August 2001 until March 2002, and as Chairman of the Board of
Directors from January 2002 until March 2002."  (Am. Compl. ¶ 6.)

A. Count I

The SEC has adequately alleged a Securities Act scheme claim
against Kirkpatrick based upon the allegations in paragraphs 61
and 91 of the amended complaint.  In paragraph 61, the SEC
alleges that Kirkpatrick arranged for a third company to take
delivery of a substantial portion of an order from
DiscJockey.com, in an effort to: (1) disguise the fact that
DiscJockey.com actually needed much less than the $3 million

worth of Enterasys product it ordered; and (2) allow the product

to be shipped from Enterasys's warehouse before the end of the

quarter, to permit revenue recognition at that time.  In other

words, the SEC alleges conduct by Kirkpatrick that had the

principal purpose and effect of creating a false appearance of

actual sales, in furtherance of a scheme to recognize revenue

that was not appropriate for recognition under GAAP.  Similarly,

paragraph 91 alleges that in connection with an investment deal

with Muzicom, "Kirkpatrick and Kay failed to obtain a legitimate

valuation for Cabletron's equity interest in Muzicom," an act

that had the purpose and effect of making the Muzicom investment

appear to have real economic value, when it did not.  The

DiscJockey.com and Muzicom allegations adequately support the

"employ any device, scheme, or artifice to defraud" element of a

Securities Act scheme claim.  Because the amended complaint

adequately alleges the elements of such a claim, as well as

supporting facts, Kirkpatrick is not entitled to dismissal of

Count I.


B. Count II

     In its order on Kirkpatrick's previous motion to dismiss

(document no. 131), the court dismissed the SEC's false-statement

claims for essentially the same reasons it dismissed the false-

statement claims against Patel – the SEC's failure to allege

falsity, Kirkpatrick's knowledge of falsity, or materiality (or some combination thereof).  The amended complaint, and the SEC's response to Kirkpatrick's motion to dismiss the amended complaint, largely mirror the approach taken with Patel, except that with Kirkpatrick, the SEC adds allegations that he participated in a transaction with ConvergeLabs that generated non-GAAP revenue in Q4, FY 01 ($179,000), Q1, TY 01 ($20,000), Q2, TY 01 ($10,000), and Q3 TY 01 ($13,000) (Am. Compl. ¶¶ 123-25), and a transaction with iPolicy that generated $850,000 in non-GAAP revenue in Q1, TY 01 (¶¶ 160-62), and that he knew about Patel's deal with Cellit, which generated $1,005,000 in non-GAAP revenue in Q1, TY 01 (¶¶ 173-77).

With the exception of the effects of Kirkpatrick's knowledge of the ConvergeLabs, iPolicy, and Cellit transactions, the analysis outlined above concerning Patel applies equally to Kirkpatrick.  The generalized collective attributions of knowledge based upon patterns and practices of reviewing end-of-quarter revenues do not qualify as allegations of specific facts giving rise to a reasonable inference of actual knowledge. Accordingly, the only two quarters that require additional consideration are Q4, FY 01 and Q1, TY 01.[27]

---

[27] The minuscule amount of revenue allegedly generated by the ConvergeLabs transaction in Q2, TY 01 ($10,000), and Q3, TY 01 ($13,000) makes reconsideration of those quarters unnecessary.

The court begins with Kirkpatrick's alleged false statements in SEC filings.  Addition of the ConvergeLabs transaction makes Kirkpatrick liable for knowledge of $196,000 in non-GAAP revenue, or approximately .07 percent of Cabletron's net revenue of $270 million for Q4, FY 01.  A misrepresentation of that magnitude is not material as a matter of law.  Similarly, allegations concerning the ConvergeLabs, iPolicy, and Cellit transactions attribute knowledge of $1.875 million in non-GAAP revenue to Kirkpatrick, or approximately .63 percent of Cabletron's net revenue of $296 million for Q1, TY 01.  That does not rise to the level of a _material_ misrepresentation.  In sum, the SEC has failed to allege that Kirkpatrick made a material misrepresentation in any SEC filing.

The only remaining potential bases for false-statement liability are statements in press releases and analyst conference calls reporting performance in Q4, FY 01, and Q1, TY 01.[28]  Based upon Kirkpatrick's knowledge of the underlying transactions, two statements from the Q1, TY 01, analyst conference call and earnings release meet the materiality threshold: the statement that Cabletron met Wall Street expectations (when Kirkpatrick

---

[28] The SEC has not cured the deficiencies regarding the Q3, FY 01, conference call and earnings release identified in the order on Kirkpatrick's previous motion to dismiss.

knew that Cabletron had not), and the statement that Aprisma had
quarterly net revenue of $22.3 million (when Kirkpatrick knew
that figure overstated revenue by at least 9.3 percent).[29]

     While the SEC has identified two material false statements
from the Q1, TY 01, analyst conference call and earnings release,
it has not adequately alleged that the statements were
Kirkpatrick's statements.  "In order to be liable for a primary
violation of . . . Section 17(a) of the Securities Act, a
defendant must have personally made either an allegedly untrue
statement or a material omission."  Tambone I, 417 F. Supp. 2d at
132.  Judge Gorton's opinion in Tambone I continues:

> The Second Circuit Court of Appeals explained, in the
> context of Section 10(b), that
>
>> a defendant must actually make a false or
>> misleading statement in order to be held
>> [primarily] liable under Section 10(b).  Anything
>> short of such conduct is merely aiding and
>> abetting, and no matter how substantial that aid
>> may be, it is not enough to trigger [primary]
>> liability under Section 10(b).
>
> Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.
> 1998) (quoting Shapiro v. Cantor, 123 F.3d 717, 720 (2d
> Cir. 1997)).
>
>      In 2004, the Southern District of New York
> confronted facts, similar to those in the case at bar,

---

[29] Based upon Kirkpatrick's knowledge of non-GAAP revenue in
Q4, FY 01, the false statement about meeting Wall Street
expectations in that quarter falls far below the materiality
threshold.

which represented a test of <u>Wright</u>.  In <u>SEC v. PIMCO</u>
<u>Advisors Fund Management LLC</u>, the SEC had brought a
civil enforcement action against Kenneth Corba, CEO of
the investment adviser to PIMCO funds.  The complaint
alleged that Corba personally negotiated and managed
market timing arrangements that were contrary to
disclosures contained in the funds' prospectuses and
that he was primarily liable for material
misrepresentations and omissions in connection with
those disclosures.  The District Court rejected that
argument, concluding that Corba could not be primarily
liable under <u>Wright</u> because he had not made or
participated in the drafting of any of the alleged
misstatements.  341 F. Supp. 2d 454, 466 (S.D.N.Y.
2004) (citing <u>Wright</u>, 152 F.3d at 175).

<u>Id.</u>

According to the amended complaint, Kirkpatrick made the

statements in the Q1, TY 01, analyst conference call and earnings

release in the following ways: (1) "Patel, Jaeger, and

Kirkpatrick reviewed and approved both the June 27, 2001 earnings

release and script for the analyst conference call" (Am. Compl. ¶

183); (2) "Patel, Jaeger, Kirkpatrick, Fiallo, and Skubisz were

present for this analyst conference call" (<u>id.</u>); (3) "Skubisz,

together with Patel, Kirkpatrick, and Jaeger, all of whom were

present for the earnings conference call . . ." (¶ 184); (4)

"Patel, Kirkpatrick, and Jaeger all of whom reviewed and approved

this earnings release . . ." (¶ 186); and (5) "Patel,

Kirkpatrick, and Jaeger reviewed and approved this earnings

release and the script for the statements made at the conference

call" (¶ 187).  In other words, there is no allegation that

Kirkpatrick actually said anything, or issued a written statement, or signed any statement prepared by someone else, or drafted a statement that was read or issued by someone else.  All the amended complaint alleges is that Kirkpatrick reviewed and approved statements prepared by "others" who are not named, and that he was physically present while statements were made by others.

In response to Kirkpatrick's motion to dismiss, the SEC argues that "Kirkpatrick is responsible for all of the misstatements because he knew of and approved of the conduct that resulted in misrepresentation to the public."  (Pl.'s Resp. (document no. 179), at 16.)  None of the cases the SEC cites in support of that proposition go nearly so far.

In <u>SEC v. Wolfson</u>, 539 F.3d 1249 (10th Cir. 2008), the court of appeals affirmed summary judgment for the SEC on a false-statement claim against  a non-speaking defendant <u>who drafted</u> two SEC filings containing false statements, one of which was submitted without any changes, <u>id.</u> at 1261.  Similarly, in <u>Hollin v. Scholastic Corp.</u> (<u>In re Scholastic Corp. Securities Litigation</u>), 252 F.3d 63 (2d Cir. 2001), the court of appeals held that the plaintiffs had stated a false-statement claim against a non-speaking individual for false statements made by

94

his company when the complaint alleged that the individual defendant "was vice president for finance and investor relations," id. at 75, and was "primarily responsible for Scholastic's communications with investors and industry analysts [and] was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic during the class period," id. at 76 (emphasis added).

In In re Alstom SA, 454 F. Supp. 2d 187, 187 (S.D.N.Y. 2006), the district court ruled that the plaintiffs' second amended complaint adequately stated a false-statement claim against non-speaking defendants who prepared financial reports that were the basis for false statements by those to whom the non-speaking defendants had submitted their reports, id. at 202–03.  And finally, in Menkes v. Stolt-Nielson S.A., No. C:03CV409(DJS), 2006 WL 1699603 (D. Conn. June 19, 2006), which was more a failure-to-disclose case than a false-statement case, the district court denied a motion to dismiss where the plaintiffs alleged that the defendants knew the information that was not disclosed and were in a position to disclose that information to the actual speaker, id. at *8.

In each of the cases on which the SEC relies, the actions by the non-speaking defendant go well beyond mere knowledge and

95

approval of the conduct of others, which is all that is alleged
here.

Moreover, courts have determined that allegations such as
those made in the amended complaint in this case are
insufficient.  For example:

> The SEC's conclusory pleadings that Ms. Berry
> "reviewed" and "discussed" various filings is
> insufficient to plead (with particularity) Ms. Berry's
> role in the purported fraud.  With respect to certain
> filings at KLA, the SEC goes one verb further and
> alleges that Ms. Berry "reviewed, discussed, and
> finalized" various public filings.  Finalizing a
> document for another executive to sign may suffice.  In
> re Software Toolworks [Inc.], 50 F.3d [615,] 628 & n.3
> [(9th Cir. 2009)] (holding auditor liable for its
> "significant role in drafting and editing" a false
> filing).  Yet the SEC fails to allege with
> particularity what Ms. Berry's role was in "finalizing"
> these filings.  The SEC presumably knows what Ms.
> Berry's role was as it has already obtained significant
> document discovery from Ms. Berry's former employers.

Berry, 580 F. Supp. 2d at 922; see also Filler v. Lernout (In re
Lernout & Hauspie Sec. Litig.), 230 F. Supp. 2d 152, 171 (D.
Mass. 2002) ("KPMG Singapore did not prepare, draft, edit or
provide numbers for the audit.  Its role was more akin to the
'review and approval' allegations which no court has found
sufficient to trigger liability after Central Bank.").

Because the amended complaint does not allege that
Kirkpatrick made any of the false statements in analyst

conference calls or earnings releases, and does not allege that
he drafted or otherwise prepared them, but only alleges that he
reviewed and approved them – without further describing the
review-and-approval process – the SEC has failed to allege an
adequate basis for holding Kirkpatrick liable for any statements
made in the conference calls and releases.

Because Kirkpatrick is not adequately alleged to have made
any statements in conference calls or earnings releases, and
because the false statements he allegedly made in SEC filings are
immaterial as a matter of law, he is entitled to dismissal of the
false-statement claim in Count II.

The amended complaint does, however, state a claim against
Kirkpatrick under 15 U.S.C. § 77q(a)(3), the Securities Act
provision pertaining to fraudulent courses of business, for the
same reasons it states a scheme claim.  But, the SEC is cautioned
that should this case proceed to trial, the court will instruct
on both section 77q(a)(1) and section 77q(a)(3) <u>only</u> if the court
is satisfied that the SEC has introduced sufficient evidence from
which a reasonable jury could find that Kirkpatrick engaged in
both a fraudulent scheme <u>and</u> a fraudulent course of business.
<u>Cf.</u> <u>Swack</u>, 383 F. Supp. 2d at 238 ("The conduct necessary to form
a Rule 10b-5(a) or (c) violation can vary widely, but presumably

these sections are intended to cover different conduct than Rule

10b–5(b).") (citing <u>Martino</u>, 255 F. Supp. 2d at 287.

C. Count III

The SEC has stated claims for direct liability against

Kirkpatrick under Rules 10b–5(a) and (c).  Because the SEC has

stated claims for direct liability under those theories, it is

necessary to consider the SEC's alternative theory of aider–and–

abetter liability only with respect to its false–statement claim

under Rule 10b–5(b).  However, as with Patel, the aider–and–

abettor theory remains available to the SEC, at future stages of

this case, should its claims for primary liability prove

unsuccessful.

The SEC identifies thirty-eight paragraphs as containing

factual allegations supporting the "substantial assistance"

element of its Rule 10b–5(b) aiding–and–abetting claim.  None of

them comes close to alleging appropriate facts with the

appropriate degree of specificity.  Paragraph 49–51 do not

mention Kirkpatrick.  Paragraphs 71–80 describe Cabletron's and

Enterasys's end–of–quarter SEC filing, earnings release, and

analyst conference call.  The misrepresentation in the SEC filing

(saying that Cabletron's net revenue was $275 million when it was

actually $270 million) is not material, as a matter of law.

Kirkpatrick's contribution to the earnings release and conference call is neither particularized (<u>i.e.</u>, his name consistently appears among a list of names, all alleged to have done one thing or another), nor specified (<u>i.e.</u>, he (and two others) are alleged to have scripted and rehearsed the conference call, but the amended complaint does not allege what content he contributed to the script, and he (and two others) are alleged merely to have "reviewed and approved" the content of both the conference call and the earnings release, but the amended complaint does not allege what that review and approval process entailed).

Paragraphs 90, 101, 102, 122, 124, 159, 160–62, 177, and 261 allege Kirkpatrick's knowledge of or participation in transactions that generated revenue that did not qualify for recognition under GAAP, but knowledge is not substantial assistance, and participation in generating non–GAAP revenue is too far removed from the making of statements that include such revenue to qualify as substantial assistance in making a false statement.  Paragraph 263 merely alleges that Kirkpatrick (and two others) closely tracked various transactions and knew that Enterasys and Aprisma used those transactions to fraudulently inflate their revenue.  Knowledge is not substantial assistance.

Paragraphs 280–83 describe Enterasys's Q3, TY 01 Form 10-Q, and conclude with this allegation: "Patel, Jaeger and Kirkpatrick caused Enterasys to make the false statements in this Form 10-Q because they reviewed and approved it."  (Am. Compl. ¶ 283.) that allegation does not particularize Kirkpatrick's role, and does not allege what, exactly, went into the Form 10-Q as a result of Kirkpatrick's actions.  And, the court has already noted the insufficiency of "review and approval" allegations of review and approval.  <u>See</u> <u>Berry</u>, 580 F. Supp. 2d at 922; <u>In re Lernout & Hauspie</u>, 230 F. Supp. at 171.  The court has already explained the inadequacy of paragraph 297.  <u>See</u> <u>supra</u>.

Paragraph 305 merely alleges that "[a]s members of the finance department, Kirkpatrick, Kay, Collins, Hurley, Boey and Gagalis had knowledge of and responsibility for the accuracy of Enterasys's books, records, and accounts."  That does not allege substantial assistance by Kirkpatrick in the making of a false statement.  Paragraph 310 alleges that Kirkpatrick, and seven others, failed to make adjusting or correcting entries in the corporate books and records of Cabletron, Enterasys, and Aprisma, without particularizing Kirkpatrick's conduct or identifying any particular accounting entry he should have made, but did not.

Paragraph 319 alleges, in a generalized fashion, that Kirkpatrick (and five others) made misrepresentations to auditors, or failed to disclose information, but those allegations are not particularized, not specific, and concern conduct to far removed from the making of statements to the SEC or the public to qualify as substantial assistance of corporate false statements.  Paragraphs 322 through 324 are more of the same.  Then there is this:

> By knowingly or recklessly providing false assurances to Enterasys's outside auditor that there were no acts of fraud perpetrated in connection with the company's financial statements, Patel, Kirkpatrick, Kay, Collins, Fiallo, Skubisz and Gagalis directly or indirectly made, or caused others to make, materially false or misleading statements, or omitted, or caused others to omit, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to Enterasys's accountants and outside auditor in connection with an audit or examination of Enterasys's financial statements or in the preparation or filing of Enterasys's documents or reports filed with the SEC.

(Am. Compl. ¶ 344.)  As with paragraphs 322 through 324, the conduct alleged in paragraph 344 – both generally and in a non-particularized fashion – appears to be lying to the outside auditor, but there are no allegations that connect the auditor's work product to any of the alleged false statements in this case. Finally, paragraph 349 does not even mention Kirkpatrick by name.

In sum, Kirkpatrick is entitled to dismissal of the SEC's Exchange Act false-statement claim, _i.e._, the part of Count III based on Rule 10b-5(b).

D. Count IV

The SEC has stated a falsified-books-and-records claim against Kirkpatrick under 15 U.S.C. § 78m(b)(5). The amended complaint adequately alleges that the corporate books and records of Cabletron and its subsidiaries recorded millions of dollars of revenue as GAAP revenue, when it was not, and the amended complaint alleges that Kirkpatrick was Cabletron's Chief Financial Officer and principal financial and accounting officer during the time when much of that revenue was entered into corporate books and records. That is enough to state a claim.

E. Count V

In its order on Kirkpatrick's previous motion to dismiss, the court ruled that the original complaint stated a deceit-of-auditors claim against Kirkpatrick under 17 C.F.R. § 240.13b2-2 based on the SG Cowen transaction. That same claim is stated in paragraphs 97, 101, 103, 104, and 105 of the amended complaint. Characteristically of the way the SEC has handled this case, however, only two of those five paragraphs are even mentioned in the relevant section of the SEC's supplemental filing, which

102

purports to list every paragraph that supports its various claims.  Even so, Kirkpatrick is not entitled to dismissal of Count V.  The deceit-of-auditors claim that the SEC believes it has pled and the claim that will actually move forward, however, are different matters.

First, to the extent that Count V makes claims against Kirkpatrick that are identical to those made against Patel, those portions of Count V are dismissed, for the reasons given above.  Second, various other portions of Count V are also infirm.  For example, the amended complaint mentions a document titled "Consideration of Fraud in a Financial Statement Audit" that "documented the responses of Kirkpatrick, Kay and Collins who falsely stated that there were no acts of fraud perpetrated against Cabletron or Enterasys for the prior year."  (Am. Compl. ¶ 329.)  The amended complaint continues:

> Kirkpatrick, Kay, Collins and Gagalis knew their respective statements to the outside auditor identified in ¶¶ 329-32 were false because they and others, whose actions they were aware of, participated in a scheme to defraud which involved causing Enterasys's books and records to fraudulently overstate revenue from transactions that they knew, or were reckless in not knowing, did not meet the requirements for revenue recognition.

(Am. Compl. ¶ 333.)  Even if Kirkpatrick participated in a scheme to defraud, as the SEC alleges, the statement alleged in

103

paragraph 329 is not false because of Kirkpatrick's fraudulent

acts; the audit question in paragraph 329 had to do with fraud

"perpetrated _against_ Cabletron" (emphasis added), not fraud

perpetrated _by_ Cabletron.  To the extent that Count V is based on

the "Consideration of Fraud" document, it is dismissed.


The SEC also relies on these allegations:


> After the fraudulently misstated books, records and
> accounts were provided to the outside auditor,
> Kirkpatrick, Kay, Collins, Hurley, Boey and Gagalis
> regularly provided additional information to the
> outside auditor as requested throughout the audit or
> review process.  Kirkpatrick, Kay, Collins, Hurley,
> Boey and Gagalis either misrepresented or failed to
> disclose the existence of material terms, contingencies
> or other elements of sales transactions that barred
> revenue recognition under GAAP during these
> communications.

> . . . .

> Accountants employed by the outside auditor stated that
> they had regular meetings with Kirkpatrick, Kay,
> Collins, Hurley and Gagalis to discuss open items
> related to the examination of Cabletron, Enterasys and
> Aprisma's financial statements, audits and the
> preparation of filings to be made with the Commission.
> In these meetings, Kirkpatrick, Kay, Collins, Hurley
> and Gagalis either misrepresented or failed to disclose
> the existence of material terms, contingencies or other
> elements of sales transactions that barred revenue
> recognition under GAAP at these meetings.

> The outside auditor held discussions with Kirkpatrick,
> Kay, Collins, Gagalis, Hurley and Barber in which these
> defendants were told that the auditor needed to review
> all aspects of investment deals, including the use of a
> third party in those transactions.  This admonition by
> the auditor directly applied to Enterasys's use of
> three-corner deals.  Kirkpatrick, Kay, Gagalis and

104

Hurley were also informed that investment deals were
considered related party transactions that required
disclosure.  During these direct conversations with the
outside auditor, these defendants did not disclose
Cabletron's or Enterasys's use of three-corner deals
which they, and others involved in the fraudulent
scheme, employed in order to hide the existence or
nature of material terms, contingencies or other
elements of sales transactions that barred revenue
recognition under GAAP.

(Am. Compl. ¶¶ 319, 322, 323.)  Such generalized non-specific
allegations do not meet the pleading requirements of Rule 9(b).
Kirkpatrick's role is not particularized in any of those three
paragraphs.  Paragraph 319 does not allege when or how
Kirkpatrick (and five other individuals) provided additional
information to the outside auditor, nor does it identify any
specific misrepresentation or failure to disclose on
Kirkpatrick's part.  Paragraph 322 mentions "regular meetings"
with Kirkpatrick (and four other individuals), but identifies no
specific meeting, and no specific misrepresentation by
Kirkpatrick.  Paragraph 323 mentions "discussions" with
Kirkpatrick (and five other individuals), but identifies no
specific discussion, and no specific failure to disclose
information on Kirkpatrick's part.

Finally, the SEC sets out the following theory of liability
for Count V:

> Defendants knew, or were reckless in not knowing, that
> Enterasys's books, records and accounts, as well as
> other documents created using those books, records and
> accounts, were provided to the outside auditor in
> connection with the examination of Enterasys's
> financial statements, audits and the preparation of
> filings to be made with the Commission.
>
> By causing Enterasys's books, records and accounts to
> wrongly report revenue and other financial information
> related to transactions through their
> misrepresentations or omissions, the Defendants
> directly or indirectly made, or caused others to make,
> materially false or misleading statements, or omitted,
> or caused others to omit, to state material facts
> necessary in order to make the statements made, in
> light of the circumstances under which they were made,
> not misleading, to Enterasys's accountants and outside
> auditor.

(Am. Compl. ¶¶ 317, 318.)  These allegations seem little more than a creative attempt to parlay a falsified-books-and-records claim into a deceit-of-auditors claim.  The effort fails.

In sum, the SEC has stated a claim against Kirkpatrick under 17 C.F.R. § 240.13b2-2, but only to the extent recognized in the court's order on Kirkpatrick's previous motion to dismiss.

## F. Count VI

Kirkpatrick is entitled to dismissal of Count VI for the reasons given above regarding Patel.

G. Count VII

     In the order on Kirkpatrick's previous motion to dismiss,
the court ruled that the SEC had stated a false-books-and-records
claim against Kirkpatrick under 15 U.S.C. § 78m(b)(2)(A).  In so
doing, the court identified, with some precision, the specific
allegations in the complaint that supported the "substantial
assistance" element of an aiding-and-abetting claim.  The court's
identification of those allegations was based upon its own search
through the complaint, which was necessitated by the SEC's
shotgun pleading.  See Fraser, 2009 WL 2450508, at *14.
Notwithstanding the court's preparation of a roadmap for pleading
Count VII, the SEC's supplemental filing, under the element
"substantial assistance," identifies a host of paragraphs similar
to those listed for Patel, but cites no paragraphs like those
identified by the court in its previous order.  The allegations
previously identified by the court may well be in the amended
complaint, but the SEC has not bothered to point them out, even
though directly asked to do so.  That is the end of the matter.
It is not the court's job (or the defendants') to hunt down
support for the SEC's claims in its voluminous and repetitious
pleading.  Accordingly, and ironically, while the original
complaint stated a claim against Kirkpatrick under 15 U.S.C. §
78m(b)(2)(A), Kirkpatrick is entitled to dismissal of Count VII
of the amended complaint for failure to comply with the court's

directive to identify the supporting allegations in the amended complaint for each claim.

## H. Count VIII

Kirkpatrick is entitled to dismissal of Count VIII for the reasons given above regarding Patel.

### Eric Jaeger

"Eric Jaeger was the Executive Vice President of Corporate Affairs for Cabletron from July 1999 through August 6, 2001. From August 6, 2001 through September 2002, Jaeger was a consultant to Enterasys and Aprisma."  (Am. Compl. ¶ 7.)

## A. Count I

As with Patel, The SEC has failed to allege a scheme claim under the Securities Act against Jaeger.  Of the more than 120 paragraphs identified by the SEC as supporting the "employ any device, scheme, or artifice to defraud" element of its Securities Act scheme claim, the ones that are the most specific and, therefore, the ones most likely to meet the Rule 9(b) pleading standard, are those pertaining to transactions with TrustWave, iPolicy, Centricity, Cellit, DigitalMojo, and Everest, in which Jaeger is alleged to have been involved.  Accordingly, the court proceeds transaction by transaction.

The allegations concerning the TrustWave transaction are these:

> In furtherance of Defendants' scheme, Jaeger and Patel participated in improperly recognizing revenues from sales to TrustWave Corp. during the fourth quarter of Fiscal Year 2001 ($43,000), and the first ($538,000) and second ($60,000) quarters of Transition Year 2001, and improperly reporting revenues in the third quarter ($60,000) of Transition Year 2001.
>
> At the time Enterasys and Aprisma recognized revenue from sales to TrustWave, Jaeger and Patel knew that TrustWave did not need the product and was only purchasing product to enable them to meet quarterly revenue goals.  In addition, Jaeger and Patel knew, or were reckless in not knowing, that the valuation for Cabletron's reciprocal investment in TrustWave lacked substance and was based on the amount of product TrustWave was willing to purchase. Under these circumstances, Jaeger and Patel knew that the transaction with TrustWave lacked economic substance and that it was improper to recognize revenue for sales to TrustWave.

(Am. Compl. ¶¶ 128-29.)  Those paragraphs, which contain the only allegations concerning the TrustWave transaction, do not allege any conduct by Jaeger.  Rather, they allege that he "participated" in recognizing revenue by knowing various things about the transaction.  See Parmalat, 376 F. Supp. 2d at 503 n.159 (pointing out the inadequacy of allegations of "participation").  And, they allege no connection between Jaeger and revenue recognition, other than his knowledge that the transaction did not qualify for it.  Accordingly, the allegations

in those paragraphs do not support the first element of a Securities Act scheme claim.

Regarding iPolicy, the amended complaint alleges that "Jaeger and Kirkpatrick participated in procuring a purchase order for approximately $900,000 from iPolicy Networks, Inc. one day before the end of the first quarter of Transition Year 2001 and improperly recognizing approximately $850,000 in revenue from this purchase order during the quarter." (Am. Compl. ¶ 160.) As for specifics, Jaeger is alleged to have "negotiated the terms of the deal" (¶ 161), and to have known, or been reckless in not knowing, that "the sales were contingent on Enterasys prepaying iPolicy for a comparable dollar amount of engineering services and making an investment in iPolicy the following quarter" (id.), and that "Aprisma intended to and did, in fact, recognize revenue for the iPolicy sale during the first quarter of Transition Year 2001, even though the material undisclosed contingencies of which they were aware precluded revenue recognition under GAAP" (¶ 162). At most, the SEC alleges that Jaeger negotiated a deal that contained terms that precluded revenue recognition under GAAP, and that he knew various things about the deal. And, while paragraph 162 refers to "material undisclosed contingencies," the SEC makes no allegations that specifically – or even generally –

implicate Jaeger in the non-disclosure of those material
contingencies.

Moving on, the amended complaint alleges that "Jaeger
negotiated and signed the investment documentation for the
Centricity transaction" (Am. Compl. ¶ 168), and that he had
knowledge of facts that precluded revenue recognition under
GAAP(¶ 169), but the amended complaint includes no allegations
that link Jaeger to the recognition of revenue from the
Centricity transaction.

With regard to Cellit, the amended complaint makes no
allegations concerning Jaeger's conduct, only his knowledge:
"Patel, with Jaeger and Kirkpatrick's knowledge, participated in
improperly recognizing approximately $1 million in revenue from
investment related sales to Cellit" (Am. Compl. ¶ 172);
"Cabletron, through Patel, with Jaeger and Kirkpatrick's
knowledge, entered into a financing arrangement with Cellit" (¶
173); "[a]t the time Cabletron entered into its agreement with
Cellit, Patel and Jaeger knew, or were reckless in not knowing,
that Cellit did not need Aprisma product . . ." (¶ 174); "Jaeger
and Patel also knew, or were reckless in not knowing, that the
investment deal with Cellit lacked economic substance  . . ." (¶
175); "Jaeger, Patel, and Kirkpatrick, who closely monitored all

investment related revenues, knew, or were reckless in not

knowing, that Cellit's purchase of Aprisma product during the

first quarter of Transition Year 2001 was contingent on an

investment by Cabletron/Enterasys that was not completed until

the following quarter" (¶ 176); and "Jaeger, Kirkpatrick and

Patel knew, or were reckless in not knowing, that it was improper

under GAAP to recognize revenue for the sale of Aprisma product

to Cellit.  Nevertheless, Cellit issued a purchase order for

approximately $1,005,000 of Aprisma product toward the end of the

first quarter of Transition Year 2001, for which Cabletron, with

Jaeger, Kirkpatrick and Patel's knowledge, improperly recognized

and reported on a consolidated basis approximately $1,005,000 in

revenue in the Form 10-Q it filed with the SEC for this quarter"

(¶ 177).  Again, the amended complaint is long on what Jaeger

knew, and short on what he did.


    The allegations concerning the DigitalMojo transactions are

as follows:


        Jaeger, together with Gagalis and Kay, caused Enterasys
        and Aprisma to improperly recognize approximately
        $701,000 in revenue from sales to DigitalMojo, Inc. . .
        .  Jaeger negotiated the three-corner investment with
        DigitalMojo.

        Hurley had advised Kay and others on August 22, 2001
        that DigitalMojo had almost no revenue, no need for the
        product, and no demonstrated ability to pay for the
        product.  He concluded that revenue for sales to
        DigitalMojo should be recorded at the cost of goods

> sold.  However, management rejected this advice and
> instead structured the transaction as a three-corner
> deal.
>
> At the time Enterasys recognized revenue from sales to
> DigitalMojo, Jaeger, Gagalis, and Kay knew that this
> investment transaction was structured as a three-corner
> deal to conceal DigitalMojo's precarious financial
> condition from Enterasys's outside auditor, that the
> transaction lacked economic substance (i.e. DigitalMojo
> did not need the product it was purchasing from
> Enterasys and Enterasys did not need the reciprocal
> services it was purchasing from DigitalMojo), and that
> the transaction did not qualify for revenue under GAAP.

(Am. Compl. ¶¶ 207-09.)  Paragraph 207 does allege that Jaeger

negotiated a three-corner deal with DigitalMojo.  But, there are

no allegations to support a claim that he did so with fraudulent

intent.  Paragraph 208 indicates that Hurley "advised Kay and

others" about DigitalMojo's financial condition, but does not

allege that Jaeger received any such advice.  And, while

paragraph 209 says that the DigitalMojo "investment transaction

was structured as a three corner deal," it attributes that

structuring to "management," not Jaeger or any other individual.

Thus, the amended complaint alleges neither that Jaeger

structured the DigitalMojo transaction as a three-corner deal nor

that he had any knowledge that would have put him on notice of a

need to conceal anything from Enterasys's outside auditor.


The allegations concerning the Everest transaction are

similarly inadequate:

113

On August 31, 2001, one day before quarter end, Jaeger
negotiated and finalized a reciprocal purchase
agreement with Everest Broadband Networks, Inc.
("Everest"), a broadband service provider based in New
Jersey.

.  .  .  .

At the time of the Everest transaction, Jaeger knew, or
was reckless in not knowing, that the reciprocal
purchase agreement with Everest lacked economic
substance, that neither company needed the other's
products or services, and that the transaction was
driven by Enterasys's desperate need to recognize
additional revenue by quarter end.  Given these
circumstances, Jaeger also knew, or was reckless in not
knowing, that it was improper for Enterasys to
recognize revenue for this transaction.

In addition, since Everest had not defined its future
need for Aprisma software, Everest requested, and
Jaeger approved, exchange rights for the software.
Although Jaeger knew, or was reckless in not knowing,
that exchange rights precluded revenue recognition,
these exchange rights were not disclosed to Enterasys's
finance department or outside auditor.

Through his active involvement in the Everest
transaction, Jaeger knowingly, or recklessly,
participated in Enterasys's improper recognition of
approximately $218,000 in revenue in both the second
and third quarter of the company's Transition Year
2001.

(¶¶ 218, 221-23.)  The amended complaint alleges that Jaeger

negotiated and finalized a deal with Everest while knowing that

it lacked economic substance, but does not make any allegation

that ties Jaeger to the accounting treatment of the revenue from

that transaction.  And, rather than alleging that Jaeger had a

responsibility to disclose exchange rights to the finance

department or outside auditor, but failed to do so, the SEC merely alleges, in the passive voice, that "exchange rights were not disclosed to Enterasys's finance department or outside auditor" by some unnamed person or persons.  Thus, while the SEC has alleged conduct by Jaeger that was not economically productive, it has not alleged conduct on his part that had the <u>purpose</u> and <u>effect</u> of creating a false appearance of fact.

Because the SEC has alleged no conduct on Jaeger's part that had the purpose and effect of creating a false appearance of fact, the amended complaint does not state a claim against him under 15 U.S.C. § 77(q)(a)(1).  Accordingly, Jaeger is entitled to dismissal of Count I.

<u>B. Count II</u>

In its order on Jaeger's previous motion to dismiss (document no. 133), the court dismissed the SEC's false-statement claims for essentially the same reasons it dismissed the false-statement claims against Patel and Kirkpatrick, the SEC's failure to allege falsity, Jaeger's knowledge of falsity, or materiality (or some combination thereof).  The amended complaint, and the SEC's response to Jaeger's motion to dismiss the amended complaint, adopt the same approach as with regard to Patel.  The SEC does not add any new transactions for which it seeks to

115

charge Jaeger with knowledge, other than through generalized
collective attributions of knowledge based upon patterns and
practices of reviewing end-of-quarter revenue.  Thus, the false-
statement claims against Jaeger fail for the same reasons the
claims against Patel and Kirkpatrick fail.  On that basis, the
SEC's false-statement claim against Jaeger is reduced to a claim
based upon two statements in the quarterly analyst conference
call and earnings release concerning Q1, TY 01: the statement
that Cabletron met Wall Street expectations and the statement
that Aprisma had revenue of $22.3 million.

    The amended complaint does not, however, adequately allege
that either the Q1, TY 01, analyst conference call or the
earnings release for that quarter were, or contained, statements
by Jaeger.  The SEC describes the press-release process in the
following way:

> Simultaneous with the audit and review process each
> quarter, Patel, Kirkpatrick, Jaeger, Collins[,] Fiallo
> and Skubisz prepared press releases and scripts for
> earnings calls with analysts.
>
> . . . .
>
> Patel and Jaeger were ultimately responsible for all
> relevant press releases.  Jaeger communicated this
> policy in email dated April 26, 2000 in which he
> stated, "As each of the four companies cranks up its PR
> machine, it is extremely important that we all remain
> cognizant of the policy concerning approval of press
> releases . . .  Press releases related to corporate
> matters (defined further below) of either the parent or

116

the subsidiaries MUST be approved by either Piyush
Patel or Eric Jaeger."  Jaeger defined "corporate
matters" to include: "transformation (purpose of the
transformation, details, timeline, etc.) . . .
corporate structure (e.g. relationship between sub and
parent, stock or option information, etc.) . . .
acquisitions, investments, etc. by [Cabletron] and the
subs[,] IPOs and spin-outs[,] revenue, revenue growth,
gross margin, operating margin, etc. [and] any other
release of major news" among other items. . . .

In addition to being subject to final approval by Patel
and Jaeger, drafts of Enterasys's press releases were
circulated to Kirkpatrick, Kay, Collins and Gagalis for
review, edit and approval.  Even after August 6, 2001,
Patel, Kirkpatrick and Jaeger continued to review and
edit Enterasys's press releases, including the
September 26, and October 29, 2001 press releases
describing the financial results for Enterasys's second
and third quarters of the Transition Year.

(Am. Compl. ¶¶ 345, 347–48.)  That general description does not

allege, in a manner consistent with the Rule 9(b) pleading

standard, that Jaeger made the two statements at issue in the Q1,

T1 01, conference call and earnings release.  Paragraphs 183,

184, 186, and 187, which allege nothing more than review and

approval, are also insufficient, for the reasons given above

regarding Kirkpatrick.


Because the amended complaint does not allege any statements

by Jaeger that were included in the Q1, TY 01, conference call or

press release, Jaeger is entitled to dismissal of the false-

statement component of Count II.

117

The course-of-business claim in Count II under 15 U.S.C. §
77q(a)(3) fails for the reasons given regarding the scheme claim
in Count I.

## C. Count III

Because the SEC has failed to state Securities Act claims
against Jaeger under any of the three theories it advanced, it
has, necessarily failed to state a claim for direct liability
under Rule 10b-5.  The SEC has, however, stated aiding-and-
abetting claims against Jaeger under Rules 10b-5(a) and (c),
based on his involvement in the transactions with iPolicy (Am.
Compl. ¶¶ 160-62), Centricity (¶¶ 168-69), and Everest (¶¶ 218-
23), subject to the same proviso that was applied to
Kirkpatrick's Securities Act course-of-business claims.  That
theory will go to the jury only if the SEC introduces evidence
sufficient to support it.  The SEC has not, however, stated an
aiding-and-abetting claim against Jaeger under Rule 10b-5(b), for
the reasons given above with regard to the Rule 10b-5(b) aiding-
and-abetting claim against Kirkpatrick, _i.e._, the SEC's failure
to identify any conduct by Jaeger that could reasonably be seen
as providing substantial assistance to the making of any false
statement.

118

D. Count IV

The amended complaint alleges that Jaeger negotiated and finalized a reciprocal purchase agreement with Everest (Am. Compl. ¶ 218) that included terms that would preclude revenue recognition under GAAP (¶¶ 219-22), yet he failed to inform the finance department of those terms (¶ 296), thus causing the creation of corporate books and records that falsely described the transaction.  Again, presuming that one who finalizes a deal has a responsibility to report its terms to the finance department, the SEC has stated a falsification-of-books-and-records claim against Jaeger under 15 U.S.C. § 78m(b)(5) and Rule 13b2-1.

E. Count V

The amended complaint does not allege that Jaeger signed any management representation letters or made any statements to auditors concerning frauds perpetrated against Cabletron, Enterasys, or Aprisma.  In fact, the amended complaint does not identify any statement Jaeger made, or caused to be made to an accountant.

Even so, in its supplemental filing, the SEC lists no fewer than forty-five paragraphs as supporting the "make a statement"

119

element of a claim for deceit of auditors against Jaeger.  Among

them:

> Although Aprisma continued to assume the risk of loss
> following the end of the quarter in which it improperly
> recognized revenue for the Wildflower transaction,
> Skubisz signed a Management Representation Letter for
> this quarter advising Aprisma's outside auditor that
> revenue had been appropriately modified for all
> transactions involving significant future obligations
> and that Aprisma's financial information had been
> fairly presented in conformity with GAAP.
>
> At the time he entered into the side agreement with
> Wildflower and sent the false management representation
> letter to Aprisma's outside auditor, Skubisz knew, or
> was reckless in not knowing, that the terms of the
> undisclosed side agreement precluded revenue
> recognition under GAAP.
>
> Given his personal approval of the Wildflower
> transaction and his understanding of the relevant
> revenue recognition principles, Skubisz knowingly, or
> recklessly, caused Aprisma to improperly recognize
> approximately $360,000 in revenue from this transaction
> during the second quarter of Transition Year 2001.
> Although this revenue was not included in Enterasys's
> consolidated revenues for the quarter, this revenue was
> incorporated in Enterasys's materially misstated net
> losses to common shareholders, pro forma and actual
> earnings per share for this quarter and the following
> quarter.

(Am. Compl. ¶¶ 238-40 (emphasis added).)  Those paragraphs do not

directly or indirectly refer to Jaeger.  While paragraphs 238-40

may state an element of a claim against Skubisz, the SEC does not

say how Jaeger might be liable for deceit of auditors based on

Skubisz's management representation letter.  Moreover, the SEC's

apparent attempt to state claims about one person based on the

actions of another is tiresomely common in the amended complaint, and leads one to wonder just how seriously the SEC is pursuing this case.[30]

In any event, because the SEC has not alleged any statements to accountants by Jaeger, the amended complaint does not state a claim against him under 17 C.F.R. § 240.13b2-2.

F. Count VI

Count VI of the original complaint was dismissed with respect to Jaeger on grounds that the SEC had alleged no conduct on his part that rose to the level of aiding and abetting the submission of false information to the SEC. That is, the original complaint did not allege conduct that proximately caused any violations of 15 U.S.C. § 78m(a). The amended complaint is

---

[30] For example, the SEC lists paragraphs 59 through 65 as stating an element of a claim against Shanahan, while those paragraphs describe a transaction with Discjockey.com in which Shanahan is not alleged to have had any role. So, too, with paragraph 224, which pertains to a transaction with Ariel in which Shanahan is not alleged to have had a role. And, in support of its deceit-of-auditors claim against <u>Shanahan</u>, the SEC identifies this: "<u>Collins</u> signed Management Representation Letters on behalf of Enterasys dated September 25, 2000, December 20, 2000, and June 27, 2001 which covered the second and third reporting periods for Fiscal Year 2001 and the first reporting period of Transition Year 2001." (Am. Compl. ¶ 338.) The SEC's supplemental filing contains far too much of this sort of thing, which is, at best, unacceptable inattentiveness or, at worst, deliberate obfuscation. Courts expect the government to have a better command of its own pleadings.

no better.  Under the heading "substantial assistance," the SEC's

supplemental filing identifies paragraphs that are either far too

general to meet the Rule 9(b) pleading requirement,[31] or do

little more than note Jaeger's participation in or knowledge of

transactions that generated non-GAAP revenue.[32]  While one

-------

[31] For example, the SEC identifies the following paragraph
as supporting the "substantial assistance" element of its false-
filings claim against Jaeger in Count VI:

> The Defendants also misrepresented information to, or
> concealed information from, the companies' outside
> auditor concerning the true nature of the transactions
> for which the company improperly recognized revenues.
> Patel, Kirkpatrick, and Jaeger were not only aware of
> the practice of concealing critical information from
> the companies' outside auditor, but approved and
> encouraged this practice to enable Cabletron,
> Enterasys, and Aprisma to continue to report
> consistently strong revenue growth and earnings per
> share results that met or exceeded Wall Street's
> expectations.

(Am. Compl. ¶ 30.)  Jaeger's conduct is not particularized, and
the allegations of approval and encouragement do not say who
Jaeger (and the other two) encouraged, or what Jaeger (and the
other two) did to communicate their approval or effect their
encouragement.  Nor does the SEC allege, even in general terms,
the nexus between the conduct alleged in paragraph 30, concealing
information from the outside auditor, and the legal theory
underlying Count VI, which is making false reports to the SEC.

[32] For example, the SEC identifies the following paragraphs
as supporting the "substantial assistance" element of its false-
filings claim against Jaeger in Count VI:

> Accordingly, Patel and Jaeger, as well as Collins and
> Kay, who also became aware that the investment was not
> completed by quarter end, knew, or were reckless in not
> knowing, that Enterasys improperly recognized $2.258
> million in revenue from the DiscJockey.com sale during
> the first quarter of Fiscal Year 2001.

person's participation in a transaction that generated non-GAAP revenue is a necessary prerequisite for a second person's submission of an SEC filing that falsely reports that non-GAAP revenue as GAAP revenue, the act of generating non-GAAP revenue is far too attenuated from the act of submitting an SEC filing to count as proximate cause for the submission, which is the standard for aider-and-abettor liability.  In short, the amended complaint does not correct the shortcomings of the original complaint and, as a result, Jaeger is entitled to dismissal of Count VI.

---

. . . .

Patel, Kirkpatrick, Jaeger and Fiallo each knew, or were reckless in not knowing, that $4.937 million of the $7.7 million increase in revenue came from transactions for which revenue should not have been recognized under GAAP.  Without these transactions, Defendants could not have reported a 5% growth rate for Enterasys.  Instead, Enterasys would have only achieved quarterly revenue growth of 1.6%, falling far short of the 20% annual revenue growth rate projection issued by Patel in Cabletron's March 29, 2000 analyst conference call.

(Am. Compl. ¶¶ 65, 74.)  Paragraph 65 alleges what Jaeger (and three other individuals) knew, not what he did, and a person's knowledge, without conduct, cannot cause anything.  Likewise, paragraph 74 alleges only what Jaeger knew.  And, neither paragraph alleges any nexus between Jaeger's knowledge and the submission of false filings to the SEC.

G. Count VII

Count VII of the original complaint was dismissed as to Jaeger on grounds that the SEC had alleged no facts that adequately connected Jaeger to the preparation of Enterasys's corporate books, records, and accounts and, as a result, alleged no facts that satisfied the proximate-cause requirement for aider-and-abettor liability.  Based upon the SEC's identification of paragraphs supporting the "substantial assistance" element of an aider-and abettor claim, the amended complaint is no better. Accordingly, Jaeger is entitled to dismissal of Count VII.

**Lawrence Collins**

"Lawrence Collins was the Controller for Enterasys from March 2000 through December 2001.  He was licensed as a CPA in Maine from 1984 through 1987."  (Am. Compl. ¶ 10.)

A. Count I

The SEC has stated a Securities Act scheme claim against Collins, based upon the following allegation:

> Collins and Kay were responsible for determining what
> reserves against revenue should be booked against the
> sales transactions which lacked the necessary
> requirements under GAAP; such as investment deals,
> three corner deals and transactions with side
> agreements.  Despite knowing of transactions which
> failed to meet the requirements under GAAP, such as
> Ariel, Accton, JBS/CTC and the three-corner deals,

> Collins and Kay failed to make entries setting up the
> proper reserves.

(Am. Compl. ¶ 306.)  That allegation is adequate to support a
claim that Collins engaged in conduct – knowingly failing to
accurately account for transactions that resulted in the
recognition and reporting of revenue that did not qualify for
revenue recognition under GAAP – that had the purpose and effect
of creating the false appearance of greater revenue than
Enterasys had the right to report, in an effort to defraud.


B. Count II

     In its order on Collins's first motion to dismiss (document
no. 130), the court ruled that the SEC failed to adequately
allege that Collins had a role in making any of the false
statements at issue, and also failed to adequately allege
affirmative conduct of the sort necessary to make him liable as
an aider and abettor.  The SEC responds, in the amended
complaint, in several ways.  First, with respect to the false
statements in SEC filings, the amended complaint alleges
generally:

> Drafts of Cabletron's filings required by the
> Commission for all of the relevant periods were
> circulated among Jaeger, Kirkpatrick, Kay, Collins, and
> Hurley for review, edit and approval.  Drafts of
> Enterasys's Forms 10-Q for the quarters ended September
> 1, and September 29, 2001 were circulated among Gagalis
> Kay, Collins, Hurley and Fiallo.

125

(Am. Compl. ¶ 351.)  Several paragraphs later, the amended

complaint sets out its theory of liability:

> By reviewing and approving or signing the filings
> required by the Commission, which they knew, or were
> reckless in not knowing, materially misrepresented the
> financial condition of Cabletron, Enterasys and Aprisma
> by overstating revenues and earnings per share and
> understating operating losses and losses to common
> shareholders, Patel, Kirkpatrick, Jaeger, Kay, Collins,
> Skubisz, Gagalis, Fiallo and Hurley made untrue
> statements of material fact or omitted to state
> material facts necessary in order to make the
> statements made, in light of the circumstances under
> which they were made, not misleading.

(Am. Compl. ¶ 364.)  With respect to the earnings releases, the

amended complaint includes an allegation such as the following

for each of the seven quarters at issue: "Collins, who reviewed

and provided the financial data for the earnings release, also

knew that it was materially inaccurate."  (¶ 78; see also ¶¶ 84,

110, 142, 183, 273, 284.)  The amended complaint also makes minor

changes to the allegations concerning several of the transactions

the SEC claims Collins was involved in.


    The court begins with the SEC filings.  Notwithstanding the

generalized, collective allegations contained in paragraph 351 of

the amended complaint, there is only one specific allegation

concerning Collins's role in preparing Enterasys's SEC filings:

126

>    On October 16, 2001, Enterasys filed a quarterly report
>    on Form 10-Q for the quarter ended September 1, 2001
>    that was reviewed and approved by Patel, Jaeger,
>    Kirkpatrick and Collins, each of whom knew that the
>    financial information contained therein was materially
>    false and misleading."

(Am. Compl. ¶ 270.)  Thus, if Collins is liable for any false
statements in SEC filings, it would be for those contained in the
SEC filings pertaining to Q2, TY 01.  However, even assuming the
proposition that "review and approval" is sufficient to make
Collins liable for false statements in the Q2, TY 01, SEC
filings, see Tambone I, 417 F. Supp. 2d at 132 ("In order to be
liable for a primary violation of . . . Section 17(a) of the
Securities Act, a defendant must have personally made either an
allegedly untrue statement or a material omission."); see also In
re Lernout & Hauspie, 230 F. Supp. 2d at 171 (noting universal
rejection of "review and approval" allegations), any false
statement for which Collins might be liable is immaterial as a
matter of law.  For that quarter, Enterasys is alleged to have
had $222.2 million of net revenue, while reporting $240,181,000.
Of the non-GAAP revenue included in that figure, Collins is
adequately alleged to have known about only $1.5 million, or
approximately .68 percent of Enterasys's actual revenue for the
quarter.  Thus, any false statement properly attributable to
Collins is not material as a matter of law.

127

The allegations related to earnings releases – that, in each of seven quarters, Collins provided "the financial data for the press releases"[33] – appear to be sufficient to assert that Collins made the statements contained in the releases.  <u>See Wolfson</u>, 539 F.3d at 1261 (holding that person who did not sign, certify or file submissions to the SEC nonetheless made false statements contained in them because he drafted both of them, and the more misleading one was filed exactly as he had drafted it); <u>SEC v. Thielbar</u>, No. Civ. 06–4253, 2008 WL 4360964, at *8 (D.S.D. Sept. 24, 2008) (holding that defendant could be held primarily liable for violating sections 17(a)(1), (2), and (3) of the Securities Act because he was "alleged to have supplied Northwestern with fraudulent financial information which he knew would be incorporated into Northwestern's publicly filed financial statements").  However, the SEC still must adequately allege Collins's knowledge of the falsity of the financial data he provided, as well as the materiality of the false statements for which is liable.

As for Collins's knowledge, he is alleged to have known of non–GAAP revenue generated by transactions with Accton ($500,000, recognized in Q1, TY 01), Ariel ($3.9 million, recognized in Q2,

---

[33] The SEC does not specifically describe what the "financial data" was that Collins is alleged to have provided.

TY 01, reported in Q3, TY 01), and JBS ($1.5 million, reported in both Q2, TY 01, and Q3, TY 01).[34]  Because the earliest transaction the SEC identifies occurred in Q1, TY 01, the amended complaint does not state a claim against Collins based on earnings releases covering any of the first four quarters at issue.

Turning to Q1, TY 01, Collins is alleged to have known about $500,000 in revenue improperly recognized under GAAP and reported by Enterasys from a transaction with Accton.  In that quarter, the SEC alleges that Enterasys's actual revenue was $222,912,000, making Collins liable for an overstatement of approximately .22 percent, which is not material as a matter of law.  Moreover, notwithstanding the allegation that Collins provided the financial data for the Q1, TY 01, earnings release, the amended complaint can only be read as alleging that he provided financial data about Enterasys, the company for whom he was the Controller. Thus, there is no basis alleged in the amended complaint for

---

[34] The amended complaint also attempts to impute to Collins knowledge of $2.258 million of non-GAAP revenue from a transaction with DiscJockey.com reported at the end of Q1, FY 01. But, at best, the amended complaint alleges that Collins became aware of that transaction at some point in October, 2000, at least two months after the issuance of any statements including that revenue.  Even if the complaint adequately alleges that Collins knew about the impropriety of recognizing revenue from the DiscJockey.com transaction in October, it does not allege that Collins knew about that transaction when the various revenue statements that included it were made.

holding Collins liable for statements about Cabletron's pro forma earnings per share, and statements that Cabletron had met Wall Street expectations.

Regarding Q2, TY 01, Collins is alleged to have known about $1.5 million in revenue improperly recognized under GAAP and reported by Enterasys from a transaction with JBS.  As with the revenue report in the SEC filings, any false statement for which Collins might be liable is not material as a matter of law. Turning to the statement in the Q2, TY 01, earnings release that Enterasys had pro forma earnings of $.11 per share, which exceeded the Wall Street expectation of $.10, Collins's false statement is not material as a matter of law, given that during that quarter, it took $3 million in net revenue to generate $.01 per share in pro forma earnings.  See note 22, supra.

That leaves Q3, TY 01.  Collins is alleged to have known about $1.5 million in non-GAAP revenue from the JBS transaction and $3.9 million in non-GAAP revenue from the Ariel transaction, all reported as GAAP revenue in that quarter.  Based on Enterasys's actual net revenue of $85,373,000 for the quarter, the court cannot conclude, as a matter of law, that it was not a material misrepresentation to overstate the company's revenue by $5.4 million, or approximately 6.3 percent.

130

In sum, the SEC has stated a claim against Collins, under 15 U.S.C. § 77q(a)(2), based on his earnings release statement that Enterasys had net revenue of $105,535,000 in Q3, TY 01.

The course-of-business claim in Count II under 15 U.S.C. § 77q(a)(3) remains viable, with the caveat stated above in the discussion of the Securities Act course-of-business claims against Kirkpatrick.

## C. Count III

Because the SEC has stated claims against Collins under 15 U.S.C. § 77q(a)(1), (2), and (3), and has adequately alleged scienter, it has also stated claims against him for direct liability under Rule 10b-5(a), (b), and (c), with the proviso that the Rule 10b-5(b) claim is limited to the one statement identified in the foregoing discussion of Count II.  Accordingly, there is no need to address the SEC's claims for aider-and-abettor liability under Rule 10b-5, although, as with Patel and Kirkpatrick, those theories remain available to the SEC at future stages of this case.

## D. Count IV

The SEC has stated a falsification-of-books-and-records claim against Collins under 15 U.S.C. § 78m(b)(5).  The amended

131

complaint adequately alleges that the corporate books and records
of Enterasys reported millions of dollars of non-GAAP revenue as
if that revenue had been properly recognized, and the amended
complaint alleges that Collins was Enterasys's controller during
the time when much of that revenue was entered into the company's
corporate books and records. That is enough to state a valid
claim.


E. Count V

The SEC's treatment of Count V in its supplemental filing is
yet another example of its superficial approach to stating claims
in this case. Rule 13b2-2 imposes liability on both those who
"make" false statements to accountants and those who "cause
[false statements] to be made." In its supplemental filing, the
SEC lists 104 paragraphs as alleging facts supporting the "make"
element. Then, the SEC lists the very same 104 paragraphs as
alleging facts supporting the "cause to be made" element. The
SEC's approach is not helpful, and seems almost vexatious, given
that the court, and the defendants, must at least understand what
it is that the SEC is alleging, in the context of the applicable
law. This unspecific, generalized, one-tale-covers-all-discrete-
causes-of-action style of pleading, again, is counterproductive.

In the order on Collins's previous motion to dismiss, the court observed that, if properly pled, Collins's participation in the Ariel transaction might support liability under Rule 13b2-2 for deceit of auditors.  As pled in the amended complaint, Collins's participation in the Ariel transactions now does provide factual support for a Rule 13b2-2 claim.  Specifically, the amended complaint alleges that "Boey modified the letter agreement [with Ariel] by creating a new backdated first page that contained . . . fabricated terms, and then forwarded the page to Gagalis and Kay, who in turn forwarded it to Hurley" (Am. Compl. ¶ 230), and that "[a]fter replacing the original first page of the letter agreement with the backdated first page and then advising both Kay and Collins of his intentions by e-mail and hearing no objections from them, Hurley presented the letter agreement to Enterasys's outside auditor" (¶ 231).  Given the SEC's allegation that "Collins was responsible for supervising Assistant Controller, Hurley" (¶ 321), and presuming that giving an auditor a falsified document qualifies as deceit of an auditor, the SEC has adequately alleged a false statement to an accountant, for which Collins is vicariously liable.  And, in addition, buried among the 104 paragraphs identified by the SEC in its supplemental filing, there is an allegation that Collins e-mailed the outside auditor an explanation of a transaction with JBS that omitted mention of return rights Collins knew were

133

granted to JBS, and that he knew to be recognition-disqualifying. (¶ 217.)  That states a claim that Collins omitted to state a material fact necessary to make his statement to the auditor not misleading.

In sum, to the extent described above, the SEC has adequately stated a deceit-of-auditors claim against Collins under Rule 13b2-2.

F. Count VI

Count VI of the original complaint was dismissed with respect to Collins on grounds that the SEC failed to allege facts concerning Collins's involvement in the Ariel transaction with the specificity required by Rule 9(b).  The amended complaint is no improvement.  And, as with Jaeger, the SEC's attempt to identify paragraphs in the amended complaint alleging Collins's substantial assistance in a false-filings violation is ineffective.  For example, the SEC identifies these four paragraphs:

> Continuing their scheme to fraudulently misrepresent
> Cabletron's financial performance and following senior
> management's directive to generate additional revenues
> whether legitimate or not, the Defendants improperly
> recognized more than a million dollars in additional
> revenue during the second quarter of Fiscal Year 2001
> (June 4, 2000 – September 2, 2000) from sales to:
> DiscJockey.com ($630,000) that were subject to the
> future contingent investment negotiated by Kirkpatrick

(see ¶¶ 59-66); JBS ($537,000), in which Enterasys
remained responsible for reselling the underlying
product (see ¶¶ 67-68); and PEAC ($74,000) that were
subject to sell-through payment terms (see ¶¶ 67-68).

Patel, Jaeger, and Kirkpatrick, who closely monitored
the revenues generated from all investment deals, knew,
or were reckless in not knowing, that Enterasys
continued to recognize revenues from the DiscJockey.com
deal even though the contingent investment had not been
completed.  In fact, on October 2, 2000, these
individuals received an e-mail from a member of the
investment team advising them that the DiscJockey.com
investment had still not been completed.

Following the review and approval of the earnings
release script by Patel, Kirkpatrick, and Jaeger, on
September 25, 2000 Patel announced in Cabletron's
second quarter earnings release and an analysts
conference call that Cabletron had achieved pro forma
earnings of $.01 per share, making it the seventh
consecutive quarter that it had met or exceeded Wall
Street's expectations.  Cabletron had not in fact met
Wall Street's expectations the prior quarter so no
consecutive quarter claim should have been made.
Fiallo and Skubisz were present for the September 25,
2000 analyst call.  Collins had reviewed and provided
the financial data for the earnings release.

In addition, without the improper revenue from
DiscJockey.com, JBS, and PEAC, Cabletron's actual pro
forma earnings per share for the second quarter of
Fiscal Year 2001 was $0.00, a 100% variance from the
announced $.01 per share and from Patel's claim in the
earnings release that "We have achieved profitability
for the consolidated company ahead of schedule [.]"

(Am. Compl. ¶¶ 82-85).  In the SEC's view, the foregoing

paragraphs, which mention neither Collins nor SEC filings,

somehow support its claim that <u>Collins</u> aided and abetted

Cabletron or Enterasys in submitting false filings to the SEC.

And the SEC makes the same argument for these paragraphs:

On June 4, 2001, Patel and Kirkpatrick signed and
caused to be filed with the SEC Cabletron's annual
report on Form 10-K for the year ended March 3, 2001.
This Form 10-K had been reviewed and approved by Patel,
Kirkpatrick, and Jaeger, each of whom knew, or was
reckless in not knowing, that the financial information
contained therein was materially inaccurate.

The cumulative impact of the Defendants' scheme on
Cabletron's fourth quarter results was to overstate
revenues by $7 million or 3%, reporting quarterly
revenues of $286 million instead of $279 million in its
Form 10-K.

As a result of these improper revenues, Cabletron also
reported operating losses of $45 million rather than
$49 million, thereby understating its operating losses
by approximately 8%.

(Am. Compl. ¶¶ 138-140.)  While those paragraphs do mention SEC

filings, they do not mention Collins.


Because the SEC has failed to identify specific facts to

support its false-filings claim against Collins, Collins is

entitled to dismissal of Count VI.


G. Count VII

Count VII of the original complaint was dismissed with

respect to Collins on grounds that the SEC failed to allege facts

concerning Collins's involvement in the Ariel transaction with

the specificity required by Rule 9(b).  The amended complaint is

no improvement with regard to liability for false books and

records under 15 U.S.C. § 78m(b)(2)(A), and the SEC's
supplemental filing is also unavailing.

For example, the SEC cites the DiscJockey.com transaction
(Am. Compl. ¶¶ 59–65), in which Collins's only participation was
to send an e-mail to those involved in the transaction, several
months after the deal was done (¶ 64).  The SEC also cites the SG
Cowen transaction (¶¶ 96–108), but only alleges that Collins
became involved more than a year after the fact, when he,
Gagalis, and Shanahan "agreed to a plan," that was never
executed, to conceal a product return to avoid a revenue reversal
(¶ 107).

Somewhat inexplicably, the SEC identifies these paragraphs
as supporting its false-books-and-records claim against Collins:

> On June 4, 2001, Patel and Kirkpatrick signed and
> caused to be filed with the SEC Cabletron's annual
> report on Form 10-K for the year ended March 3, 2001.
> This Form 10-K had been reviewed and approved by Patel,
> Kirkpatrick, and Jaeger, each of whom knew, or was
> reckless in not knowing, that the financial information
> contained therein was materially inaccurate.
>
> The cumulative impact of the Defendants' scheme on
> Cabletron's fourth quarter results was to overstate
> revenues by $7 million or 3%, reporting quarterly
> revenues of $286 million instead of $279 million in its
> Form 10-K.
>
> As a result of these improper revenues, Cabletron also
> reported operating losses of $45 million rather than

137

$49 million, thereby understating its operating losses
by approximately 8%.

(Am. Compl. ¶¶ 138-40.)  Those paragraphs mention Patel,
Kirkpatrick, and Jaeger, but not Collins, and discuss SEC
filings, but not corporate books and records.  And then there are
these paragraphs:

> In furtherance of the Defendants' scheme, Shanahan,
> Collins, and Kay participated in improperly recognizing
> approximately $500,000 in revenue from sales to Accton
> Technology Corp. during the first quarter of Transition
> Year 2001.
>
> At the time Enterasys recognized revenue from sales to
> Accton, Shanahan, Collins, and Kay knew that Accton had
> purchased product to assist Enterasys in meeting its
> revenue goals, that Accton did not need the product,
> and that Accton intended to return the purchased
> product.  To avoid recognizing Accton's return of
> product, Shanahan and Kay authorized Enterasys to
> purchase unneeded services from Accton to offset the
> account receivable recorded for the transactions.
>
> Shanahan, Collins and Kay knew that Enterasys intended
> to, and did, in fact, recognize approximately $500,000
> in revenue from sales to Accton during the first
> quarter of Transition Year 2001 even though it was
> improper to recognize revenue from these sales given
> the foregoing circumstances.

(Am. Compl. ¶¶ 164-66.)  While those paragraphs allege that
Shanahan and Kay authorized Enterasys to purchase unneeded
services from Accton, the only allegations concerning Collins
pertain to what he knew about the Accton transaction and
Enterasys's recognition of revenue from it.  Substantial
assistance in Enterasys's violation of 15 U.S.C. § 78m(b)(2)(A)

138

is not adequately alleged by reference to things that Collins
knew or thought; thoughts alone cannot proximately cause
anything.

The SEC comes closest to the mark in the following
paragraph:

> As set forth in Sections IV. F. and G., Collins knew of
> and concealed side agreements or material sales terms
> with Accton, Ariel and JBS/CTC which precluded revenue
> recognition.  Collins did not require that the terms of
> the side agreements appear on the purchase order, be
> communicated to the other members of the finance
> department, or recorded accurately in the company's
> books, records or accounts.

(Am. Compl. ¶ 299.)  That paragraph, however, mischaracterizes
the allegations concerning the Accton, Ariel, and JBS/CTC deals.
Section IV. F. alleges that Collins knew various things about the
deal, but not that he did anything to conceal side agreements or
material sales terms.  (¶¶ 164-66.)  Section IV. G. alleges that:
(1) Collins knew that Hurley submitted fraudulent documentation
of the Ariel transaction to the outside auditor, which supported
the SEC's claim in Count V, but not that Collins did anything
that proximately caused inaccuracies in Enterasys's corporate
books and records (¶¶ 224-34); and (2) Collins gave the outside
auditor misleading information concerning the JBS/CTC
transaction, which supported the SEC's claim in Count V, but not

139

that Collins did anything that proximately caused inaccuracies in Enterasys's corporate books and records (¶¶ 216–17).

In sum, the SEC has failed to state a false–books–and–records claim against Collins under 15 U.S.C. § 78m(b)(2)(A).

H. Count VIII

Count VIII of the original complaint was dismissed as to Collins on grounds that the SEC failed to allege facts concerning Collins's involvement in the Ariel transaction with the specificity required by Rule 9(b).  In his current motion to dismiss, Collins argues that the amended complaint does not even identify him as having had any responsibility for devising or maintaining a system of internal accounting controls, and does not allege any conduct on his part that would constitute aiding and abetting a corporate violation of 15 U.S.C. § 78m(b)(5).  In its objection, the SEC identifies no factual allegations that support Count VIII, and its supplemental filing identifies no factual allegations that Collins had any responsibility for devising or maintaining a system of internal accounting controls,[35] or that he provided substantial assistance that

---

[35] Paragraph 305 does allege that "[a]s members of the finance department, Kirkpatrick, Kay, Collins, Hurley, Boey and Gagalis had knowledge of and responsibility for the accuracy of Enterasys's books, records and accounts."  But alleging responsibility for corporate books and records both collectively

caused anyone who did have such responsibilities to shirk them.
Accordingly, Collins is entitled to dismissal of Count VIII.


### Michael Skubisz

"Michael A. Skubisz was the Chief Executive Officer and
President of Aprisma from 1999 until August 2002."  (Am. Compl. ¶
12.)


A. Count I

The SEC has adequately alleged a Securities Act scheme claim
against Skubisz based upon the allegations in paragraphs 123,
171, and 237 of the amended complaint.  In paragraph 123, the SEC
alleges that "[t]o induce ConvergeLabs to purchase Aprisma
products and services that it did not need, Skubisz granted the
company undisclosed and unlimited exchange rights that were
confirmed in a side agreement dated February 28, 2001" (emphasis
added).  In other words, the SEC alleges conduct by Skubisz that
had the principal purpose and effect of creating a false

_____

and so generally is insufficient given the judicially recognized
distinction between "internal accounting controls" and "a
company's actual accounting system."  SEC v. Dauplaise, No.
6:05CV1391 ORL 31KRS, 2006 WL 449175, at *9 and n.29 (M.D. Fla.
Feb. 22, 2006) (citing SEC v. World-Wide Coin Invs., Ltd., 567 F.
Supp. 724, 750 (N.D. Ga. 1983)).  Alleging that Collins, and
others, were responsible for the accuracy of Enterasys's
corporate books and records is not the same as alleging that
Collins was responsible for devising or maintaining Enterasys's
system of internal accounting controls.

appearance of fact in furtherance of the scheme.  Similarly, paragraph 171 alleges that Skubisz personally granted undisclosed exchange rights to Sonda do Brasil, which created the false appearance of a transaction that qualified for revenue recognition under GAAP.  And, paragraph 237 alleges that Skubisz entered into an undisclosed side agreement with Wildflower under which Wildflower submitted a purchase order to Aprisma with shipping terms that supported revenue recognition (i.e., FOB Origin), while actually enjoying different terms (i.e., FOB Destination) that were more favorable to Wildflower but that disqualified the transaction for revenue recognition.  That is, Skubisz's undisclosed side agreement created the false appearance that the Wildflower transaction was subject to FOB Origin shipping terms when, in fact, it was subject to FOB Destination terms.  The ConvergeLabs, Sonda, and Wildflower allegations adequately state the "employ any device, scheme, or artifice to defraud" element Securities Act scheme claim.  Because the amended complaint adequately alleges the other elements of such a claim, Skubisz is not entitled to dismissal of Count I.


B. Count II

Skubisz moves for judgment on the pleadings on the false-statement claim in Count II on grounds that none of the transactions he was involved in was material, and he does so by

comparing the non-GAAP Aprisma revenue he is adequately alleged
to have known about to the net revenue reported by Cabletron and
Enterasys, quarter by quarter.  That analysis misses the point.
The amended complaint does not allege that Skubisz made any
statements about Cabletron or Enterasys.[36]  Thus, the net revenue
of those companies is not the proper frame of reference for
determining the materiality of Skubisz's statements.  Because
Skubisz is alleged to have made statements about Aprisma and its
revenue, the materiality of his allegedly false statements must
be measured against Aprisma's actual net revenue.

Skubisz is alleged to have reported, in a December 20, 2000,
earnings release and conference call (at the end of Q3, FY 01),
that Aprisma had net revenue of $19.7 million and a sequential
quarterly growth rate of 13.4 percent, while knowing that those
figures included $1.8 million in non-GAAP revenue from a
transaction with SG Cowen.  The court cannot conclude that an

---

[36] The amended complaint does say that Skubisz was present
while statements were made about Cabletron and Enterasys during
analyst conference calls, but presence while somebody else speaks
does not make a person who was present but mute liable for what
the speaker said.  Moreover, given the small amount of revenue
generated by Aprisma in comparison with the revenue of Cabletron
and Enterasys, it is untenable to say that a false report about
Aprisma revenue by Skubisz to someone making a statement about
Cabletron or Enterasys is adequate to charge Skubisz with
liability for making a statement about corporate parent Cabletron
or corporate sibling Enterasys merely because such a statement
included Aprisma data.

overstatement of revenue by more than ten percent is immaterial as a matter of law.  So, too, with the second statement about Aprisma revenue for which the SEC seeks to hold Skubisz liable. He is alleged to have said, in a June 27, 2001, quarterly analyst conference call (at the end of Q1, TY 01), that "Aprisma continued to achieve 'sequential quarterly revenue growth' " (Am. Compl. ¶ 184), while knowing that Aprisma had, in fact, experienced a decline in revenue that quarter, from $21.9 million to no more than $21.727 million.  While the complaint does not adequately allege Skubisz's knowledge of all the non-GAAP revenue recognized and reported by Aprisma that quarter, the materiality of his false statement is a matter better left to the finder of fact.

In sum, the SEC has stated a claim against Skubisz, under 15 U.S.C. § 77q(a)(2), based on his conference-call statements that Aprisma had net revenue of $19.7 million in Q3, FY 01, and that Aprisma had sequential quarterly revenue growth in Q1, TY 01.

The SEC adequately alleges a Securities Act course-of-business claim against Skubisz, with the same caveat stated above with regard to Kirkpatrick's Securities Act course-of-business claim.

C. Count III

     The SEC has stated claims for direct liability against
Skubisz under Rules 10b-5(a), (b), and (c), with the proviso that
the Rule 10b-5(b) claim is limited to the two statements
identified in the foregoing discussion of Count II.  Accordingly,
there is no need to address the SEC's claims for Rule 10b-5
aider-and-abettor liability, although, as with Patel,
Kirkpatrick, and Collins, that alternative theory remains
available to the SEC at future stages of this case.


D. Count IV

     The SEC has alleged that Skubisz secured purchase orders
from, and granted unlimited exchange rights to, ConvergeLabs (Am.
Compl. ¶ 123), did not place the recognition-disqualifying
exchange rights in the purchase orders (id.), and failed to
inform the finance department of the exchange rights (¶ 300),
thus causing the creation of corporate books and records that
falsely described the transaction.  That is enough to state a
falsified-books-and-records claim under 15 U.S.C. § 78m(b)(5) and
Rule 13b2-1.


E. Count V

     Among the paragraphs the SEC identifies as alleging facts
supporting a Rule 13b2-2 deceit-of-auditors claim against
Skubisz, these come the closest:

Since Aprisma could not guarantee delivery and transfer
risk of loss to Wildflower by the end of the quarter,
it could not properly recognize revenue for the FOB
Destination order in the quarter in which the order was
placed.  Unwilling to lose this revenue, Skubisz
entered into an undisclosed side agreement to induce
Wildflower to submit a new purchase order with FOB
Origin shipping terms, which provided the risk of loss
would shift to Wildflower upon Aprisma's shipment of
the product and allow Aprisma to recognize revenue in
the current quarter.  Skubisz's side agreement, which
was not disclosed to the outside auditor, assured
Wildflower that, notwithstanding an FOB Origin shipment
term in the purchase order, Aprisma would bear the risk
of loss for the shipment as if the terms were still FOB
Destination.

Although Aprisma continued to assume the risk of loss
following the end of the quarter in which it improperly
recognized revenue for the Wildflower transaction,
Skubisz signed a Management Representation Letter for
this quarter advising Aprisma's outside auditor that
revenue had been appropriately modified for all
transactions involving significant future obligations
and that Aprisma's financial information had been
fairly presented in conformity with GAAP.

(Am. Compl. ¶¶ 237, 238).  What is notable about those paragraphs

is what is not alleged.  First, paragraph 237 alleges that the

Wildflower side agreement "was not disclosed to the outside

auditor," but says nothing about whose responsibility it was to

make such disclosures.  One must presume that the SEC chose to

use the passive voice for a reason.  In addition, the lack of

specificity concerning reporting responsibilities, either

internal or external, deprives paragraph 238 of any adequately

alleged facts regarding Skubisz's knowledge of the falsity of the

statements in his management representation letter.

146

In sum, the SEC has failed to state a claim against Skubisz under Rule 13b2-2.

F. Count VI

Because the SEC has identified no conduct by Skubisz that could qualify as a proximate cause of any false reporting to the SEC by Cabletron or Enterasys, Skubisz is entitled to dismissal of Count VI.

G. Count VII

The three paragraphs the SEC identifies as supporting the "substantial assistance" element of a false-books-and-records claim under 15 U.S.C. § 78m(b)(2)(A), paragraphs 29, 312, and 314, do no such thing.  Skubisz is entitled to dismissal of Count VII.

H. Count VIII

The four paragraphs identified by the SEC as supporting the "substantial assistance" element of its accounting-controls claim against Skubisz fail to meet the Rule 9(b) pleading standard (Am. Compl. ¶¶ 29, 312), do not mention Skubisz at all (¶ 57), or do not allege relevant conduct (¶ 300).  Skubisz is entitled to dismissal of Count VIII.

147

**Jerry Shanahan**

"Jerry A. Shanahan was the Executive Vice President of Operations and Quality at Cabletron from September 2000 to March 2001.  He was the Chief Operating Officer of Enterasys from March 2001 until his resignation in May 2002. Previously Shanahan served as Vice President of International Operations for Cabletron from February 2000 to September 2000."  (Am. Compl. ¶ 8.)


A. Count I

The SEC has adequately alleged a Securities Act scheme claim against Shanahan based upon the allegations in paragraphs 165, 245, and 246 of the amended complaint.  In paragraph 165, the SEC alleges that "[t]o avoid recognizing Accton's return of product, Shanahan and Kay authorized Enterasys to purchase unneeded services from Accton to offset the account receivable recorded for the transaction."  In other words, the SEC alleges conduct by Shanahan that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. Similarly, paragraph 246 alleges that Shanahan "[e]ntered into an undisclosed side agreement with Tech Data with the intent of concealing terms that would otherwise preclude revenue recognition in the current quarter."  The Accton and Tech Data allegations adequately state the "employ any device, scheme, or

148

artifice to defraud" element of a Securities Act scheme claim.
Because the amended complaint adequately alleges the other
elements of such a claim, Shanahan is not entitled to dismissal
of Count I.

B. Count II

Shanahan moves to dismiss the false-statement claim in Count
II on grounds that he is not alleged to have made any statements
and that even if any false statements made by others are properly
attributed to him, they are immaterial as a matter of law.

The amended complaint does not allege that Shanahan signed,
filed, or caused to be filed any SEC forms.  It does not allege
that he scripted, rehearsed, or was present for any analyst
conference calls.  And it does not allege that he drafted, or
made any statements quoted in, any press releases.  It does not
allege that he reviewed or approved any SEC filings or press
releases.  Nor does it allege that he provided any financial
information used to prepare any SEC filings, press releases, or
analyst conference calls.  Rather, the SEC appears to argue that
Shanahan made false statements about the performance of Cabletron
and Enterasys because he engaged in transactions that generated
non-GAAP revenue.  That is not enough.

149

As the court has already noted, "[i]n order to be liable for a primary violation of . . . Section 17(a) of the Securities Act, a defendant must have personally made either an allegedly untrue statement or a material omission." Tambone I, 417 F. Supp. 2d at 132.  The SEC quotes Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc., 128 S. Ct. 761 (2008) for the proposition that it is not necessary that there "be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b-5," id. at 769.  But that hardly means that a person can be liable under Rule 10b-5(b) or 15 U.S.C. § 77q(a)(2) without making a statement, or omitting to state a material fact. Of course, one can make a statement in several ways.  The most obvious ways are to actually utter the words that make up the statement, or to sign or issue a document containing them.  Under the right circumstances, one can, for purposes of securities-fraud liability, make a statement by playing an integral role in preparing a document that contains it.  See Wolfson, 539 F.3d at 1261.[37]  In other words, "[c]ourts have found that vicarious liability can attach where one is 'sufficiently responsible for the speech such that he could properly be said to have made the false statement.' "  SEC v. Conaway, No. 2:05-CV-40236, 2009 WL

---

[37] In SEC v. Tambone, 550 F.3d 106 (1st Cir. 2008), the court of appeals held that one can be liable under Rule 10b-5(b) for using a false statement made by another.  But that opinion has been withdrawn pending rehearing en banc.  See 573 F.3d 54 (1st Cir. 2009).

902063, at *13 (E.D. Mich. March 31, 2009) (quoting <u>SEC v. KPMG</u> <u>LLP</u>, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006)).  But the SEC has identified no case in which a person who has done what Shanahan is alleged to have done in this case is, by virtue of that conduct, liable for a subsequent false statement made by another.

In one case on which the SEC relies, the district court ruled that the SEC had stated a false-statement claim against a defendant who had, among other things, "directed the fraudulent acquisition accounting" on which the false statements were based. <u>Power</u>, 525 F. Supp. 2d at 420.  Here, Shanahan is not alleged to have played nearly so active a role in producing the false statements at issue.  Shanahan's alleged conduct also falls short of the conduct in <u>Conaway</u> that exposed the defendant to liability for making a false statement:

> Conaway . . . as Kmart's Chief Executive Officer, had a
> direct and immediate fiduciary duty to Kmart's
> shareholders that carried with it the duty to speak
> truthfully on material matters and to correct untruths
> where he found them.  <u>Cf</u>. <u>Shapiro v. Cantor</u>, 123 F.3d
> 717, 721-22. (2d Cir. 1997) (outside auditor who did
> not issue an opinion owed no fiduciary duty to the
> public and was therefore not liable for silence in the
> face of a material omission).  At a minimum, the
> evidence is such that a reasonable juror could conclude
> that: Mr. Conaway was a principle architect of the two
> schemes to stretch vendor payments to ease the
> liquidity problem; he was an active and knowing
> participant in keeping this secret except for a limited
> number of Kmart employees; he fostered the misleading
> Project eLMO coverup story and the false "talking
> points"; and that after CFO Jeffrey Boyer was

151

discharged for highlighting liquidity problems Mr.
Conaway put in his place Kmart's Treasurer McDonald
whom he had brought to Kmart, and whom he had reason
know would be a team player on keeping Project SID and
the AP System under wraps.  Such a juror could conclude
that Defendant Conaway knew or should have known that
the use of Project SID and the AP System to deal with
Kmart's third quarter liquidity problem would not find
expression in the 10-Q(3) prepared under McDonald's
watch, and that investors would be deprived of "the
opportunity to look at the company through the eyes of
management" regarding the systematic and extensive plan
to stretch vendor payments.

Conaway, 2009 WL 902063, at *13.  Here, again, the SEC's factual

basis for claiming that Shanahan made false statements is that he

knowingly engaged in transactions that generated non-GAAP

revenue.  He may well have done so, but that conduct is too

attenuated from the act of making a statement to support a claim

under 15 U.S.C. 77q(a)(2).  Accordingly, as to Shanahan, the

false-statement component of Count II is dismissed for failure to

state a claim


     The SEC adequately alleges a Securities Act course-of-

business claim against Shanahan, with the same caveat stated

above with regard to Kirkpatrick, Jaeger, Collins, and Skubisz;

both scheme and course-of-business claims will go to the jury

only if the SEC introduces evidence in support of each.

C. Count III

     The SEC has stated claims for direct liability against
Shanahan under Rules 10b-5(a) and (c), which obviates the need to
consider aider-and-abettor liability for the SEC's Rule 10b-5
scheme and course-of-business claims, with the proviso, stated
above with regard to Patel, Kirkpatrick, Collins, and Skubisz,
that the aider-and-abettor theory remains available to the SEC at
future stages of this case, should its claims for primary
liability prove unsuccessful.  For the reasons given with regard
to Kirkpatrick, the SEC has failed to state a claim against
Shanahan for aider-and-abettor liability under Rule 10b-5(b).


D. Count IV

     The SEC has failed to state a falsified-books-and-records
claim against Shanahan under 15 U.S.C. § 78m(b)(5) and Rule 13b2-
1.


     In paragraph 298, the SEC alleges that Shanahan is liable
for falsifying corporate records because he did not provide the
finance department with recognition-disqualifying information on
transactions with GovStreet, Accton, and Tech Data.  With regard
to the GovStreet and Accton transactions, the amended complaint
does not allege facts about Shanahan' role from which it could
reasonably be inferred that he had a duty to report anything to

the finance department.  Concerning GovStreet, the amended complaint alleges that: (1) "Shanahan and others" met with corporate officers of GovStreet to discuss an investment deal (Am. Compl. ¶ 118); (2) Cabletron, <u>not Shanahan</u>, proposed the terms of the deal (<u>id.</u>); (3) Shanahan "caused Enterasys to recognize" revenue from the deal, without saying how he did so (¶ 120); and (4) Shanahan knew that improperly recognized revenue was included in various SEC filings (¶ 121).  Absent an allegation that Shanahan actually concluded the deal, the amended complaint does not adequately allege any basis for holding him liable for failing to inform the finance department of its terms. The allegations concerning Accton are similarly infirm.  (<u>See</u> ¶¶ 164–66.)

     The allegations concerning Enterasys's transaction with Tech Data are as follows:

          In the final days of the second quarter, Shanahan
          bolstered the Defendants' fraudulent revenue scheme by
          procuring a $3 million purchase order from Tech Data
          Canada, Inc. ("Tech Data"), a company with which
          Enterasys was negotiating a primary distributorship
          relationship in Canada.

          After agreeing on the terms of Tech Data's initial
          purchase order, an Enterasys salesperson memorialized
          the parties' agreement in an August 23, 2001 letter.
          This letter stated that, in return for Tech Data
          submitting a $3 million purchase order to Enterasys by
          quarter end, Enterasys agreed to grant Tech Data sell-
          through payment terms (whereby Tech Data was not

154

required to pay Enterasys until Tech Data resold the
inventory to end-users).

The following day, Kay, concerned that the terms of the
letter precluded Enterasys from recognizing revenue in
the current quarter, sent an e-mail to Shanahan and the
letter's author stating:

> Guys, the payment term in the Tech Data Canada
> letter that states no payment unless sold out
> makes this revenue recognition on a sales out
> basis.  I had provided advice on several occasions
> that this had to be changed.

On August 29, 2001, a second Enterasys salesperson sent
an e-mail to Shanahan attaching a new letter agreement
and advising him that the original letter agreement
with Tech Data had been revised to delete the sell-
through payment terms.  Highlighting that the revisions
were made to fraudulently conceal terms that were
problematic for revenue recognition and were not
intended to modify the parties' original agreement,
this e-mail states:

> We stressed that this was not a retraction of our
> original commitment to them but a requirement to
> facilitate our ability to recognize the revenue
> this quarter.  [Tech Data] was fine with the
> change and wanted an email from you which
> referenced the two [revisions] and our continuing
> commitment to the intent of the original
> agreement.

That same day, Shanahan sent an e-mail to Tech Data
confirming that Enterasys would honor the two terms
that had been removed from the parties' official letter
agreement.

By entering into an undisclosed side agreement with
Tech Data with the intent of concealing terms that
would otherwise preclude revenue recognition in the
current quarter, Shanahan caused Enterasys to
improperly recognize $3 million in revenue in the
second quarter of Transition Year 2001 and to conceal
critical information about the Tech Data transaction
from its finance department and outside auditor.

155

(Am. Compl. ¶¶ 241–46.)  The SEC alleges that Shanahan negotiated a deal with Tech Data that included terms that precluded revenue recognition, but also identifies various unnamed Enterasys salespersons as being responsible for committing the terms of the agreement to paper.  While those unnamed salespersons may have caused falsification of Enterasys's books and records, by failing to inform the finance department of the recognition-disqualifying terms in the deals they memorialized, there is nothing in the complaint to suggest that Shanahan had any duty to report the terms of those deals to the finance department.

The remainder of the fifty-eight paragraphs the SEC identifies as supporting its falsified-books-and-records claim against Shanahan are even less availing than those discussed above.  Accordingly, the SEC has failed to state a claim against Shanahan under 15 U.S.C. § 78m(b)(5) and Rule 13b2-1.

E. Count V

Shanahan is entitled to dismissal of Count V for the reasons given above with regard to Patel and Jaeger.  The amended complaint does not allege that Shanahan signed any management representation letters, or made any other statements to accountants.  And, its other theory of liability for deceit of auditors, which elevates participation in transactions that

generated non-GAAP revenue into the creation of false books and
records, and then elevates the creation of false books and
records into deceiving accountants, is untenable.


F. Count VI

Because the SEC has alleged no conduct by Shanahan that was
the proximate cause of any false reporting to the SEC by
Cabletron or Enterasys, Shanahan is entitled to dismissal of
Count VI.


G. Count VII

The amended complaint comes closest to stating a false-
books-and-records claim against Shanahan in the following
paragraph:

> As set forth in Section IV. E., F. and G., Shanahan
> entered into investment deals and side agreements with
> GovStreet, Accton and Tech Data.  Shanahan also moved
> terms from the Tech Data purchase agreement into
> another undisclosed side agreement after being informed
> by the finance department that the terms would bar
> revenue recognition.  Shanahan did not require that the
> terms of these investment deals and side agreements
> appear on the purchase order, or be communicated in any
> other way, to the finance department.

(Am. Compl. ¶ 298).  That paragraph, however, mischaracterizes
the allegations concerning the GovStreet, Accton, and Tech Data
deals.  Section IV. E. alleges that Shanahan met with GovStreet
officers, but that Cabletron - not Shanahan acting on behalf of

Cabletron – entered into "an undisclosed verbal side agreement with GovStreet," and the paragraphs devoted to the GovStreet transaction say nothing about the process by which information about the deal was, or should have been, reported to the finance department.  (¶¶ 118–22.)  Section IV. F. alleges that Shanahan knew various things about the Accton transaction, and that "[he] and Kay authorized Enterasys to purchase unneeded services from Accton to offset the account receivable for the transactions," but not that Shanahan did anything that proximately caused inaccuracies in Enterasys's corporate books and records.[38]  (¶¶ 164–66.)  Finally, Section IV. G. alleges that Shanahan had various contacts with Tech Data, but says nothing about Shanahan's role in reporting the Tech Data deal to the finance department.  (¶¶ 241–46.)

In sum, the SEC has failed to state a false-books-and-records claim against Shanahan under 15 U.S.C. § 78m(b)(2)(A).

---

[38] As the court has noted, the act of entering into a transaction that generates revenue that does not qualify for recognition under GAAP is too attenuated from the act of creating corporate books and records to be the proximate cause of a false corporate record.  Corporate record keeper Angie may be held directly liable for creating a false corporate record.  Such a violation may be aided and abetted by Betty, when Betty provides false information to Angie.  But aider-and-abettor liability is not so expansive as to ensnare Carol when the only allegations concerning her are that she conducted a transaction about which Betty provided information to Angie.

**Conclusion**

The SEC's effort to maintain all claims against all defendants under every stretched legal theory imaginable was doomed in large part from the start.  Each of the pending motions (documents 157 (Shanahan), 158 (Patel), 159 (Kirkpatrick), 160 (Jaeger), 162 (Collins), and 165 (Skubisz)) is granted in part and denied in part.  Because the SEC has been afforded more than ample opportunity to state its claims, the dismissals are with prejudice.  Perhaps with some focus, the SEC will find the case manageable.  In any event, the case that remains is described below.

The case against Patel consists of Count II (reduced to a limited false-statement claim), Count III (reduced to a limited false-statement claim), and Count IV (reduced to a falsification-of-books-and-records claim based on the Cellit transaction).

The case against Kirkpatrick consists of Count I (limited as described above), Count II (reduced to a course-of-business claim), Count III (reduced to scheme and course-of-business claims), Count IV, and Count V (limited as described above).

The case against Jaeger consists of Count III (reduced to scheme and course-of-business claims), and Count IV (reduced to a

159

falsification-of-books-and-records claim based on the Everest transaction).

The case against Collins consists of Count I (limited as described above), Count II (with a limited false-statement claim), Count III (with a limited false-statement claim), Count IV, and Count V.

The case against Skubisz consists of Count I (limited as described above), Count II (with a limited false-statement claim), Count III (with a limited false-statement claim), and Count IV (reduced to a falsification-of-books-and-records claim based on the ConvergeLabs transaction).

The case against Shanahan consists of Count I (limited as described above), Count II (reduced to a course-of-business claim), and Count III (reduced to scheme and course-of-business claims).

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 30, 2009

160

```
cc:  Peter D. Anderson, Esq.
     John R. Baraniak, Jr., Esq.
     William Cintolo, Esq.
     Philip G. Cormier, Esq.
     Victor W. Dahar, Esq.
     Maria R. Durant, Esq.
     Nancy J. Gegenheimer, Esq.
     Andrew Good, Esq.
     Steven M. Gordon, Esq.
     Miranda Hooker, Esq.
     Leslie J. Hughes, Esq.
     Lucy J. Karl, Esq.
     William H. Kettlewell, Esq.
     John C. Kissinger, Esq.
     Diana K. Lloyd, Esq.
     Jeffrey S. Lyons, Esq.
     Richard J. McCarthy, Esq.
     Peter B. Moores, Esq.
     Patrick T. Murphy, Esq.
     Ann Pauly, Esq.
     Michelle R. Peirce, Esq.
     Michael D. Ramsdell, Esq.
     Jeffrey B. Rudman, Esq.
     Jennifer M. Ryan, Esq.
     James A. Scoggins, II, Esq.
     Jonathan A. Shapiro, Esq.
     Kevin E. Sharkey, Esq.
     Bruce A. Singal, Esq.
     Peter A. Spaeth, Esq.
```