UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

Plaintiff,

v.

PIYUSH G. PATEL, DAVID J. KIRKPATRICK,
ERIC JAEGER, BRUCE D. KAY, ROBERT J.
GAGALIS, ROBERT G. BARBER, JR.,
LAWRENCE COLLINS, MICHAEL A.
SKUBISZ, JERRY A. SHANAHAN,
HOR CHONG (DAVID) BOEY,

Defendants.

No. 01:07-00039-SM

<u>ORAL ARGUMENT REQUESTED</u>

## <u>DEFENDANT ERIC JAEGER'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Jonathan A. Shapiro
WILMER CUTLER PICKERING HALE
AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
(650) 858-6000

Jeffrey B. Rudman (admitted *pro hac vice*)
James W. Prendergast
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

July 27, 2011

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................................1

I.      THE SEC CANNOT AVOID SUMMARY JUDGMENT BY
        IGNORING PRIOR COURT ORDERS AND ITS RULE 56 BURDEN ..........................2

II.     THE SEC FAILS TO PUT FORTH ANY EVIDENCE
        DEMONSTRATING MR. JAEGER'S "ACTUAL KNOWLEDGE" OF
        IMPROPER REVENUE RECOGNITION..........................................................................5

III.    THERE IS NO TRIABLE ISSUE OF FACT TO SUPPORT THAT MR.
        JAEGER "SUBSTANTIALLY ASSISTED" A FRAUDULENT
        SCHEME ..........................................................................................................................10

        A.      There Is No Evidence To Prove Mr. Jaeger "Substantially
                Assisted" A Fraudulent Scheme On Everest Broadband......................................10

        B.      There is No Evidence to Prove Mr. Jaeger Substantially Assisted
                a Fraudulent Scheme on Centricity.......................................................................11

        C.      There is No Evidence to Prove Mr. Jaeger Substantially Assisted
                a Fraudulent Scheme on iPolicy ...........................................................................12

IV.     THE SEC HAS NOT PROVIDED EVIDENCE OF A BOOKS AND
        RECORDS VIOLATION WITH RESPECT TO THE EVEREST
        BROADBAND TRANSACTION ....................................................................................13

CONCLUSION....................................................................................................................16

ACTIVEUS 90203043v1

## TABLE OF AUTHORITIES

**PAGE**

Federal Cases

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) .............................................................................................. 3

*In re Alstom SA Secs. Litig.*,
    406 F.Supp.2d 433 (S.D.N.Y. 2005) ...................................................................... 3

*In re Lernout & Hauspie Secs. Litig.*,
    236 F.Supp.2d 161 (D. Mass. 2003) ...................................................................... 3

*In re Parmalat Secs. Litig.*,
    376 F.Supp.2d 472 (S.D.N.Y. 2005) ...................................................................... 3

*In re ZZZZ Best Sec. Litig.*,
    864 F.Supp. 960 (C.D. Cal. 1994) ......................................................................... 3

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ................................................................................... 3

*Rochester Ford Sales, Inc. v. Ford Motor Co.*,
    287 F.3d 32 (1st Cir. 2002) .................................................................................... 3

*SEC v. Apuzzo*,
    758 F.Supp.2d 136 (D. Conn. 2010) ...................................................................... 11

*SEC v. Berry*,
    580 F.Supp.2d 911 (N.D. Cal. 2008) ..................................................................... 3

*SEC v. Delphi Corp.*,
    2008 U.S. Dist. LEXIS 78671 (E.D. Mich., Oct. 8, 2008) ..................................... 3

*SEC v. DiBella*,
    2005 U.S. Dist. LEXIS 31762 (D. Conn., Nov. 29, 2005) ...................................... 3

*SEC v. Espuelas*,
    579 F.Supp.2d 461 (S.D.N.Y. 2008) ...................................................................... 12

*SEC v. Espuelas*,
    698 F.Supp.2d 415 (S.D.N.Y. 2010) ...................................................................... 13

*SEC v. Forman*,
    2010 U.S. Dist LEXIS 56802 (D. Mass., June 9, 2010) ........................................ 3

*SEC v. Leslie*,
    2010 U.S. Dist. LEXIS 84906 (N.D. Cal., Aug. 18, 2010) ..................................... 3

ACTIVEUS 90203043v1

*SEC v. Lucent Techs., Inc.*,
   610 F.Supp.2d 342 (D.N.J. 2009) ........................................................... 3

*SEC v. Orr*,
   2006 U.S. Dist. LEXIS 11447 (E.D. Mich. 2006) ........................................ 3

*SEC v. Patel*,
   No. Civ. 07-CV-39-SM, 2009 WL 3151143 (D.N.H., Sept. 30, 2009) ..................... 1

*SEC v. Power*,
   525 F.Supp.2d 415 (S.D.N.Y. 2007) .................................................. 2, 3, 6

*SEC v. Sandifur*,
   No. C05-16316, 2006 WL 538210 (W.D. Wash., Mar. 2, 2006) ............................ 9

*SEC v. Slocum, Gordon & Co.*,
   334 F.Supp.2d 144 (D.R.I. 2004) ........................................................... 3

*SEC v. Tambone*,
   417 F.Supp.2d 127 (D. Mass. 2006) ........................................................ 3

*SEC v. Tambone*,
   473 F.Supp.2d 162 (D. Mass. 2006) ..................................................... 3, 6

*Simpson v. AOL Time Warner, Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ............................................................. 3

*United States v. Mackey*,
   117 F.3d 24 (1st Cir. 1997) ................................................................ 4

*United States v. Pagan-Santini*,
   451 F.3d 258 (1st Cir. 2006) .............................................................. 4

*Veltex Corp. v. Matin*,
   2010 U.S. Dist. LEXIS 108402 (C.D. Cal., Sept. 27, 2010) ............................... 3

Federal Statutes

15 U.S.C. § 78m(b)(5) ......................................................................... 13

ACTIVEUS 90203043v1

## INTRODUCTION

For over eight years, Eric Jaeger has endured the SEC's unsubstantiated aspersions, which first tried to make him primarily responsible for purported securities fraud in connection with his company's financial reporting on twenty-nine different transactions, and, when that failed, tried to make him an aider and abettor of an equally broad fraudulent revenue recognition "scheme." This strategy failed too. All that remains against Mr. Jaeger is a very narrow aiding and abetting claim under Rule 10b-5(a) & (c) involving *just three* transactions (Count III) and an even narrower books and records claim under Rule 13b2-1 involving *only one* deal (Count IV). Now, with its Opposition to summary judgment on these last two claims, the SEC has finally surrendered the last of its credibility by advancing theories that flat out mischaracterize and grossly exaggerate the content of the "evidence" — and that flatly contradict the Court's prior Orders and are even directly at odds with the concessions of its *own* "expert."

The Court has made clear that aiding and abetting liability requires *admissible evidence* of both actual knowledge <u>and</u> substantial assistance of alleged wrongdoing – in this case, a fraudulent revenue recognition scheme. *SEC v. Patel*, No. Civ. 07-CV-39-SM, 2009 WL 3151143, at *22 (D.N.H. Sept. 30, 2009) (hereinafter "Order"). "That scheme is [allegedly] one to generate revenue not properly recognized as revenue under generally accepted accounting principles ("GAAP") *and* to improperly recognize that revenue while claiming to adhere to GAAP principles." *Id.* at *9. Incorrect revenue recognition under GAAP is not enough. *Id.* Yet, as the SEC's own expert acknowledges, there is no direct evidence that Mr. Jaeger had actual knowledge of even the intended revenue recognition for any of the three transactions, let alone that there was a fraudulent scheme to recognize that revenue.

Further, even if one were to put aside the sheer absence of evidence that Mr. Jaeger actually knew of a fraudulent revenue recognition scheme, nothing that he did "substantially

assisted" that scheme.  In particular, the SEC cannot meet its Rule 56 burden to adduce *admissible evidence* that Mr. Jaeger's "assistance" with any of the three deals was so "substantial" that it was the "proximate cause" – not merely one of multiple or contributing "but for" causes – of the Company's alleged scheme with respect to iPolicy, Centricity and Everest Broadband.  *See* Order at 54-55 (*citing SEC v. Power*, 525 F.Supp.2d 415, 422 (S.D.N.Y. 2007) (internal citation omitted)).  The most that can be said is that Mr. Jaeger was one of several employees who assisted with certain elements of these three transactions, but without any role or indeed knowledge of how the revenue from them would – or would not – be recognized.  Indeed, as the SEC's expert agreed, that there was nothing about the structure of any of the transactions that prevented the proper application of the revenue recognition rules.[1]

## I.     THE SEC CANNOT AVOID SUMMARY JUDGMENT BY IGNORING PRIOR COURT ORDERS AND ITS RULE 56 BURDEN

Mr. Jaeger's Motion for Summary Judgment is based on this Court's September 30, 2009 Order, in which the Court could not have been more clear that the very narrow, three-deal aiding and abetting claim "will go to the jury only if the SEC introduces evidence sufficient to support it."  Order at 118.  That Order is exceptionally detailed – the Court went on to tell the SEC *precisely* what it needed to proceed to trial, including by defining the "scheme" upon which it sustained Count III, and articulating the demanding "knowingly and substantially assisted" standard that the SEC must satisfy.  *See* Jaeger's Motion for Summary Judgment (Dkt. No. 224) ("MSJ") at 12-13, 21 (citing Order at 21, 24, 54-55, 99).  The Order was just as specific as to why the Court limited the "books and records" claim to only one deal, and again what the SEC need to prove under that narrow Count IV.  MSJ at 22-23 (*citing* Order at 119).

---

[1]      *See* Henning Dep. Tr. 285:7-14 (Q. There is nothing inherent about the structure of these transactions that prevents an appropriate decision being made regarding whether or not revenue can be recognized from them, there's no magic element to them that disguises the transaction?  A.  *I agree, yes.*).

The SEC, however, inexplicably ignores that Court Order.[2]  After referring to the Order only in passing (on p. 5), the Opposition for the most part flatly contradicts — and repeatedly falls back on arguments that have been explicitly rejected by — the Court's prior rulings.  For example, the Opposition unilaterally broadens and redefines the alleged "scheme" that the Court so carefully circumscribed, asserting that Mr. Jaeger "misrepresent[ed] the financial statements" published to investors.  Objection to Jaeger's Mot. for Summary Judgment (Dkt. No. 234) (hereinafter "Opp.") at 22.  The Court, however, clearly limited the aiding and abetting a Section 10(b)(a) and (c) claim "based on his involvement in the transactions with iPolicy, Everest Broadband and Centricity."  Order at 118.  And the Court Order could not be more clear that the SEC cannot prove up its scheme claim with evidence of the already-dismissed claim that Mr. Jaeger is responsible for false financial statements.  MSJ at 12 (citing Order at 16 n.9).

The Opposition only spotlights the SEC's dearth of *evidence* against Mr. Jaeger by rehashing the same superficial allegations that this Court previously rejected.  Throughout the Opposition the SEC persists with its theory that Mr. Jaeger violated the securities laws because he "tracked," was "intimately involved" with, "kept close tabs" on the business, and/or by "reviewing" documents and/or "negotiating."  Opp. at 2, 4, 7, 11-12.  Those are *precisely* the same generic assertions that the Court held were too insubstantial to survive even minimal

---

[2]       The SEC also simply does not address a long list of precedent and other court decisions that, for the reasons stated in our opening brief, require entry of summary judgment for Mr. Jaeger.  *See generally*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994); *In re Alstom SA Secs. Litig.*, 406 F.Supp.2d 433 (S.D.N.Y. 2005); *In re Lernout & Hauspie Secs. Litig.*, 236 F.Supp.2d 161 (D. Mass. 2003); *In re Parmalat Secs. Litig.*, 376 F.Supp.2d 472 (S.D.N.Y. 2005); *In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960 (C.D. Cal. 1994); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005); *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32 (1st Cir. 2002); *SEC v. Berry*, 580 F.Supp.2d 911 (N.D. Cal. 2008); *SEC v. Delphi Corp.*, 2008 U.S. Dist. LEXIS 78671 (E.D. Mich. Oct. 8, 2008); *SEC v. DiBella*, 2005 U.S. Dist. LEXIS 31762 (D. Conn., Nov. 29, 2005); *SEC v. Forman*, 2010 U.S. Dist LEXIS 56802 (D. Mass. June 9, 2010); *SEC v. Leslie*, 2010 U.S. Dist. LEXIS 84906 (N.D. Cal., Aug. 18, 2010); *SEC v. Lucent Techs., Inc.*, 610 F.Supp.2d 342 (D.N.J. 2009); *SEC v. Orr*, 2006 U.S. Dist. LEXIS 11447 (E.D. Mich. 2006); *SEC v. Power*, 525 F.Supp.2d 415 (S.D.N.Y. 2007); *SEC v. Slocum, Gordon & Co.*, 334 F.Supp.2d 144 (D.R.I. 2004); *SEC v. Tambone*, 417 F.Supp.2d 127 (D. Mass. 2006); *SEC v. Tambone*, 473 F.Supp.2d 162 (D. Mass. 2006); *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006); *Veltex Corp. v. Matin*, 2010 U.S. Dist. LEXIS 108402 (C.D. Cal. Sept. 27, 2010).

ACTIVEUS 90203043v1

scrutiny under Rule 12(b)(6) (Order at 19, 109-112, 117 (allegations that Mr. Jaeger "closely monitored," participated," negotiated," and "review[ed] and approve[d]" were insufficient)), and thus certainly do not meet the SEC's much weightier evidentiary burden under Rule 56.  *See* MSJ at 10.

Moreover, and as set forth in greater detail below, what the SEC calls "evidence" often is not anything of the sort.  A large subset of its appendix consists of emails that, on their face, are irrelevant — because they were neither sent by nor to Mr. Jaeger, do not mention Mr. Jaeger, and/or have nothing to do with the transactions for which they need to prove his culpable "substantial assistance."  *See, e.g*., Exs. 30, 32, 35, 44, 47, 50, 59.  The SEC also cannot defeat summary judgment by pointing to random FBI interview summaries ("302s"), which for the most part do not all support the propositions for which they were cited and, in any event, are inadmissible hearsay.[3]  Nor can the SEC get to trial by relying on an expert affidavit that is inadmissible on its face (because the SEC's accountant has neither a factual basis nor professional expertise to opine on Mr. Jaeger's subjective state of mind), and should be stricken for the reasons set forth in the Motion to Strike filed herewith.  *See generally*, 7/27/11 Jaeger's Mot. to Strike the Decl. of Steven Henning.

Finally, the SEC misrepresents the evidentiary record by suggesting that it is entitled to some form of evidentiary presumption because eight years ago Mr. Jaeger purportedly "withheld information" when producing email in response to an investigative subpoena.  Opp. at 14, n.10.  Contrary to the SEC's assertion, Mr. Jaeger produced the entirety of the Enterasys email he had on his home computer that the SEC asked for.  As the production letter makes clear, due to the manner in which Enterasys configured its computers, Mr. Jaeger only had access to the headers

---

[3]     *See United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) (a statement contained in an FBI report held inadmissible hearsay);  *United States v. Pagan-Santini*, 451 F.3d 258, 264 (1st Cir. 2006) (statements on FBI tape recording held inadmissible hearsay).

ACTIVEUS 90203043v1

of some email (*i.e.*, to/from/cc/subject), but was not able to access the body of those email because that data was stored securely on the Company's computers.  *See* 7/27/11 Decl. of Jonathan A. Shapiro in Supp. of Reply and Mot. to Strike, Ex. B.  Indeed, contrary to "withholding" anything, it was Mr. Jaeger who first discovered, and then alerted the SEC to, this data recovery issue in a letter to the SEC sent on July 14, 2003.  That the SEC is now — nearly a decade later — raising and mischaracterizing this issue, to fabricate some evidentiary presumption, speak volumes about its lack of actual evidence.

In the final analysis, nowhere in the Opposition (or its phonebook of exhibits) has the SEC come forward with what it needed to survive summary judgment under the Court's Order and the many other court decisions upon which Mr. Jaeger relies – *i.e.*, admissible proof of Mr. Jaeger's actual knowledge of the impropriety of recognizing revenue from the three deals, and also that he personally was the proximate cause of a fraudulent scheme with respect to each of those deals.

## II.     THE SEC FAILS TO PUT FORTH ANY EVIDENCE DEMONSTRATING MR. JAEGER'S "ACTUAL KNOWLEDGE" OF IMPROPER REVENUE RECOGNITION

The SEC asserts that it has met its burden under Rule 56 to demonstrate material facts pertaining to Mr. Jaeger's actual knowledge of a fraudulent scheme at Cabletron because he was "intimately involved with the day to day business operations" and "intimately involved with tracking revenues."  Opp. at 4.  However, beyond these rhetorical inferences surrounding Mr. Jaeger's employment and job title (which are undisputed), the SEC has not adduced any evidence that Mr. Jaeger understood the intricacies of revenue recognition generally, much less any fact connecting Mr. Jaeger to the actual revenue recognition assessments for any of the three remaining transactions.  MSJ at 16-17.  This falls far short of the SEC's obligation to demonstrate evidence to prove that Mr. Jaeger had "actual knowledge" that his conduct "was

part of an overall activity that was improper."  Order at 54-55 (*citing Tambone*, 473 F.Supp.2d at 167-68); *see also SEC v. Power*, 525 F.Supp.2d 415, 422 (S.D.N.Y. 2007) ("mere awareness and approval of a primary violation is insufficient" for aiding and abetting fraud).

**First**, critically absent from the Opposition is any evidence that Mr. Jaeger was responsible for revenue recognition, or for that matter had any role whatsoever in the process whereby, after deals closed, the accountants determined what subset of the revenue could be recognized under GAAP, and for which reporting period.  *See* MSJ at 15-16.  There is no dispute that Mr. Jaeger's education and experience was that of a lawyer.  *See* MSJ at 16.  Nor any dispute that Enterasys had a Finance Department consisting of accountants responsible for recognizing revenue from all transactions, and responsible for disclosing and explaining those accounting judgments to the outside auditors.  MSJ at 16.  Indeed, even the SEC's own expert, Steven Henning, readily acknowledged that there is no explicit evidence demonstrating that Mr. Jaeger was charged with revenue recognition responsibility.  *See* Henning Dep. Tr. 165:9-18.

**Second**, putting aside that he was not involved in the accounting decisions, the SEC does not even have any evidence that Mr. Jaeger "actually knew" the intended or actual revenue recognized by Enterasys as a result of the three deals.  *See* Order at 41-42.  The SEC's expert, Steven Henning, who had access to and searched all of the SEC's records and testimonial evidence, testified candidly:

> Q.  Do you know of any documents which explicitly shows that Mr. Jaeger knew of the revenue recognition decision for a particular for one of the three transactions once it was made?
>
> A.  Not that I recall explicitly.[4]

---

[4]     *See* Henning Dep. Tr. 166:20-25; Tr. 222:17-224:14 (no opinion that Jaeger "specifically knew" of the intended revenue recognition for any of the three transactions); Tr. 273:4-8 (no direct evidence that Jaeger knew how the Everest Broadband transaction would be treated for revenue recognition purposes); Tr. 295:17-296:20 (no direct evidence that Jaeger was aware of any concern on the part of Enterasys with respect to the timing of payments affecting revenue recognition associated with iPolicy) Tr. 229:18-230:2 (no opinion that Jaeger participated in revenue recognition associated with iPolicy).

The SEC certainly cannot prove Mr. Jaeger's "actual knowledge" of improper revenue recognition with respect to iPolicy, Centricity and Everest Broadband by pointing to a handful of email as "evidence" that he tracked revenue and/or "reviewed and developed guidance on revenues." *Compare* MSJ at 16 *with* Opp. at 13. Of course, the SEC's "review and approve" refrain did not even survive a motion to dismiss, *see supra*, and, in any event, even a cursory reading of the cited email makes clear how far away the SEC is from a triable case. Exhibit 5 is a collection of emails from August 1999 – and thus is not even evidence of Mr. Jaeger's knowledge at the time of the three transactions *nearly two years later*. Putting aside the date/chronology disconnect, none of the emails submitted in Exhibits 4 through 11 make *any* mention of iPolicy, Centricity, or Everest Broadband, much less demonstrate that Mr. Jaeger "negotiated and personally consummated" these transactions to "falsely inflate revenues." *Compare* Opp. at 4 *with* GA, Exs. 4-11.

**Third**, even assuming (incorrectly) that Mr. Jaeger actually knew the timing and the amount of revenue to recognize for the three deals, the SEC has never adduced any evidence that he actually knew the accounting rules such that he could even possibly have possessed the actual knowledge that such accounting decisions violated GAAP. *See* MSJ at 16 (citing Order at 21). To the contrary, the SEC has already admitted – in discovery responses that the Opposition conspicuously fails to even address – that because the "proper application of GAAP requires an accountant," a non-accountant like Mr. Jaeger would not know whether some, or all, or any of the revenue from any given deal could be recognized. MSJ at 16 (citing 2/8/11 Murphy Decl. in Supp. of Jaeger's Mot. Summ. J. (Dkt. No. 227), Ex. J, at Admission 3). The Opposition conspicuously ignores the admissions that the SEC made in those Rule 36 responses, which are unambiguous, binding on and admissible against the SEC. *See* MSJ at 16.

- 7 -

If anything, the SEC spotlights its absence of proof of "actual knowledge" on the part of Mr. Jaeger by contending, that he has some generalized awareness of revenue recognition rules. See Opp. at 13. The SEC again demonstrates its propensity to overstate the record by relying on Exhibit 4, the stale email string from August 1999 attaching a summary of Cabletron's then-existing revenue recognition policies. That summary or policies do not "evidence" of Mr. Jaeger's knowledge of the relevant accounting in 2001 *because its own expert acknowledges that those policies "did not address revenue recognition from sales to investee companies"* such as iPolicy, Centricity or Everest Broadband. *See* Henning Report at 1-10, attached hereto as GA, Ex. 3.2. It is not even clear that Mr. Jaeger had anything to do with that outdated, irrelevant summary of the policies because Mr. Jaeger was neither the author nor a recipient of either of the two emails to which they were attached (sent at 12:49 p.m. and 1:45 p.m., respectively). GA, Ex. 4. Although Mr. Jaeger is listed as recipient on a different email that seems to be embedded within Exhibit 4 (as the second attachment to the 12:49 p.m. and 1:45 p.m. emails) that certainly is not "evidence" that can foreclose summary judgment because it simply identifies Mr. Jaeger as one of the Cabletron executives authorized to approve certain non-standard contract terms and does not address revenue recognition in any way.

Of course, even if the SEC had not admitted that only a CPA could determine the correctness of the relevant accounting, its own expert has made crystal clear precisely how complicated a proper revenue recognition analysis will be for these transactions under GAAP. That is, the allegedly incorrect recognition of revenue from the three transactions results from the application of one or more of three rules addressing: (1) the collectability of the revenue based on the financial ability of the purchaser, (2) expenses from research and development, and (3) exchange rights purchasers may possess. *See* Henning Decl., ¶¶19-21, 30, 37, 41-43). Yet

- 8 -

again, the SEC's expert concedes that, at best, Mr. Jaeger may have been familiar with the

revenue recognition rule only for collectability.  *See* Henning Dep. Tr. 277:23-278:16.[5]

**Finally**, there is absolutely no evidentiary basis for the SEC's theory (really, an

assumption) that Mr. Jaeger somehow "must have" known that the three deals would result in

improper revenue recognition under GAAP simply because he was involved in those

transactions.  This is, of course, the same presumed knowledge that this Court and others have

rejected as a pleading matter.  Order at 54-57, 122-23; *see SEC v. Sandifur*, No. C05-16316,

2006 WL 538210 at *12 (W.D. Wash. Mar. 2, 2006) (aiding and abetting claim dismissed for

"total lack of any alleged connection between those defendants' involvement in structuring the

transaction and their knowledge that it was being done for allegedly illegal purposes.").  There

certainly is no evidence in the record to suggest that there was anything inherently or obviously

improper about any of the three transactions.  To the contrary, the only evidence the SEC has

placed on the record is from its own expert, who confirms that there is nothing particularly

improper — much less obviously improper under GAAP — to these deals:

> Q.  There is nothing inherent about the structure of these transactions that
> prevents an appropriate decision being made regarding whether or not revenue
> can be recognized from there, there's no magic element to them that disguises the
> transaction?
> A.  *I agree, yes.*

*See* Henning Dep. Tr. 285:7-14.

---

[5]       Even with respect to that one collectability criteria, however, the SEC's expert was equally forthright when
he admitted that there was no direct evidence that Mr. Jaeger knew of any financial condition of iPolicy, Centricity,
or Everest Broadband that would affect revenue recognition.  *See* Henning Dep. Tr. 276:17-277:13.

ACTIVEUS 90203043v1

## III.   THERE IS NO TRIABLE ISSUE OF FACT TO SUPPORT THAT MR. JAEGER "SUBSTANTIALLY ASSISTED" A FRAUDULENT SCHEME

### A.   There Is No Evidence To Prove Mr. Jaeger "Substantially Assisted" A Fraudulent Scheme On Everest Broadband

The Opposition parrots the Complaint by asserting that Mr. Jaeger "negotiated and finalized" the Everest transaction while aware that it was not properly recognizable as revenue. Opp. at 23.  The SEC does not, however, fairly address the reasons why Mr. Jaeger is entitled to summary judgment on the Everest Broadband claim.  *See* MSJ at 21-25.

Foremost, the SEC blithely ignores the gaping evidentiary hole at the center of its Everest Broadband claim:  the lack of a signed or finalized reciprocal purchase letter.  MSJ at 21.  The purported "side letter" upon which the SEC has based its claim still remains an unsigned, unfinalized, draft document.  GA, Ex. 38.  As such, that document is inadmissible hearsay; it certainly is not proof of any agreement with Everest, reciprocal or otherwise.  *See* MSJ at 21.

Instead of addressing this deficiency, the SEC baldly reiterates that Everest was "a sham transaction."  Opp. at 8.  The Court brushed aside that meaningless pejorative at the motion to dismiss stage.  *See* Order at 44 ("conclusory descriptions" of deals as "sham transactions" are no basis to sustain a claim).  The SEC cannot forge a triable dispute out of the investigative testimony of Darrin Ullerick which is both inadmissible hearsay and on its face forecloses the SEC's assertion of an improper "side letter":

- Mr. Ullerick testified that he could not find any finalized "side letter," even after looking for it.

- Mr. Ullerick testified that the letter from Cabletron "had nothing to do with accounting rules, zero."

- Mr. Ullerick testified that Everest "needed" the product and that it would have been a "good transaction" for Everest even if Enterasys had not bought any product or services from Everest.

- Mr. Ullerick testified that he did not know whether Everest had the right to exchange product.

- 10 -

- Mr. Ullerick does not once mention Mr. Jaeger in any of the cited testimony.

Darrin Ullerick's February 11, 2003 SEC Testimony at 22, 110.

Left with no admissible evidence to support its contention that a reciprocal rights agreement existed (much less that Mr. Jaeger had actual knowledge of the accounting implications of such) and no factual basis to prove that Everest was a "sham," the best that the SEC can do is point to emails that are completely untethered to Everest or Mr. Jaeger, or, in many instances, both.  It is, for example, asserted that Mr. Jaeger attended an offsite meeting that was apparently part of the scheme.  However, no mention whatsoever is made of Everest in the supporting email.  *See* GA, Ex. 31.  Likewise, the email that the SEC asserts indicates that Everest was needed to meet the "coveted $20 million" revenue shortfall was neither sent, copied, or received by Mr. Jaeger.  GA, Ex. 32.  The "substantial assistance" standard demands far more than these inferential facts of Mr. Jaeger's conduct.  *SEC v. Apuzzo*, 758 F.Supp.2d 136, 147-48 (D. Conn. 2010) (aiding and abetting "may not rest on the bare inference that the defendant must have had knowledge of the facts.").

### B.     There is No Evidence to Prove Mr. Jaeger Substantially Assisted a Fraudulent Scheme on Centricity

Rather than demonstrating that it possesses admissible evidence against Mr. Jaeger with respect to Centricity, the SEC resorts to the now stale refrain that he "negotiated and finalized" a loan to Centricity.  Opp. at 11.  It is apparent that this conclusion is solely extrapolated from the fact that Mr. Jaeger's signature appears on a promissory note.  GA, Ex. 49.  Nowhere is it indicated how Mr. Jaeger participated in negotiations or "finalized" the loan.  Nor is any attempt made to connect this loan to any role of Mr. Jaeger in improper revenue recognition.  There is no possible connection — as demonstrated by Exhibits 10, 11, and 25 to the Opposition, which the SEC cites as demonstrating Mr. Jaeger's knowledge of the false Centricity revenue.  Opp. at 12.

The hodge-podge of emails, most of which predate the transaction, make no mention of Centricity at all.

Likewise, the SEC mischaracterizes the actual substance of the Declaration from Mr. Huffard.  Nothing in this declaration says that Mr. Jaeger directed the negotiations with Centricity or otherwise provided such substantial assistance that he proximately caused a fraudulent scheme.  To the contrary, Mr. Huffard merely surmises that from his conversations he knew that Mr. Jaeger "had knowledge of the Centricity transaction."  GA, Ex. 13 at ¶ 15.  Conspicuously absent is any allegation that Mr. Jaeger did anything to conceal, manipulate or deceive, or was specifically informed at any time about the accounting treatment for Centricity from Mr. Huffard, or anyone else, much less that the accounting was improper.  *See SEC v. Espuelas*, 579 F.Supp.2d 461, 484 (S.D.N.Y. 2008) (aiding and abetting charge fails where no allegation that someone with accounting knowledge communicated that transactions were being accounted for improperly).

### C.   There is No Evidence to Prove Mr. Jaeger Substantially Assisted a Fraudulent Scheme on iPolicy

The SEC Opposition is also plagued with overstatement in its attempt to cast Mr. Jaeger as central to the iPolicy transaction.  First, the SEC again mischaracterizes the potential testimony of Mr. Huffard by claiming that he will establish Mr. Jaeger as the driving force behind the iPolicy transaction.  Opp. at 5-6.  While Mr. Huffard declares that he "assisted" Mr. Jaeger on the transaction, he does not say that the deal was driven by Mr. Jaeger.  Nor would Mr. Huffard's testimony defeat Summary Judgment because that testimony speaks only to Mr. Jaeger's role in suggesting a NRE agreement and does <u>not</u> address the purchase of product by iPolicy on which revenue would ultimately be recognized.

Second, the SEC's nearly exclusive reliance on the NRE agreement fails to substantiate

- 12 -

its contention that the transaction was "a round trip of cash from Cabletron to iPolicy."  Opp. at 6.  The SEC fails to address the NRE agreement directly or offer any evidence demonstrating that it was signed by Mr. Jaeger.  Moreover, no factual connection is made to connect the dots between the NRE agreement and the purportedly improper revenue recognition.  The emails that the SEC pretends demonstrate the "round trip nature" of the transaction, in fact, focus solely on the NRE and make no mention of the actual product purchases by iPolicy that lead to the allegedly improper revenue.  GA, Exs. 19, 20.  Indeed, Mr. Jaeger is not sent nor copied on the invoices for the product purchase.  GA, Exs. 17, 18.

Likewise, the email that the SEC quotes at length on page 6 of the Opposition is actually an exchange between iPolicy and Mr. Louriero at Cabletron — not Mr. Jaeger — and contains no discussion of Mr. Jaeger's role in the transaction.  Nor does it contain any discussion what the relevant revenue recognition principles were or how they were applied.  Opp. at 6.  This is precisely the type of inferential leap which the "substantial assistance" standard prohibits.  *See SEC v. Espuelas*, 698 F.Supp.2d 415, 433 (S.D.N.Y. 2010) ("A defendant provides substantial assistance only if [he] affirmatively assists, helps to conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.").[6]

## IV.   THE SEC HAS NOT PROVIDED EVIDENCE OF A BOOKS AND RECORDS VIOLATION WITH RESPECT TO THE EVEREST BROADBAND TRANSACTION

In continuing to pursue a books and records claim against Mr. Jaeger under 15 U.S.C. § 78m(b)(5) and Rule 13b2-1, the SEC rests its arguments principally on the general assertion that it has evidence of "[Mr.] Jaeger's involvement with the books and records throughout the

---

[6]   The SEC attempts to weave together still other emails that are, at best, tangential to Mr. Jaeger and iPolicy. For example, there is no evidence that the internal credit control that the SEC claims the iPolicy transaction violated was ever presented to Mr. Jaeger.  GA, Ex. 22.  Nor does the credit authorization for iPolicy have Mr. Jaeger's name on it.  GA, Ex. 23.

ACTIVEUS 90203043v1

entire relevant period." Opp. at 24. This is not enough. In permitting the SEC to pursue this claim, the Court narrowed it to documentation in connection with a single transaction, *i.e.*, Everest Broadband, and insisted that the SEC show that "one who finalizes a deal has a responsibility to report its terms to the finance department." Order at 119.

To this point, the SEC fails to cite any evidence that Mr. Jaeger had responsibility for transmitting the Everest Broadband transaction documentation to the Company's finance department or that the finance department did not receive the information. Nor, does the SEC identify any evidence that Mr. Jaeger falsified the information that was given to the Company's finance department.[7] Indeed, the Opposition concertedly avoids this Court's very specific question. Rather, it merely rehashes that the revenue from the transaction was purportedly recognized improperly to meet a purportedly known goal of $20 million for the quarter ending September 1, 2001. Opp. at 24. However, besides being irrelevant to the Court's question about documentation responsibility,[8] the SEC's proffered evidence does not even show that Mr. Jaeger was aware that revenues from the Everest Broadband transaction were needed to meet this goal.[9]

Through its argument, the SEC focuses on, and mischaracterizes, purported evidence not relevant to the central question. First, for the mischaracterization that Mr. Jaeger withheld

---

[7]    The SEC's expert, who claims to have followed same procedures that would have been followed by an auditor, made this lack of evidence clear:  "Q. Did Mr. Jaeger falsify accounting records, to your knowledge or to your understanding?  A.  I don't recall if he had.  I don't believe so but I don't recall if he had.  Q.  Were any accounting records falsified in connection with any of the three transactions, to your understanding?  A.  I don't know that any of the records were falsified."  Henning Dep. Tr. 167:17-168:3.  Once more this is at odds with the SEC's own unsupported assertions. *See* Opp. at 25 ("There is ample evidence that Jaeger falsified the books and accounts of Enterasys in violation of Section 10(b)(5)").

[8]    If the SEC indeed had evidence that Mr. Jaeger had been given such documentation delivery responsibility, it certainly did not share that evidence with its expert, who testified "I don't know what his responsibilities were for the documentation." *See* Henning Dep. Tr. 176:6-15.

[9]    Specifically, the SEC relies on the Company's "pipeline" tracking sheet for fiscal year Q2 2002 attached to a string of August 21, 2001 emails, the last of which states that the investment list "need[s] to yield $20M." *See* Opp. at 9 (citing GA, Ex. 33).  As yet another example of the SEC's mischaracterization of the evidence, however, this last email from the Company's COO Jerry Shanahan did not go to Mr. Jaeger.  GA, Ex. 33.  Moreover, the "pipeline" tracking sheet demonstrates just the opposite of what the SEC suggests.  It does not identify any revenues from Everest Broadband as being needed to meet the Company's purported $20 million goal.  *Id.*

information, the SEC cites a KPMG request — not even sent to Mr. Jaeger — for documentation packages on certain transactions including Everest Broadband.  Opp. at 24 (citing GA, Ex. 44).  By its very nature, the email demonstrates nothing about whether the Company's finance department, as opposed to KPMG, had received this transaction information.  In addition, the SEC offers no evidence that the Company failed to respond to this request.  Even if relevant, it would be unreasonable to assume that an auditor would allow such a documentation request to go unanswered, and, thereby, allow the Company to report revenue without providing any backup for it.

Second, the SEC mischaracterizes and exaggerates Mr. Jaeger's September 4, 2001 congratulatory emails to his colleagues on a "great job" at the end of the quarter and instructions for assembling a "clean" set of transaction documentation as a "dictation" of what should not be provided to the auditors.  *See* Opp. at 11, 24 (citing GA, Ex. 43).  Again, the SEC's assertion does not speak to the relevant question of whether the Everest Broadband documentation was delivered to the Company's Finance Department or whether Mr. Jaeger had responsibility for such delivery.  In addition, there is no mention of the Everest Broadband documentation anywhere in this Exhibit.  Further, Mr. Jaeger's instruction was not to withhold information from KPMG, but simply not to deliver it until the personnel assembling the paperwork "clearly underst[ood]" each deal."  *Id*. (citing GA, Ex. 43 (quoting 9:06 a.m. email)).  Perhaps most importantly, far from suggesting that some documentation be withheld, Mr. Jaeger's first email of the day instructed expressly that "we should provide a 'book' to finance that ***includes all of the paperwork on all of the deals; do not provide piecemeal information***."  GA, Ex. 43,

(quoting 9:04 a.m. email) (emphasis added).[10]

In the end, Mr. Jaeger is entitled to summary judgment on the SEC's books and records claims because nothing that the SEC offers demonstrates that Mr. Jaeger had the "responsibility to report [the Everest Broadband] terms to the finance department" (Order at 119) or, even if he did have such responsibility, that the finance department did not receive those terms.

## CONCLUSION

For the reasons stated, as well as those ser forth in his opening brief, Mr. Jaeger respectfully requests that this Court grant his Motion for Summary Judgment.

Respectfully submitted,

ERIC JAEGER,

By his attorneys,

_____

Jonathan A. Shapiro
Jeffrey B. Rudman (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
(650) 858-6000

---

[10] Other purported evidence on which the SEC mistakenly relies either has nothing to do with Everest Broadband or auditor documentation for the related quarter (*see* Opp. at 11 (citing GA, Exs. 45, 46)) or was never sent or received by Mr. Jaeger (*id.* (citing GA, Ex. 47)). The SEC similarly overstates what GA, Ex. 47 – which Mr. Jaeger never even saw – purports to be. In response to a KPMG (7:52 a.m.) request merely for a "list" of the new investment deals in the quarter, the Company provided the requested list. Contrary to the SEC's mischaracterization (*see* Opp. at 11), KPMG, in its request, did not ask for any sort of "information sheet" explaining the terms any transactions or for documentation related to the transactions.

- 16 -

**CERTIFICATE OF SERVICE**

I, Jonathan A. Shapiro, hereby certify that Defendant Eric Jaeger's Reply in Support of

his Motion for Summary Judgment filed through the ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing and paper copies will

be sent to those indicated as non-registered participants on July 27, 2011.

/s/ Jonathan A. Shapiro
Jonathan A. Shapiro, Esq.

ACTIVEUS 90203043v1