```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW HAMPSHIRE
```

Securities and Exchange
Commission,
    Plaintiff

    v.                              Civil No. 07-cv-39-SM
                                    Opinion No. 2011 DNH 129
Eric Jaeger and
Jerry A. Shanahan,
    Defendants

O R D E R

In February of 2007, the Securities and Exchange Commission ("SEC") filed suit against ten defendants, seeking injunctive relief under 15 U.S.C. § 77t(b) and 15 U.S.C. §§ 78u(d) and (e) for alleged violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and several rules promulgated under those statutes.  The court granted various motions to dismiss and the SEC filed a First Amended Complaint.  Again, several defendants moved to dismiss.  And, again, the court granted those motions, either in full or in part.

Subsequently, the SEC settled its claims against a number of defendants.  Two claims remain against Defendant Eric Jaeger: an aiding-and-abetting claim under Rules 10b-5(a) and (c) (Count III) and a falsification-of-books-and-records claim (Count IV). Jaeger moves for summary judgment.  The SEC objects.  For the reasons discussed, Jaeger's motion is denied.

## Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support its claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party. See generally Fed. R. Civ. P. 56(c). It

naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, unsupported conclusions, and mere speculation. See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).

## Discussion

I.  Count III.

In a prior order, the court construed the SEC's claims against Jaeger in Count III of the First Amended Complaint as follows:

> Because the SEC has failed to state Securities Act claims against Jaeger under any of the three theories it advanced, it has necessarily failed to state a claim for direct liability under Rule 10b-5.  <u>The SEC has, however, stated aiding-and-abetting claims against Jaeger under Rules 10b-5(a) and (c), based on his involvement in the transactions with iPolicy (Am. Compl. ¶¶ 160- 2), Centricity (¶¶ 168-69), and Everest (¶¶ 218- 23)</u>, subject to the same proviso that was applied to Kirkpatrick's Securities Act course-of-business claims.

September 30, 2009 Order (document no. 209) at 118 (emphasis supplied).

To establish its aiding-and-abetting claims against Jaeger under Rules 10b-5(a) and (c), the SEC must prove that:

> (1)  a primary violation 10b-5(a) and/or (c) was committed; and

3

    (2)    Jaeger was aware of that primary violation; and

    (3)    Jaeger knowingly or recklessly provided substantial assistance to the primary violator(s) of the rule.

See 15 U.S.C.A. § 78t(e).  See also SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009); SEC v. Johnson, 530 F. Supp. 2d 325, 332 (D.D.C. 2008).

Jaeger's motion insists that the "most that can be said is that [he] was one of several employees who assisted with certain elements of these three transactions, but without any role or indeed knowledge of how the revenue from them would – or would not – be recognized."  Reply Memorandum (document no. 249) at 2.  But, the SEC points to sufficient evidence, if credited by a trier-of-fact, to establish Jaeger's aiding-and-abetting liability.

First, there is ample evidence to support the conclusion that employees of Cabletron, Enterasys, and Aprisma violated Rules 10b-5(a) and (c) as part of the scheme(s) to recognize revenue from transactions that did not generate recognizable revenue, thereby misstating revenue amounts on corporate financial statements.  As to the second and third elements, the SEC points to sufficient evidence to create genuine (i.e., trial-worthy) issues of material fact:

> Jaeger negotiated and finalized the iPolicy, Everest and Centricity transactions [at a time] when: 1) he was fully apprised of the criteria for revenue recognition; 2) he was one of Cabletron's Authorized Representatives to approve sale transactions that did not meet the criteria; 3) he took the lead in drafting the guidance on revenue that was reported at analyst calls; 4) he reviewed and made changes to the financial statements throughout the relevant period and in particular for the quarters in which revenue was reported on these three transactions.  Jaeger was responsible for giving transaction documents to accounting.  Jaeger interfered with the process of giving proper documentation to outside auditors, who could have corrected the improper revenue for the transactions.  Jaeger aided and abetted the primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Memorandum in Opposition to Summary Judgment (document no. 234) at 23.

With respect to the iPolicy transaction, for example, the SEC has pointed to evidence suggesting that Jaeger was fully aware of (and actually negotiated) the terms of the transaction, by which iPolicy would receive funds from Cabletron and then immediately turn around and purchase goods with those funds from Aprisma.  See, e.g., Memorandum in Opposition to Summary Judgment, Exhibits 19, 20, and 21.  In fact, because the iPolicy transaction was "nonstandard," it had to be approved by an authorized Cabletron Representative like Jaeger.  See Exhibit 4.  There is also evidence suggesting that Jaeger was aware that Aprisma needed to (and, in fact, would) recognize revenue from

the iPolicy transaction, in order to meet its quarterly income projections.  See, e.g., Exhibit 27 (e-mail dated April 10, 2001, from Jaeger to the CEO of Cabletron and the CEO of Aprisma, saying "I spoke today with Lisa Lentz and Jack Huffard.  We clear[l]y do not have enough investment deals in the pipe to close the gap.  Now is the time to get creative.  I am pushing Jack to look for more security MSPs and to cull through his other deals.  Aprisma must also help source more deals."); Exhibit 26 (Transcript of June 27, 2001, Q1 FY02 Cabletron conference call, at which Jaeger was present and at which Aprisma announced its (improperly calculated) quarterly earnings, which included revenue from the iPolicy transaction).

And, finally, there is evidence supportive of the SEC's view that Jaeger had a sufficient understanding of accounting principles to fully realize that Aprisma could not properly recognize revenue from the transaction with iPolicy.  See generally Exhibit 52 (describing Jaeger's extensive experience, as an attorney in private practice, with "public offerings, venture capital financings, mergers and acquisitions and corporate partnering"); Exhibit 10 (showing Jaeger's familiarity with proper revenue recognition principles, as he prepared profit and loss statements for Cabletron's four operating companies); Exhibit 4 (discussing "Cabletron's General Revenue Recognition

Rules," outlining end-of-quarter booking requirements, and identifying Jaeger as one of only four "Authorized Cabletron Representatives," by whom all terms and conditions of transactions with resellers had to be reviewed and approved); Exhibit 34 (e-mail in which Jaeger wrote, "I would like to spend at least 15 minutes w/ Piyush and Henry taking them through the balance sheet, the changes we have made and the explanations for the issues that remain. Henry is on the front lines with the investors, and we do not want him caught off-guard."); Exhibit 46 (series of e-mails in which Jaeger was asked for "all of the R&D investment related documents for deals that closed during Q1," so they could be provided to the outside auditors – documents which Jaeger apparently never provided to the outside auditors).

II. Count IV.

In its order of September, 2009, the court described the claims in Count IV of the SEC's amended complaint against Jaeger as follows:

> The amended complaint alleges that Jaeger negotiated and finalized a reciprocal purchase agreement with Everest (Am. Compl. ¶ 218) that included terms that would preclude revenue recognition under GAAP (¶¶ 219-22), yet he failed to inform the finance department of those terms (¶ 296), thus causing the creation of corporate books and records that falsely described the transaction. Again, presuming that one who finalizes a deal has a responsibility to report its terms to the finance department, the SEC has stated a falsification-

>of-books-and-records claim against Jaeger under 15
>U.S.C. § 78m(b)(5) and Rule 13b2-1.

September 30, 2009 Order at 119.  That statute provides that "No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)."  15 U.S.C. § 78m(b)(5).  And, Rule 13b2-1 provides that "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. § 240.13b2-1.

With respect to the "knowing" requirement of section 78m(b)(5), the SEC need not demonstrate that Jaeger was actually aware that he was violating the law.  Instead, it need only show that he was aware of the falsification and did not act through ignorance, mistake, or accident.  See, e.g., U.S. v. Reyes, 577 F.3d 1069, 1080 (9th Cir. 2009); SEC v. Kelly, 765 F. Supp. 2d 301, 322 (S.D.N.Y. 2011).  Consequently, evidence that Jaeger misled company auditors can support the SEC's claim that he knowingly circumvented a company's system of internal accounting controls.  See, e.g., SEC v. Retail Pro, Inc., 673 F. Supp. 2d 1108, 1142 (S.D. Cal. 2009).  Similarly, evidence that Jaeger "contributed to the issuance of materially misleading financial statements," is sufficient to establish liability under Rule

8

13b2-1. <u>SEC v. Lucent Technologies, Inc.</u>, 610 F. Supp. 2d 342, 370 (D.N.J. 2009).

In addition to the evidence summarized above, the SEC points to the following in support of its claims: (1) as early as 1999, Jaeger was made aware of the revenue recognition criteria for Cabletron and its subsidiaries (Exhibit 4); (2) all corporate press releases concerning "revenue, revenue growth, gross margin, operating margin, etc." had to be approved by one of two people: Piyush Patel or Eric Jaeger (Exhibit 7); Jaeger controlled, or had substantial influence over, which documents were provided to the outside auditors (Exhibits 28, 43, 44, 45, 46).

So, for example, with regard to Jaeger's role in Enterasys having improperly recognized revenue from its transaction with Everest, the SEC says:

> Jaeger's involvement with books and records related to Everest demonstrate his liability for violations of Section 13(b)(5) and Rule 13b2-1 thereunder. The revenue from Everest was reported in the second quarter of fiscal year 2002 (September 2001), the quarter in which Enterasys became a public company, and that revenue helped Enterasys achieve the coveted $20 million it had been looking for throughout the quarter. Jaeger was aware of the shortfall and the need to find $20 million in revenue. Exh. 31. Jaeger knew that Enterasys achieved the $20 million in sales and that Everest was part of the total amount. Exh. 43. "Great [effort last week] but the work is not over." Jaeger then dictated to the CFO of Enterasys what documents should not be given to the outside auditor, KPMG. Id.

> Evidence shows that the documents for the Everest transaction were not given to KPMG. Exh. 44. Jaeger reviewed the financial statements that were going into the public filings for the quarter on September 16, 2001. Exh. 48.

Memorandum in Opposition to Summary Judgment (document no. 234) at 24.

And, with respect to Jaeger's role in Aprisma's improperly recognizing revenue from its non-recurring engineering agreement with iPolicy (which the SEC describes as a "round trip of cash" from Cabletron to iPolicy), the SEC says:

> Jaeger's intent is also demonstrated by his conduct with respect to iPolicy. In that transaction accounting asked Jaeger for documents on June 4, 2001 which was quarter close. Jaeger told accounting they are just tying up loose ends but in fact, the transaction documents had not even been signed. Exh. 46. Aprisma improperly recognized revenue in the quarter and iPolicy was one-third of that improper revenue.

Id. at 25.

The foregoing evidence, along with the addition evidence cited in the SEC's memorandum (document no. 234) and its statement of disputed facts (document no. 235) is sufficient, if credited by a trier-of-fact, to warrant the conclusion that Jaeger violated section 78m(b)(5) and/or Rule 13b2-1.

Conclusion

For the foregoing reasons, as well as those set forth in the SEC's legal memorandum and its statement of disputed facts, the existence of genuinely disputed material facts precludes the entry of judgment as a matter of law in favor of Defendant Jaeger.  Accordingly, his motion for summary judgment (document no. 224) is denied.

Jaeger's motion to entirely strike the declaration of Steven Henning (document no. 248) is likewise denied.  The court is aware of the requirements imposed by Rule 56 and, in ruling on Jaeger's motion for summary judgment, it has not considered those portions of the affidavit offering inadmissible statements (e.g., FBI Form 302 reports) or inadmissible portions of the Henning report.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

August 19, 2011

cc: All Counsel of Record