# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br>v.<br><br>PIYUSH G. PATEL, DAVID J. KIRKPATRICK, ERIC JAEGER, BRUCE D. KAY, ROBERT J. GAGALIS, ROBERT G. BARBER, JR., LAWRENCE COLLINS, MICHAEL A. SKUBISZ, JERRY A. SHANAHAN, HOR CHONG (DAVID) BOEY,<br><br>Defendants. | <br><br>Civil Action No. 01:07-00039-SM |

## EXPERT REPORT OF DOUGLAS J. KANGOS

### I. INTRODUCTION AND ASSIGNMENT

I am a Partner in the Assurance - Technology, Information and Communications Sectors practice of PricewaterhouseCoopers LLP ("PwC") in Boston. I earned a BA in International Relations and Economics from Clark University and a Masters Degree in Business Administration from Babson College. I am a licensed Certified Public Accountant in Massachusetts and have over 25 years of professional experience. I am a member of the American Institute of CPAs, and the Massachusetts Society of CPAs. My C.V. is attached as Exhibit 1. I have not provided testimony in the last four years.

Counsel for Eric Jaeger ("Mr. Jaeger") engaged me, through PwC, in connection with certain claims made by the United States Securities and Exchange Commission ("SEC") regarding allegations against Mr. Jaeger related to certain financial accounting and reporting practices of Cabletron Systems Inc. ("Cabletron"), Enterasys Networks, Inc. ("Enterasys"), and Aprisma Management Technologies, Inc., ("Aprisma") (collectively the "Company"). Specifically, counsel asked me to provide a response to the May 23, 2011 report and opinions of the SEC's accounting expert, Steven L. Henning (the "Henning Report") in relation to claims regarding three Company transactions and allegations that Mr. Jaeger put various processes and practices in place that led to the

misstatement in the Company's consolidated financial statements, failed to devise and implement adequate internal controls, and participated in the overriding of existing internal controls. I expect to respond to any opinions and/or testimony that the SEC's accounting expert may provide at deposition or trial. To the extent that additional information is provided closer to the trial date, I may be asked to update and supplement this report.

This report and the opinions and conclusions reached herein are based on documents produced in this action, testimony and exhibits from depositions taken in this case, publicly available information, as well as my personal education, and business experience. In particular, I have reviewed the documents, professional rules and comments, and deposition testimony on which Mr. Henning has relied with respect to the three subject transactions and Mr. Jaeger. I have also reviewed the deposition testimony of Mr. Henning in this case, and his declaration provided in opposition to Mr. Jaeger's motion for summary judgment. The materials I considered in preparing this report are of the type that are reasonably relied on by experts in my field. The materials that I relied on in preparing this report are identified in this report and/or Exhibit 2 hereto. This report reflects work completed and materials available to me through today. I reserve the right to supplement this report should additional information come to my attention before trial.

Our services were performed in accordance with Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we provide no attestation on financial statements, as we did not audit any information provided to us. This information has been prepared solely in connection with the *SEC v. Piyush Patel, et al.* litigation and is not intended for reliance by any third parties or in any other context.

PwC is compensated for the time spent by its professional staff on this matter at the applicable hourly billing rates, which range from $225 to $595 per hour, plus out-of-pocket expenses incurred; my rate is $595. We have no financial interest in the outcome of this dispute, and our compensation is in no way dependent on the substance of my opinion.

## II. BACKGROUND

The Company designs, develops, markets and supports comprehensive networking solutions focusing on the network security, availability and mobility needs of enterprises. In February 2000, Cabletron transferred substantially all of its operating assets and liabilities to four operating subsidiaries as part of a plan to make each of the subsidiaries independent (the "Transformation"). These subsidiaries were Enterasys, Aprisma, Riverstone Networks, Inc. ("Riverstone"), and Global*Network* Technology Services, Inc. ("GNTS"). In July 2001, the operations of GNTS were discontinued through the acquisition of a portion of GNTS by a third party, the assumption of certain contracts and employees of GNTS by Enterasys and Aprisma, and the discontinuance of the remaining business operations of GNTS. Following the initial public offering of a

portion of Riverstone's common stock in February 2001, Cabletron distributed its holdings of Riverstones' common stock to Cabletron's stockholders in a spin-off transaction on August 6, 2001. Also on August 6, 2001, Enterasys was merged with and into Cabletron, and the name of the surviving corporation was changed to Enterasys Networks, Inc. In September 2001, the Company amended its by-laws to change its fiscal year end from the Saturday closest to the last day in February to the Saturday closest to the last day in December of each year.[1] On August 9, 2002, the Company completed the sale of Aprisma to a third party.[2]

In its Form 10-K filing for the period ended December 29, 2001 (filed on November 26, 2002), the Company announced that "in January 2002, we discovered that a previously recognized $4 million sale in our Asia Pacific region did not qualify for revenue recognition during the period in which we had originally reported the revenue. Separately in January 2002, we learned that the U.S. Securities and Exchange Commission, or SEC, had opened a formal order of investigation relating to us and our affiliates...As a result of the internal review, we have restated our financial statements for the fiscal year ended March 3, 2001, the fiscal quarters within that fiscal year, and the first three fiscal quarters within the ten-month transition period ended December 29, 2001."[3]

In 1998, Mr. Jaeger became General Counsel and Senior Vice President of Cabletron, responsible for supervising the legal department and outside counsel.[4] In July 1999 through approximately August 2001, he was the Executive Vice President of Corporate Affairs.[5] After his resignation, Mr. Jaeger entered into a consulting agreement with the Company which was effective from September 2001 through September 2002.[6] Prior to his employment at Cabletron, Mr. Jaeger earned a B.S. in Computer Science at the Massachusetts Institute of Technology and a J.D. from Boston College Law School and worked as an associate in the corporate department at Ropes & Gray LLP focused on high-technology industries.[7]

I understand that the SEC's remaining claims against Mr. Jaeger relate to the Company's transactions with three customers - iPolicy Networks ("iPolicy"), Centricity, Inc. ("Centricity"), and Everest Broadband Networks ("Everest").

### III. INTERNAL CONTROL

According to the Committee of Sponsoring Organizations of the Treadway Commission[8] ("COSO"), internal control is broadly defined as a process, effected by an entity's board

---

[1] Form 10-K for the ten month transition period ended December 29, 2001 p.17.
[2] Form 10-K for the ten month transition period ended December 29, 2001 p. 3.
[3] Form 10-K for the ten month transition period ended December 29, 2001 p.3.
[4] Affidavit of Defendant Eric Jaeger in Support of His Motion for Summary Judgment p.2.
[5] Eric Jaeger testimony September 18, 2003 p. 75
[6] Form 10-K for the ten month transition period ended December 29, 2001 p.64.
[7] Exhibit 52 to the Affidavit of Nancy Gegenheimer.
[8] Internal Control - Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission p. 7

of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories:
1. Effectiveness and efficiency of operations.
2. Reliability of financial reporting.
3. Compliance with applicable laws and regulations.

According to COSO's Internal Control - Integrated Framework, "internal control is, to some degree, the responsibility of everyone in an organization."[9] Regarding Management's roles and responsibilities for internal control, the Framework states that "the chief executive officer is ultimately responsible and should assume ownership of the system...by providing leadership and direction to senior managers and reviewing the way they're controlling the business. Senior managers, in turn, assign responsibility for establishment of more specific internal control policies and procedures to personnel responsible for the unit's functions."[10]

While certainly related, in my opinion, the elements of the COSO Framework relevant to this case are those internal controls related to financial reporting, not those related to the effectiveness and efficiency of operations or compliance with applicable laws and regulations. In my view, regulatory filings of financial information (e.g. Forms 10-K and 10-Q filed with the SEC) fall into the category of internal controls over financial reporting.

Based on my review, there appear to be a series of gaps in the Company's internal controls related to financial reporting that contributed to certain transactions being recorded incorrectly in the Company's financial statements. In my experience and consistent with the COSO guidance cited above, the senior executive principally accountable for the controls related to financial reporting is the chief financial officer. In fact, the SEC functionally memorialized this perspective in 2002 when it adopted SEC Rule 302 as directed by Section 302(a) of the Sarbanes-Oxley Act of 2002, which require an issuer's principal executive and financial officers to certify the financial information contained in the issuer's quarterly and annual reports.

Based on the COSO guidance, and my understanding of Mr. Jaeger's background and role within the Company, I would not expect Mr. Jaeger to have been primarily involved with devising, implementing, or monitoring internal controls related to financial reporting matters. Consistent with Mr. Jaeger's position, deposition testimony, and affidavit in support of summary judgment, nothing cited by Mr. Henning or in his testimony demonstrates that Mr. Jaeger was specifically assigned such a role and responsibility. At best, Mr. Jaeger was involved with certain operational and/or compliance controls that only tangentially intersected with financial reporting controls. However, based on my review, I have not seen any evidence that Mr. Jaeger overrode, or knowingly aided others to override, financial reporting controls that led to material

---

[9] Internal Control - Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission p. 7
[10] Internal Control - Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission p. 6

4

misstatements of revenue during either the fiscal year ended March 3, 2001 or the ten-month period ended December 29, 2001. The accounting entries related to the three transactions subject to this dispute (iPolicy Networks, Centricity, and Everest, discussed in more detail below) were recorded in the Company's books and records by the finance and accounting staff, not Mr. Jaeger. It is not typical and I would not expect that Mr. Jaeger, or other Company personnel outside of the finance and accounting organization would understand the complexities and nuances of the relevant accounting literature that pertains to the three transactions discussed below. Consistent with his testimony, nothing in Mr. Henning's report, nor in any evidence or deposition testimony that I reviewed, indicates that Mr. Jaeger possessed sufficient knowledge and experience to properly account for the three transactions described below or even that Mr. Jaeger knew of the intended application of the relevant accounting guidance or actual revenue recognition for any of the three transactions.

Furthermore, the Company's attention to growth initiatives, which has been portrayed as both obsessive and aggressive by Mr. Henning, were principally driven by the CEO, certain members of the Board of Directors and Wall Street estimates. While it is not clear to me what Mr. Henning means by such a characterization, it is my experience that most, if not all, commercial companies, whether operating in the same industry as the Company or not, are aggressive about revenue growth. An obsession about growing revenue does not inherently imply that internal controls over financial reporting are deficient or that a company's management has the ability or willingness to override such controls. Additionally, Mr. Henning appears to imply that the Company's monitoring of the investment portfolio and/or potential deals as an avenue to expand revenue and increase market share is unreasonable and indicative of management's, including Mr. Jaeger's, intent to ignore both the Company's internal control over financial reporting and the relevant financial accounting and reporting guidance. Mr. Henning, however, did not identify any direct evidence in support of his suggestion regarding Mr. Jaeger's assumed intent, nor does the evidence or testimony that I reviewed reveal otherwise. As more fully discussed in my report below with regard to the three transactions I have been asked to focus upon, key individuals within the financial and accounting function of the Company had access to the information necessary to make the proper accounting journal entries in accordance with specific and relevant accounting literature.

## IV. THE THREE TRANSACTIONS

There are three points that are relevant to each of the three following transactions and key to my opinion regarding the contention that Mr. Jaeger knew or should have known that the original accounting and reporting of these transactions was inappropriate and should have been accounted for differently.

First, in each case representatives of the finance and accounting function within Cabletron and its wholly-owned subsidiaries were aware of the elements of each arrangement. These finance and accounting personnel had the requisite knowledge and experience to assess the accounting and reporting of each transaction on its merits and in accordance with applicable financial accounting and reporting guidance.

5

Second, nothing in what I have reviewed suggests that Mr. Jaeger was involved in assessing revenue recognition for the three transactions, nor, given their accounting complexity, would I expect him to have been. In my experience, a non-accountant like Mr. Jaeger lacks the knowledge and experience to effectively assess the inter-relationships between the facts and circumstances of arrangements as complex as those below with the myriad of complex financial accounting guidance related to revenue recognition, investments, non-monetary transactions and research and development required to reasonably determine the extent to which some or all revenue from a transaction could be recognized and when. According to Mr. Jaeger's testimony, and nothing in the documentation I have reviewed suggests otherwise, revenue recognition was not his role and he did not have an understanding of what the overall revenue recognition requirements were like for a company like Enterasys.[11] Additionally, the SEC has, in conjunction with this matter, stated -- I believe correctly --that the "proper application of GAAP requires an accountant to consider all of the facts and circumstances surrounding a transaction to determine whether it is proper for revenue recognition."[12]

Third, each of the three transactions possess multiple characteristics and, therefore, different but various business and accounting complexities. However, none of the individual structures are inherently fatal to the proper recognition of revenue. No aspect of their structure precluded or concealed proper revenue recognition. The ultimate recognition of revenue under each is dependent upon their unique facts and circumstances. As stated above, consistent with his testimony, I would not expect Mr. Jaeger to possess the sophisticated knowledge and experience to ascertain the proper accounting for these transactions. While the documentation I have reviewed suggests Mr. Jaeger may have been aware of certain basic concepts of revenue recognition, such as collectability, there is no evidence that Mr. Jaeger was charged with revenue recognition responsibility. Nor, as Mr. Henning confirmed in his testimony, did I find any evidence that Mr. Jaeger knew the intended application of the relevant accounting guidance for any of the transactions. Likewise, the record shows that Mr. Jaeger did not know what the actual revenue recognition decision was nor how it was determined or whether the financial condition of the three companies or the timing of payments would affect revenue recognition. Again, Mr. Henning conceded each of these points in his deposition testimony.

**iPolicy**
Based on my review of the documents, I understand that the Company's transaction with iPolicy included three components - $850,000 sale of software from Aprisma to iPolicy, $1,000,000 Cabletron investment in iPolicy via a convertible promissory note, and a non-recurring engineering ("NRE") agreement whereby Cabletron paid iPolicy $900,000 in exchange for certain engineering services.

---

[11] Defendant Eric Jaeger's Separate Statement of Undisputed Facts in Support of Motion for Summary Judgment p.3
[12] Response to Jerry Shanahan's First Request for Admissions to the SEC p.1.

6

An April 23, 2001 email from Jack Huffard, business development at Cabletron, to Tom Loureiro, Cabletron Assistant General Counsel (excluding Mr. Jaeger) requesting that Mr. Loureiro send iPolicy a non-disclosure agreement regarding upcoming discussions also states that "this is a referral from Piyush, IPolicyNet.com".[13] The same email string includes an April 18, 2001 conference call meeting request issued by Jack Huffard to Vimal Vaidya, President and CEO of iPolicy and another iPolicy representative.

I understand that iPolicy Purchase Order #CAP00093 dated May 31, 2001 was issued to Aprisma for Spectrum Enterprise Manager and Spectrum Security Manager totaling $850,000.[14] Aprisma invoice #INV1100005938 dated June 1, 2001 for $375,000 and #INV1100005994 dated June 2, 2001 for $475,000 were issued to iPolicy.[15] The full amount of the purchase order was recorded as revenue during the quarter ended June 2, 2001. Furthermore, Aprisma Credit Line Authorization for iPolicy dated 6/2/01 was authorized by D. Ferreira with the comments "reviewed and approved with Mike L. and Merrill K. approved $850K order with Net 45 days on PO#CAP0093 based on current cash position of $3M. Venture funded by Greylock Partners and Morgan Stanley Venture Partners."[16] Nothing cited by Mr. Henning, and nothing I have reviewed, demonstrates that Mr. Jaeger was involved with, approved, processed or even saw this sales documentation.

Regarding the Cabletron investment and NRE Agreement with iPolicy, I reviewed a June 1, 2001 letter from Eric Jaeger to Vimal Vaidya, President and CEO of iPolicy which states that the Company "is interested in pursuing a potential relationship with iPolicy related to the security platform products you have under development...to help foster our relationship and fund your further development, we would consider making an equity investment...we understand, however, that the engineering resources of your company are expensive and limited. To help compensate you for your efforts, we agree to pay an NRE fee of $850,000."[17] I understand that the NRE fee subsequently paid by Cabletron was $900,000.

I understand that the $1,000,000 Cabletron investment was executed effective June 5, 2001 pursuant an iPolicy Convertible Promissory Note[18] executed by Jamal Rabbani, V.P. Operations of iPolicy and a Note Purchase Agreement executed on behalf of the companies by Jamal Rabbani of iPolicy and David Kirkpatrick, Cabletron CFO.[19] Again, nothing cited by Mr. Henning, and nothing I have reviewed, shows that Mr. Jaeger was involved in the execution of this transaction.

Effective June 8, 2001 iPolicy and Cabletron executed an NRE Agreement, including a provision for Cabletron to pay iPolicy $900,000 ("NRE Payment") concurrently with

---

[13] ETS 56054
[14] APR 007439
[15] EG 000604-605
[16] APR 007440
[17] EG 000595
[18] ETS 02313 - 02318
[19] EG 000563 - 000570

execution of the agreement which was signed by Jamal Rabbani and David Kirkpatrick on behalf of the companies.[20]

A June 1, 2002 KPMG preliminary draft memorandum regarding Accounting for Certain Investments and Nonmonetary Transactions reports on a number of Cabletron investments, including iPolicy. The memo states that "the expense for the $900 NRE paid to iPolicy should be netted against revenue to reduce recognized revenue to $0, with the excess amounts charged to expense in the period the arrangement was completed"[21] because the iPolicy transaction was viewed as a research and development arrangement. This memo also cites the following relevant accounting literature reviewed and considered as a basis for its preliminary conclusions:
- APB Opinion No. 29, *Accounting for Nonmonetary Transactions,*
- EITF 00-8, *Accounting by a Grantee for an Equity Instrument to Be Received in Conjunction with Providing Goods or Services,*
- Staff Accounting Bulletin No. 101, *Revenue Recognition* and
- footnote 8 of APB Opinion No. 10, *Omnibus Opinion - 1966*

There is no evidence, as Mr. Henning conceded in his deposition testimony, that Mr. Jaeger was aware of the intended application of the relevant accounting guidance for this transaction, nor, more generally, the accounting for the research and development costs. In my opinion, it would take an accountant experienced in the accounting for arrangements with characteristics similar to this one, to properly determine how the relevant accounting literature should be applied.

A July 8, 2002 document regarding Enterasys Investment Valuation references the Company's retention of two former Arthur Anderson consultants with experience in valuation and concludes regarding the iPolicy transaction Enterasys "has determined that this arrangement was a swap that did not meet the criteria for revenue recognition under SAB 101 and therefore, all of the previously recognized revenue is being reversed."[22]

Based on my review, the iPolicy arrangement included multiple transactions, involving complex accounting issues and various representatives from the Company, including the CFO and a referral from the CEO. According to the FBI's notes regarding the interview of Mr. Hurley, Mr. Hurley and Mr. Kirkpatrick were involved and aware of the elements of the iPolicy transaction and Mr. Hurley stated that the Company recorded the entire $1.85M (which includes the $850K for NRE) as an investment. It is clear that individuals with the requisite accounting and reporting knowledge and experience, namely the CFO of Cabletron and assistant controller of Cabletron, were individually and collectively aware of the various facets of the iPolicy arrangement. It was incumbent upon them to determine the appropriate accounting and reporting for Cabletron and each of its wholly-owned subsidiaries including Enterasys and Aprisma. Nothing that I have reviewed indicates that Mr. Jaeger was involved in assessing revenue recognition,

---

[20] ETS 250344 - 250348
[21] KPMG 161603 - 161648
[22] KPMG DF 012323 - 012337

8

or otherwise aware of the intended application of the relevant revenue recognition guidance, for the iPolicy transaction, nor, given its accounting complexity, would I expect him to have been.

**Centricity**

Based on my review of the documents, I understand that the Company's transaction with Centricity included three components - $1,000,000 Cabletron investment from March 2000[23], $400,000 additional investment in April 2001 and $99,312 sale of goods from Enterasys in June 2001. As Mr. Henning conceded in his testimony, the only indication of Mr. Jaeger's involvement in this transaction was his signature on the document for the Cabletron investment in April 2001. Nothing cited by Mr. Henning, or that I have reviewed, demonstrates any participation by Mr. Jaeger in Enterasys's sale of goods to Centricity.

My review of the Centricity documents included a April 6, 2001 email string between certain Centricity representatives, Jack Huffard and Tom Loureiro of Cabletron, and Bill Monaghan of Fernwood Advisors, Inc. (excludes Mr. Jaeger), which references final negotiations and/or changes to a revised bridge loan agreement. In the email string, Lynn Nye of Centricity states that "it looks like we are good to go" and that Mark (presumably Mark Bonnett of Centricity) will call Tom (presumably Tom Loureiro of Cabletron) to cover a couple of small items. Nye further states "that you know our financial position and we have disclosed everything to you in respect to our current cash and accounts payable. Within the representation, one could take the position that we are insolvent...let me know how you would like to handle that topic."[24] As Mr. Henning conceded, and as my review confirmed, there is no evidence that Mr. Jaeger was aware of Centricity's financial condition as of the April 2001 Cabletron investment.

The April 2001 additional Cabletron investment is supported by a Convertible Subordinated Promissory Note for $400,000 and a Preferred Stock Purchase Warrant between Centricity, Inc. and Cabletron dated April 16, 2001 and executed on behalf of each company by Lynn Nye, President and CEO of Centricity and Eric Jaeger. [25] According to a spreadsheet of minority investments attached to a September 4, 2001 Tony Hurley email[26], $250,000 of cash was invested in Centricity on April 28, 2001.

I understand that the remaining $150,000 investment (i.e. $400,000 investment less the $250,000 cash investment) was in the form of product credits which I understand correlate to Centricity Purchase Orders #101 dated May 25, 2001 issued to Aprisma for $50,000 and Centricity Purchase Orders #102 dated May 25, 2001 issued to Enterasys for $99,312. These purchase orders appeared to be faxed to Gayle Spence at Cabletron.[27] It does not appear that the $50,000 purchase order to Aprisma was fulfilled but I understand that Enterasys recorded revenue of $93,000 during the quarter ending June 2, 2001 and $7,000 in the quarter ending September 1, 2001 of the

---

[23] KPMG 30036
[24] Exhibit #650
[25] EG 000232 - 000237
[26] EG 003226 - 003231
[27] KPMG 30060 - 30063

9

transition year in connection with the $99,312 purchase order. The fact that a portion of the invoiced amount was recorded as revenue (appropriately or not) and a portion was deferred (appropriately or not) indicates that the accounting and finance organization not only scrutinized the transaction, but concluded that it had sufficient information regarding this transaction to make such an assessment. I am not aware of any evidence that Mr. Jaeger was involved in the execution of this sale transaction.

A June 4, 2001 email from Tony Hurley to various Cabletron representatives confirms that he received the investment agreements related to the April 2001 Centricity investment.[28]

In a July 19, 2001 email from Mr. Nye to Mr. Huffard in response to Cabletron efforts to obtain current financial information from Centricity, Mr. Nye states that "as you know we don't have any funds or employee's we will not be able to submit any financials until that issue is cleared up." Mr. Huffard forwards this email to Tony Hurley on July 20, 2001.[29] While this email post-dates the quarterly earnings and 10-Q filing for quarter ending June 2, 2001, it indicates that Mr. Hurley and the accounting and finance organization of the Company was fully aware of Centricity's financial situation in the quarter in which the previously deferred $7,000 was recorded as revenue. Furthermore, the originating email in this string was from a Bridget Arnold of Enterasys which indicates she "worked with Tony Hurley and Jack Huffard" and was "responsible for providing quarterly updates to Cabletron management as to the status of our investment in your Company." Cabletron's initial investment in Centricity dates from 2000. According to a spreadsheet of minority investments attached to a September 4, 2001 Tony Hurley email, the Company recorded an impairment charge of $1,250,000 on July 28, 2001.[30]

The Henning Report states that Mr. Jaeger and Mr. Huffard "should have made the appropriate personnel aware of Centricity's poor financial condition so that an informed decision could have been made regarding the recognition of revenue. This knowledge would have enabled the appropriate accounting personnel to conclude that revenue recognition in this instance would have been a violation of GAAP."[31]

However, the evidence indicates that finance and accounting personnel should have had sufficient knowledge of the Centricity relationship in April 2001 as they would have been directly involved in the disbursement of the $250,000 investment, Mr. Hurley had the investment documents prior to issuance of the quarterly financial information, they would have recorded the $93,000 of revenue, and they had in place a procedure to update quarterly information regarding the Company's investments. And, as noted above, Mr. Hurley acknowledged that he was aware of Centricity's inability to pay during the quarter in which the remaining $7,000 was recognized as revenue in contravention to the Company's revenue recognition policy. The Company's Software Revenue Recognition Policy states that "All purchase orders (signed by the customer)

---

[28] Exhibit 728
[29] EG 000270
[30] EG 003226 - 003231
[31] The Henning Report 2-5 pps.7-8.

must be reviewed by sales accounting..." including, among other things, "the customer has the financial ability to pay us, on our regular payment terms...if we provide the customer financing, then revenue is deferred until the customer pays us."[32]

Nothing I have reviewed indicates that Mr. Jaeger was involved in assessing revenue recognition for the Centricity transaction, nor, given its accounting complexity, would I expect him to have been. Likewise, as Mr. Henning conceded in his testimony, and as confirmed by my review, there is no direct evidence that Mr. Jaeger knew of the intended application of the relevant accounting guidance or the actual revenue recognition for the transaction.

**Everest**
Based on my review of the documents, I understand that the Company's transaction with Everest included two components - a $251,900 sale of goods from Enterasys, and a $253,000 purchase of services from Everest. Enterasys recorded $217,500 in revenue related to its sale to Everest during the quarter ended September 1, 2001 with the remaining $34,400 in revenue deferred until later quarters.

My review of the Everest documents included:
- March 31, 2001 email from Piyush Patel with the subject line of "Everest" sent to various Cabletron representatives, including David Kirkpatrick and Jack Huffard (excluding Mr. Jaeger) which states that "I want to do only deal that I invest $XM right now and I get PO of $XM right now, not later.[33]
- April 2, 2001 email string between Jack Huffard, Dan Harding and John Kern (excluding Mr. Jaeger) that includes an attached unexecuted memorandum of understanding from Piyush Patel to Jeffrey Feldmen, CEO of Everest, which states "Cabletron Systems will invest $2.0MM under a convertible note agreement...Everest agrees to issue a purchase order to Riverstone for $2.0MM in hardware/services products [sic] at the time of investment. Payment will be cash simultaneous with the investment round."[34]
- August 31, 2001 email string between Jeffrey Feldman, Hamid Modarrissi and Dan Ullerick of Everest and Matt Murphy of Aprisma (excluding Mr. Jaeger) regarding agreement on Aprisma Sales Quotation dated August 31, 2001 for $251,900 (for Spectrum NOC Manager/iView Capacity Assurance Ent Bundle for $217,500 and related maintenance for $34,400).[35]
- August 31, 2001 facsimile from Darrin Ullerick to Jack Huffard (excluding Mr. Jaeger) with Everest P.O. #10912 for $251,900 in goods/services from Enterasys along with a letter provided by what appears to be one of Everest's suppliers including sales confirmation language regarding Everest's purchase orders issued to that supplier.[36]

---

[32] APR 007417
[33] Exhibit #1061
[34] Exhibit #744
[35] Exhibit #199
[36] Exhibit #200

11

- August 31, 2001 Enterasys Contract #40042911 with Everest for $34,400 related to service and maintenance executed by Hamid Modarressi, CIO on September 10, 2001.[37]
- August 31, 2001 email string between Mr. Ullerick, Mr. Huffard, and Mr. Jaeger regarding the status of an Enterasys purchase order to be issued to Everest, specific language Everest wants in that Enterasys purchase order, and Ullerick's request for specific language in a side letter stating Everest's "ability to swap out items listed on your quote."[38]
- August 31, 2001 facsimile from Jack Huffard to Darrin Ullerick (excluding Mr. Jaeger) with Enterasys Purchase Order #4540036219 issued to Everest for $253,000 related to Data and Voice Circuits and Services.[39]
- August 31, 2001 unexecuted letter (two versions) purportedly from Eric Jaeger to Darrin Ullerick regarding Everest's ability to exchange elements of the software being purchased.[40]
- September 4, 2001 email from Tony Hurley sent to (or cc'd) various Cabletron representatives, including Robert Gagalis, Gayle Spence and Jack Huffard (excluding Mr. Jaeger) with the subject "R&D Investments" including a spreadsheet that references Everest under a subheading for investments "signed during Q2 FY'02 which we expect to recognize revenue" and a notation that says "Enterasys/Aprisma shipped approx. $0.2 million."[41]

The Henning Report alleges that Eric Jaeger and Jack Huffard orchestrated a reciprocal purchase transaction with Jeff Feldman, Chief Executive Officer of Everest, Darrin Ullerick, Chief Financial Officer of Everest and Hamid Modarressi, Chief Information Officer of Everest, whereby Everest would purchase Aprisma's Spectrum software from Enterasys and at the same time Enterasys would purchase data and voice services from Everest.[42] The Henning Report states that the entire transaction was subject to a side letter dated August 31, 2001 that Darrin Ullerick negotiated with Eric Jaeger and that this side letter spelled out the terms of the exchange rights given to Everest in connection with the Aprisma software.[43] The report also states that "it is clear that Eric Jaeger was fully aware of the intended purpose of the transaction. The documents provide compelling evidence that he participated in a scheme to enable Enterasys to structure the form of the transaction in such a way as to achieve the desired accounting results, namely, to boost revenue on the books of Enterasys."[44] Inconsistent with his testimony that he was not aware of any direct evidence that Mr. Jaeger knew of the intended application of relevant revenue recognition and other accounting guidance for any of the three transactions, Mr. Henning's Report further asserts that "the lack of internal controls at Enterasys, enabled Eric Jaeger and Jack Huffard to design and fabricate a transaction with the intention of increasing revenue. The Everest transaction

---

[37] EB 00023 - 00025
[38] Exhibit #202
[39] Exhibit #201
[40] Exhibit #203 & 204
[41] EG 003225 - 003231
[42] The Henning Report 2-8 p.1
[43] The Henning Report 2-8 p.3
[44] The Henning Report 2-8 p.7

12

was negotiated by Eric Jaeger and Jack Huffard. Specifically, Mr. Jaeger utilized a side agreement to negotiate the terms of the exchange rights given to Everest. Enterasys accounting department should have verified whether or not the services included on its purchase order to Everest had any value to Enterasys before any revenue from a related sale to Everest was recorded."[45] Despite this assertion, and as Mr. Henning conceded in his testimony, there was nothing inherent in the structure of the Everest Broadband transaction that precluded the proper recognition of revenue.

Further, based on what I have reviewed, the notion of a reciprocal purchase agreement between the Company and Everest was evidenced as early as March 2001 in an email from the Company's CEO to, among other representatives, the CFO. Moreover, Company finance and accounting staff necessarily were involved in reviewing the Company's purchase order to Everest, approving and disbursing $253,000 to Everest. Significantly, there is no evidence to suggest the side letter was finalized and I understand an executed copy of the letter has not been identified.

Nothing in what I have reviewed indicates that Mr. Jaeger was involved in assessing revenue recognition for the Everest transaction, nor, given its accounting complexity, would I expect him to have been. Likewise, as Mr. Henning conceded in his testimony, and as confirmed by my review, there is no direct evidence that Mr. Jaeger knew of the intended application of the relevant accounting guidance or the actual revenue recognition for the transaction or the applicable accounting rules for such revenue recognition.

## V. CONCLUSION

Based on documents reviewed related to the iPolicy, Centricity and Everest transactions, there is no evidence to support the claim that Mr. Jaeger personally aided and abetted a scheme to generate revenue not properly recognized as revenue under GAAP and to improperly recognize that revenue while claiming to adhere to GAAP principles.

Based on what I have reviewed, there is no evidence that suggests Mr. Jaeger's actions in relation to any of the three transactions were with the purpose and effect of creating the false appearance of actual sales. Their structure did not preclude or conceal proper revenue recognition and there is no direct evidence that Mr. Jaeger knew of the intended application of the relevant accounting guidance or the actual revenue recognition for any of the three transactions. Nor is there evidence that Mr. Jaeger knew of the revenue recognition guidance relevant to these transactions or that he knew the information that might have precluded the recognition of revenue as originally recorded by the Company.

Based on what I reviewed, there is no evidence that suggests Mr. Jaeger should have taken affirmative steps beyond his area of responsibility and expertise to ensure the Company's compliance with the books and records requirements related to the Everest

---

[45] The Henning Report 2-8 p.11

transaction. Consistent with his affidavit in support of his motion for summary judgment, there is also no evidence to suggest that Mr. Jaeger had been assigned or had assumed responsibility for the delivery of individual transaction documents to the Company's finance organization. In any event, there is no evidence that information regarding elements of the Everest arrangement, needed to assess revenue recognition and reporting for the transaction, were withheld from the finance department.

_____           July 27, 2011
Douglas J. Kangos                                           Date

Exhibit 1

# DOUGLAS J. KANGOS, CPA
# CURRICULUM VITAE

125 High Street
Boston, MA 02110
617-530-5044 (direct)
douglas.j.kangos@us.pwc.com

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| **1996 to present** | **PricewaterhouseCoopers LLP** | |
| 1999 to present | Partner, Assurance - Technology, Information and Communications Sectors | |
| 1996 to 1999 | Senior Manager, Assurance - Technology, Information and Communications Sectors | |
| **1994 to 1996** | **The May Department Stores** | |
| | Director of Inventory, Filene's Division | |
| **1987 to 1994** | **Coopers & Lybrand LLP (now PricewaterhouseCoopers LLP)** | |
| 1991 to 1994 | Manager, Financial Advisory Services | |
| 1989 to 1991 | Senior Associate, Assurance | |
| 1987 to 1989 | Associate, Assurance | |
| **1983 to 1984** | **Micom Systems, Inc.** | |
| | Sales Engineer | |

## EDUCATION

MBA, Babson College, 1987 - concentration in Finance and Accounting
BA, Clark University, 1983 - International Relations and Economics

## PROFESSIONAL CERTIFICATION

Certified Public Accountant, Massachusetts, 1991

## PROFESSIONAL MEMBERSHIPS

American Institute of Certified Public Accountants
Massachusetts Society of Certified Public Accountants

## PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2007 to 2010 | National Professional Services Group, PricewaterhouseCoopers LLP |
| 2000 to 2007 | Northeast Telecommunications Sector Leader, PricewaterhouseCoopers LLP |
| 1998 to 2010 | Technical Accounting and Auditing Instructor, PricewaterhouseCoopers LLP<br>  Equity Instruments<br>  Valuation |
| 1998 to 2007 | Assurance Quality Review Program, PricewaterhouseCoopers LLP |

Exhibit 2

*United States Securities and Exchange Commission v. Piyush Patel, et al.*

First Amended Complaint
Expert Report of Steven L. Henning dated May 23, 2011
Declaration of Steven L. Henning in Support of Plaintiffs' Response in Opposition to Defendant Eric Jaeger's Motion for Summary Judgment dated May 23, 2011
Deposition of Mr. Henning dated June 30, 2011
Form 10-K for the ten month transition period ended December 29, 2001
Affidavit of Defendant Eric Jaeger in Support of His Motion for Summary Judgment
Eric Jaeger testimony dated September 18, 2003
Exhibit 52 to the Affidavit of Nancy Gegenheimer.
Internal Control - Integrated Framework of the Committee of Sponsoring Organizations of the Treadway Commission
SEC Certification of Disclosure in Companies' Quarterly and Annual Reports
EG 011942 - 011947
EG 011990 - 012000
EG 011948 - 011960
Defendant Eric Jaeger's Separate Statement of Undisputed Facts in Support of Motion for Summary Judgment
Response to Jerry Shanahan's First Request for Admissions to the SEC
ETS 56054
APR 007439 - 007440
EG 000604-605
EG 000595
ETS 02313 - 02318
EG 000563 - 000570
ETS 250344 - 250348
KPMG 161603 - 161648
KPMG DF 012323 - 012337
Federal Bureau of Investigation Anthony Hurley interview on 7/1/04 transcription dated 8/20/04
KPMG 30036
Exhibit #650
EG 000232 - 000237
EG 003226 - 003231
KPMG 30060 - 30063
Exhibit 728
EG 000270
APR 007417
Exhibit #1061
Exhibit #744
Exhibit #199
Exhibit #200
EB 00023 - 00025
Exhibit #202
Exhibit #201
Exhibit #203 & 204

## CERTIFICATE OF SERVICE

On this 27th day of July, 2011, I, James W. Prendergast, hereby certify that a copy of the foregoing Expert Report of Douglas J. Kangos was hereby served, via electronic mail and U.S. mail, upon the following:

**Nancy J. Gegenheimer**
**James A. Scoggins, II**
**Jeffrey S. Lyons**
**Leslie J. Hughes**
US Securities & Exchange Commission (CO)
1801 California St, Ste. 1500
Denver, CO 80202
303 844-1105
Email: scogginsj@sec.gov
Email: lyonsj@sec.gov
Email: hugheslj@sec.gov
Email: gegenheimerN@sec.gov
*Attorneys for the Plaintiff US SEC*


**Andrew Good**
**Philip G. Cormier**
Good & Cormier
83 Atlantic Ave
Boston, MA 02110
617 523-5933
Fax: 617 523-7554
Email: agood@goodcormier.com
Email: pcormier@goodcormier.com
*Attorneys for the Defendant Shanahan*

/s/ James W. Prendergast
_____
James W. Prendergast