IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>ERIC JAEGER and<br>JERRY A. SHANAHAN,<br><br>                    Defendants. | No. 01:07-00039-SM<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT ERIC JAEGER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN LIGHT OF NEW AUTHORITY**

**I.     INTRODUCTION**

Defendant Eric Jaeger now moves for summary judgment as to the claim that he aided and abetted an alleged "scheme" by Enterasys under Rule 10b-5(a) and (c).[1] Following this Court's decision denying Mr. Jaeger's prior summary judgment motion, a New York federal court held that under the Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (June 13, 2011), "[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act *that is distinct from an alleged misstatement*." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. Sept. 22, 2011) (emphasis added).

---

[1] This Motion raises new legal issues not present in Mr. Jaeger's previous motion for summary judgment based upon a change in the law that occurred after Mr. Jaeger's previous Motion was filed (*Janus*) and decided (*Kelly*). In any event, a "court may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995); *see also* L.R. 7.2(e) (motion for reconsideration may be filed at any time with "cause"—meaning "an intervening change in the governing legal standard"). Pursuant to the November 25, 2009 Joint Discovery Plan (Dkt. 218), the deadline for filing a motion for summary judgment is July 16, 2012 (i.e., 120 days before the November trial date).

1

Here, the Court has already dismissed all claims of both primary and secondary liability for the revenue misstatements against Mr. Jaeger.  Sept. 30, 2009 Order (Dkt. 209).  He remains accused only of aiding and abetting a "scheme" to misstate revenue by negotiating and structuring three transactions as to which revenue later was recognized improperly.  *Id*. at 118.  However, the undisputed evidence -- including from the SEC's own expert -- is that the transactions were not "inherently" deceptive, nor did they necessarily result in improper revenue recognition.  On this record, Mr. Jaeger is entitled to summary judgment as to the "scheme" claim against him under *Janus* and *Kelly*.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[2]

The SEC's aiding and abetting allegations against Mr. Jaeger involve "scheme(s) to recognize revenue from transactions that did not generate recognizable revenue, ***thereby misstating revenue amounts on corporate financial statements***."  *See* August 19, 2011 Order (Dkt. 255) at 4 (emphasis added).  All claims of primary and secondary liability based on the financial statements themselves have been dismissed against Mr. Jaeger.  Sept. 30, 2009 Order at 108-124.

In particular, Mr. Jaeger is accused of participating in, negotiating, and structuring three transactions as to which revenue allegedly was improperly recognized.  First Amended Complaint ¶ 162 ("Jaeger and Kirkpatrick also knew, or were reckless in not knowing, that Aprisma intended to and did, in fact, recognize revenue for the iPolicy sale during the first quarter of Transition Year 2001, even though the material undisclosed contingencies of which they were aware precluded revenue recognition under GAAP"); ¶ 168 ("To bridge revenue shortfalls for the quarter, Jaeger participated in improperly recognizing approximately $100,000

---

[2] For a detailed explanation of the facts and background of this case, see Defendant Eric Jaeger's Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 224-1) and supporting documents.

in revenue from sales to Centricity, Inc. during the first ($93,000) and second ($7,000) quarters of Transition Year 2001, and to improperly recognize revenues of $7,000 during the third quarter of Transition Year 2001. Jaeger negotiated and signed the investment documentation for the Centricity transaction."); ¶ 221 ("At the time of the Everest transaction, Jaeger knew, or was reckless in not knowing, that the reciprocal purchase agreement with Everest lacked economic substance, that neither company needed the other's products or services, and that the transaction was driven by Enterasys's desperate need to recognize additional revenue by quarter end. Given these circumstances, Jaeger also knew, or was reckless in not knowing, that it was improper for Enterasys to recognize revenue for this transaction").

*Both* experts in this case have testified that there was nothing inherent in the structure of these transactions that necessarily resulted in revenue being misstated, or concealed the facts necessary for a proper revenue recognition determination.  Mr. Jaeger's expert, Douglas Kangos, opined that "none of the individual structures [of the transactions] are inherently fatal to the proper recognition of revenue," and "[n]o aspect of their structure precluded or concealed proper revenue recognition."  Lux Affidavit Ex. B ("Kangos Op.") at 6.  The SEC's own expert, Steven Henning, testified that:

> Q.  There is nothing inherent about the structure of these transactions that prevents an appropriate decision being made regarding whether or not revenue can be recognized from them, there's no magic element to them that disguises the transaction?
>
> A.  I agree, yes.

Lux Affidavit Ex. A ("Henning Tr.") at 285:7-14.

### III.     ARGUMENT

#### A.     Legal Standard

A party is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a). "The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact for trial." *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002) (J. McAuliffe). An assertion that a fact cannot be genuinely disputed may be supported by a showing "that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). "After such a showing, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *Rochester Ford Sales*, 287 F.3d at 38 (internal citations omitted). Once the Court has "examin[ed] the facts in the light most favorable to the nonmoving party and draw[n] all reasonable inferences in its favor," the Court must determine whether the moving party is entitled to judgment as a matter of law. *Id.*

In order to establish liability as a "secondary" actor for aiding and abetting a scheme, the SEC must show: "1) a primary violation was committed, 2) the defendant[] had a general awareness that [his] conduct was part of an overall activity that was improper and 3) the defendant knowingly and substantially assisted in the primary violation." Sept. 30, 2009 Order at 54-55 (citing *SEC v. Tambone*, 473 F. Supp. 2d 162, 167-68 (D. Mass. 2006)).

#### B.     "Scheme" Liability Lies *Only* Where There is Evidence of an Inherently Deceptive Act Separate and Apart from a Misstatement, and There is No Such Evidence Here

In the Court's extensive decision more than two years ago dismissing the vast majority of the SEC's claims against Mr. Jaeger and the other defendants, the Court "delineate[d], precisely,

4

the scheme" at issue in this litigation as "one to generate revenue not properly recognized as revenue under [GAAP] and to improperly recognize that revenue while claiming to adhere to GAAP principles."  Sept. 30, 2009 Order at 21.  Later, the Court denied Mr. Jaeger's summary judgment motion because the SEC had presented evidence of "scheme(s) to recognize revenue from transactions that did not generate recognizable revenue, thereby misstating revenue amounts on corporate financial statements."  Aug. 19, 2011 Order at 4.

However, the Supreme Court recently limited liability for alleged misstatements under Rule 10b-5(b) to persons who had "ultimate authority" over a statement and, thus, were the "maker" of a material misstatement.  *Janus Capital Grp.* 131 S. Ct. at 2302.  Since then, *Kelly* has made crystal clear that *Janus* prohibits the SEC from circumventing the restrictions on "misstatement" liability simply by labeling the alleged misconduct a "scheme."  *Kelly*, 817 F. Supp. 2d at 344 ("[w]here the SEC is attempting to impose primary liability under subsections (a) and (c) of Rule 10b-5 for a scheme based  on an alleged false statement, permitting primary scheme liability when the defendant did not 'make' the statement would render the rule announced in *Janus* meaningless").  That is, as a matter of law, "scheme" liability under Rule 10b-5 "hinges on performance of an inherently deceptive act that is distinct from an alleged misstatement."  *Id*.

*Kelly* went on to analyze whether certain "round trip" transactions pursuant to which AOL had misstated revenue were inherently deceptive and could be the basis for scheme liability against executives who could not be liable for the misstatements themselves.  The court concluded that they were not:

> the alleged round-trip transactions by AOL between 2000 and 2003 are deceptive ***only because of AOL's subsequent public misrepresentations***.  There is nothing inherently deceptive about structuring a transaction with a counterparty so that the

5

>    counterparty purchases advertising, and AOL touted this practice
>    to the media. . . . ***It is the manner in which these transactions
>    were accounted for by AOL and reported to the public***—AOL's
>    alleged improper recognition of advertising revenue from such
>    transactions—***that is deceptive, and not the act of engaging in
>    such transactions itself***.

*Id*. (emphasis added); *see also SEC v. Mercury Interactive, LLC*, 2011 WL 5871020, at *2 (N.D. Cal. Nov. 22, 2011) ("[i]n general, courts have held that a fraudulent scheme claim under Rule 10b–5(a) or (c) cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b–5(b) claim") (internal citations omitted).  To the contrary, *Kelly* explained that liability for "scheme" liability is limited to "inherently deceptive" acts for example, where "one broker would send his price to a second broker, which would then report that price back to the first as a purportedly independent quote" or "manipulative stock trades." *Kelly*, 817 F. Supp. 2d at 344.

*Kelly* is on all fours with this case.  It compels the entry of partial summary judgment for Mr. Jaeger.  The SEC here – just like in *Kelly* -- charges an individual with a "scheme" to enter into "round trip" transactions in order to misstate revenue. *Compare* August 19, 2011 Order at 4 (SEC alleges "scheme(s) to recognize revenue from transactions that did not generate recognizable revenue, thereby misstating revenue amounts on corporate financial statements") *and* Henning Tr. at 289:18-19 (referring to the SEC's allegations as involving "a round-tripping of the cash") *with Kelly*, 817 F. Supp. 2d at 343 (the SEC "defines the nature of the purported scheme by explicit reference to the alleged public misrepresentations—the inflation of advertising revenue").

Like the defendants in *Kelly*, Mr. Jaeger is no longer subject to actionable claims for the misstatements of revenue, but is simply being sued for some alleged role in negotiating and structuring the underlying transactions as a "scheme." *Compare* September 30, 2009 Order at

118 (dismissing all 10b-5 claims except for aiding and abetting a scheme to recognize revenue) *with Kelly*, 817 F. Supp. 2d at 342 (SEC did not allege that defendants made any misrepresentation, but did allege that defendants were involved "in negotiating, structuring, documenting, and approving the allegedly fraudulent round-trip transactions"). The undisputed evidence, however, is that (as was the case with the "round-trip" transactions in *Kelly*) there was nothing inherently deceptive about the iPolicy, Centricity, or Everest Broadband transactions. *See* Kangos Op. at 6; Henning Tr. at 285:7-14. In other words, it was Enterasys' misstatement of revenue from the transactions, not the transactions themselves, that was deceptive.

Therefore, because there is no inherently deceptive act separate and apart from the revenue misstatements at issue, there can be no "scheme" liability. Mr. Jaeger cannot be liable for aiding and abetting a "scheme" to misstate revenue, and he is entitled to summary judgment as a matter of law on Count Three.

|  |  |
|---|---|
| Dated:  June 25, 2012 | Respectfully submitted,<br><br>ERIC JAEGER,<br><br>By his attorneys,<br><br>  */s/ Jonathan A. Shapiro*_____<br>Jonathan A. Shapiro<br>Elizabeth H. Skey (admitted *pro hac vice*)<br>WILMER CUTLER PICKERING<br>   HALE AND DORR LLP<br>950 Page Mill Road<br>Palo Alto, CA  94304<br>(650) 858-6000<br><br>Jeffrey B. Rudman (admitted *pro hac vice*)<br>James W. Prendergast (admitted *pro hac vice*)<br>Peter A. Spaeth (admitted *pro hac vice*)<br>James T. Lux (admitted *pro hac vice*)<br>WILMER CUTLER PICKERING<br>   HALE AND DORR LLP<br>60 State Street<br>Boston, MA  02109<br>(617) 526-6000 |

**CERTIFICATE OF SERVICE**

    I, James Lux, hereby certify that Mr. Jaeger's Motion for Summary Judgment will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on June 25, 2012.

Dated:  June 25, 2012                       */s/ James Lux*
                                                        James Lux