**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>   v.<br><br>ERIC JAEGER and<br>JERRY A. SHANAHAN,<br><br>        Defendants. | No. 01:07-00039-SM<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT ERIC JAEGER'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN LIGHT OF NEW AUTHORITY**

**INTRODUCTION**

Nearly three years ago, this Court determined that the SEC "failed to state a claim for direct liability under Rule 10b-5" against Eric Jaeger "under any of the three theories it advanced" because "the SEC has alleged no conduct on Jaeger's part that had the purpose and effect of creating a false appearance of fact."  Opinion and Order, Sept. 30, 2009 ("Sept. 30 Order"), Dkt. 209 at 115, 118.  The Court also dismissed the claim for aiding and abetting a false statement (*i.e.*, Rule 10b-5(b)), leaving the SEC a lone claim under Rule 10b-5 of aiding-and-abetting a purported "scheme" in violation of subsections 10b-5(a) and (c), based on Mr. Jaeger's involvement in the transactions with iPolicy, Centricity, and Everest Broadband.  *Id*.

But the SEC's Opposition to Eric Jaeger's Motion for Summary Judgment (the "Opp.") now makes it perfectly clear that the SEC's remaining aiding and abetting claim depends, and always has depended, on a primary "scheme" involving nothing more than the making of the same allegedly false statements.  Thus, notwithstanding the clear distinction between

1

misstatement and scheme liability in the statute (and this Court's order), the SEC now unabashedly states that:

> Jaeger may be held liable if the SEC proves a primary violation has occurred and Jaeger has ***provided substantial assistance to the making of the statement*** [i.e., "misstatements of revenue and earnings per share in corporate financial statements filed with the SEC and earnings releases so as to induce investors to purchase the securities of Enterasys"].

Opp. at 1-2 (emphasis added). But that theory cannot possibly be a basis to defeat the pending summary judgment motion against the remaining Rule 10b-5(a) and (c) claims because it is *precisely the same claim that this Court has already (twice) dismissed*:

> The SEC has not, however, stated an aiding-and-abetting claim against Jaeger under Rule 10b-5(b) . . . *i.e.*, the SEC's failure to identify any conduct by Jaeger that could reasonably be seen as *providing substantial assistance to the making of any false statement*.

Sept. 30 Order at 118 (emphasis added).

To the extent the SEC is (despite its words) pursuing a claim for aiding and abetting a scheme involving something more than a false statement, it fails as a matter of law. In a strikingly similar factual context, in *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. Sept. 22, 2011), the court held that a scheme claim must involve "***an inherently deceptive act that is distinct from an alleged [revenue] misstatement***." *Id*. The undisputed consensus testimony of both parties' experts is that there was nothing "inherently" deceptive about the three transactions that remain at issue as against Mr. Jaeger.

The SEC's Opposition fundamentally mischaracterizes the substance of Mr. Jaeger's motion. *First*, the SEC argues that *Kelly* is inapplicable because it is about primary, not secondary, scheme liability. But that is exactly the point — *Kelly* forecloses ***primary*** scheme liability in this case, and in the absence of primary scheme liability, Mr. Jaeger cannot be

2

secondarily liable for aiding and abetting. *Second*, the SEC argues that *Kelly* is incorrect because misstatements may be part of an actionable scheme. But this misconstrues *Kelly*, which holds that a scheme including misrepresentations must also include conduct that is inherently deceptive for reasons other than the misstatements.

*Finally*, the Opposition devolves into several pages of makeweight argument, including inapposite analogies to criminal RICO, mail and wire fraud statutes and an obviously irrelevant discussion of what the SEC calls the "long legal history" of the scheme concept (drawing upon treatises and cases that are centuries old). None of this fairly confronts Mr. Jaeger's simple summary judgment argument under the new *Kelly* authority, but instead seems calculated to confuse or hide the SEC's imperiled scheme argument in the hope of merely surviving another few weeks until trial this November.

For these and the other reasons set out below, Mr. Jaeger is entitled to judgment in his favor.

## I.   THE SEC FAILS TO DIFFERENTIATE ITS SCHEME CLAIM FROM THE ALREADY-DISMISSED STATEMENT CLAIM

The Opposition first proceeds from a premise that this Court has already rejected — that the SEC can bring a claim against Mr. Jaeger for aiding and abetting fraudulent statements. Sept. 30 Order at 115-17 (ruling for the second time that the SEC's false-statement claims failed to state a claim or to "allege falsity, Jaeger's knowledge of falsity, or materiality"); *id*. at 118 (dismissing SEC's claims for aiding and abetting "the making of any false statement").

Remarkably, the SEC ignores the Court's distinction between aiding and abetting a misstatement, and aiding and abetting a scheme, by insisting that it can go to trial on the theory that Mr. Jaeger "provided substantial assistance to the making of [a false] statement." Opp. at 1-2, 11. Whether couched explicitly as a scheme to make false statements, or more obliquely

3

described as "a scheme to wrong another in his property rights by means of a misrepresentation," the fundamental fact remains: the primary "scheme" on which the SEC purports to base Mr. Jaeger's aiding and abetting liability involves nothing more than false statements.

## II. THE SEC'S OPPOSITION CONFIRMS THAT IT CANNOT PURSUE A SCHEME CLAIM BASED ON THE THREE TRANSACTIONS

### A. The *Kelly* Decision Foreclosed an Essentially Identical "Scheme" Claim Based On Essentially Identical Facts

Even if the SEC were proceeding on a theory that Mr. Jaeger aided and abetted a scheme that went beyond the making of false statements — *i.e.*, one based on the three transactions at issue — that claim is clearly foreclosed by *Kelly*. *Kelly* stands for a simple point. If a claim for a fraudulent statement fails, a scheme claim must also fail unless the scheme itself involves additional conduct that is inherently deceptive. *See Kelly*, 817 F. Supp. 2d at 343 (rejecting "the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability . . . by labeling the alleged misconduct a 'scheme' rather than a 'misrepresentation'").

As an initial matter, the Opposition seems committed to the point that *Kelly* is somehow inapposite because it involved primary scheme liability, not secondary scheme liability. Opp. at 2-3, 9. That is a red herring. Mr. Jaeger never claimed that *Kelly* addressed secondary liability. Rather, Mr. Jaeger argued that because *Kelly* forecloses primary scheme liability based on the three transactions in which Mr. Jaeger was allegedly involved, *a fortiori* he cannot be liable for aiding and abetting that scheme. *Id.*; 15 U.S.C. § 78t(e).[1]

When it gets to the requirement of a deceptive act, the SEC asserts that "the Supreme Court recognized that deceptive acts can include misrepresentations, the exact opposite of what

---

[1] This Court has already dismissed any primary scheme liability claim against Mr. Jaeger. Sept. 30 Order at 118. Therefore, in order to prove liability against Mr. Jaeger, the SEC must show that someone else engaged in a scheme that was inherently deceptive and that Mr. Jaeger substantially and knowingly assisted that scheme. Thus, whether or not *Mr. Jaeger himself* "committed any deceptive acts" (Opp. at 8) is irrelevant — he is no longer being charged with primary scheme liability.

Jaeger argues here." Opp. at 12. But this is a straw-man argument: Mr. Jaeger never suggested that *Kelly* holds that misrepresentations cannot be a part of a deceptive scheme. Instead, what *Kelly* teaches is that there must be *something more* than just false statements — the scheme must include conduct that is "inherently deceptive" separate and apart from the misrepresentations.

This is precisely where the SEC's claim collapses. The Opposition makes clear that the alleged scheme here involves only "the artificial inflation of revenue, misstated financial statements, and the deprivation of investors' property rights" (Opp. at 3), all of which turn fundamentally on the fact that these allegedly "inflated" revenues were the subject of public statements. *Kelly* addressed, and rejected, 10b-5(a) and 10b-5(c) claims under precisely these same circumstances, because — like here — there was nothing deceptive about the underlying transactions for which revenue was improperly recognized.

As in this case, *Kelly* concerned a purported scheme by a technology company in the early 2000's to engage in round-trip transactions, which were then improperly accounted for to recognize revenue. When the SEC failed to plead a misstatement claim under Rule 10b-5(b), it re-packaged its claims as "scheme" liability under Rules 10b-5(a) and (c). Under those circumstances, the *Kelly* court held:

> By contrast, ***the alleged round-trip transactions by AOL between 2000 and 2003 are deceptive only because of AOL's subsequent public misrepresentations***. There is nothing inherently deceptive about structuring a transaction with a counterparty so that the counterparty purchases advertising, and AOL touted this practice in the media. Indeed, the SEC concedes that the "policy of selling advertising to counterparties was considered within AOL to be typical in business and a matter of common sense." ***It is the manner in which those transactions were accounted for by AOL and reported to the public — AOL's alleged improper recognition of advertising revenue from such transactions-that is deceptive, and not the act of engaging in such transactions itself***.

*Kelly*, 817 F. Supp. 2d at 344 (emphasis added).

5

This case is on all fours with *Kelly* on the facts and the claims asserted. Accordingly, the same result should follow here.

### B. The SEC Cannot Wish Away the *Kelly* Inherently Deceptive Test Based on the Undisputed Evidentiary Record, Including Its Own Expert's Testimony

Despite its heated rhetoric, and despite submitting a lengthy statement of purportedly disputed facts (none of which are material to Jaeger's simple motion), the SEC has not identified a single respect in which the three transactions themselves were inherently deceptive (much less admissible evidence to show as much), except by reference to "the manner in which those transactions were accounted for . . . and reported to the public" — in other words, exactly the claim that *Kelly* rejected. *Id.*

One of the many sources cited in Mr. Jaeger's motion was the testimony of the SEC's own expert witness, agreeing with Mr. Jaeger's counsel that "[t]here is nothing inherent about the structure of these transactions that prevents an appropriate decision being made regarding whether or not revenue can be recognized from them." Henning Tr. at 285:7-14. Although the Opposition contains formulaic recitation of certain elements of the transactions (Opp. at 15-16), all of these features were considered by the SEC's expert and Mr. Jaeger's expert, both of whom concluded that the transactions were in no way inherently deceptive. *See SEC v. Daifotis*, 2011 U.S. Dist. LEXIS 60226, at *25 (N.D. Cal. June 6, 2011) ("[c]onduct that is consistent with the defendants' normal course of business would not typically be considered to have the purpose and effect of creating a misrepresentation").

The SEC argues that this quotation "misstates" Dr. Henning's testimony (Opp. at 16), but does not explain how. After a digression during which Dr. Henning noted that obviously the transactions were ultimately incorrectly accounted for — because, as Dr. Henning noted, "they were restated because of the facts here" — Mr. Jaeger's counsel asked the pertinent question,

6

which could not have been clearer (and did not involve any assumptions about different facts). Opp. at 16-17. Dr. Henning's answer was equally clear.

### C. The SEC Cannot Sidestep *Kelly* With Irrelevant Legislation and Very Old Authority

The SEC attempts to bury its *Kelly* problem by citing irrelevant cases that hold, under other statutes (*e.g.*, RICO, mail fraud, and wire fraud), a "scheme to defraud" may involve no more than a misstatement. Opp. at 12-15. Unlike the criminal mail and wire fraud statutes that the SEC relies upon, Rule 10b-5 explicitly differentiates between scheme liability under Rules 10b-5(a) and (c) and misstatement liability under Rule 10b-5(b). *Compare* 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) *with* 17 C.F.R. § 240.10b-5. As this Court has acknowledged, the presence of three different prongs under Rule 10b-5 creates the presumption that they are "intended to cover different conduct" — that is, "[i]f the claimed fraudulent schemes or practices consisted simply of misleading statements and omissions, then they would fall entirely within the ambit of Rule 10b-5(b), and no separate (a) or (c) actions would lie." Sept. 30 Order at 17 (*quoting SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006)); *see also Kelly*, 817 F. Supp. 2d at 343-44.

The few cases that the SEC cites that actually were decided under Rule 10b-5 are also inapposite. First, none of these cases addresses the circumstances present here, where the SEC has simply re-packaged its false statement claims as scheme claims. Moreover, the cases cited by the SEC actually support Mr. Jaeger's argument. For example, the SEC cites *Stoneridge* to show that "deceptive acts can include misrepresentations, the exact opposite of what Jaeger argues here." Opp. at 15 (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)). As noted above, this badly misreads Mr. Jaeger's argument, as he argues only that where schemes include misrepresentations they must

7

include other inherently deceptive conduct (*see supra*), such as the backdating of agreements as was the case in *Stoneridge*. 552 U.S. at 155, 158. In any event, in *Stoneridge*, the Supreme Court actually recognized the *distinction* between deceptive conduct — which is actionable under Rules 10b-5(a) and (c) — and false statements — which are actionable under Rule 10b-5(b). *Stoneridge*, 552 U.S. at 158 ("[c]onduct itself can be deceptive" and such deceptive conduct is distinct from misrepresentations tied to "specific oral or written statements").

Similarly, the SEC cites *Affiliated Ute* for the proposition that scheme liability may lie based only on "misleading statements and omissions for purposes of enticing investors to sell their securities," even absent any "additional or 'distinct' deceptive conduct." Opp. at 14-15 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). But this misreads the Supreme Court's decision. The basis of the claim in *Affiliated Ute* was deceptive conduct — specifically, the fact that certain "market makers" violated their pervasively-regulated duties as broker-dealers by selling shares to the Ute Indians without making additional disclosures. *Affiliated Ute*, 406 U.S. at 153. Therefore, the Supreme Court found that defendants violated Rule 10b-5(a) and (c) ***despite the fact*** that "defendants may have made no positive representation or recommendation." *Id.*[2]

### III. CONCLUSION

For the foregoing reasons and the reasons set forth in Mr. Jaeger's opening memorandum, Mr. Jaeger's motion should be granted and he should be granted summary judgment.

---

[2] The SEC's other citation, to *United States v. Rybicki*, is simply taken out of context — the court discussed the materiality requirement, not the scope of scheme liability. 354 F.3d 124, 146 ("[a] *material* misrepresentation is an element of the crime") (emphasis in original). The case does not involve a situation where a plaintiff is trying to expand scheme liability as a "back door into liability for those who help others make a false statement." *Kelly*, 817 F. Supp. 2d at 834.

Dated: September 7, 2012 		Respectfully submitted,

ERIC JAEGER,

By his attorneys,

*/s/ Jonathan A. Shapiro*
Jonathan A. Shapiro
Elizabeth H. Skey (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
(650) 858-6000

Jeffrey B. Rudman (admitted *pro hac vice*)
James W. Prendergast (admitted *pro hac vice*)
Peter A. Spaeth (admitted *pro hac vice*)
James T. Lux (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

**CERTIFICATE OF SERVICE**

    I, James Lux, hereby certify that Mr. Jaeger's Reply Memorandum in Support of his Motion for Summary Judgment will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on September 7, 2012.

Dated:  September 7, 2012              */s/ James Lux*
                                                                        James Lux