# Exhibit 2

Criminal Trail Day 16 afternoon session  11/30/2006  1:40:00 PM

## Page 1

1. IMPORTANT NOTICE
2.
3. * PLEASE READ BEFORE USING REALTIME ROUGH DRAFT *
4.
5. AGREEMENT OF PARTIES
6.
7. WORKING WITH REALTIME ROUGH DRAFTS
8.
9. We, the party working with realtime and rough
10. draft transcripts, understand that if we choose to use
11. the realtime rough draft, that we are doing so with the
12. understanding that the rough draft is an uncertified
13. copy.
14. We further agree not to share, give, copy,
15. scan, fax, or in any way distribute this realtime rough
16. draft in any form (written or computerized) to any party
17. outside of the realtimed trial.
18. However, our own experts, co-counsel and staff
19. may have limited internal use of same with the
20. understanding that we agree to destroy our realtime
21. rough draft and/or any computerized form, if any, and
22. replace it with the certified transcript upon its
23. completion.

## Page 2

1. CASE:   USA v. Gagalis
2.
3. Jury trial Day 16, afternoon session
4.
5. DATE:   11/30/06
6.
7.
8. REPORTER'S NOTE:
9.
10. Since this trial testimony has been realtimed
11. and is in rough draft form, please be aware that there
12. will be a discrepancy regarding page and line number
13. when comparing the rough draft, rough draft disk, and
14. the final transcript. Also, please be aware that the
15. realtime screen and uncertified rough draft transcript
16. may contain untranslated steno, misspelled proper names,
17. incorrect or missing Q/A symbols or punctuation, and/or
18. nonsensical English word combinations. All such entries
19. will be corrected on the final, certified transcript.
20.
21.
22. Diane M. Churas, CSR
23.
24.
25.

## Page 3

1. November 30, 2006
2.     United States of America V Gagalis
3.     Jury trial day 16
4.     Afternoon session.  Continuation of direct
5. examination of Mr. Boyer (
6.     (UNCERTIFIED, UNEDITED ROUGH DRAFT.) 140 p.m.
7.     THE COURT:  Go ahead counsel.
8.     MS. CONRY:  Good afternoon Mr. Boyer.  I want
9. to pick up on one issue we were talking about right
10. before we broke.  This Para-Protect we came to the
11. conclusion that 140,000 was the right number for revenue
12. and I want you to walk true the math for the jury if you
13. would.
14.     A.  Okay.
15.     A.  Based upon information the company had compiled
16. through their additional procedures we determined that
17. the value of the investment, the million dollars
18. investment that was over valued, and they had recognized
19. initially 628 thousand in revenue in Q3.  They
20. calculated that that had to be reduced by 508,000.  So
21. that the remaining amount, 140, was the maximum that
22. could be recognized.  So I took a look at this and got
23. comfortable with that.  There was a little difference
24. here in that some of the information that they had
25. suggested that the value perhaps shouldn't be more than

## Page 4

1. nine at this 5,000 for the investment.  It was a little
2. different than 140,000 but in my mind not significant
3. enough for me to be concerned with that.
4.     Q.  And you look at valuations prepared by others
5. as part of your normal auditing practice at times is
6. that right sir?
7.     A.  Yes as part of my audit procedures I would
8. review valuation work done by others.
9.     Q.  And is that acceptable in the accounting
10. practice, reliance on specialists or other experts?
11.     A.  Oh, yes.
12.     Q.  What's the guidance on that if you remember?
13.     A.  Well basically in our professional standards
14. we are allowed to rely on the expertise of specialists.
15. If it's a valuation of the company there are valuation
16. specialists who we would rely on in assisting us in
17. forming a conclusion as to whether a valuation is
18. appropriate.  We do the audit work and as part of that
19. audit work we would involve a specialist in some cases.
20.     Q.  I want to be clear.  The only two instances
21. where you looked at a valuation or considered the
22. factors mathematically into an opinion for revenue is
23. GEMMS and Para-Protect is that right?
24.     A.  For these five transactions that's correct.
25.     Q.  And did you test the reasonableness of the

**5**

1  assumptions in the valuation or just take a look at them
2  for reasonableness before you opined?
3      A.  Yes.  As part of our audit work where they do
4  valuations would be that we would look at all the
5  underlying data that went into that valuation, and if
6  there was a third party who had performed the valuation,
7  we would look at the information of the company our
8  audit client had given to the valuation specialist to
9  make sure that that's reasonable information so that the
10 specialist could come to a reasonable conclusion.
11     Q.  Okay.  I want to shift gears for a second now.
12 If you see I put our chart backup there.  I'd like you
13 to come out and explain to the jury, we've referred to
14 these as three-corner deals but in the two versions I
15 drew there is only two corners so I wonder if in your
16 analysis you will show them where the third corner came
17 in?
18     A.  Sure.  Okay.  Let me start by two pieces to
19 this slide.  One is at the top.  He talked about just
20 the cash for stock with without the product sale.  Now,
21 what we are talking about is here at the bottom.  So
22 this is when these three separate elements have been
23 combined to show really the substance of the
24 transaction.  Now in order to show you how the
25 transaction came about, let's do this.  Let's add the

**6**

1  distributor.  And what we really have is the Enterasys,
2  the distributor and GEMMS.  So what happens is, just to
3  make this a little clearer, let's just reverse these.
4  This is the product and this is the stock.  Otherwise I
5  can't fit it on the page.
6        Enterasys sells the product to the distributor
7  and then the distributor sells it to GEMMS, and we put
8  that as a dotted line.  And then GEMMS give us the stock
9  back to Enterasys.  Give us the stock, giving it back.
10 So what you have here is you have this transaction.
11 Enterasys sells to a distributor, normal transaction we
12 see lots of those as the auditor.  That's a big part of
13 their business selling to distributors.  Then we see
14 Enterasys receiving the stock from GEMMS.  So we see
15 those two pieces.  But what we originally didn't see in
16 these three-corner deals was the tie between the
17 distributor and GEMMS.  That's why I put that in a
18 dotted line.  We didn't see that connection.  What we
19 were provided was the this transaction standing on its
20 own just like this, this transaction you would have seen
21 just as a normal distributor sale.  What we didn't see
22 is this connection.
23     Q.  Did you see the cash flows going from
24 Enterasys to GEMMS to the distributors and back to
25 Enterasys?

**7**

1      A.  Yes.  We would see the cash flow.  Remember
2  that the cash basically circles right around.  So you
3  know the cash and in some of these transactions the cash
4  circled around almost immediately.  Enterasys would be
5  paying GEMMS a million dollars for the equity.  GEMMS
6  would then buy through the distributor.  GEMMS would pay
7  the distributor who would pay Enterasys.  So the cash
8  would cycle back very, very quickly.  So when you really
9  look at this the substance of the transaction really
10 isn't cash.  It's this change of the products.
11     Q.  I just want to be clear Mr. Boyer.  You said
12 you saw the cash.  During Q2 did you know GEMMS was
13 taking the money it got from Enterasys and sending it to
14 the distributor in the Enterasys proceedings?
15     A.  No see we would not make that connection.  We
16 would see the cash in the normal course of distributor
17 sales but we wouldn't see the connection here.  We
18 wouldn't see the connection in cash and we wouldn't see
19 the connection in sales.
20     Q.  When you found out about that connection what
21 opinion did you reach that all of those three legs of
22 that transaction were linked or not?
23     A.  Well, the conclusion that I came to was these
24 transactions had to be linked.
25     Q.  So that they were linked and once you came to

**8**

1  the opinion they were linked what conclusion did you
2  come to about whether they needed to be collapsed?
3      A.  Well, I would use the terms linked and
4  collapsed as one and the same.  Once they are linked
5  once they are collapsed however you want to say it then
6  you look at it for one transaction for accounting
7  purposes much not two or three independently.  It's just
8  one transaction, how do I account for it, non-monetary
9  transaction and it would go back to that concept of fair
10 value of what you give up and what you receive.
11     Q.  And what in the accounting literature do you
12 rely on for your opinion that the transaction should be
13 collapsed or linked?
14     A.  Well you know I look to Staff Accounting
15 Bulletin 101 that we had been talking about earlier and
16 in there they talk about the evidence of an arrangement.
17 Remember that's the contract or sales order that we have
18 ( SAB 101 ( and in there they refer to side letters,
19 they refer to other agreements that could have an impact
20 on that sales agreement that you have.  For instance if
21 that sales agreement isn't final until it's -- until
22 another agreement is entered into, then that's the
23 concept of linking is that you need to make sure that
24 you have properly included all the potential terms and
25 that final agreement includes everything that would be

**9**

1   relevant to that exchange in this case exchange of stock
2   for product.
3       Q.  And during the August September and October
4   period when you were reviewing Q2 did you ever tell any
5   of the defendants your opinion that these three-corner
6   transactions or three leg transactions needed to be
7   collapsed?
8       A.  I'm sorry during what period.
9       Q.  During the initial Q2 review, that is
10  September, October, August, that time period?
11      A.  Yes.
12      Q.  Who did you tell and when?
13      A.
14          THE COURT:  Do you want him to sit back down.
15          MS. CONRY:  You can go ahead and sit back
16  down.
17      A.  Well those conversations occurred during our
18  meetings to discuss the investment transactions.
19      Q.  Do you review things called open items list
20  when you were performing the procedures in August and
21  September?
22      A.  Yes.
23      Q.  And do you recall whether you asked about
24  sales in channel partners related to investments during
25  the change of those open items list?

**10**

1       A.  Yes that was one of the questions that would
2   be in the open items list.
3       Q.  And you were sending that to various people in
4   the finance department including Mr. Kay and Mr.
5   Gagalis?
6       A.  Yes.
7       Q.  I just want to follow up as a last area I want
8   to touch on with you and that is materiality.  I think
9   you spoke to the jury about that yesterday and can you
10  remind them of what staff accounting bulletin applies to
11  materials?
12      A.  Yes that's Staff accounting bulletin '99.
13      Q.  And we talked about quantitative versus
14  qualitative materiality did we talk about that
15  yesterday?
16      A.  Yes we did.
17      Q.  And I want to ask you for our combined
18  transactions and let's take Para-Protect out because
19  that's Q3 so just Ariel TechData WorldLink and GEMMS.
20  What do those add to ballpark?
21      A.  Those add up to a little less than twelve
22  million.  Why don't we just round it and say eleven
23  million dollars.  That's an easy number to use.
24      Q.  Great.  So in combination for the second
25  quarter can you tell the jury whether you think in sum

**11**

1   those overstatements of revenue were material
2   quantitatively?
3       A.  Okay.  My conclusion was that those
4   adjustments were material and the reason for that is if
5   we think about back to our discussion yesterday where
6   there's this concept of quantitative materiality and
7   qualitative materiality and we are talking about the
8   significance to the users of the financial statements
9   and for the second quarter of that year Enterasys had
10  recorded and reported their SEC filings approximately
11  240 million dollars in revenue and Enterasys regularly
12  provided guidance to the Wall Street analysts involved
13  with the company and they would tell them what they
14  expected the quarter results to be and one of the things
15  was that they disclosed their sales for the quarter
16  and/or their estimate of the sales.  And for that
17  quarter they had in advance told the Wall Street
18  analysts that they thought that revenues would be
19  between 238 million and 242 million.  Now they ended up
20  reporting 240 million right in the middle, and in their
21  press release they said that they had met the analysts
22  expectation because they were in that range.  I believe
23  that was I think the 6th consecutive quarter where they
24  had met analysts expectations.  Sales were up, and very
25  important, very important measure.  You know the

**12**

1   companies want to continue to meet the analysts
2   expectations.  So it's a very important measure for
3   everybody involved in the financial statements including
4   the users.
5           So if you look at these adjustments in total
6   the eleven million dollars if the company had recorded
7   these transactions properly, you know instead of 240
8   million, they would have had 229 million in revenues.
9   They would have been below the low end of the range of
10  238 million.  So they would not have been able to say
11  that they met analysts expectations for the 6th
12  consecutive quarter.  They would have missed
13  expectations.  When we think back to our discussion
14  yesterday qualitative factors, one is does it change the
15  trends of the financial information and I would say yes,
16  it changes the trends because the company didn't meet
17  the expectations that they set in Wall Street.
18      Q.  And I think I might have messed up because we
19  added to eleven million and I forgot to subtract out
20  what you thought was appropriate?
21      A.  Right.  And that's why I used eleven million.
22  If we do the whole thing we are probably close to eleven
23  million but the concept is what they recognize versus
24  what they should have.
25      Q.  And that difference is eleven million?

**13**

1   A.  That's correct.
2   Q.  And how about on an individual basis -- let me
3   back up to be clear.  In the aggregate are they material
4   quantitative or actually let me stick with qualitative I
5   apologize (?
6   A.  Sure.
7   Q.  Is the Ariel 3.9 million material
8   qualitatively?
9   A.  Well if we do the same exercise.  If the range
10  was 238 to 242 million, for total revenues and Ariel was
11  not recorded that would mean that sales would be below
12  the bottom of the estimate.  I would say -- I would
13  expect that that would be material.
14  Q.  Okay.  How about TechData Canada at that.  Was
15  that qualitatively material?
16  A.  That's the same calculation.  That's below the
17  238 million.  So I put that in the same category.
18  Q.  And how about WorldLink?
19  A.  WorldLink the same thing, below 238 million.
20  Q.  So those three at least are qualitatively
21  material is that right?
22  A.  Yes.  My conclusion would be those would be
23  qualitatively material.
24  Q.  Your Honor I have no further questions at this
25  time?

**14**

1       THE COURT:  Thank you.  Cross-examination.
2           CROSS-EXAMINATION
3           BY ( by Mr. Cintolo (
4   Q.  Good afternoon Mr. Boyer?
5   A.  Good afternoon.
6   Q.  Mr. Boyer my name is Bill Cintolo and I
7   represent David Boey?
8       MS. CONRY:  Are there any exhibits.
9       MR. CINTOLO:  Nothing that hasn't been
10  admitted.
11      MS. CONRY:  Anybody else.
12      MS. CONRY:  Mr. Rehnquist.
13      MR. REHNQUIST:  I will give "em to you at the
14  break.
15      THE COURT:  No you are supposed to turn them
16  over beforehand.
17      THE COURT:  Go ahead.
18  Q.  Mr. Boyer you had lunch this afternoon?
19  A.  Yes, I did.
20  Q.  Had lunch with David Wilson?
21  A.  Yes, I did.
22  Q.  David Wilson is another witness in this case?
23  A.  That's my understanding.
24  Q.  Did you discuss your testimony with him?
25  A.  No.

**15**

1   Q.  Mr. Boyer I have a tendency to talk a
2   little fast.  If I talk too fast for you please slow me
3   down okay?
4   A.  I will.
5   Q.  Mr. Boyer in this particular situation you had
6   a occasion to see a purchase order from a company called
7   Ariel to Enterasys; correct?
8   A.  Yes.
9   Q.  And that purchase order was dated on August
10  31st 2001; correct?
11  A.  I believe that it was yes.
12  Q.  And you knew did you not that after the
13  purchase order was received within the time period of
14  the quarter, that delivery of the product was
15  effectuated pursuant to the purchase order; correct?
16  A.  Yes, I believe that's correct.
17  Q.  And you understand that normally if a purchase
18  order is received and delivery is effectuated, that
19  revenue is countable, recognizable for that quarter;
20  correct?
21  A.  Well there are a number of criteria that have
22  to be met --
23  Q.  Mr. Boyer I understand there are a number of
24  criteria.  I'm asking normally if you see a purchase
25  order that is received within the time limit, a timely

**16**

1   purchase order and timely delivery normally that makes
2   the revenue recognizable; correct?
3   A.  I'm sorry could you repeat the question.
4   Q.  Yes.  Normally in normal circumstances and
5   we'll get to the abnormal in awhile all right.  Normally
6   if the purchase order is received in a timely fashion
7   meaning before the quarter is ended and delivery is
8   effectuated pursuant to the purchase order in a timely
9   fashion revenue is recognizable; correct?
10  A.
11  A.  Assuming that all other provisions of GAAP
12  have been met.
13  Q.  And we are always assuming that all the
14  provisions have been met; right?
15  A.  Well.
16  Q.  Mr. Boyer, Mr. Boyer, listen you are a
17  cautious man are you not?
18  A.  Yes, I am.
19  Q.  You like to be precise; correct?
20  A.  I try.
21  Q.  Okay.  Let me see if I can get it another way.
22  Did you have an occasion to see a contract, a letter of
23  agreement relating to the Ariel transaction in this
24  particular case at some point in time after August 31st
25  but before September 26, 2001?